1

1    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:                )

4                                     )  File No.  FL-04184-A

5    CERTAIN POSSIBLE FRAUDULENT      )

6    ISSUERS OF SECURITIES            )

7

8    WITNESS:  Dan Oran

9    PAGES:    1 through 245

10   PLACE:    Securities and Exchange Commission

11             801 Brickell Avenue

12             Suite 1800

13             Miami, Florida 33141

14   DATE:     Thursday, January 21, 2021

15

16       The above-entitled matter on for hearing,

17   via WebEx, pursuant to notice at 10:00 a.m.

18

19

20

21

22

23

24          Diversified Reporting Services, Inc.

25                 (202)467-9200

2

```
1    APPEARANCES:

2

3    On behalf of the Securities and Exchange Commission:

4         TRISHA FUCHS, ESQ.

5         RAYNETTE NICOLEAU, ESQ.

6         801 Brickell Avenue

7         Suite 1800

8         Miami, FL 33141

9

10   On behalf of the Witness:

11        JAMES SALLAH, ESQ.

12        JOSHUA BAUTZ, ESQ.

13        Sallah, Astarita & Cox, LLC

14        3010 N Military Trail

15        Suite 210

16        Boca Raton, FL 33431

17

18

19

20

21

22

23

24

25
```

3

```
 1                   C O N T E N T S

 2    WITNESS:                      EXAMINATION

 3    Dan Oran                            5

 4

 5    EXHIBITS      DESCRIPTION         IDENTIFIED

 6    1   Form 1662                        10

 7    16  subpoena                         16

 8    17  subpoena                         22

 9    18  subpoena                         23

10    19  background questionnaire         27

11    20  Form S-1                         99

12    21  Form S-1 amended                109

13    23  S-1A                            133

14    24  consulting agreement            138

15    27  S-1A                            147

16    29  press release                   206

17    32  letter                          214

18    38  web capture                      93

19    39  web capture                      52

20    40  AG office document               46

21    41  email                           182

22

23

24

25
```

4

```
 1                    P R O C E E D I N G S
 2           MS. FUCHS:  We are on the record at 9:58 a.m.
 3   on January 21st, 2021.  My name is Trisha Siller
 4   Fuchs.  I'm senior counsel in the Enforcement
 5   Division of the Securities and Exchange
 6   Commission.  Also present is Raynette Nicoleau,
 7   senior counsel with the Division of Enforcement.
 8   We are officers of the Commission for the purposes
 9   of this proceeding.
10           Mr. Oran, the oath or affirmation to tell the
11   truth will be administered via Webex rather than
12   in person.  Do you understand and agree that this
13   oath or affirmation to tell the truth will have
14   the same effect as if administered in person?
15           MR. ORAN:  Yes.
16           MS. FUCHS:  Okay.  Mr. Oran, please raise
17   your right hand.
18           Do you swear or affirm to tell the truth,
19   the whole truth, and nothing but the truth?
20           MR. ORAN:  Yes.
21   Whereupon,
22                         DAN ORAN
23   was called as a witness and, having been first duly sworn,
24   was examined and testified as follows:
25                         EXAMINATION
```

```
1              BY MS. FUCHS:
2       Q      Thank you.  Before we begin, I want to
3   reconfirm the understandings that the staff had with
4   your counsel, Mr. Sallah in e-mails prior to today.
5              MS. FUCHS:  Also to confirm, Mr. Sallah, are
6   you representing Mr. Oran as his counsel here
7   today?
8              MR. SALLAH:  I am.
9              MS. FUCHS:  Okay.  Are you representing
10  anyone else in these proceedings?
11             MR. SALLAH:  Individual or entity?
12             MS. FUCHS:  Either.  Both.
13             MR. SALLAH:  Profile Solutions and Blackpoll
14  Fleet International.  Nobody else.
15             MS. FUCHS:  I'm sorry.  Jim, I couldn't hear
16  you -- the last part.
17             MR. SALLAH:  No other.  No individuals.
18             MS. FUCHS:  Okay.  Thank you.  Mr. Sallah,
19  during this Webex testimony, SEC will provide
20  access to exhibits, including portions of our
21  investigative file contingent on your
22  representation that you and your client will not
23  in anyway record, save or capture any of this
24  material or record the testimony generally.  This,
25  of course, does not preclude you from taking notes
```

1    during the testimony.  Do you agree not to record,

2    screenshot, save or capture any of this material

3    during this Webex testimony?

4         MR. SALLAH:  Of course.

5         BY MS. FUCHS:

6    Q    Mr. Oran, do you also agree not to record,

7    screenshot, save or capture any of this material during

8    the Webex testimony?

9    A    I agree.

10   Q    Okay.

11   A    Yes.

12   Q    I'm sorry?  Mr. Oran, can you confirm who is

13   in the room with you?

14        MR. SALLAH:  Yes.  Jim Sallah, Dan Oran,

15   obviously, and Joshua Bautz associate here at

16   the -- our office.  Mr. Bows will step out at

17   11:00 a.m. just -- I don't want to interrupt

18   everything, but he's going to have to step out

19   because he actually has to call on another matter

20   with the Miami office.

21        MS. FUCHS:  Okay.  Can you also agree to let

22   us know if anyone at any time enters the room or

23   leaves the room?

24        MR. SALLAH:  Trish, you're freezing up a

25   little bit.  You're freezing.

7

1            MS. FUCHS:  Oh.  I was going to say you're

2    freezing.  Can you hear me now okay?

3            MR. SALLAH:  Yes.  A little sketchy.  You're

4    still frozen.  It's like very -- there's like a

5    lag, a Internet lag or something.

6            MS. FUCHS:  Can you hear me okay now?

7            MR. SALLAH:  Yeah.  What we may want to do,

8    Trish -- we've done this before -- we call on the

9    phone, mute that and do it on the phone so the

10   audio is clear; does that make sense?  Have you

11   guys done it like that before?

12           MS. FUCHS:  Yeah.  I've had to do that one

13   time.  So you mean that --

14           MR. SALLAH:  Let's try that 'cause it seems

15   to work better.

16           MS. FUCHS:  Right.  Okay.  So let's try that

17   and if we have issue, then we can do it that way.

18           MR. SALLAH:  I'll just mute everything.  So

19   we're going mute this from here, okay?

20           MS. NICOLEAU:  Trisha, I think it's a problem

21   on their end 'cause you're coming from fine, so

22   you don't have to dial in.  I think you're good.

23           MS. FUCHS:  Okay.  Perfect.

24           MR. SALLAH:  Hello.  Trish?

25           MS. FUCHS:  Yeah.  I hear you fine.

8

```
 1              MR. SALLAH:  Perfect.  This is way better.

 2    Because really it was a lag video, it's no big.

 3    It's really just being orally -- you know,

 4    being -- and see the documents that matter.

 5              MS. FUCHS:  I know.  It's a little tough,

 6    yeah.  Okay.  If you have any issues, let us know

 7    and we can always take a break.

 8              MR. SALLAH:  We shouldn't now.  Yeah.  We

 9    should be fine now.

10              MS. FUCHS:  Great.  Okay.  And if you can

11    please agree that you will let us know if anyone

12    enters or leaves the room.

13              MR. SALLAH:  Yes, of course.

14              MS. FUCHS:  Okay.

15              MR. SALLAH:  You'll be able to see it.  You

16    guys can see the whole room, so -- I mean there is

17    only door, so -- but I'll identify the person if

18    they come in or leave so the court reporter would

19    know.

20              MS. FUCHS:  Thank you.

21              BY MS. FUCHS:

22        Q    Mr. Oran, please state your full name,

23    including middle name and spell your name for the

24    record.

25        A    Dan Oran.  My first name is D-A-N, my last
```

 1   name is O-R-A-N.

 2        Q    Okay.  Have you ever been known by any other

 3   name?

 4        A    No.

 5        Q    Bear with me.  I'm trying to make it a little

 6   louder 'cause I couldn't hear you as well.

 7             And have you ever been known by any other

 8   name?

 9        A    No.

10        Q    Okay.  This is an investigation by the United

11   States Securities and Exchange Commission in the matter

12   of certain possible fraudulent issues of securities to

13   determine whether there have been violations of certain

14   provisions of the federal securities laws.  However,

15   the facts developed in this investigation might

16   constitute violations of other federal or state, civil

17   or criminal laws.

18             Prior to the opening of the record you were

19   provided with a copy of the formal order of

20   investigation in this matter.  It will be available for

21   your examination during the course of this proceeding.

22             Mr. Oran, have you had an opportunity to

23   review the formal order?

24        A    Yes.

25        Q    Prior to the opening of the record you were

10

```
 1    provided with a copy of the Commission's supplemental

 2    information -- supplemental information form 1662,

 3    which was marked as Exhibit No. 1.

 4                        (SEC Exhibit No. 1 was marked

 5                        for identification.)

 6            Have you had an opportunity to read this

 7    document?

 8        A    Yes.

 9        Q    And do you have any questions or concerns

10    regarding Exhibit No. 1?

11        A    No.

12        Q    Okay.  As we mentioned before, Mr. Sallah

13    Mr. Bows are representing you.

14            MS. FUCHS:  Would counsel please identify

15    themselves by stating your name and your firm's

16    name.

17            MR. SALLAH:  Yes.  My name is James Sallah.

18    The name of the law firm is Sallah, Astarita and

19    Cox, LLC.  We are at 3010 North Military Trail,

20    Boca -- Suite 200, Boca Raton, Florida 33431.

21    Phone number is (561)989-9080 and Joshua Bautz is

22    at the same address and same firm as to that for

23    location-wise.

24            BY MS. FUCHS:

25        Q    Mr. Oran, is there -- are you on any
```

1   medication or is there any other reason that you cannot

2   provide full and accurate testimony today?

3        A    I'm on medication after Corona, but I do my

4   best of my knowledge to corporate to get you all the

5   information you need.

6        Q    What kind of medication?

7        A    It's a pills for blood thinners that affect

8   me for the last -- from May until now.  I'm still

9   taking it.  I was hospitalized in Coronavirus with the

10  clinical death in the hospital for 21 days, so -- but

11  I'm okay.  I can --

12       Q    Okay.

13       A    I can -- I cooperate as much as I can.

14       Q    Okay.  Does the medication or the

15  Coronavirus, has that affected your memory in any way?

16       A    It did affect my long memory.  My short

17  memory is okay.  My long memory I have some issues, but

18  anything I need I read and I try to cooperate.

19       Q    Okay.  And when you said your long memory

20  is --

21            MR. SALLAH:  Mr. Oran actually -- Trish,

22  Mr. Oran was actually intubated and passed away

23  and was brought back.  I mean it was pretty

24  serious.

25            BY MS. FUCHS:

12

1        Q      Wow.  Wow.  Well, I'm glad to hear you're

2    doing better.

3        A      Thank you.

4        Q      Has -- and when you say long memory, your

5    long memory has been affected, but not your short-term

6    memory.  Can you give me -- like when you say long-term

7    memory, what are your referring to?

8        A      I have things that I remember and things that

9    I don't remember, but everything I don't remember, I

10   can go back to details and find out.  You know, I write

11   everything to be able to answer.  You know, I don't --

12   a lot of things I cannot remember.  I will try and get

13   to facts.  You know, I don't -- I will do my best to

14   answer whatever you need.

15       Q      Okay.  And have you had a physician tell you

16   that this has affected your long-term memory?

17       A      I didn't go to the physician yet because I

18   waiting for next month to go again to do all the

19   workout.  I did couple things.  They don't know what to

20   say because it's still new and they don't have any

21   knowledge why I'm affecting, but we checking.  Every

22   month I go to the doctors.

23       Q      Okay.  Have you -- so have you been diagnosed

24   yet in terms of memory issues because of COVID?

25       A      They -- I don't request for diagnosis.  I

13

1    request to find out what's my problem.  Not yet.  They

2    working on it.  They say after CAT scan they will know

3    way better, you know, what's going on with me.

4         Q    Okay.

5         A    But the affect is affect.  I'm suffering from

6    different things, including my memory.

7         Q    Okay.  Is that -- do you think that will

8    affect your testimony today in terms of, for example,

9    how you can testify and how long you can testify today?

10        A    I will cooperate with you as much as I can.

11   I usually can stay long.  I need to go bathroom, come

12   back, you know, but I will try to behave.  You know, to

13   stay as much as you need me.

14        Q    Okay.  If -- I just want to make sure you

15   know that if you don't feel well, you know, if it's

16   affecting your ability to -- for certain period of

17   time.  Like you can't -- you need breaks or you can't

18   sit for as longer period of time, let us know, we'll

19   accommodate you, okay?

20        A    I appreciate it.  Thank you very much.

21        Q    Yeah.  Please just let us know.  Okay.

22             I'm just going to go over a few procedures

23   we'll be following today.  We're going to be asking you

24   questions, both Raynette and I, and please remember

25   you're under oath just as you would be in court.

14

1              The court reporter transcribes these

2    proceedings and will create a transcript of your

3    testimony at the end.  During your testimony any member

4    of the staff may ask a question or a series of

5    questions, please allow the staff to complete the

6    question before responding.  If we talk over one

7    another the recording of the testimony won't be as

8    clear.  Also please make sure to answer our questions

9    verbally because the court reporter can't pick up

10   nodding or other gestures; do you understand that?

11       A    Yes.

12       Q    And if we inadvertently interrupt your

13   answer, please let us know and we'll let you finish?

14       A    Okay.

15       Q    Also, if at any time you don't understand a

16   question, please let us know so we can try to clarify

17   the question for you.  If you answer a question, we're

18   going to assume that you understood it.  And as I

19   mentioned before, if at any time you want to take a

20   break, let us know and we'll be happy to accommodate

21   you.  The only thing we would ask is that, if there's a

22   question pending that you answer it.

23              And also if you have -- if at any time --

24   like I said before, if you don't feel well, let us

25   know, okay.  There's -- it's fine to take a longer

1    break or end early and continue later.  That's fine.

2    Also, the staff controls the record, so only we can

3    tell the court reporter to go off the record.  And if

4    we have any conversations that are substantive when

5    we're off the record, we have to summarize them when we

6    go back on the record.  And when we go back on the

7    record after a break, if -- let's say we've just been

8    talking about something that's not substantive, we

9    would just confirm that with you that we didn't have

10   any substantive conversations.

11          Also, during the course of the testimony

12   we're going to be asking you questionings about things

13   that happened or may have happened in the past.

14   Obviously, we understand that time has gone by since

15   these events and you're likely to have a better or

16   complete memory of some events than others.   In

17   answering a questions about these events, however, you

18   should tell us about all of your memories or

19   recollections that are responsive to the question, not

20   just those that are specific or perfectly clear, or

21   those of which you are 100 percent sure.  We're asking

22   you also for vague memories, general memories, cloudy

23   memories or any memories of which that you're less than

24   100 percent certain.  So in other words, we're asking

25   you for any responsive recollection whatsoever that you

16

```
1    may have, even if it's incomplete or uncertain, or

2    vague, or nonspecific and then we can sort out which of

3    those memories are clear and certain, which are less

4    clear and less certain; do you understand this?

5         A    Yes.

6         Q    Okay.  So if you answer I don't recall or I

7    don't remember, or I forget, we're just going to assume

8    that you have no memory or recollection whatsoever that

9    is responsive to the question asked, not even fuzzy or

10   less than crystal clear memories; do you understand

11   that?

12        A    Yes.

13        Q    And it may be that reviewing certain

14   documents refreshes your recollection as to events that

15   you are questioned about, so in such a case, we're

16   asking for your testimony on everything that's

17   responsive to the questions, not just clear or specific

18   recollections; do you understand that?

19        A    Yes.

20        Q    Great.  Can you see what I've put on the

21   screen?

22        A    Yes.

23                    (SEC Exhibit No. 16 was marked

24                    for identification.)

25        Q    Okay.  So I just shared on the screen what
```

17

```
1    has been marked as Exhibit No. 16.  That is a subpoena
2    to you that was dated November 7th, 2019 to Dan Oran.
3    Is this a copy of the subpoena that you're appearing
4    pursuant to here today?
5         A    It's Dan Oran there.
6         Q    I'm sorry.  Can you hear me?
7         A    Yes.
8              MR. SALLAH:  He just want to point out that
9         that's not his name, but, yes, that is the
10        subpoena that he received and responded to.
11             BY PLAINTIFF:
12        Q    Oh.  Because it says Daniel; is that right?
13        A    That's correct.  It's not my name.
14        Q    Okay.  It's Dan.  Okay.  Thank you for
15   clarifying that.  But this is the copy of the subpoena
16   that you're appearing pursuant to here today; is that
17   correct?
18        A    That's correct.
19        Q    Okay.  And just -- we want to confirm for the
20   record that the subpoena had called for your appearance
21   at our offices in Miami, Florida, but, obviously,
22   because of the pandemic, we're having to do it via
23   Webex.
24        A    Yes.
25        Q    The subpoena also calls for the production of
```

18

1   certain documents, have you provided all documents

2   called for by the subpoena?

3       A    I produce all the documents that I be able to

4   retrieve, yes.

5       Q    Okay.  So then let's just go through that a

6   little bit.

7            Can you describe for us what you mean by

8   that, all the documents you were able to get?

9       A    I get all my stuff and send you all the

10  documents on that list that you send me, that's what I

11  mean.

12      Q    Okay.  Were there any -- okay.  So maybe --

13  can you describe for us the search that was conducted

14  for the subpoenaed documents and tell us who conducted

15  that search?

16      A    My personal assistant and my -- myself, my

17  accounting department, my advisors, everybody be able

18  to have any record, I ask them to provide me the

19  records and put it together, and I sent all of it to

20  you guys.

21      Q    Okay.  When you say your personal -- I'm

22  sorry.  I didn't mean to interrupt you.  I apologize.

23           When you say your personal assistant, who are

24  you referring to?

25      A    In that time I think was Robbie Hicks.

19

1        Q    Okay.  Robbie Hicks?

2        A    In that time, yes.

3        Q    But not presently; is that what you mean?

4        A    She is not working for me from last year

5   sometime.

6        Q    Okay.  And then I think you also mentioned

7   that you had your accounting department helping you.

8        A    Yes, because there was some --

9             MR. SALLAH:  Trish.

10            BY MS. FUCHS:

11       Q    Mr. Oran?

12            MR. SALLAH:  Yeah.  We can hear you.

13            MS. FUCHS:  Oh. I think you started to speak

14       and then I didn't hear anymore.

15            MR. SALLAH:  So she asked you about the

16       accounting department.

17       A    Rebecca Malka, my accounting and Anna Berman,

18   they handling all my books and records.  They retrieve

19   all the books and records of accounting, whatever you

20   ask.  And Lenny Tucker retrieve all the documents that

21   we have by the e-mails and I send you everything,

22   everything you requested.  And we hire a guy also to do

23   all the e-mails and I think all the -- of my website

24   and all the question you ask me, he retrieve it from

25   one of my IT guys and the company that retrieve what

20

1    you ask.

2         Q    Were any documents that called for by the

3    subpoena, were any of them withheld for any reason?

4         A    I don't have any documents because I don't

5    have anything to hide, so I send everything.

6              MR. SALLAH:  Wait.  Excuse me.  Trish, there

7         were some privileged documents that were withheld,

8         correspondence with attorneys and so forth.  Dan,

9         you may want to reiterate.

10        A    Okay.  Some documents been hold because of

11   attorney privilege or something, that's the only one I

12   think we owe or we took out from the e-mails, I'm

13   correct.

14             MR. SALLAH:  Sure.

15        A    Yeah.

16             BY MS. FUCHS:

17        Q    Okay.  Other than privileged documents, were

18   there any documents called for by the request, but not

19   provided that were in your possession at a prior time,

20   but that were lost, destroyed or otherwise disposed of?

21        A    No.

22        Q    Okay.  And just -- we note for the record

23   that a voluminous amount of documents were produced by

24   your counsel at the very end of December and also last

25   week, so we do anticipate that we might need to call

1   you back for continued testimony regarding those

2   documents, but we can discuss that further.  We don't

3   know at this point.

4        MR. SALLAH:  And Mr. Oran is in 100 percent

5   cooperation mode.  Whatever you need from him,

6   he's here to answer your questions.  He wants to

7   cooperate a hundred ten percent; is that correct,

8   Mr. Oran?

9        A    Yes.

10        MS. FUCHS:  And Jim, as I mentioned to

11   Mr. Oran, please, if he's not feeling well at any

12   point, just please let us know, okay?

13        MR. SALLAH:  We appreciate that.  We

14   appreciate that, Trish.  We really do.

15        MS. FUCHS:  Yeah.

16        MR. SALLAH:  That came across loud and clear.

17        MS. FUCHS:  Good.

18        MR. SALLAH:  He does have to go to the

19   restroom quite a bit 'cause he's on a lot of

20   medication for his system, his liver and stuff, so

21   he goes out a lot, but we'll tell you guys if he

22   needs to take a break.

23        MS. FUCHS:  Totally understandable.

24   Raynette, do you have anything before I get out of

25   this document?

1          MS. NICOLEAU:  No.

2          MS. FUCHS:  Okay.

3                    (SEC Exhibit No. 17 was marked

4                    for identification.)

5          BY MS. FUCHS:

6     Q    The court reporter has just marked -- I'm

7     sorry.  I'm just showing what the -- what has

8     previously been marked as Exhibit No. 17.  Are you able

9     to see that?

10    A    Yes.

11    Q    Okay.  This is a subpoena dated June 18th,

12    2019 to Profile Solutions, Inc. care of Dan Oran.  Do

13    you recognize this document?

14    A    Yes.

15    Q    Okay.  I'm going to be asking you some of the

16    same questions I just asked.  If that -- Exhibit No. 17

17    calls for the production of certain documents, have you

18    provided to the staff all documents called for by the

19    subpoena?

20    A    Yes.

21    Q    Okay.  Was the -- I was going to ask -- I

22    wanted to ask you the search that you conducted for the

23    subpoenaed documents, is that the same search as you

24    described for your personal subpoena?

25    A    Yes.

23

```
 1        Q    Did you use the same people to assist you

 2   that you did --

 3        A    Yes.

 4        Q    -- for your personal subpoena, which is

 5   Exhibit 16?

 6        A    Yes.

 7        Q    Okay.  And for this subpoena, were there any

 8   documents that have been withheld for any reason?

 9        A    No.

10        Q    Okay.  And for this subpoena to Profile

11   Solutions, Exhibit No. 17, were there any documents

12   called for by a request that were not provided that

13   were in your possession at a prior time or that were

14   lost, destroyed or otherwise disposed of?

15        A    No.

16        Q    Okay.

17             MS. FUCHS:  Raynette, do you have any

18   questions regarding this document?

19             MS. NICOLEAU:  No.

20                  (SEC Exhibit No. 18 was marked

21                   for identification.)

22             BY MS. FUCHS:

23        Q    I'm now showing you what's been marked as

24   Exhibit No. 18, a copy of a subpoena dated June 18th,

25   2019 to Blackpoll Fleet International care of Dan Oran,
```

24

1    CEO.  Can you see this document?

2         A    Yes.

3         Q    Do you recognize the document?

4         A    Yes.

5         Q    Okay.  I'm going to ask you the same question

6    I ask for Exhibit 17, whether you have provided to the

7    staff all documents called for by the subpoena?

8         A    Yes.

9         Q    Okay.  Was the search that you conducted for

10   the subpoenaed documents undertaken by the same people

11   who assisted you in the search for the documents called

12   for by exhibits 16 and 17?

13        A    Most of them the same people in Blackpoll and

14   that time we have more staff working there that they

15   help me to retrieve those documents, but I'm assuming

16   they're all the same people, yes.

17        Q    Okay.  Anyone else --

18        A    Secretary --

19        Q    I'm sorry.  I interrupted you accidently.

20   Who else did you say was helping you for the Blackpoll

21   subpoena?

22        A    Accounting and my personal secretary.  At

23   that time we have secretary in Blackpoll, probably she

24   helped.  I'm not sure.  I don't remember.  But we

25   retrieved everything you ask.

1        Q    And what's the name of that personal

2    secretary at Blackpoll?

3        A    In that time, if I'm not mistaken, it was --

4    I think it's Kenya Kodyacova (Ph).

5        Q    Do you know the spelling for the court

6    reporter?

7        A    I'm not sure.  I cannot spell it.

8             MR. SALLAH:  We can get the spelling.

9        A    I can get you the spelling later on in

10   minutes.

11            BY MS. FUCHS:

12       Q    Okay.  Any other individuals who helped with

13   the Blackpoll Fleet International subpoena, which is

14   Exhibit 18?  Sorry.  Could you hear me?

15            MR. SALLAH:  No.  We didn't hear anything.

16       What was the question, Trish?

17            BY MS. FUCHS:

18       Q    Oh.  I'm sorry.  I asked if there was anyone

19   else --

20       A    No.

21       Q    -- who assisted in the -- in locating and

22   gathering documents for the Blackpoll subpoena, which

23   is Exhibit No.18?  Anyone else that you can think of

24   who you did not mention previously for the other

25   subpoenas?

1        A    Steve Delgrado.  At that time he worked in

2   the company and he passed away.  He is no longer with

3   us.

4             BY MR. SALLAH:

5        Q    Stevie?

6        A    Yeah.

7        Q    How you spell his last name?

8        A    Delgrado.

9        Q    D-E-L-G-R-A-D-O.

10       A    Yeah.  He used to be the IT and then he

11  passed away from the Corona.

12            MS. FUCHS:  Oh.

13            MR. SALLAH:  He died of COVID.

14            MS. FUCHS:  Oh.  That's so sad.  I'm sorry to

15       hear that.

16            BY MS. FUCHS:

17       Q    Is there anyone else other than him that

18  assisted in the gathering --

19       A    No.

20       Q    -- of the documents?  Okay.

21       A    No.

22            MS. FUCHS:  Raynette, any questions?  Do you

23       have any questions regarding this document?

24            MS. NICOLEAU:  No.

25            MS. FUCHS:  Okay.

```
 1                    (SEC Exhibit No. 19 was marked

 2                    for identification.)

 3          BY MS. FUCHS:

 4          Q    I'm showing you what has been marked as

 5   Exhibit No. 19, which is the background questionnaire

 6   that you provided to us which is dated January 11th,

 7   2021.  First of all, thank you for providing this to

 8   us.  It saves us a lot of time.

 9               Can you tell us who prepared this document?

10          A    I did it with my accounting girl at my

11   office.

12          Q    Okay.  And who were they?

13          A    Rebecca Malka.

14          Q    Okay.  Rebecca and Malka or Malka is her last

15   name?

16          A    No.  Her name is Rebecca, her last name is

17   Malka.

18          Q    Okay.  Anyone else?

19          A    No.  Actually, yes, because I didn't know how

20   to prepare it in the beginning and Mr. Lenny Tucker

21   Help us because I didn't know how to do it.  We didn't

22   know how to approach this list.  Lenny Tucker help us.

23          Q    Okay.  If you could look at -- I move the

24   document.  If you could look at where it says No. 5

25   part 1.  And it says that -- I think your spouse
```

1    Nataliya Kirk -- am I pronouncing that correctly?

2        A    That's correct.

3        Q    Okay.  That her occupation is owner of GFS

4    and CSA8411.

5        A    That's correct.

6        Q    Can you tell us what GFS is and also what CSA

7    8411 what they are?

8        A    Of course.  GFS is a travel company that we

9    owned until November 2020 and CSA is a office building

10   that we owned and she manages the building.  It's a

11   rental office building.

12       Q    The CSA 8411?

13       A    That's correct.

14       Q    And what's the address of that office

15   building?

16       A    8411 West Oakland Park Boulevard, Sunrise,

17   Florida; the ZIP code is -- I need to look at my

18   driver's license.  One second.

19           MR. SALLAH:  He's going to get the ZIP code

20       out.

21       A    33351.

22           BY MS. FUCHS:

23       Q    Is Profile Solutions located at that address?

24       A    All my business located in different offices

25   in that address, yes.

29

1       Q   Okay.  And has GFS ever had any business

2  relationship or engaged in any business transactions

3  with any entities of which you've been an officer,

4  director or a member?

5       A   No.

6       Q   So that would include nothing -- no business

7  transactions with Profile Solutions?

8       A   No.

9       Q   Or Blackpoll?

10      A   No.  Different business in the same building,

11  but nothing to do with each other.

12         BY MR. SALLAH:

13      Q   Wait a minute.  Did it ever book flight?  I

14  mean it was a travel agency?

15      A   No.  No.  We on the timeshare business.  We

16  didn't book flight.

17      Q   Okay.

18      A   We didn't do anything.

19      Q   Just want to make sure there was no -- they

20  didn't book flights or --

21      A   No.

22      Q   -- whatever.  Was just timesharing.  Got it.

23        BY MS. FUCHS:

24      Q   Okay.  And I think we'll get to this in a

25  little bit more detail, but has the state of Florida

1    attorney general ever brought any administrative

2    proceeding against GFS, you or Nataliya Kirk?

3         A    I guess GFS, yes, but we settle it down.

4    It's nothing against me or Nataliya.

5         Q    Okay.  So we'll -- yeah.  We'll get to that

6    in a moment.

7         A    Yes.

8         Q    Has Ms. Kirk or any entity which she has been

9    an officer or director, member, has she received any --

10   or any -- has she or any entity that I just mentioned

11   received anything of value from any entity of which

12   you've been an officer, director or member?

13        A    I think I give my wife some shares from

14   Blackpoll and from PSIQ.  From my own shares that I

15   own, I give her some shares to hold in her name.  But

16   if she receive any money or any salaries from those

17   entity?  No.

18        Q    Okay.  Was the shares that she received I

19   think you said of Blackpoll and did you say also

20   Profile Solutions?

21        A    PSIQ, yes.

22        Q    PSIQ.  I'll say PSIQ.

23             Did she -- why did she receive those shares?

24        A    She is my wife.  She tell me you have shares,

25   I want shares too, so I need to give her.  What I gonna

31

1   do?  I gonna go with divorce from her?  No.

2          MR. SALLAH:  Let's make it -- Trish, let's

3      make it clear.  I don't think they were -- I think

4      they were issued to him, correct?

5   A    Yes.

6          MR. SALLAH:  And then he subsequently --

7   A    That's correct.

8          BY MR. SALLAH:

9   Q    You can do whatever you want with them?

10  A    Yeah.

11  Q    She didn't get them directly from the

12  company?

13  A    No.  No.  No.  From me.

14         MR. SALLAH:  It was his own personal shares.

15         BY MS. FUCHS:

16  Q    Okay.  So what I was going to ask is, did she

17  provide any services to any of the companies?  Was this

18  some time of compensation, those shares?

19  A    No.  No.  No.  It's my own shares that I give

20  her some of them.

21  Q    Okay.  Has Ms. Kirk ever been a signatory on

22  any financial account for any business of which you've

23  been an officer, director or member?

24  A    I think she's authorized on any of my -- in

25  my companies -- any on my private company she authorize

1    signature.

2         Q    Okay.  So which private companies?

3         A    In case of something happen to me, you know,

4    she have the signatures on the company.  I send you the

5    list.  I cannot give you all the names because I don't

6    remember.

7         Q    Okay.

8         A    You have the list with all my companies.

9         Q    Okay.  Is she a signatory on any financial

10   account for PSIQ?

11        A    No.

12        Q    Or Blackpoll?

13        A    No.

14        Q    Okay.  And then if you can go to -- I'm going

15   down to No. 13 on page 5 where you see Nutra Pharma?

16        A    I been -- sorry.

17        Q    I see the dates that you had listed, but what

18   is your current relationship with Nutra Pharma?

19        A    I invest money.  I invest $300,000 with Nutra

20   Pharma and I had request to have office, sit on the

21   board to be able to make sure that the company working

22   fine.  I was on the board for few months, when I

23   realize the company is not working in the way I should

24   be there and I left the company.  I resigned from the

25   company and I sue them for the money that I give them.

33

1    It's a lawsuit in court and we waiting for the result

2    of the judge.

3          Q     Okay.  So it's still pending; is that right,

4    the lawsuit?

5          A     Lawsuit still pending.  We going back and

6    forth.  They don't want to return the money.

7          Q     Okay.  And was Nutra Pharma the first

8    publicly traded company that you were an officer or

9    director of?

10         A     Yes.

11         Q     Okay.  How -- and -- so I was going to ask

12   how that came about.  Was that just because you made

13   that -- your investment or was there any other reason

14   that you became a director?

15         A     I understand they have a problem to sell the

16   products and they ask me to help them to sell their

17   products all over the world because of my relationship.

18   And I get into the company and when I realize they

19   lying to everybody, including me, I didn't keep it, I

20   just left.

21         Q     What were they --

22         A     I put a lot of people --

23         Q     I'm sorry.

24         A     I put a lot of people in contact.

25         Q     You put a lot of people in contact, what does

34

1    that mean?

2         A    In contact with them to sell the products and

3    then everybody that I put in, they tell me something is

4    wrong, it doesn't work the way it should be work.  You

5    know, the guy is not honest, so I -- in the time after

6    I realize myself that he mislead me, I just left the

7    company.

8         Q    Okay.  And when you -- you had mentioned that

9    they were lying, what are you referring to when you

10   said they were lying?

11        A    It's all big lawsuit from the SEC against

12   Nutra Pharma, that they know exactly what happen.  I

13   called the SEC in those times to be a part of it to

14   help the SEC, but the SEC never come back to me, so I

15   don't know.

16             BY MR. SALLAH:

17        Q    But what do you think they did?  Forget the

18   SEC.  What do you think they did?

19        A    They lie to everybody that they have snake

20   venom farm, that they have orders from a lot of people,

21   that all these -- they all lie.  You know, they all

22   make it up, you know.  And, you know, nobody care.

23        Q    So the lies you said were; they said orders

24   from people that they didn't have.  What else did you

25   say?

35

```
 1        A    Mislead the people they have snake farms,
 2   they doing sales over, you know, all kind of things.
 3   That's the way they put me into the company to help
 4   them to sell because they say they have a lot of
 5   interested people about the products, but, you know,
 6   when I realize, it's not true, you know, I just get
 7   out.
 8        Q    Okay.  And how did you realize it wasn't
 9   true?
10        A    Because I worked in the company and I work on
11   the sales, and I find out what they produce and what
12   they say, it's not the correct things.
13        Q    Okay.
14        A    It's not working for the purpose they mention
15   to work.
16        Q    And was Lenny Tucker involved with Nutra
17   Pharma as well?
18        A    When I have a problem with them, that's the
19   time I met Lenny Tucker and I ask him to work with me
20   to try to retrieve my money from them and he was
21   helping me to try to retrieve the money, but we didn't
22   succeed.
23             BY MR. SALLAH:
24        Q    No.  But did he have a relationship with
25   Nutra Pharma?
```

36

1       A     He was -- he was promoter.

2       Q     Promoter?

3       A     Yes.  Like he work with them to promote them.

4             BY MS. FUCHS:

5       Q     What do you mean promoter?  Like what did he

6    do?

7       A     He introduct people to the company.  I don't

8    know exactly his role there, but, you know, he have a

9    contract with them.  I don't know.  I never get into

10   the contract.  I just introduce between them, you know.

11      Q     When you said you introduce, is that how you

12   met Mr. Tucker?

13      A     I met Mr. Tucker through one of my partner,

14   Elizabeth Kawinski, that she own one of the company

15   that I involved with and she introduced me to Lenny

16   Tucker.

17      Q     Okay.  Well, we'll get into that, too.

18            And it shows here Beta Music you were a

19   director from April 4th, 2019 to September 5th, 2019.

20   What's your current relationship with Beta Music?

21      A     Beta Music, I'm suing them in the court -- in

22   Broward court for stealing my money and mislead me, and

23   mislead all the investors.  I put it in -- I think

24   it's -- I don't know exactly the date, but after I was

25   in the hospital she did somethings in the company that

1    I don't think is right and I put a lawsuit against

2    them.

3        Q    Okay.  So -- when you said she -- what's the

4    status of your lawsuit?

5        A    It's still in court.  It's between the court

6    and the lawyer.  It's a public record.  I think it is,

7    correct?

8            MR. SALLAH:  Trish, we can get you copies of

9        these lawsuits if you need any of this stuff.

10           MS. FUCHS:  Yes.  Just to summarize, like,

11       what the status is.

12       A    She mislead me all along from the day I

13   become her partner until the day she change and, you

14   know, take the company and stole everything from

15   everybody, you know.

16           BY MS. FUCHS:

17       Q    Okay.  So let me break down a little bit of

18   what you said.  You said you were suing her, one of the

19   things you said you're suing her for was stealing money

20   from you.  What -- can you elaborate on that?

21       A    Yeah.  I invest with her over $500,000 from

22   my personal money, you know.  I took mortgage for the

23   building that we own and I invest 200,000 in the

24   beginning and then I invest so much money with her.

25   And one day I came to her and I say, come on,

1    Elizabeth, it doesn't work the way you're saying.  You

2    give me all these things; future, future, future.  We

3    don't make money.  Something is wrong.  The company is

4    losing money every month and I finance it, and I cannot

5    have more finance.  You know, I'm getting broke.  And

6    she say, oh, if it's -- you know, I going to buy out

7    the company from you.  You going to buy out the public

8    company.  You know, all kind of nonsense.  I tried to

9    help in the beginning and I see I don't go nowhere, and

10   she start to steal the debt out the company to another

11   company that she create; nonprofit company.

12            BY MR. SALLAH:

13       Q    She transferred the assets to the company?

14       A    She transferred some of the assets to the

15   company and she tried to business to that company and

16   bring little money to the public company and to

17   original company, so -- and I was in the hospital and

18   she changed all the shares of who makes decision in the

19   company to her name itself, so she is the only

20   decision-maker in the company now.  So I got -- I don't

21   think that I have any other way besides to sue her.

22       Q    Okay.  And you said that she was misleading

23   you and your investors, what did you mean by that?

24       A    When I start to invest with her, I invest

25   only $200,000 and always she said she need more money

39

1    to go, more money to go; she need to develop a software

2    and we need more money to go, more money to go and I

3    start to get my family involve, my friends, you know,

4    to invest money with her.  And after two years I

5    realize that all the money that invest is going in

6    traveling, is going in stuff that, you know, what,

7    people that I don't know and the company -- people that

8    she hired and they don't do anything for the company.

9    So I sit with her.  I say, Elizabeth, we need to change

10   the path.  You know, we need to do something else.  It

11   doesn't work what you doing, you know.  Oh, I need

12   another 200,000.  Last 200,000.  I go put the loan on

13   my house for $200,000 and that's it.  From that

14   $200,000 I give it to her and she change the face.  You

15   know, and try to retrieve the money because I loan it

16   and I put mortgage on one of the properties, you know,

17   and I need to return the money and she disappear.  Then

18   she offered the guy -- instead of paying back, she

19   offer him half of the money, you know, and half --

20   she's going to forget about it.  And I didn't agree

21   with it.  I don't think it's right.  I don't think it's

22   right to do that to the people that invest money with

23   us.

24       Q    You said she offered some guy half of the

25   money, what does that mean?

1          A     It mean I put $200,000 in the company as a

2     loan for a year and then after the year pass, she

3     offered to give him $100,000 and forget about the rest.

4     You know, don't pay it.  We don't pay the rest.  That's

5     it.  Take your $100,000; no interest for your money,

6     nothing and forget about it.  And I didn't agree with

7     it.  I don't think it's right.

8          Q     Okay.  So that was offering you half; is that

9     what you meant?

10          A     Me, they didn't offer nothing.  They don't

11     want to pay me nothing.  For me, they don't want to pay

12     anything.

13          Q     Who --

14          MR. SALLAH:  Trish, the lawsuit lays out --

15          again, you can ask him, but I'm just telling you.

16          The lawsuit well layout just --

17          BY MR. SALLAH:

18          Q     Correct me if I'm wrong, one of your

19     allegations is, while you were sick she set up a new

20     company, transferred all the assets over, she's the

21     only shareholder and now that's the company.  Nothing

22     flows back to the old company that you own?

23          A     No.  She flow little bit back to the old

24     company.  Nonprofit organization and she in both

25     company.  She cannot be.  Cannot be.

1      Q    Okay.

2           MS. FUCHS:  Raynette, do you have any further

3      questions on that?

4           MS. NICOLEAU:  No, Trish.  Thanks.

5           MS. FUCHS:  Okay.

6           BY MS. FUCHS:

7      Q    Just one more.  How many -- did you bring any

8  investors to Beta Music?

9      A    Yes, I bring.  There's list of investor, you

10 got all of them.  I send you all the list.  I cannot

11 remember now, but it's a list of investors.

12          BY MR. SALLAH:

13     Q    But these are all friends and family?

14     A    Both friends and family of mine.

15          BY MS. FUCHS:

16     Q    Okay.  As you can see, I'm scrolling down.

17 So No. 25 -- question No. 25 talks about -- first the

18 first paragraph it talks about an investigation and

19 being deposed in connection with an investigation from

20 the Broward County State Attorneys Office related to

21 GFS World, LLC.  Can you tell us more about this?

22     A    It was a customer complain about GFS.

23 100-and-something complain over GFS for the state

24 attorney.

25     Q    Okay.

1      A    They send me subpoena to prove everything on

2    the company, I prove everything on the company.  After

3    the investigation, from 100-and-something complain,

4    only six or seven complain was real complain.  The rest

5    of them is another company.  Not me.  Not belongs to

6    us.  Not have anything to do with us.  So the

7    investigation finish with the terms of the state

8    attorney that I accept on behalf of the company.  We

9    return money to the people because those companies,

10   when I used to be involved with it, it was money back

11   guarantee to the people.  Anybody not happy, I return

12   the money anyway.  So they just complain for the state

13   attorney with no reason because we return the money

14   regardless.  If you don't happy with the product, we

15   return you the money.  It's on the policy of the

16   company, on the contract of the company.  When the

17   state attorney realize there's nothing behind it, they

18   just come and ask me for money to pay them for the work

19   for some penality.  So we pay them the money and that's

20   it.

21            MR. SALLAH:  Are we sure -- and again,

22        Trish --

23            BY MR. SALLAH:

24        Q    Are we sure it was the Broward County State

25   Attorney and not the Attorney General's Office?

1        A     I'm not sure, but I think it's Broward

2   County.

3        Q     Was this the one -- who handled this?

4   DeSouza?

5        A     Daniel DeSouza, the lawyer.  I don't own the

6   company no more, so --

7        Q     All right.  I got it.

8             MR. SALLAH:  Trish, I don't think this is the

9         Broward County.

10            MS. FUCHS:  Yeah.

11            MR. SALLAH:  I got the document.  I think it

12        was the Attorney General's Office for a FDUTPA

13        claim, you know, and I think it was just against

14        GFS.

15            BY MR. SALLAH:

16       Q     But weren't you as an owner required to

17   guarantee the payment of the moneys back?

18       A     I did.  I did guarantee.  Me and my wife

19   guarantee the payments.  We pay them whatever they

20   request and we --

21            MR. SALLAH:  I can get you the documents

22        related to that, Trish.  It wasn't -- it was the

23        attorney general FDUTPA, whatever group it is up

24        there.  It wasn't Broward County State Attorney.

25            MS. FUCHS:  Yeah.  We have -- we have --

44

1       actually, we'll show you just to make sure that

2       we're on the same page and we -- there's no

3       misunderstanding.

4           BY MS. FUCHS:

5       Q    Is this the same GFS that was listed in No. 5

6   of your background questionnaire, the same entity we

7   just talked about a short while ago?

8       A    Yes.

9       Q    Yes?

10      A    Yes.

11      Q    Okay.  And then the next paragraph under 25

12  talks about an arrest at the Miami International

13  Airport with the open balance with one of your

14  companies.  Can you tell us what that relates to?

15      A    Yeah.  I came to United States one of the

16  Valentine's Day, you know, to surprise my wife.  I came

17  back from Israel and I been arrested, and I report it.

18  They say the arrest is with no bail.  You cannot get

19  out in Miami.  I ask what's the reason.  We cannot tell

20  you.  I go to court after a few days because it was

21  Valentine and the judge tell me.  It's something in Las

22  Vegas that they can put arrest without bail.  Only in

23  Las Vegas.  Only place in the country with Casino.  I

24  ask what's the problem.  He say you owe money to Las

25  Vegas Caesar Palace.  I said, I don't owe them money.

45

1   I don't know how it come up, but what I need to do to

2   be released.  He tell me, you need to pay this money

3   and they release you and go to Las Vegas.  I did the

4   same thing.  I pay the money here in Florida; they

5   release me from jail; I fly to the court in Las vegas.

6   And the judge tell me, if you have any problem with

7   them, sue them.  You nothing to do here and he let me

8   go.

9       Q    Okay.

10          MS. FUCHS:  Raynette, do you have any other

11       questions regarding Exhibit No. 19?

12          MS. NICOLEAU:  No.

13          MS. FUCHS:  What's that?

14          MS. NICOLEAU:  No, I don't.  No, I don't.

15       Thanks.

16       A    And he's been dispatch from court.  I don't

17   remember when.

18          MR. SALLAH:  That's fine.

19                  (SEC Exhibit No. 40 was marked

20                  for identification.)

21          BY MS. FUCHS:

22       Q    I'm showing you what was marked as Exhibit

23   No. 40.  It's a document -- Office of the Attorney General

24   State of Florida Department of Legal Affairs.  It's in

25   the matter of GFS World, LLC, Dan Oran, Nataliya Kirk,

46

1    Vladimir Kudyako and some other entities.

2            Exhibit No. 40, is this the document we were

3    just referring to before for No. 25 in your background

4    questionnaire?

5        A    Yes.

6        Q    Okay.  So we'll just confirm that's it

7    correct.  It not the Broward -- it wasn't Broward.  It

8    was the State of Florida Attorney General's Office; is

9    that correct?

10       A    Yes.  It's on the paper, yes.

11       Q    Right.  Okay.

12            MR. SALLAH:  Just for the record, Josh Bows

13       is stepping out to make a call.

14            MS. FUCHS:  Okay.  Thank you.

15       A    Can I go to restroom for one minute?

16            MR. SALLAH:  Yes.  He'd like to know if he

17       can go to the restroom?

18            MS. FUCHS:  Yeah, of course.

19            MR. SALLAH:  Can we take a break, Trish?

20            MS. FUCHS:  Of course.  We'll take a break.

21            THE WITNESS:  Thank you.  Thank you.

22            MS. FUCHS:  Thank you.

23            (Whereupon, a brief recess was taken, after

24       which, the following was had.)

25            MS. FUCHS:  We're back on the record after a

47

```
 1        short break.

 2              BY MS. FUCHS:

 3        Q    During that time we had no substantive

 4   conversations, is that correct, Mr. Oran?

 5        A    Yes.

 6        Q    Okay.  Before we went on the break we had put

 7   up on the screen Exhibit No. 40, a copy of the Attorney

 8   General assurance of voluntary compliance document.

 9              MR. SALLAH:  Is it, Trish, 40 or 20?

10              MS. FUCHS:  40.  It's -- there's some

11        exhibits that are out of record, Jim.

12              MR. SALLAH:  Okay.

13              BY MS. FUCHS:

14        Q    Is this -- and this we just confirm -- I just

15   want to confirm, this is the document you refer to in

16   your background questionnaire regarding GFS; is that

17   correct?

18        A    That's correct.

19        Q    Okay.  And if you look, go down.  I'm

20   scrolling down in the document to paragraph 20,

21   injunctive terms, what does that refer to?

22        A    You need to ask my lawyer.  I don't know.

23        Q    Okay.  So do you have any understanding as to

24   what this means?

25        A    I don't have any understanding in the law.  I
```

48

1    have understanding that I hire the lawyer and they do

2    the job what need to be done.  I don't know.  I don't

3    know what they want and why they approach and this is

4    why I hire lawyers.

5        Q   Do you know what you're enjoined from doing?

6    Just not using legal jargons, just your own

7    understanding.

8        A   I didn't do anything wrong in the beginning

9    and I didn't do anything wrong until I start the

10    company, so they claim some claims and we agree not to

11    do whatever we didn't do any way.  So I don't know.

12    This is why I hired the lawyer and they figure out what

13    we should do and what we should not.  And I'm not

14    running the company on a daily basis.  I have a

15    manager, they report to my lawyers and then working

16    together not to do any mistakes.  But I didn't do

17    anything there.  I not work physically in the company.

18        Q   And do you notice there's initial on the

19    bottom of each page; do you know whose initials those

20    are?

21        BY MR. SALLAH:

22        Q   Those your initials, Dan?

23        A   This is my initial, yes.

24        Q   Okay.  If you go down, I've scroll down to

25    paragraph 35, compliance, do you understand what this

49

1    requires you to do or the other parties who are

2    respondents?

3        A    I did -- I did understand when that time was

4    happen, when my company used to be mine.  It's no

5    longer mine.  I have the manager of the company sitting

6    with the lawyer and with me, and we decide how to

7    approach it so we not going to have any issues.  We did

8    approach it.  I get rid of the company last year in

9    November.  I don't own the company and I don't do

10   anything or any of this business any way.

11       Q    Okay.  Why were you the person who initialed

12   this since there were other respondents as well?

13       A    Because I was working with the lawyers and

14   they ask me to initial and I initial it.

15       Q    Okay.  But do you -- do you have any

16   understanding as to why you were the ones who

17   initial -- you were the one rather than someone else?

18       A    No.  It can be my wife; it can by Vladimir.

19   They want all of us to be on the paper.  We all sign

20   for the paper.

21       Q    Okay.  And if you see, I have scrolled down

22   to page 18 of 39 of this document, which is Exhibit 40.

23   Is that your signature under GFS World, LLC where it

24   say "agreed to"?

25       A    That's correct.

1        Q    Okay.  And it dated it looks like

2    November 17th, 2017; is that correct?

3        A    That's correct.

4        Q    Okay.  And it says that you are -- you were

5    president of GFS World, LLC doing business as Global

6    Fulfillment Services; is that correct?

7        A    That's correct.

8        Q    Okay.

9            MS. FUCHS:  Raynette, do you have any

10       questions?

11           BY MS. NICOLEAU:

12       Q    Mr. Oran, you said that you no longer -- that

13   you got rid of the company last year, does that mean

14   you sold the company?

15       A    I sold the company in November -- November --

16   I think it was November 1st, 2020.  I not own the

17   company.

18       Q    Okay.  Who did you sell it to?

19       A    To one of my affiliator that he used to do

20   business with me.  His name is Jean something.  I don't

21   remember his last name.  He used to be one of my

22   affiliator and I sold him the company.

23           MR. SALLAH:  We could get that information.

24       We can get that information.

25       A    It's on contract with Daniel DeSouza, the

1    closing and everything.

2         Q    Okay.  All right.  Thank you.

3              BY MS. FUCHS:

4         Q    Did you sell GFS?  Was it a cash transaction?

5         A    He give me deposit of $150,000 in November

6    and he pay me the payments every month until -- I think

7    it's 24 months of partial payment every month.

8         Q    Okay.  But I mean, there's no -- is there any

9    kind of stock involved or is it a cash transaction?

10        A    What you mean?  I sold him the stocks of the

11   company with all the equipment, with all the

12   information on the company.

13             MR. SALLAH:  Trish, is it -- wait.  Hold on.

14             BY MR. SALLAH:

15        Q    Is it an LLC?

16        A    It's under LLC.

17        Q    Would be a membership change, not stock.

18        A    Whatever, it was there.  I don't know.

19             BY MS. FUCHS:

20        Q    Right.  Sorry.  I'm not the lawyers.  I have

21   lawyer.  They do the --

22             MR. SALLAH:  He doesn't know.

23             BY MR. SALLAH:

24        Q    But whatever, it was a transfer, the

25   ownership?

52

1       A    Everything transferred to him 100 percent.  I

2   don't own anything on this company anymore.

3            BY MS. FUCHS:

4       Q    Why did you decide to sell it?

5       A    I came after Corona.  I really don't do

6   anything from February until now.  I'm just trying to

7   cover.  So I cannot handle anything and I need to find

8   how to get straight again and make sure that I can

9   start fresh in couple months when I going to be

10  healthy.  They say in May, June, July I will be able to

11  come back to normal.  So right now, I'm very not

12  concentrate and my mind is not on working, you know,

13  and I just sick.

14           MS. FUCHS:  Raynette, do you have anymore

15       questions regarding this document, Exhibit 40?

16           MS. NICOLEAU:  No.  Thank you.

17           MS. FUCHS:  Okay.  Okay.  Do you see me now?

18           MR. SALLAH:  Yes, Trish.  Now you're back up.

19           MS. FUCHS:  Caretha, can you see me now?

20           THE COURT REPORTER:  Yes, I can.

21           MS. FUCHS:  Okay.  Perfect.

22                    (SEC Exhibit No. 39 was marked

23                    for identification.)

24           BY MS. FUCHS:

25       Q    Do you -- can you see Exhibit 39 that I just

1    put up?

2          MR. SALLAH:  Yes, we see it.

3          BY MS. FUCHS:

4      Q    And for the record, Exhibit 39 is part of an

5    excerpt of a web capture for senior management for

6    PSIQ.  And just -- Mr. Oran, is it okay if I just refer

7    to Profile Solutions as PSIQ?

8      A    Whatever comfortable for you, yes.

9      Q    Okay.  Perfect.  What is -- do you recognize

10   this document, Exhibit 39?

11     A    This is -- seems like -- I'm not sure, but it

12   seems like one of my profile.

13     Q    Does it look like -- when you say one of your

14   profile, does it look like a part of the website for

15   Profile Solutions or PSIQ?

16     A    It's possible.  I don't know.  I don't know

17   when the website.  If it's there, it should be there.

18   I don't know.  I don't know where you guys got it from,

19   but you got it from somewhere.

20     Q    Was there web --

21     A    I cannot tell you where.

22     Q    Okay.  Was there a website for PSIQ?

23     A    It's still a website for PSIQ, yeah.

24     Q    Okay.  Who produced that website?

25     A    We build the websites.

1        Q     Okay.  Who did that?

2        A     One of my -- I don't know if it was Ricardo

3   or Henry, or Steve.  I don't know.  One of them.  One

4   of the IT guys of the company.  I don't know which one.

5        Q     Who provided the information, the content for

6   the website?

7        A     I provide the content.  It's my content.

8   It's what I did.  What I did on those times before and

9   after.

10       Q     Did anyone assist you in providing that

11  content?

12       A     Yeah.  Lenny Tucker help me to write it down

13  and then we send it to the lawyer, I think so.  When we

14  put it in to make sure that everything is correct.

15       Q     Okay.  So you and Lenny Tucker, anyone else?

16       A     I don't think so.

17       Q     Okay.  And I think you just said you and

18  Lenny fucker provided it to a lawyer, is that what you

19  said?

20       A     Any documents or any documents that I

21  produced always been check with one of my lawyers.  I

22  cannot tell you who it was at that time and that

23  minute, and what this document came from.  If it came

24  from another company that I was before and we moved

25  that document to another company, I cannot tell you.

1      Q    So you -- is it correct that you can't recall

2    which lawyer you would have provided this to a copy of?

3      A    I cannot.

4           BY MR. SALLAH:

5      Q    Who could it have been?  What lawyer?

6      A    I need to check who was the lawyer in the

7    company and PSIQ at that time, and he probably got the

8    same e-mail.

9      Q    It could have been Jackson?   It could have

10   been --

11     A    It can be Jackson; it can be Leinwand; it can

12   be Henry; it can be Eddie Nurieli; it can be one of

13   them.  I don't know which because with we work with

14   many lawyers.

15     Q    Did you mention -- you mentioned three I

16   think.  One was Jackson?

17     A    Yeah.  Jackson Maurice.

18     Q    But Jackson, is Jackson the first name or

19   last name?

20     A    I think Jackson is his first name.  Maurice

21   is his last name.  I'm not sure.

22          MR. SALLAH:  He's the lawyer on the front of

23      the S-1s for profile.

24          BY MS. FUCHS:

25     Q    Okay.  Right.  So Jackson Maurice.  Maurice

```
 1    you think is the last name or a different attorney?

 2              MR. SALLAH:  Morris.  Jackson Morris,

 3         M-O-R-R-I-S.

 4              MS. FUCHS:  Jackson Morris.  Right.

 5              BY MS. FUCHS:

 6         Q    Any other attorneys it could have been?

 7         A    It can be Jonathan Leinwand.

 8         Q    Anyone else?

 9         A    It can be Henry Nasser.

10              BY MR. SALLAH:

11         Q    Henry Nasser?  N-A-S-S-E-R?

12         A    I don't think so.  I don't know how to spell

13    his last name.

14

15              BY MS. FUCHS:

16         Q    Anyone else?

17         A    No.  Not that I know.

18         Q    Okay.  Are you -- but are you -- are you

19    certain that you provided it to an attorney to review?

20         A    I'm 100 percent that any document that I see,

21    one of the attorneys see it.

22         Q    Okay.  So if you're looking at the first page

23    of Exhibit 39 for senior management, the first one is

24    you, Dan Oran; is all that information correct that's

25    in that paragraph?
```

1      A     Dan Oran CEO has been the president, chief

2    executive officer in Profile Solutions, that's correct.

3    That's what I've been.

4      Q     Right.

5      A     Blackpoll Fleet International, Inc., since --

6    that supposed to be correct.  If they didn't, they

7    mistaken the date.  I don't think they did mistake.

8    Dan Oran has been -- that's correct.  I was consulting

9    in the Cyber Tech.  This is also correct, when I moved

10   to the US; registered is correct; the commercial

11   property is correct and this is correct.  Aboulafia, I

12   used to manage it and we did this, too; this is

13   correct.  Everything is correct there.

14     Q     What's Aboulafia?

15     A     Aboulafia used to be one of my electronic

16   companies in 2005, '6, '7, something like that.  And I

17   used to have electronic stores in downtown Miami.

18     Q     Okay.  The next page under senior management

19   for Profile Solutions is Leonard Tucker, do you know

20   who wrote that information about Mr. Tucker?

21     A     I'm assuming Mr. Tucker himself.

22     Q     Okay.  And why does it have -- in parens why

23   does it say consultant?

24     A     When I met Mr. Tucker he was offer me

25   services in consultings through Nutra Pharma.  When I

58

```
 1    start my first deal with public companies because of

 2    his knowledge, I ask him if he want to be a consulting

 3    and if I going to get Blackpoll, and he agree to be

 4    consulting and I hire him as consulting to the company.

 5    I give him positions and I bought the company; we

 6    structure the deal together and I bought the company,

 7    and he become very close to me.  I put him in a seat

 8    next to me in my office and we work together for few

 9    years.

10         Q    And he still works with you?

11         A    He's not.  After this incident I blame him

12    for most of it because, you know, he supposed to guide

13    me in the right way and whatever happened with you

14    guys, I think is part of his fault if I get to the

15    situation, so I fire him.

16         Q    Okay.  And when did you fire him?

17         A    Well, last year sometime.  I cannot tell you

18    exactly dates.  It's not in mind.  If you need the

19    documents, we send documents.  And he's been fired.

20    But we on good terms.  You know, I fire him from the

21    company.  He say that it's not his fault.  It's nothing

22    related to him.  He didn't do anything wrong.  You

23    know, I didn't want to shut him down and sue him for

24    the damages he create me.  I just waiting to see what's

25    the real problem.
```

1      Q    When you say you fired him from the company,

2  what company are you referring to?

3      A    From all of them.  From Blackpoll, from PSIQ

4  and from Beta.  He been fired from all of them.

5      Q    Okay.  And when you said you blamed him for

6  this incident, what incident are you referring to?

7      A    The SEC stopped me from trading.  I didn't do

8  anything wrong on my behalf.  I didn't know if I did

9  anything wrong or I don't do.  So he supposed to be to

10 watch so I don't get in any trouble.  I don't have any

11 problem with anybody.  To check everything with the

12 lawyers to make sure everything is correct.  I did not

13 come from that world.  I come from a retail business.

14 And everything was -- and his opinion and make sure

15 that been check with the lawyers and make sure that we

16 doing the correct things, and when everything come down

17 to investigation, I don't like it.  I don't supposed to

18 be here.

19     Q    When you said that the SEC stopped you from

20 trading, what are you referring to?

21     A    I'm referring the SEC stopped Blackpoll from

22 trading in the market and then stopped Beta, and then

23 stopped PSIQ with the subpoena, ten days holding.  I

24 cannot come back to trading.  The SEC destroyed by

25 company, all my operation, all my work for the years.

1         Q    Did Mr. Tucker still work for you after the

2    trading suspension of Blackpoll?

3         A    After the trading suspension in Blackpoll he

4    did work for us for few more months and then I fire him

5    because of one of the argument that he claiming is not

6    his fault and he wanted to keep paying him the money

7    that I pay him and I cannot afford to pay no more and I

8    fire him.

9         Q    And it says here that he -- he's listed under

10   senior management and why is he listed here under

11   senior management?

12        A    He was in my right-hand -- in my -- he was

13   doing everything for the company.  He work with me on a

14   daily basis as a consulting and management, you know,

15   because I -- I been traveling all over the world to

16   close deals and to manage the operation, and I need

17   somebody in my office to help me out with all the

18   paperwork; to help me out with all the interactions and

19   he did for me all these stuff.

20        Q    Okay.  And I think you start to say he was

21   your right hand; is that what you were saying?

22        A    That's what I'm saying, yes.

23        Q    So was he, in fact, a member of senior

24   management for Profile?

25        A    He was a consulting, but he was consulting

1    for the company.  I don't know if you want to call it

2    senior manager -- consulting senior manager.  He was

3    with me 24 hours a day.  I work 20 hours a day in those

4    times you know.  And he was always available for me to

5    do whatever need to be done.

6        Q    Did he ever have a title with -- we'll start

7    with Profile Solutions.  Did he ever have a title with

8    Profile Solutions?

9        A    I don't know.  If he was, he uses the

10   consulting.  I don't know if he have a title.  I don't

11   think so.

12       Q    I mean some type officer or director?

13       A    I don't think he been officer or director in

14   the company, no.

15       Q    Why was that?

16       A    I didn't find anything to put him as an

17   officer or director in the company.  In that time I

18   didn't find a reason to do that.

19       Q    Did he do the work that an officer or

20   director would have done?

21       A    I don't know what you call work of officer or

22   director.  He did anything I ask him to do.

23       Q    Well, did he do anything different that one

24   of your officer or director would have done for you?

25       A    I don't know how to answer that.  I'm sorry.

62

```
 1    That's the question that I cannot answer.  He was a
 2    consulting for my company.  I don't know how to answer
 3    that question.  I didn't hire him as a director and I
 4    didn't hire him as a officer.  He was a consulting.
 5        Q    So if you can give me specifics of -- for
 6    Profile what he did in consulting.  I know you said he
 7    was available to you 24 hours a day, what specifically
 8    did he do for Profile?
 9        A    He prepare -- checked all the records of my
10    deals with -- coordinate with my lawyers, coordinate
11    with the stock exchange -- stock security exchange,
12    coordinate with my -- with anybody that I ask him to
13    do, prepare for me all the documents which then send
14    them to the lawyers to be checked and then bring it
15    back to the company, and I sign for them.  He did all
16    the work for me as a consulting.
17        Q    Was there ever a discussion that you had with
18    him as to any reason why he could not be listed or
19    should not be listed as an officer or director of PSIQ?
20        A    He always say that he can be a director in
21    the company.  I didn't want to put him on the company
22    director.  I didn't want to put him there.  He always
23    ask, you know.  I didn't want to put him there because
24    I don't know.  You know, he was my main guy and I
25    didn't know -- I didn't want to have more commitment
```

63

1    that I have on him for the big salary to put him and

2    then I going to have a problem to get rid of him, you

3    know, if something happen, you know, from my experience

4    in life.

5        Q    So he asked to be a director; is that what

6    you said?

7        A    Few time.  Few time we have that discussion,

8    but I never did it.

9        Q    And you didn't want him to be director

10   because of the salary; is that it?

11       A    You know, he have a big salary with me and I

12   didn't want to have more into the company.  When I

13   realize -- in the beginning we didn't have any

14   discussion like this, but when I realize that I start

15   to have issues with the SEC, I didn't want to have more

16   commitment with him to have another problem.  So, you

17   know, he say it's not his problem.  He can be a

18   director, an officer in the company.  He can be in the

19   front of the company.  You know I realize that -- you

20   know, he's -- he should be a consulting.

21       Q    It talks about that he has experience in

22   management, marketing, administrative, organization and

23   sales.  That's the first sentence.  What's your

24   understanding of what that experience is?

25       A    Whatever I understand from Mr. Tucker, that

1    he used to work in the past and be involve with the

2    stock market and he know anything in and out of the

3    stock market, and he can help to -- he can help me to

4    run my operation smoothly and secure without any issues

5    and any problem.  This is why I hired him.

6        Q    Did he tell you how he was involved in the

7    stock market?

8        A    He tell me that in -- 30 years ago he was

9    involved with few trading public companies and he tell

10   me all his background stories and everything.

11       Q    How is he -- did he tell you -- what kind of

12   stories did he tell you?

13       A    He tell me all these story about he was

14   convicted and that he was siting in jail and he did

15   some mistake in the past.

16       Q    When did he tell you he was a convicted

17   felon?

18       A    Right after I hire him.  Maybe few weeks

19   after I hire him.

20       Q    When was that?

21       A    I think it was 2017.

22       Q    Did he say what he was convicted for?

23       A    He tell me what he convicted for and he bring

24   me a paper to say that if conviction, he can operate a

25   public company with me; he can work with me.  He has no

1    problem with it.  I consult with my lawyers all over

2    and say it's okay.  He doesn't need to do anything.  He

3    can be consulting.  I check with all the three lawyers

4    at that time, everybody say he's okay, so I didn't say

5    any problem with that, you know, to hire him, you know.

6         Q     Which lawyers did you talk with?

7         A     Henry Nasser from New York.  I forgot the --

8               MR. SALLAH:  Sichenzia.

9         A     Sichenzia & Ross and I consult with --

10              MR. SALLAH:  Jackson Morris.

11        A     Jackson Morris and I consult with few other

12   lawyers, everybody tell me that he have no problem to

13   work in a public company as consulting.

14

15              BY MS. FUCHS:

16        Q     And did they say anything -- did they say

17   that in any kind of written form?

18        A     I don't know.  I don't think I have any

19   written form, no.  No.  But even today the lawyer say

20   that he doesn't think one of the lawyers --

21              MR. SALLAH:  Let's not get into

22        attorney-client stuff.

23        A     Okay.  I'm sorry.  I don't have anything on

24   record.  Sorry.

25              BY MS. FUCHS:

1        Q    Okay.  So nothing in writing?  For example,

2   no letters or e-mail, or anything?

3        A    Nothing in writing.

4        Q    Okay.  Was the reason he was made a

5   consultant instead of an officer or director because of

6   his conviction?

7        A    I don't think so.  His name showing on all

8   the documents, all the paper.  Anybody want to know who

9   is Lenny Tucker, just look at his name.  You know, I

10  don't think he hiding behind anything.  I don't think

11  so.

12       Q    No.  I -- what I meant was, was there an

13  understanding that he would be called a consultant

14  instead of an officer or director because of his

15  conviction?

16       A    I don't think so.  I don't think so.

17       Q    Can you tell me what you mean you don't think

18  so?

19       A    I don't think because of his position of a

20  consulting or any other position.  I didn't find -- you

21  know, I didn't want him to be in the company for my

22  reason, not because of his -- or something.  I tell him

23  I don't want another person in the company.

24            BY MR. SALLAH:

25       Q    You you're the only officer in the company?

1          A    I'm the only officer and director.  I don't

2     want somebody that happen to me with Elizabeth.  She

3     have the rights and she did whatever she want now and

4     I'm stuck.  I need to go to the court.

5          Q    Did you have any understanding as to any

6     limitations he had because of his conviction?

7          A    The letter he show me it's from an officer of

8     the SEC that he sue him.  That officer sue him and put

9     him in jail.  That he have no problem to do any of

10    those transaction, so -- to work in any public company

11    and do any position, so I really don't know.  I really

12    don't know.

13         Q    What letter did he show you?

14         A    From an officer that put him in jail.  The

15    officer that convict Lenny was giving him a letter that

16    he can work in any -- the lawyer now in somewhere and

17    he give him a already that he can work in any public

18    company, do any position.  So I don't have any other

19    way -- and I show this.  You know, I talk to my lawyers

20    and everybody say it's okay, so as a consulting he can

21    work with me.

22         Q    Okay.  Did you have a -- did you keep a copy

23    of that letter?

24         A    I didn't.  I didn't find a reason to keep a

25    copy, no.

68

1       Q    Did you have any --

2       A    He has it.  He has it.

3       Q    Did you ask him for a copy?

4       A    I didn't.  I can ask him.  I didn't want to

5   ask him yesterday.  Actually, I think about it

6   yesterday.  I didn't want to ask yesterday.  I don't

7   have it.

8       Q    Okay.  So you haven't asked him for it; is

9   that correct?

10      A    I didn't.  I didn't.

11      Q    Okay.

12           BY MR. SALLAH:

13      Q    You didn't keep it in the ordinary course?

14   we don't want to ask him for it now.

15      A    No, I didn't.

16           BY MS. FUCHS:

17      Q    Do you know what his criminal conviction was

18   for?

19      A    I didn't understand it because I'm not from

20   that part of business before.  I didn't understand what

21   he did.  But he did something and he -- you know, he

22   convict for that.  I don't know.  I don't know.  He did

23   some stealing or something.  I don't know what he

24   exactly did.

25      Q    Did you read the letter that he showed you?

69

1          A    I read it, but I don't remember what was on

2     it in details.  I don't remember.

3          Q    Do you remember if the letter said anything

4     about what he was convicted for?

5          A    I don't remember.  I don't want say something

6     that I don't remember.

7          Q    Did you see any copy of the document, the

8     judgment or order against him regarding his conviction?

9          A    I didn't.

10         Q    Did you Google him to see?

11         A    Actually -- I'm sorry.  Sorry.  Yeah, I did.

12    I did.  I did.  I did read it.

13         Q    Oh.  When?

14         A    Long time ago, but I did.  If you ask me now

15    to remember what was on there, I don't remember, but I

16    did read it.

17         Q    How did you get a hold of it?

18         A    One of my colleagues give it to me in one of

19    our meetings after I already hire Lenny Tucker.

20         Q    Which colleague?

21         A    His name is Benny Alan.

22         Q    Was that before Mr. Fucker told you about his

23    conviction?

24         A    It's before Mr. Tucker told me about his

25    conviction, yeah.

1       Q    And when you -- and how did Benny find out

2    about that?

3       A    His lawyer Google Lenny Tucker and he show me

4    the paper.

5       Q    Did Benny have any concerns?

6       A    He did, but, you know, it's my fault.  I told

7    him -- I don't know if it's my fault because I don't

8    think he did anything wrong until now.  I told him that

9    I think he's a good guy, you know.

10      Q    Did you have any concerns about Mr. Tucker's

11   criminal conviction?

12      A    I'm open mind to convict fellers to give him

13   second chance.  I didn't take any consideration of

14   Lenny going to do anything in my office regarding any

15   crime because I told him, the first thing I go, I go to

16   the law and I gonna sue you if you do something wrong

17   with me.  So I'm a opened guy.  You know, I think to

18   give second chance to people in particular with all the

19   lawyer say it's okay to give him the job.  You know, I

20   didn't find anything against him until something

21   happened and I know that he did something wrong.

22      Q    Do you know besides the criminal conviction,

23   does he have any other disciplinary background?

24      A    What is disciplinary?  I don't know.

25           BY MR. SALLAH:

1      Q    Did he get in trouble for anything else

2   besides the criminal conviction?

3      A    Not that I know.

4           MR. SALLAH:  By the way, Trish, just for the

5      record, Joshua Bautz has come back in the room.  I

6      just want you guys to be aware of that for the

7      record.

8           MS. FUCHS:  Thanks, Jim.  'Cause you're not

9      on video, I can't see you right now.

10          MR. SALLAH:  Really?  Trish, we can't see

11     you.  You can't see us?

12          MS. FUCHS:  Yeah.  I can see the court

13     reporter, I can't so you.

14          MR. SALLAH:  'Cause we can see you and the

15     court reporter.

16          MS. FUCHS:  We can continue though.

17          MS. NICOLEAU:  I can see Jim's office.

18          BY MS. FUCHS:

19     Q    Do you know if he had any disciplinary

20   background with the SEC?

21     A    I really don't know if -- I don't think -- I

22   don't know if he have anything.  No, I don't know.

23          MS. FUCHS:  And Jim, just to let you know; I

24     saw your office a second ago and it went off, but

25     don't worry.  It's not a big deal.  As long as I

72

1          can hear you, it's fine.

2              BY MS. FUCHS:

3          Q    And I think we talked briefly before that you

4    met him through a Elizabeth Karkowski; is that correct?

5          A    Kawinski.  She was -- she was that time my

6    partner in one of my private company.

7          Q    And how did you -- did she introduce you to

8    Mr. Tucker?

9          A    She bring him physically to my office and

10   introduce me the best guy in the world to do a

11   public -- to help me with Nutra Pharma for the public

12   trading company.

13         Q    Do you remember when that was?

14         A    Sometime in 2016.

15         Q    Do you know how she knew him?

16         A    Apparently they from the same background.  I

17   don't know.  They was friends.  I don't know how.

18         Q    Okay.  And what did he tell you about his

19   involvement with public companies?

20         A    He tell me that he know how to operate public

21   company because I didn't have any experience.  I need

22   somebody next to me to help me out to sort the

23   structure and to make sure I don't do anything wrong.

24   So he said he can help me.  He know how to do it.  Make

25   sure that nothing going to happen because he already

73

1    have the experience in public companies.  And, you

2    know, she bring him to my office; she's my partner; I

3    trust her judgment, you know, and I hired him.

4         Q    Okay.  Was he also -- on behalf of PSIQ, was

5    he the contact for the transfer agent?

6         A    He was the -- because I'm traveling a lot

7    between the countries, you know, I need somebody on

8    ground to be able to contact the transfer agents and to

9    contact the lawyers, and, yes, he did it.

10        Q    Did he have to have your approval before

11   doing certain job duties or was there anything that he

12   could do on his own without your approval?

13        A    He didn't do -- I don't think he did anything

14   without my approval because -- in my authorization,

15   everything needs to go through me.  If he did something

16   without my approval, I don't know what.

17        Q    Was he allowed to work on press and --

18   releases without your approval?

19        A    Any press release that I did I read it before

20   and I consult with my lawyers before I release them.

21   He didn't put any press release without me to go over.

22        Q    Was he -- was he allowed to work with any

23   marketing companies without your approval?

24        A    I did approve one marketing company to work

25   with that I know.  I don't think we work with any other

74

1    marketing company.

2         Q    What was that marketing company?

3         A    I don't know the name, but I know the name of

4    the person.  He -- the owner of the marketing company

5    was Adam Berk.

6         Q    Okay.  Was there also a company called

7    Broadman?

8         A    I don't know if it was Broadman.  I don't

9    think we hire a Broadman.  I think one of -- if I'm not

10   mistaken.  I don't know.  One of the shareholders hired

11   them in my opinion.

12        Q    What's your present relationship with

13   Mr. Tucker?

14        A    We on good terms.  We talking on the phone

15   when I need some documents to retrieve something from

16   the company.  He have most of the -- all the documents,

17   actually, for the company.  Until I fire him, he got

18   all the documents.  And, you know, for me it's easy to

19   retrieve it from his e-mails because I don't write much

20   e-mail.  He write most of the e-mails and I approve

21   them, so he have all the -- easy to find them.

22        Q    Are you -- do you have any type of work

23   relationship with him at all?

24        A    In this meeting?  No.  No.  He work with

25   other public company.

1      Q    Are you planning any types of future business

2  activities with him?

3      A    If I know that Lenny Tucker have no issues

4  with the stock exchange, I will consider.  If I know

5  there is a problem with him on -- in the stock

6  exchange, I never going to hire him again to anything.

7      Q    Did you speak -- have you spoke with him

8  about potentially having future business activities

9  with him?

10      A    He try to get me involve with a lot of

11  investments, I'm not doing anything until I clear the

12  situation that I am in right now.  I don't do any

13  business, not investment, no follow what he does.  He

14  doesn't bother me -- bother me now.  It's my situation?

15      Q    Have you told him you'll consider doing work

16  with him at some point in the future?

17      A    I didn't tell him anything until I verified

18  what is the problem.  I don't know the problem.  Until

19  now I don't know from you guys what's the problem, so

20  how I going to tell him anything.

21      Q    Was he ever a signatory on any financial

22  accounts of any businesses in which you were an

23  officer, director or member?

24      A    Never.

25      Q    Okay.  Were there any functions that any of

76

```
1    your businesses, let's say -- let's start with PSIQ.

2    Was there any function that he was not involved with?

3         A    I took him as my consulting, so anything I

4    did in those company I ask him his opinion.  So he know

5    everything about what I did in those years.  You know,

6    I took him as a consulting.  And when I pay so much

7    money to do consulting, I sit with him and ask him.

8    Again, after we consult or we prepare anything in my

9    request, I send everything to the lawyer to make an

10   opinion on it to make sure that it's correct.  So more

11   than that, I don't know.

12        Q    Okay.

13             MS. FUCHS:  Raynette, before I go to the next

14        page of Exhibit 39, do you have any questions?

15             MS. NICOLEAU:  Yes.

16             BY MS. NICOLEAU:

17        Q    Mr. Oran, who made the decision to profile

18   Mr. Tucker on Profile Solutions' website?

19        A    I sit with my website guy and with my -- with

20   Lenny and I sit with -- on the web and I send the

21   request on whatever need to be done change it in

22   between us and we did the decision to put or to

23   describe anything from there.

24        Q    Okay.  So are you saying you made the

25   decision to profile Mr. Tucker on the website?
```

1       A    Yes.  I put -- I authorize to put his

2   information on the website.

3       Q    Okay.  Why did you profile him on the website

4   as a consultant?

5       A    Because he is working with me as my

6   consulting and I want everybody know that he exist,

7   he's there.  I don't want to have any surprise.  Later

8   on somebody tell me that he working in my company and

9   nobody know about him.  He's hiding.  He's there.  He's

10  on the front.  I think everybody need to know that if

11  anybody have any issues, he's there.

12      Q    And besides --

13      A    It didn't seems like he -- sorry.

14      Q    Go ahead.

15      A    I think everything needs to be open and we

16  put it on the front so everybody know.  All the

17  documents it shows with consulting.  I didn't see any

18  problem.

19      Q    Okay.

20           MS. NICOLEAU:  Trisha, can you scroll down on

21      that document.

22           BY MS. NICOLEAU:

23      Q    Okay.  So profile Shimon Fhima on the

24  website?

25      A    Yeah.  Shimon Fhima, yes.

78

1    Q    Okay.  An Mr.  -- does Mr. Fhima work for

2  Profile Solutions?

3    A    Mr. Fhima is the CEO of Elite Hemp Product

4  that's owned by Profile Solutions.  The CEO of the

5  company is related, connected because we own Elite Hemp

6  Product.  So he's connected to Profile Solution, yes.

7    Q    Okay.  So he's the CEO of the subsidiary?

8    A    He's the CEO of the subsidiary, still the CEO

9  of the subsidiary.

10    Q    Okay.  Were there any other -- did Profile

11  Solutions have any employees?

12    A    The only -- I want to keep it there, very

13  simple.  It was only me and the accounting, and the --

14  other thing, I didn't want to spend so much money on

15  employees with no reason because we have -- at that

16  time we have only one entity with three or four

17  employees.  I didn't put so much expenses on it to

18  bring more people for no reason.  So it was me, Lenny

19  as the consulting, and Anna Berman is accounting,

20  Rebecca is second accounting, they do the accounting;

21  lawyers.  And we did -- we trying to do S-1, so we

22  have -- what you call it?  To fix our financials to

23  prepare our financials for the S-1, we need to do all

24  the they things, financials statements, so it was

25  enough expenses for me to put everything and I don't

79

 1    need to have more employees with no reason.

 2        Q    Okay.  Was Anna Berman an employee of Profile

 3    Solutions?

 4        A    No.  She was consulting account for -- to

 5    prepare the S-1 for the company that we did the

 6    auditing financial statement.

 7        Q    Okay.  So Anna Berman was a consultant for

 8    Profile Solutions?

 9        A    Yes.

10        Q    Okay.  And you mentioned someone else's name,

11    a second accountant?

12        A    Rebecca Malka.  She's an in-house accounting

13    for the company.

14        Q    Okay.  So she was an employee of Profile

15    Solutions?

16        A    She was with other company.  She is an inside

17    company, take care of all the companies.  Inside

18    accounting.  She have all the QuickBooks, all the

19    numbers, all the expenses, all the invoices to prepare

20    everything; she handle it.

21            BY MR. SALLAH:

22        Q    Your comptroller?

23        A    She is the controller, yeah.

24            BY MS. NICOLEAU:

25        Q    Okay.

1      A    And we have an accounting outside accounting

2  also.

3      Q    Why didn't you have Anna Berman or Rebecca

4  Malka on the websites?

5      A    I didn't know that I need to put them on the

6  website.  I really didn't know.  I didn't put them.  I

7  don't know.  No reason.

8      Q    Okay.

9      A    Anna Berman, she's an outsider.  She's --

10  provide me an invoice, I don't know if I need to put --

11  I didn't think I need to put her.  And Rebecca, she was

12  working for me.  I didn't know that I need to put them

13  on the website.

14      Q    So what do you mean --

15      A    Nobody tell me that.

16      Q    So what do you mean Rebecca was an outsider?

17  She was a consultant, correct?

18      A    No.  No.  No.  Rebecca is an inside

19  accounting for all my companies.  At that time when we

20  put the website, she wasn't.  I don't know.  Too long

21  story.  I don't know if she did work for me or not.

22  But Anna Berman, she's an outside firm that doing --

23  auditing all my documents before they go into the

24  auditor, so she's an outsider.  She's not need to be on

25  the web.  I don't think she not need to be there.  I

81

```
 1    don't think so.
 2         Q    Okay.  So she was an -- she's an outside
 3    accounting firm that you hired?
 4         A    Yeah.  I hired her to audit the books of the
 5    companies for me to do the S-1 to get auditing
 6    financial statement.  So before you can do auditing
 7    final statement, you need to spend these money with her
 8    to approve it, then it go to the auditor, then when the
 9    auditor approve it, then it going back to you guys with
10    signature of the auditors.  So this is what they tell
11    me, this is what I did.
12         Q    Okay.  Did she have -- did Anna Berman have a
13    consulting agreement for Profile Solutions?
14         A    I'm assuming it's in the S-1.  I'm positive
15    that she have a consulting and it's in the S-1.
16         Q    Okay.  And just -- can you tell me whether
17    she was retained as your accounting firm or did she
18    provide consulting services for Profile Solutions?
19         A    I cannot answer that if you want the question
20    to be detailed.  I know for sure that she have an
21    agreement, she have a contract with the company, so I
22    don't know what exactly the question.
23         Q    I think may be you were making a distinction,
24    Mr. Oran, about Anna Berman.  That she was a -- you
25    considered her an outside -- an outsider of the
```

82

1    company; is that correct?

2       A   She is auditing my books, not working for me.

3    Working for herself, her company.

4       Q   Okay.

5       A   This is what I know.

6       Q   Okay.  But for Mr. Tucker, you said that he

7    was a consultant as well, but you consider him an

8    insider of the company?

9       A   I don't -- he working next to me.  I don't

10   know what you consider.  My considerations with him, he

11   was my consulting, so I don't know what you want to

12   consider him.  My consideration, he's in my consulting.

13   He work next to me, he work with me in my office, but

14   he was my consulting.

15      Q   Did you consider Mr. Tucker as an integral

16   part of your company?

17      A   As what?

18         MR. SALLAH:  Did you consider him an

19       important?  Can we say important?

20         MS. NICOLEAU:  Yes.  That fine.  Important,

21       yes.

22         BY MR. SALLAH:

23      Q   Important part of your company?

24      A   I was considering him as very important asset

25   for my company in this time.

83

```
 1              BY MS. NICOLEAU:

 2         Q    Okay.  And is that the reason why you listed

 3    Mr. Tucker on Profile Solutions website?

 4         A    Yes.  I list him because he was working with

 5    me as a consulting on a daily basis and I want people

 6    to know that he's there.

 7         Q    And why did you want people to know that he

 8    was there?

 9         A    I already say in the beginning.  I got this

10    information that he have a problem and I didn't want to

11    hide it.  I want to make sure everybody know he's

12    there.  He's doing the job for me.  That's why I put

13    him on the page, on the Internet.  I don't hide

14    anything.

15         Q    Okay.  And when Ms. Fuchs asked you about

16    Broadman, you said that you thought a shareholder had

17    hired Broadman?

18         A    I don't recall who is Broadman.  I'm sorry.

19    I don't know the name, so I don't recall the name right

20    now.  If you allow me to find who is the guy, I can

21    return back with an answer.  I don't know who is the

22    name.  The only one I retain in my memory is Adam Berk.

23         Q    Okay.  So who were you talking about when you

24    said you thought the shareholder had hired a marketing

25    firm?
```

84

1           BY MR. SALLAH:

2       Q    Do you remember who you were talking about

3   or --

4       A    The guy from New York that came to my office,

5   he wanted to represent us for -- to promote us and I

6   didn't accept him, you know.  And I don't know if it's

7   that firm or no.  If you know who is behind the firm,

8   if you fell me the name.  He came and I didn't like

9   him.  I didn't like the guy.  I didn't think he's -- he

10  want to pay him a lot of money and he didn't -- he

11  didn't make sense for me, so I send him back and then

12  one of my shareholder before I brought the company hire

13  him to do something for the company without me to agree

14  with it.  I didn't agree with it, but they hire him.

15  He do the things without us to approve it.

16      Q    What's the name of the shareholder?

17           MR. SALLAH:  He's the large shareholder.

18      A    He's the shareholder in Beta.  Jim Ellis.  If

19  I'm not mistaken, I'm putting it correct.

20           BY MS. NICOLEAU:

21      Q    Jim Ellis?

22      A    Jim Anis or something like that.

23      Q    Okay.  Do you know how you spell the last

24  name?

25           MR. SALLAH:  Do you want him to start looking

85

1          through his stuff to try to find the name?

2               MS. NICOLEAU:  Sure.  I mean, if it's not

3          going to take you long.

4          A    No.  It's one of the biggest shareholder of

5     Beta.  I really -- I think it's Jim Anis or Jim Ellis.

6     I don't know.  He's on the record there.

7          Q    Okay.  That's fine.

8               MS. NICOLEAU:  Trisha.

9               MS. FUCHS:  Are you finish, Raynette?

10              MS. NICOLEAU:  I'm finish.  Thank you.

11              BY MS. FUCHS:

12         Q    Okay.  So I have a few follow-up questions.

13    You said that you thought Mr. Tucker was important; is

14    that correct?

15         A    That's correct.

16         Q    Tell me why you thought he was important?

17         A    At that time his opinion on each matter that

18    I have with the public company was making sense because

19    any time he tell me, I check with my lawyers and

20    everything came up, that's the right things to do and I

21    think he's a good asset for me to grow.  I cannot do

22    everything by myself.  I need somebody next to me.  In

23    the future I plan for him to give him a position direct

24    with the company, but I didn't do it yet.  I believe

25    that if we go to the S-1 and everything was correct,

1    and the company going in the right direction, I will

2    give him more responsibilities and more thoughts to be

3    part -- sitting as part of the company.  This is what I

4    plan, but it didn't work as we plan.  God have

5    mysterious ways.

6        Q    You said you would give him more

7    responsibility or position.  What -- can you --

8        A    I would give him position; position.  He did

9    a lot.  I suppose, in my opinion, it's to be -- make

10   sure that he get a position and stay with the company

11   for long-term.  All my people that I work with and they

12   with me with a long-term, I feel very comfortable at

13   that time with him.  I didn't see any problem with it.

14       Q    What kind of position were you thinking of?

15       A    I don't know.  I don't know.  I don't know.

16   Something.  I don't know yet.  I don't know what to

17   give him.  I don't know what to do.  I think about him

18   as a serious asset.  I don't think about anything right

19   now because it all not make sense.

20       Q    I don't want to put words in your mouth, but

21   I -- you might have said -- or let me ask you this

22   correct, did you rely on him heavily at PSIQ?

23       A    I rely on me and myself.  I concern anything

24   that he tell me how to behave and everything.  I rely

25   on my lawyers.  I don't rely on nobody beside my

87

    1    lawyers.

    2        Q    And why -- why did you put him under senior

    3    management for PSIQ and not Anna?

    4        A    Because Anna was not next to me.  She did her

    5    job from her house or from her office and I talk to her

    6    once every five days or six days, or whatever.  He was

    7    next to me every day sitting next to my desk.  I think

    8    that's the right thing to do.

    9        Q    Did he ask you to put him on the website

   10    under senior management?

   11        A    I think the lawyer -- one of my lawyer tell

   12    me to put him there.  I don't remember.  It's too long

   13    and I cannot tell you exactly what happen in that

   14    situation, but he's there for a reason.

   15        Q    And what's that reason?

   16        A    Not to hide anything.  That he's working with

   17    me on a daily basis.

   18        Q    What does that mean, "not to hide anything"?

   19        A    That guy have a record and I don't want

   20    somebody to come to me and say you hide him in the

   21    company and you didn't exclose [sic] that he's working

   22    with you, exactly what you guys doing now.  He's there.

   23    He's every day there, you need to show.  He need to be

   24    that he's working with me on a daily basis.  My

   25    reasonable commonsense to put him on there.

88

1        Q    Okay.  So you said you put him on there

2    'cause you didn't want to hide anything about his

3    record; is that correct?

4        A    About his record, about he's working with me,

5    about anybody coming next day to say, oh, you hide him

6    behind the corner; he have record; he did that in the

7    past and 30 years ago.  I didn't want to hide it.

8        Q    But if you didn't want to hide anything about

9    his record, why didn't you mention his record in this

10   description of him?

11       A    Again, I ask all the -- I'm not the lawyer,

12   guys.  You trust me and ask me question like I'm -- I'm

13   not the law.  I ask my lawyer, they say, don't need

14   after ten years to consult with anybody anything about

15   him.  It's illegal to do that or whatever they tell me

16   at that time.  I don't -- I don't hide him.  He's

17   there.  You can Google his name and you know who he is.

18   I didn't hide anything and I didn't mean to hide

19   anything if that's what it sounds like.

20       Q    No.  I just don't understand.  Just trying to

21   understand when you said you didn't want to hide

22   anything 'cause he had a record, but I don't see

23   anything in here that would give any notice to anyone

24   looking at him about his record.  So I was trying to

25   understand then, if you're putting him in here -- if

```
1    you're putting him in here -- sorry -- not to hide

2    anything, what -- I don't understand how that -- I'm

3    trying to understand from you how that is accomplished

4    when there's nothing about his background.

5         A    I ask my lawyers if I need to put his things

6    and they say no.  I asked them again and they say no.

7    It's 30 years ago; you don't need to put it.  After he

8    show the letter I a hundred percent thinking that I do

9    the right things.  If I know that there is any issue

10   with him to disclose it, I will disclose it right away.

11   I'm not going to hide him.  I'm not hiding anybody;

12   anybody.  I don't hide myself to anything I did.

13   Anything I would do in the future I always say up

14   front, I did A, B, C, that was the result.  This is who

15   I am.

16              MR. SALLAH:  You are getting worked up.  I

17         want you to relax a little bit.

18         A    It's not fair, you know.  It's the same

19   thing, question and question about the same thing that

20   I always it.

21              BY MS. FUCHS:

22         Q    We're just trying to understand.

23              BY MR. SALLAH:

24         Q    They're trying to understand why Lenny is

25   disclosed on there, but not his criminal background and
```

90

1    I think your answer that, you didn't believe you need

2    to because it was longer than 10 years.

3         A    That's what the lawyer tell me.  This is what

4    my lawyer tell me, not to do it.  Not to put it in.

5    You don't need it.  It's not necessary.  What I going

6    to do?  I'm not the lawyer.  I didn't hide him.  If I

7    want to hide him, he would not there.  He was behind

8    the scene.

9              BY MS. FUCHS:

10        Q    Did you have any understanding that

11   Mr. Tucker had to be called a consultant because of his

12   disciplinary past?

13        A    I swear that I didn't understand that this

14   way.  If I know that this way, I never agree with it.

15   I ask my lawyers and they tell me it's okay.  I don't

16   agree to hide anybody without anybody.  And anybody

17   coming with a questions like my partner Benny came to

18   me and ask me about it, I confront it.  I don't hide

19   it.  I don't see any reason to hide it.

20        Q    I was just trying to understand.  Was there

21   ever a discussion with anyone along the lines of

22   Mr. Tucker needs to have a title of consultant rather

23   than a different title because of his disciplinary

24   past?

25        A    Not with me, not that I know and not to hide

91

1   him.  I didn't do that to hide anybody.  I'm saying

2   again and again, I don't hide him.  I put him on the

3   front line, he's there.  He sign.  He is in the SEC

4   record.  He is on document.

5         BY MR. SALLAH:

6       Q    They're asking about title.  Was there a

7   reason?

8       A    No.  I'm saying no.  No.

9         BY MR. SALLAH:

10      Q    What else would you have called him?

11      A    If I go to the S-1 and if I go to everything

12  that he promise that it going to happen.  You know,

13  like he work with me and then he say, Dan, you need to

14  do A, B, C.  I trust his judgment to do all these

15  things to be fully reported company.  And I did

16  everything that he request.  I spend hundreds of

17  thousands of dollar.  You know, I trust his judgment

18  and if I go through everything and it succeed and we

19  going to be a good company, I don't know.  I find a

20  position with him on the company, but I didn't see it

21  happening, you know.  I lose all my money, all my

22  family money, all my friend money.

23         MS. FUCHS:  Raynette, do you have anything --

24      any other questions on Exhibit 39?

25         MS. NICOLEAU:  Yes.

92

1          BY MS. NICOLEAU:

2     Q     Mr. Oran, what senior management

3  responsibilities did Mr. Tucker have?

4     A     He need to work with all my request for

5  lawyers and for accounting, and for shareholders; when

6  I'm overseas to send me the documents, me to send the

7  documents to the shareholders; to help me out to create

8  the -- each time that we do press release, to go over

9  the press release.  I hire a company to write the press

10  release, to go over that with them and me, to go to

11  send it to the lawyer to get approved.  Everything must

12  to be -- he was helping me with everything.

13     Q     So the functions that you just listed, you

14  considered those senior management responsibilities?

15     A     Yes.

16     Q     Okay.

17          MS. NICOLEAU:  All right, Trish, that's it.

18          BY MS. FUCHS:

19     Q     Did he help negotiate any contracts or

20  business deals?

21     A     He did been with me in few of the deals that

22  I create.  He was putting his opinion on those deals,

23  yes, but he didn't have a decision as to make the deals

24  or not make the deals.

25     Q     Did you listen to his opinions?

1      A    I did listen to his opinion, yes.

2      Q    What was your -- what did you think of what

3    he said?

4      A    You know, you asking two and a half years of

5    business to answer you in a question.  Sometimes it was

6    saying smart things.  Sometimes I didn't accept them.

7    Sometimes I consider it.  I didn't -- you know, I don't

8    think he will be able to change my opinion on the deals

9    because he say something.  I very focus.  I know what I

10   want. I know what deals I want to happen for myself.

11   So he was there.

12            MS. FUCHS:  Raynette, anything before I leave

13       Exhibit 39?

14            MS. NICOLEAU:  No.

15                (SEC Exhibit No. 38 was marked

16                  for identification.)

17            BY MS. FUCHS:

18      Q    I'm now showing you what was previously

19   marked as Exhibit No. 38 and that document is a web

20   screen capture from Elite, which I believe before you

21   mentioned was a subsidiary of PSIQ; is that correct?

22      A    That's correct.

23      Q    Okay.  Do you recognize this document,

24   Exhibit No. 38?

25      A    Yes, I recognize the document.  It's from the

94

```
 1    website.

 2         Q    Okay.  And who created the content for this

 3    web capture?

 4         A    The website -- our website -- the website

 5    manager with my CEO from Elite.

 6         Q    Okay.  And did you review and approve the

 7    content?

 8         A    I did go over the content at that time, yes.

 9         Q    Okay.  I'm scrolling down.

10              MS. FUCHS:  Raynette, do you have any

11         questions regarding -- I'm scrolling down to

12         Ms. Kirk, do you have anything before I get to

13         that?

14              MS. NICOLEAU:  No.

15              MS. FUCHS:  Okay.

16

17              BY MS. FUCHS:

18         Q    Is she -- it says Nataliya Kirk, is that HR

19    director for Ms. Kirk?

20         A    She been in the company in the beginning of

21    the company.  She no longer working with us.  She was

22    helping us to create the company, you know, to be

23    there, but I don't think she's -- she's not longer

24    doing anything in that company.

25         Q    Okay.  Was she at some point HR director for
```

1    Elite Hemp Products?

2        A    She did, yes.

3        Q    Okay.

4        A    She did in the beginning.  When we create the

5    company she was there.

6        Q    For Elite, Elite Hemp Products; is that

7    correct?

8        A    For Elite Hemp Products, yes.

9        Q    Did she receive any compensation for that?

10       A    I think I never pay her.

11       Q    Do you know if she received any type of

12   compensation?

13       A    I don't think.  I'm telling you I think we

14   never pay her.  She did it as a volunteer to help.

15       Q    Okay.

16

17            BY MR. SALLAH:

18       Q    What about 401K contribution?

19       A    Nothing.  Nothing.  She did it as -- to help

20   us grow in the beginning, but she's not longer there.

21   She's a Realtor.

22            BY MS. FUCHS:

23       Q    Okay.  And then under her it has Leonard

24   Tucker and it says corporate governance.  Why was

25   Mr. Tucker listed as corporate governance for Elite?

```
 1          A     Honest, the truth, I don't know.

 2          Q     What does corporate governance mean here?

 3          A     I don't know.  I never see it.  I'm sorry.

 4          Q     But you approved the content; is that

 5   correct?

 6          A     At that minute I probably, yes, but I don't

 7   know.  I really don't know.  I cannot go back to the

 8   minute.

 9                BY MR. SALLAH:

10          Q     Does this refresh your recollection or no?

11          A     No, it doesn't refresh me.  I don't know what

12   the corporate governor.  You know, why --

13          Q     What does it say underneath it?

14          A     I don't know.  I cannot see it.

15          Q     Providing high-level support and advice to --

16          A     Maybe because he was in PSIQ and Elite is in

17   the bottom a subsidiary.  We put him there.  I don't

18   understand what's the reason we put it there.  Honest,

19   I don't know.

20                BY MS. FUCHS:

21          Q     Well, I'll read it to you.

22          A     I cannot go back two years.

23          Q     Okay.  It says -- under his name under

24   corporate governance it says, "Providing high-level

25   support and advice to the Elite leadership, requires
```

97

1    the knowledge of the regulatory requirements pertaining

2    to the complex world of the hemp industry.  We

3    essentially have to balance" -- wait -- "We essentially

4    have to balance the interest of our company,

5    shareholders, management, customers, suppliers,

6    financiers, government and the community."

7         A    In my opinion, it's because he was doing --

8    helping us in PSIQ.  He help us in Elite and he

9    research and do all things for Elite for trademark or

10   whatever we try to do there, he help out, but he help

11   out as the PSI and we put him on the front of it.  I

12   don't remember exactly why.  I'm not going to lie.

13        Q    Did he have a separate title with Elite?

14        A    No.  He was part of PSIQ.  He didn't have a

15   separate title in Elite.  I don't think so.

16        Q    Is that correct that he provided high-level

17   support and advice to Elite leadership, I guess,

18   pertaining to the knowledge of regulatory requirements?

19        A    That's what --

20        Q    Pertaining --

21        A    That -- sorry.  Sorry.

22        Q    I'm sorry.  I think I cut you off by

23   accident.

24        A    I say that he was sitting with me in all the

25   meetings with Elite with the CEO and the staff, and

98

1    help, and research, and did things that I need to do in

2    Elite to make sure everything is going to be on the

3    legal way; consult with the lawyers about different

4    requirement in Elite, but he never get paid from Elite

5    or have any -- like this I call it like a queen.  He

6    have nothing to do, only to help out.  He not get

7    salary, just to help out the company to grow.

8           MS. FUCHS:  Raynette, do you have any

9        questions?

10          MS. NICOLEAU:  No.  Thank you.

11          BY MS. FUCHS:

12      Q    Do you want -- you want to take your -- did

13   you --

14      A    No.  No.  No.  What's the time now?

15          BY MR. SALLAH:

16      Q    It's 12:17.

17      A    No.  I have time until 2:00.  It's okay.

18   Let's keep going.

19      Q    We're going to want to take a break at some

20   point.

21      A    Whatever you guys want.  I don't --

22          MR. SALLAH:  Trish, can I suggest this?  We

23       take a five-minute break so we can order lunch

24       like in and then take a lunch break from, like,

25       1:30 to -- from 1:00 to 1:30, if that's okay with

99

1      you guys and the court reporter?

2           MS. FUCHS:  Let me check with the court

3      reporter.

4           THE COURT REPORTER:  That's fine with me.

5      Thank you.

6           MS. FUCHS:  Raynette?

7           MS. NICOLEAU:  Me too, Trisha.

8           MS. FUCHS:  Okay.  So we'll take a short

9      break now and then we'll come back, and like he

10     said, we'll take a lunch break later on.  Okay.

11     Thank you.

12          (Whereupon, a brief recess was taken, after

13     which, the following was taken.)

14          MS. FUCHS:  We're back on the record after

15     the short break.  During that time there were no

16     substantive conversation; is that correct,

17     Mr. Oran?

18     A    Yes.

19               (SEC Exhibit No. 20 was marked

20               for identification.)

21          BY MS. FUCHS:

22     Q    We're showing you what has been marked as

23  Exhibit No. 20, the form S-1.

24          MR. SALLAH:  Trish, just so you know, you

25     have it up, but I a -- I also have it printed out

1     in hard copy, the S-1.  Not the amended; the S-1

2     October 19, 2018.

3          MS. NICOLEAU:  Okay.  Jim, that's great.

4     Something happened with Trisha, so just give us a

5     moment.

6          MS. FUCHS:  Could you not hear me for a

7     while?

8          MR. SALLAH:  Yeah.  We couldn't hear.

9     Raynette couldn't either.  She thought you were

10    off the grid.

11         MS. FUCHS:  Yeah.  Raynette just called me.

12    But can everyone hear me now?

13         MR. SALLAH:  Yes.  Your screen is frozen, but

14    we can hear you.

15         MS. FUCHS:  Okay.  I guess we'll just

16    continue then.  Jim, I actually thought that the

17    silence was 'cause you were looking to locate, you

18    know, your documents, you needed a few minutes.

19         MR. SALLAH:  No.  No.  We were fine.  He's

20    got a hard copy S-1, we got the exhibits all

21    online if we need to access them, so whatever you

22    need.

23         MS. FUCHS:  Hello.

24         MR. SALLAH:  Trish?

25         MS. FUCHS:  Okay.  I can't hear you.

```
 1              MR. SALLAH:  Trish.  You can't hear us?

 2         Madam court reporter, can you hear Trish?

 3              MS. FUCHS:  I just got a pop up.  If you can

 4         hear me, I just got a pop up that there's trouble

 5         connecting me to my network.

 6              MR. SALLAH:  We can hear you, Trish.

 7              THE COURT REPORTER:  Trish, you're going in

 8         and out.

 9              MS. NICOLEAU:  Maybe it'd better for her to

10         dial in.

11              (Technical difficulties)

12              MS. FUCHS:  So Raynette, pull Exhibit 20.

13              MS. NICOLEAU:  Yes.  Just give me a second.

14              MS. FUCHS:  Okay.  And that would be form S-1

15         filed with the Commission on October 19, 2018.

16              MR. SALLAH:  Yes, we see that.

17              MS. FUCHS:  Okay.

18              MR. SALLAH:  It not appear -- Just so you

19         know, it does not appear on the screen, but we

20         happen to have a hard copy of it thankfully.

21              MS. FUCHS:  Okay.  Great.  Raynette, is it

22         okay if I ask a few questions?

23              MS. NICOLEAU:  Yes, go ahead.

24              MR. SALLAH:  Of course.

25              MS. FUCHS:  Okay.
```

1          BY MS. FUCHS:

2      Q    Can you tell us -- first of all, if you can

3  give us some background on what PSIQ does?

4      A    PSIQ is a public trading company that -- and

5  associate with Elite Hemp Product.  Elite Hemp Product

6  is company that's owned by PSIQ, that we manufacturing

7  a brand name by name Elite.  Everything is from hemp.

8  We manufacturing cosmetics, eatables and smokeable

9  product from hemp flower.

10     Q    And what are PSIQ subsidiary company?

11     A    PSIQ currently have three subsidiaries.  One

12  of them is Elite; the second one is Canaberry Tech in

13  Israel; this third one is Stem in Africa.  That's the

14  three company.  The three owned hundred percent in this

15  moment.

16     Q    Okay.  Can you repeat that?  What were you

17  saying about Stem in Africa?  What's the name of the

18  company?

19     A    Stem.  I don't -- it's Stem something.  I

20  think it's Stem, Inc. it's a subsidiary of PSIQ that

21  supposed to grow cannabis in Africa.

22     Q    And so those are the only subsidiaries; is

23  that correct?

24     A    Right now that's the only subsidiary of PSIQ.

25     Q    Okay.  Was it -- was the name Stempro

1    International; is that it?

2         A    That's it, Stempro International.   That's

3    correct.

4         Q    Okay.   And is Stempro International a wholly

5    owned subsidiary of PSIQ?

6         A    Stempro International belongs to PSIQ 51

7    percent and to Stem Holding USA, 49 percent.   We do

8    joint ventures for the deal in Africa and we are a

9    partner there.

10        Q    Okay.   And where in Africa?

11        A    In Eswatini.   It's what's well-known as

12   Swaziland in Africa.

13             BY MR. SALLAH:

14        Q    Have you been there?

15        A    I've been there a few times, yeah.

16             BY MS. FUCHS:

17        Q    And how did you become involved with PSIQ?

18        A    I became involved -- I invest money in Elite

19   Hemp Product in the beginning and when Lenny start to

20   work for me for Blackpoll, we think about to get the

21   company Elite public.   When he start to advice me, he

22   bring me an offer to buy PSIQ and to put Elite as the

23   first subsidiary to raise money for the company so we

24   can grow up worldwide and that's what I did.

25        Q     Okay.   So you first invested with Elite and

1    how did -- when was that?

2         A    I don't know.  When we open Elite.  I don't

3    know.  I cannot recall.  Maybe 2014, '15.  I don't

4    know.

5              BY MR. SALLAH:

6         Q    You can look at the record.

7         A    The record is here, I just need to look for

8    them.  They have all the records.  I send them all the

9    records.  They should have it.

10        Q    Okay.

11        A    I invest money in Elite and then after a year

12   from opening Elite, we decide -- I decide to take it

13   public to raise more money so we can grow.

14             BY MS. FUCHS:

15        Q    Okay.  How did you come to invest with Elite?

16        A    I have two nice, handsome guys came to my

17   office and they want to open Elite, and I came to

18   invest the money for them.  One of them is Shimon

19   Fhima, the CEO of Elite, and another guy that is left

20   to -- he moved back to Israel I think in 2017.

21        Q    What was his name?

22        A    Guidon something.  I don't know.  Guidon last

23   name?  I don't know his last name.

24        Q    So you said that you came to invest in Elite

25   because Shimon and Guidon came to your offices and told

1    you about Elite; is that correct?

2         A    And told me about they want to open a hemp

3    company; that's with the trend now.  Everybody invest

4    in this.  They convince that I can invest with them.

5         Q    Did you know them before?

6         A    I know Shimon for the last 30 years and

7    Guidon for the last 30 years, yes.  I know them from

8    my -- all the friendship with them.

9         Q    Okay.  So you were friends with them prior?

10        A    Yes.

11        Q    Are any of them relative of yours?

12        A    They not my relative.  They are friend for 30

13   years, mutual friends.  We do -- we never -- actually,

14   with Shimon I did business in the past.  With Guidon I

15   never did any business.

16        Q    What kind of business you and Shimon?

17        A    I used to have retail stores and he was -- he

18   was manage one of the retail stores and then he bought

19   it from me.

20        Q    Okay.  So you came to invest with Elite and

21   then what was Lenny Tucker's involvement?

22        A    He was not involved, I telling you.  I invest

23   with Elite right before Lenny Tucker came to be in

24   contact with me.  After I think a year or something

25   like that when I have Elite, I think it's a good idea

1    to take it public because at that time all the CBD

2    companies go public and I think it's an opportunity to

3    grow the money, and raise money for it, and be public

4    trading in the American market.

5        Q    Was it your idea to go public or was it

6    someone else who suggested that to you?

7        A    The truth, it was my dream to have -- to run

8    public trading company in the US.  I think it's an

9    opportunity to be successful.  I was thinking it was

10   opportunity.  I don't think no more and I did it

11   because of my opinion on the market -- American market.

12       Q    Okay.  And so you wanted you said to -- you

13   did say you wanted to take Elite public; is that

14   correct?

15       A    That's correct.  Elite was private holding

16   company.  I was own I think over 90 percent of the

17   company because of my investment and I think it was

18   good opportunity to take it public.

19       Q    And how much did you invest with Elite?

20       A    If I not mistake, the first round I invest

21   like hundred and something thousand dollars, the first

22   round when I just came into the company.

23           BY MR. SALLAH:

24       Q    Altogether.

25       A    Altogether right now, it's probably about

107

1   400, 500,000, maybe more.  I don't even have numbers.

2   The accounting have the numbers.

3        Q    Okay.  And did Elite become a public company?

4        A    Elite joint venture with PSIQ.  PSIQ bought

5   the assets of Elite when I took over PSIQ Profit

6   Solution and we brought the asset from Elite, and I

7   left my investment there to grow with the company.

8        Q    Okay.  When you say "the company", what

9   company are you referring to?

10       A    Elite.

11       Q    Okay.  So Exhibit 20, the original S-1 that

12  was filed with the Commission October 19th, 2018, who

13  drafted that?

14       A    The lawyer.  Anything on the S-1 is the

15  lawyer draft, Jackson Morris.

16       Q    Okay.  And who provided Mr. Morris with the

17  information that was contained in Exhibit 20, the PSIQ

18  form S-1?

19       A    I authorize Lenny to provide the Jackson

20  Morris all the documents requiring like the lawyers to

21  prepare the S-1s.  So everything we have in our

22  position, we follow to the lawyer.  The lawyer work on

23  the S-1, prepare the S-1, send it back to me to review,

24  I reviewed it, as much as my memory give me that I

25  reviewed it, and I signed for it, and we send it back

108

```
 1    and apply.

 2         Q    Okay.  Did Mr. Tucker prepare any of the text

 3    that was contained in the S-1, which was marked as

 4    Exhibit 20?

 5         A    I have no knowledge to tell you if it's

 6    prepared, but I believe he helped the lawyers to

 7    prepare all the documents to make sure that nothing is

 8    wrong and everything is correct.

 9         Q    Did anyone else participate in providing the

10    information that was contained --

11         A    I believe Anna Berman; I believe the auditor;

12    I believe my staff in the office.  Everybody did their

13    part and put it together and send to the lawyer.

14         Q    Okay.  And I believe you said that you

15    reviewed it; is that correct?

16         A    I did review it to make sure that everything

17    they put down is correct.

18         Q    And you approved it; is that correct?

19         A    I approved it, that's correct.

20         Q    And who was -- who was responsible for the

21    content of Exhibit 20?

22         A    My lawyer.  The lawyer name is Jackson L.

23    Morris.

24         Q    And who else from PSIQ was responsible for

25    the content?
```

109

1          A    I told you it was me, it was Lenny Tucker, it

2     was my Anna Berman, it was -- at that time I think

3     Robbie Hicks, one of my personal assistant.  Anybody

4     need to -- I don't -- I cannot -- I don't know exactly

5     who, but everybody who worked on it to get the right

6     paperwork and documents.

7          Q    Okay.

8               MS. FUCHS:  Raynette, do you have any

9          questions on Exhibit 20 before I get to exhibit

10         21?

11              MS. NICOLEAU:  No.

12              MS. FUCHS:  Okay.

13                       (SEC Exhibit No. 21 was marked

14                       for identification.)

15              BY MS. FUCHS:

16         Q    So the profile form S-1 amendment No. 1 has

17    been marked as Exhibit No. 21 and that was the form S-1

18    amendment No. 1 filed with the Commission on March 5th,

19    2019.

20              Do you have that in front of you?

21              MR. SALLAH:  Yes.  We have it in front of us.

22              BY MS. FUCHS:

23         Q    Okay.  Just asking a similar -- a few similar

24    questions as to the original S-1 which was marked as

25    Exhibit 20.  If you can tell me who provided the

1   information that was contained in this document?

2       A    Jackson Morris.  He -- lawyer.  My lawyer.

3       Q    Okay.  And as to the individuals who provided

4   the content that's contained in Exhibit 21, is that the

5   same individuals who you just mentioned for Exhibit

6   No. 20?

7       A    I know that they ask us for some write down

8   the S-1 for some reason.  The lawyer work with the same

9   crew to get it down and we filed it again.

10      Q    Okay.  Was it the same individuals; you,

11  Mr. Tucker?

12      A    I'm assuming.  I cannot go back to the time.

13  Yes.  I'm assuming it's the same because it's couple

14  months different between this and this.  It's the same

15  people been involved, yes.

16      Q    Okay.  So I just have to finish the question

17  just -- I know you were anticipating my question, but I

18  just have -- just so the record is clear, I just have

19  to finish the question.  I appreciate it.  I know you

20  anticipated the question, but I just have to finish it

21  so the record is clear.

22           And why was an amended S-1 filed for PSIQ?

23      A    Excuse me?

24           BY MR. SALLAH:

25      Q    Why was an amended S-1 filed for PSIQ?

1       A    Because that's the --

2       Q    SEC?

3       A    The SEC request to amend it.  They ask for

4   answers and questions, and ask to amend it, so we amend

5   it.

6       Q    So is it correct that it was -- PSIQ filed it

7   to respond to certain questions or comments by the SEC;

8   is that correct?

9       A    That's correct, yes.

10      Q    Okay.  All right.  So if you -- Mr. Oran and

11  Jim, if you see on the bottom it has 64 pages, if you

12  could go to page --

13          MR. SALLAH:  Yeah.

14          BY MS. FUCHS:

15      Q    -- 7 of 64.

16          MR. SALLAH:  Of course.  Okay.  We're there.

17          MS. FUCHS:  Okay.  Great.

18          BY MS. FUCHS:

19      Q    So it says -- under prospectus summary with

20  the second paragraph where it starts -- beginning the

21  word start, "We manufacture, market, distribute and

22  sell food products sometimes refer to edibles and

23  topical preparation."  Can you tell us what you mean

24  that word manufacture?  What does that -- can you

25  elaborate on what that mean in this context?

112

1     A    Manufacturing the brand name of Elite.  It

2    mean that anything with the name Elite Hemp Product is

3    our product.  We manufacturing that product in

4    different facilities.  So -- and some of them in

5    California; some of them in Oregon; some of them in

6    Colorado.  We manufacturing the only things by name

7    Elite.  We not manufacturing any other product, that's

8    what it mean.

9     Q    Okay.  'Cause I want to just get like a full

10   understanding what that means.  Like what -- did Elite

11   have -- or does Elite have its own plant or does it

12   outsource?

13     A    We not planning to -- we don't have own plant

14   to manufacture.  We outsourcing all Elite product with

15   other manufacturing with GMP and all the regulation

16   they need for those product to be manufacturing.

17     Q    Okay.  And who does Elite outsource to?

18     A    Excuse me?

19        BY MR. SALLAH:

20     Q    Who does Elite outsource to?

21     A    There's a list of companies that you have and

22   I cannot recall because I not working with the daily

23   manufacturing of the product.  It's the CEO Shimon

24   manufacturing.  So it's the list I provide to you with

25   all the companies we do business with.

113

1          BY MS. FUCHS:

2      Q    Okay.  So you're saying that you provided a

3  list of the companies; is that correct?

4      A    That's correct.  That was one of the question

5  and we retrieve all the documents from the

6  manufacturing and we send it to you guys.

7          BY MR. SALLAH:

8      Q    So who deal -- Shimon deals with them

9  typically?

10     A    I don't deal with manufacturing.  I only help

11  him in sales.  I don't get involved in manufacturing.

12  Only if it's a big deal that I need to get involve, if

13  no, he doing all the work.

14         BY MS. FUCHS:

15     Q    Okay.  So I'm just saying, you don't know

16  offhand any of the names; is that correct?

17     A    I don't know offhand of any company, but we

18  have a list of company they provide to you.

19     Q    Okay.

20         MS. FUCHS:  Raynette, do you have any other

21      questions before I move to a different page?

22         MS. NICOLEAU:  No.

23         MS. FUCHS:  Okay.

24         BY MS. FUCHS:

25     Q    If you could move to page 10 of 64.

1          MR. SALLAH:  Okay.  We're there, Trish.

2          MS. FUCHS:  Perfect.  Okay.

3          BY MS. FUCHS:

4      Q    Do you see the paragraph that's right under

5   the heading that says, "Our independent registered

6   public accounting firm's audit report excludes an

7   explanatory paragraph"?  Do you see that, Mr. Oran?

8   The sentence that begins with --

9      A    Let's look for it.

10          MR. SALLAH:  Where at, Trish?  Can you point

11      to with it, like, the cursor or something?

12          MS. FUCHS:  I can't 'cause I'm not -- the

13      sentence begins with, "We" --

14          MR. SALLAH:  You got it.  Yes, that's it.

15      Okay.  You pointing to it.  That's helpful.  Right

16      there.

17          MS. FUCHS:  Yes.

18          BY MS. FUCHS:

19      Q    So where it says, "We have suffered recurring

20   loses from operations and having accumulated deficit of

21   $404,272 at September 30th, 2018," can you elaborate on

22   that what that deficit consist of?

23      A    Again, you need to ask my accounting.  I

24   cannot elaborate on it.  I not remember.

25      Q    Okay.

115

```
 1        A    You need to ask -- this is accounting

 2   question, I'm not doing accounting.  I'm only

 3   provide -- accounting provide that from a reason.  I

 4   don't know why and how, and I don't recall.  It's not

 5   that I don't know.  It's my recall.  I can answer.  I

 6   cannot answer that far.

 7             BY MR. SALLAH:

 8        Q    Could you recall the company was suffering

 9   loss?

10        A    Yeah.  If it's here, it's correct.  You know,

11   it's auditing.  It's been audit financial statement, so

12   it's been audit.  It's nothing there that's not audit.

13        Q    Do you know how PSIQ was funding the deficit?

14        A    My own money.  I dump money and bring more

15   money from my family and more money from my friends.

16        Q    Okay.  So it was you personally with family

17   members and friends; is that correct?

18        A    Yes.  I put money and dump more money, and

19   more money until the company succeed to today.  We have

20   a good company.

21        Q    Okay.  And was that through loans?

22        A    Everything through loan.  Everything that I

23   loan the company, it's a promissory note from me to the

24   company.  Everything is set up and by the booking --

25   bookkeeping.
```

1      Q    Sorry.  I'm just looking for --

2      A    This is part of the loan.  This is not

3  everything.  Many more.

4      Q    If you can go to page 12 of 64 there's a

5  paragraph that begins, "We derive 58 of our revenues in

6  2017 and 37 percent of our revenues in 2018 from two

7  customers," do you see that?

8      A    Yes.

9      Q    Who were those two customers?

10     A    You are asking me a question so detail I

11  cannot get, but the customers are -- they are on the

12  company.  I need to go to the company books and find

13  out.  I don't remember.  But I think one of the guys is

14  from the Internet.  They selling over Amazon and eBay.

15  The second customer may be an exporter.  They take the

16  goods from Florida overseas.  I don't -- I cannot tell

17  you.

18           MR. SALLAH:  We can find that.

19     A    We can find everything that's in the record

20  because it's on record.

21           BY MS. FUCHS:

22     Q    Okay.  But you don't know --

23     A    And is on the financial statement.  I

24  cannot -- I'm not -- I'm not Elite CEO.  Elite CEO can

25  answer those questions better than me, but anything on

117

```
 1    those terms been write down.  They been go over the

 2    accounting, auditing financial through the lawyers.

 3    Everything is -- that I write down that is correct to a

 4    hundred percent?

 5              BY MR. SALLAH:

 6         Q    So this is an easy one if we needed to find

 7    it?

 8         A    Yes.  It's on the financial statement.  I can

 9    call Anna Berman and she answer it.  I don't know.  I

10    cannot remember two years ago who it was.

11              BY MS. FUCHS:

12         Q    Without remember specifically who they were,

13    do remember having any contact with them?

14         A    Probably I did, but I'm not -- again,

15    probably I did.  I'm not the CEO of Elite.  The CEO of

16    Elite working with them on a daily basis.  If any

17    issues I getting involved.  I don't get involve if I

18    don't have issues.

19              BY MR. SALLAH:

20         Q    It was a simple yes-or-no question.

21         A    No.

22         Q    Do you remember getting any contact --

23         A    Maybe.  I don't remember.

24         Q    Okay.  So you don't remember?

25         A    I don't remember.
```

118

```
 1        Q    It's possible?

 2        A    Yeah.  It's possible, of course.

 3        Q    But you would know if it was like a relative

 4   or a friend of yours; is that right?

 5             BY MR. SALLAH:

 6        Q    Customers or friend, or your relatives?

 7        A    Definitely it's not relative and not friend

 8   of mine.

 9        Q    Okay.  Okay.  All right.

10             MS. FUCHS:  Raynette, do you have any -- do

11        you have any other questions before I move on from

12        this?

13             MS. NICOLEAU:  No.

14             MR. SALLAH:  By the way guys, I want to

15        reiterate.  If there's any information you need to

16        fallow up on with Shimon or anybody like that, we

17        can get you this information.  He'll know it.

18             MS. FUCHS:  Thank you.

19             BY MS. FUCHS:

20        Q    If you could move down to page 14 of 64.

21   Management --

22             MR. SALLAH:  For sure.  Where there.

23             MS. FUCHS:  Okay.  Management discussion and

24        analysis.

25             MR. SALLAH:  Yes.  We're there.
```

119

1          BY MS. FUCHS:

2     Q     Who was responsible for including this

3     section?  Who put together this part of the --

4     A     Anna Berman.  Anna Berman.

5     Q     Okay.  Do you know any details about the

6     revenues and cost of revenues?

7     A     I know that anything we did in Elite go

8     through three different people to find out that they

9     correct, that the profits of the goods and the cost of

10    the goods been putting together in the correct way.  So

11    it was by Elite accounting -- in Elite accounting going

12    to Rebecca, my accounting in my office, going to Anna

13    Berman and going to whatever did the auditing.  I don't

14    know who did the auditing.  I think is Jackson Bolton

15    did the auditing on this company.  So everything we

16    write down go to four different checkout to make sure

17    all the numbers are correct.

18    Q     Okay.  And were you see it says significant

19    customers where it says for the year ended December

20    31st, 2017 and December 31st 2016, and the aggregate

21    two customers or four customers, respectively,

22    accounted for 58 percent and 72 percent for our total

23    revenues for each respective period.  I do want to be

24    aware of who those customer are?

25    A     Again I repeating.  I don't know who the

```
 1   customer.  I'm assuming it's few customers that did

 2   business.  Everything is paid by checks or wire

 3   transfer and it is in the record of company.  I don't

 4   know the name of it.

 5        Q    Okay.  And do you -- do you have any

 6   understanding -- for cost of revenues, do you have any

 7   understanding as to the decrease in 2017 from 2016?  Do

 8   you have any understanding?

 9        A    I don't.  You need to ask my accounting and

10   the firm that auditing my books.  That question is for

11   them.

12        Q    Okay.

13        A    I just provide the invoices, cost of goods

14   and they do all the rest.

15        Q    Okay.  And similar question.  Under that

16   which is general administrative expenses, do you have

17   any understanding as to the increase from 2016 to 2017?

18   Do you know what was attributable to?

19        A    It's probably salaries and cost of goods.  I

20   don't know.  You need to ask accounting.  I'm not in

21   accounting.

22        Q    Okay.  Okay.

23             MS. FUCHS:  Raynette, do you have anything

24        further before I move on?

25             MS. NICOLEAU:  No.
```

121

```
 1            BY MS. FUCHS:

 2       Q    I don't know if you're going to -- if you

 3  could go down page 16 of 64.

 4            MR. SALLAH:  Yeah.  We're there.

 5            BY MS. FUCHS:

 6       Q    Okay.  I don't if -- it's a similar question,

 7  but I don't know if you'll know.  But do you see where

 8  it says 2018 for the nine month ended September 30th?

 9            MR. SALLAH:  Yes, we see it.

10            BY MS. FUCHS:

11       Q    In 2017 it was 74,739.  In 2018, 636,717.

12  That's the percent of change.  It says it's 752

13  percent.  Do you have any understanding as to what

14  caused the revenues to grow so much?

15       A    Yeah.  I spend so much money to go to all the

16  shows in the United States.  All the shows I go in each

17  one of them, spend hundreds of thousands of dollars on

18  fares and my business increase.  I don't see that as a

19  problem of the business.

20

21            BY MR. SALLAH:

22       Q    She's not asking if it's a problem.  She's

23  saying, do you recall.

24       A    Of course I recall.  We spend so much money

25  at the time in booking, go -- fly all over the country;
```

122

```
1    fly all over to get business.

2         Q    To conferences?

3         A    Conferences, shows.  Everything is in --

4         Q    All the CBD shows?

5         A    Yeah.  All the CBD shows.  Everything is

6    pictures and being done.

7         Q    Were a hundred percent of the revenues

8    derived from Elite products?

9         A    A hundred percent of the revenue came from

10   Elite products, yes.

11        Q    Okay.  And who was responsible for helping to

12   grow the revenues?  I know you just mentioned about

13   going to these different places and traveling, who else

14   besides yourself?

15        A    We have -- I don't work -- again, I'm

16   repeating.  I'm not work in Elite and I don't got to

17   the show, and I don't do the work of Elite.  Is a CEO

18   there by the name of Shimon Fhima.  He have a crew

19   working for him in the office with him to sell, to go

20   to the shows, to advertise the company, to

21   manufacturing the goods.  Everybody working in the

22   company and we getting better and better every year.

23        Q    Okay.  I misunderstood.  I thought you said

24   we like saying you.  So it was Shimon; is that right?

25        A    Shimon is the CEO of Elite.  I'm not -- I'm
```

123

1    only represent for Elite.  I working now in Elite and

2    bring customers, and grow the revenue of Elite because

3    in PSIQ, I don't have nothing to do in this minute.  So

4    I'm spending my time and bring more customer, and

5    develop more market for Elite so we can go to this year

6    to do better from last year.

7        Q    Okay.  Was Mr. Tucker involved in helping --

8    in creating these revenues -- growing these revenues?

9        A    Mr. Tucker is no longer with the company, so

10   he's not involved.  When he work with me, he did help

11   with represent -- for example, Chichi Chong, he

12   represent me to those companies, I close deal with them

13   and he try to big people to buy from the company, but

14   that's all his involvement.  Was not doing the sales of

15   anything there.

16       Q    Okay.  And --

17            BY MR. SALLAH:

18       Q    He introduce you to Chichi Chong?

19       A    Yeah.

20

21            BY MS. FUCHS:

22       Q    I don't know if -- you might know this.  It

23   talks significant customers.  Where it says, during the

24   months ended September 30, 2018 and '17, Elite had one

25   customer that approximated 37.32 percent of sales and

124

1    one customer that approximated 31 percent of sales,

2    respectively.

3            Once again, do you have any idea of who these

4    customers are?

5        A    I'm assuming he's the guy from the Internet

6    selling on Amazon and eBay.  One of the guy that he did

7    very well with us until 2020 and in 2020 he's not

8    longer doing any business with us, but our revenue are

9    the same or even better from 2019.  So I don't recall

10   exactly which customers because I don't follow

11   customers.

12       Q    Okay.  So you don't recall the name; is that

13   correct?

14       A    No.

15       Q    And where does Elite products have its

16   financial account?  What banks?

17       A    I think now we in PNC Bank.

18       Q    Okay.  Any others?

19       A    I don't think so.  I think we are in PNC.

20   Maybe in TD Bank.  You know, I don't remember, but I

21   can -- this is -- you have already all those documents

22   also.  All my bank accounts, all my companies bank

23   account, you have it.

24            BY MR. SALLAH:

25       Q    Elite as well?

125

1        A     Elite as well.  Everybody of my company she

2    got.  She got everything.

3        Q     Besides these two customers that are

4    referenced, do you know what's the remaining source of

5    the revenues, where they come from?

6        A     Internet, Amazon, eBay Zulily, Groupon.  I

7    don't know.  Whatever.  We have open field.  Customer

8    overseas, customer in United States.  Most of the

9    states -- the states we allow to sell products, we have

10   customers.

11           MS. FUCHS:  Raynette, do you have any other

12       questions before I move on?

13           MS. NICOLEAU:  No.

14           MS. FUCHS:  Okay.

15           MS. NICOLEAU:  Is this a good time for lunch

16       or did you want to go a little further?

17           MS. FUCHS:  I'm sorry.  What?

18           MS. NICOLEAU:  Is this a good time for lunch?

19           MS. FUCHS:  Oh.  Whatever you guys want, fine

20       with me.

21           MR. SALLAH:  Yeah.  That's fine.  You want to

22       take like a half hour, Raynette?

23           MS. NICOLEAU:  Well, I was thinking -- let's

24       take until 2:00 so that Trish can both take her

25       lunch and also work out her technical issues.  So

126

1          that extra ten minutes will help us work out those

2          technical issues.

3                  MR. SALLAH:  Whatever -- it's your guys

4          record.  Whatever you guys want to do.

5                  MS. NICOLEAU:  Yeah.  Let's do --

6                  MR. SALLAH:  Take til 2:00?

7                  MS. NICOLEAU:  Yes.

8                  MS. FUCHS:  Okay.  So we'll be back at 2:00

9          then.

10                 MS. NICOLEAU:  Okay.

11                 MS. FUCHS:  Okay.

12                 MS. NICOLEAU:  Thank you.  Off the record.

13                 (Whereupon, the luncheon adjournment was

14         taken, after which, the following was taken.)

15                 MS. FUCHS:  We're back on the record at 2:06

16         p.m. after a lunch break.

17                 BY MS. FUCHS:

18         Q    Shortly before going back on the record, Jim,

19    you mentioned that Mr. Oran recollected a few answers

20    to some questions, and so we wanted to give you an

21    opportunity to clarify or make my additions to what

22    you, Mr. Oran, had testified to.

23         A    The first question that you ask me is

24    regarding the four hundred and something thousand

25    dollar that we show as losses and I didn't recall what

1    happen, but when they do the auditing financial

2    statement, we give a lot of products in the shows free

3    to customers just to get to know us.  So it was big

4    amount of money that we give away and they didn't want

5    to write that as sales because we didn't sell it, so

6    write it as a loss because we give away.  If I'm not

7    mistake, that's the amount.  It was very big amount.

8    And this was the amount in the first year of the

9    company.

10       Q    Okay.

11       A    The second question you ask me --

12       Q    I appreciate it.

13       A    -- is, who is the two companies that buy from

14   you in 2017, the big amount of money.  One of name is

15   Alon Ezra.  He's a kid that selling everything on

16   Amazon, eBay that buy from us a lot of -- and this

17   year.  And second time is a CBD distributor group.

18   They selling all smoke shop product.  They used to buy

19   a lot from us.  They now manufacturing their own

20   product.  They don't buy anymore from us.

21       Q    Okay.  Were those customers that Shimon

22   found?  Was he the one who found those customers?

23       A    Shimon deal with them.  Shimon found them.  I

24   don't have anything to do with non of them besides --

25   yeah, I talk to them a few times.  Maybe one or twice

128

1    on the phone.  Maybe three times on the phone, but

2    nothing to do with sales.  In general what we planning,

3    what the company want to do, what is our things; we

4    talked about it and nothing more than that.

5        Q    Okay.  All right.  Is there anything else

6    before we continue?

7        A    That's the two question that we miss.  No.  I

8    don't have anything.

9        Q    Okay.  Okay.  Well, thank you for clarifying

10   those questions and telling us that.

11           So going back to page 17 of 64 of Exhibit 21.

12   One of the things we notice is the increase in

13   consulting expenses.

14           BY MR. SALLAH:

15       Q    You know, we touched on that.  You want to

16   explain what that passage is?

17           BY MS. FUCHS:

18       Q    Do you see whether it says approximately two

19   hundred 5,000 result of an increase in consulting

20   expenses, can you elaborate on that?

21       A    I cannot get into the detail.  Probably we --

22   it's what time?  2018 is the second year that Lenny

23   gets paid from the company and I gets paid from the

24   company, so probably the salaries that we get paid,

25   plus one of the board member gets paid or the expenses

129

1    for the financial statements.  I don't know.  I need to

2    go to the detail of those transactions.  I don't know.

3           BY MR. SALLAH:

4       Q    She is just focused on the consulting

5    expense.

6       A    Yeah.  Consulting is Anna Berman.  Also I

7    think is consulting.

8       Q    How much were you paying Lenny?

9       A    Lenny -- Lenny get in 2018 I think 12,500 a

10   month.

11          BY MS. FUCHS:

12      Q    I'm sorry.  I couldn't hear you.  Could you

13   repeat that?

14      A    I'm assuming Lenny get in 2,000 -- sometime

15   in 2018 12,500 a month.  In the beginning he get 7,500

16   and then we raise him to 12,500.

17      Q    That was for 2018 you said?

18      A    Sometime in 2018 I raise his salary.  I don't

19   remember when exactly.  I cannot -- I need to go to the

20   record to know the exact timing.

21      Q    And that was consulting just for PSIQ?

22      A    Just for PSIQ, yes.  In each company he have

23   a different agreement.

24      Q    Okay.  And then why did -- also, what was the

25   cause of the rent increase?

1        A    We go from a small office to a big office, so

2   we had more square foot.  We changed the location to a

3   huge location, so the rent increased by the square

4   foot.

5        Q    Okay.  The new location you moved to, is that

6   a location that you own or --

7        A    It's in the same building.  I was in a small

8   location and then we require a big location because we

9   have more inventory, more sales, more team to work, so

10  we transfer from one floor to a second floor; half of

11  the floor to a better floor.

12       Q    Okay.  And so that's the building that's

13  owned by Nataliya Kirk; is that right?

14       A    That's correct.  It's my building.  The

15  building we own.

16       Q    Okay.  And then the advertising expenses.

17  Can you tell us what kind of advertising that was?

18       A    Yeah.  We have different advertising.  We

19  send fliers to customers.  We make books.  We make

20  catalogs.  We spend money on fliers.  We spend money on

21  the shows.  Give away products.

22       Q    Okay.

23            MS. FUCHS:  Raynette, do you have any other

24       questions before I get to some of the exhibits to

25       Exhibit 21?

1          MS. NICOLEAU:  No.

2          BY MS. FUCHS:

3      Q    Okay.  Mr. Oran, I know you mentioned what

4  Lenny Tucker received in consulting, can you tell us

5  what type of compensation you received from PSIQ?

6      A    In the beginning I received 7,500 and after

7  that 12,500, and after that I didn't receive nothing.

8  I keep fulfill the company needs and put my own money

9  back.  So anything I took from the company, I put

10  probably three time more.

11      Q    Okay.  Was -- that money that you got, was

12  that consulting fees?

13      A    No.  I was on the board.  I think it was the

14  board -- as CEO of the company.  I think I have an

15  agreement as CEO or something like that.  There's an

16  agreement there for my position in the company.

17      Q    Was that a consulting agreement with Elite

18  products that you're referring to?

19      A    No.  Elite was consulting, but I move from

20  Elite to PSIQ.  It was an officer and director salary I

21  think.

22      Q    So you were getting the same amount as

23  Mr. Tucker?

24      A    I get salary.  I didn't -- honest, I didn't

25  get salary.  I took salary, but I put it back in the

132

1    company.  I invest it back.  If you see there the

2    paperwork, everything I took, I put three time more.

3         Q    But -- I understand.  But the 12,500, isn't

4    that the same amount that Mr. Tucker was getting?

5         A    The same amount I took for me and I took for

6    him.  I didn't want to take more money.  I think it was

7    enough for me for the time in the time I spend for this

8    company.

9         Q    But why was he getting as much as you were?

10        A    He work hard with me and I think he deserve

11   to get paid that much.

12        Q    Okay.

13        A    No reason for it.  He was working very hard

14   around the clock with me, so that's what -- I offer him

15   7,500 and when I see that we doing good and the company

16   grow, I raise him and I raise myself too.

17        Q    Okay.

18             MS. FUCHS:  Raynette, do you have anything

19        else on Exhibit 21?  Do you have any questions

20        about --

21             MS. NICOLEAU:  No.  I'm good.

22             MS. FUCHS:  -- 10.1?

23             MS. NICOLEAU:  No.

24             MS. FUCHS:  Okay.

25                       (SEC Exhibit No. 23 was marked

133

```
 1                    for identification.)

 2          BY MS. FUCHS:

 3      Q    All right.  I'm showing you what's been

 4  marked as Exhibit No. 23, which is actually the same

 5  thing as Exhibit 10.2 to the S -- the PSIQ S-1A, so you

 6  should have that handed, Jim.

 7          MR. SALLAH:  Which?  I'm sorry.  Which?

 8          MR. BOWS:  PSIQ amended.

 9          MS. FUCHS:  It was filed with EDGAR.  We've

10      marked it Exhibit 23, but it's actually Exhibit

11      10.2.

12          MR. SALLAH:  We're talking about in here --

13      in the --

14          MS. FUCHS:  It's the employment agreement.

15      It says affective --

16          MR. SALLAH:  I got it.

17          MS. FUCHS:  It says affective May 1st, 2018.

18          MR. SALLAH:  Okay.

19          MS. FUCHS:  It says replaces the agreement

20      made November 1st, 2017 by Elite Products

21      International, LLC and Shimon Fhima.

22          MR. SALLAH:  Okay.  Hold on.  We're doing it

23      right now.  Here we go.

24          MR. BOWS:  And there is the amendment right

25      her.
```

134

```
 1            MR. SALLAH:  Yeah.  There is the amendment

 2       10.2.  Okay.

 3            BY MS. FUCHS:

 4       Q    Okay.  I'm putting this up so it's a little

 5  easier.  Do you know how much -- what Mr. -- I'll just

 6  call him Shimon.

 7            Do you know what Shimon's compensation is?

 8  Here it is.  We're looking at section 3 if you see.

 9       A    Yeah.  He got whatever is there.  It's 4,000

10  a month.

11       Q    4,000 per month.  Okay.  And do you know how

12  that was negotiated?

13       A    I negotiate with him.  In that time that's

14  when we starting the company, that was the first

15  agreement.  He change it.  His agreement been change.

16  It's not correct for now, but it was then.

17       Q    I know you said before that Shimon was a has

18  been a friend for 30 years, did he ever -- did he ever

19  live with you at a certain point?

20       A    Yeah.  He got divorced from his wife and at

21  the time he used to live with my guest house for -- in

22  the beginning of -- we starting the company for a few

23  months, I think a year, maybe a year and-a-half.  He

24  just been guest in my guest house in my house in

25  Weston, yes.
```

135

1      Q    Okay.  For how long?

2      A    I don't know.  Maybe a year; maybe a year and

3  a half.  Until he gets on his feet, then he got back to

4  his -- he rent a place and he move out.

5      Q    Did he pay you rent for that?

6      A    The truth, he supposed to pay me, he never

7  pay me, I never ask for it.

8      Q    Okay.  So he didn't give you any type of

9  compen- -- compensate you in any way; is that correct?

10     A    Not to living with me as my guest, no.  No.

11     Q    Does he owe you any money?

12     A    Owes me money?  No.  He doesn't owes me

13  money.  I don't -- listen, I guest him in my house,

14  that's all about it.  I don't ask for money.

15     Q    Okay.  'Cause I thought you said he was

16  supposed to pay rent, but he didn't.

17     A    In the beginning -- in the beginning he was

18  supposed to pay me rent, then, you know, he start to

19  work with me in the company and he making 4,000 a

20  month, I tell him build yourself until you going to be

21  strong and go to your own.  I didn't take from him any

22  money.  I don't recall taking from him any money.

23     Q    Okay.  So do you expect him to pay you

24  anything in the future for that?

25     A    I don't expect him to pay me.  I don't ask

136

1    him to pay me.  I don't ask for the rent.

2        Q    Okay.  Did he enter any -- into any loans

3    with you?

4            BY MR. SALLAH:

5        Q    You ever loan him money?

6        A    I don't remember.  I don't think so.  I don't

7    think so.  He doesn't owe me any money in this minute.

8    If I give him few thousand and he return it, I don't

9    remember.  Maybe yes, maybe no.  I don't remember.

10           BY MR. SALLAH:

11       Q    Something substantive, 10,000?

12       A    No.  No.  I don't think so.  No.  No.  No.  I

13   bought his -- I rent his car, I give him the house to

14   live, what else exactly.  Working in the company.  I

15   don't think, no.  I don't recall anything he owe me.

16       Q    Is there a reason that Mr. Tucker's

17   compensation is higher than Shimon's?

18       A    Yeah.  Because Mr. Tucker is handling all the

19   public company that I don't know how to handle it and

20   Shimon didn't know how to handle it, that's why he gets

21   paid more.

22       Q    Oh.  If you look at 3.4 -- paragraph 3.4.

23           BY MR. SALLAH:

24       Q    Yeah.  Right there.

25       A    I see it.

1          MR. SALLAH:  We're on it.

2          BY MS. FUCHS:

3     Q    It talks -- yeah.  It talks about a monthly

4  bonus.  And it says, that shall not exceed 3,500 per

5  month.  It talks about sales over 50,000 per month.

6     A    Over 50,000.  Not 15, 50.

7     Q    Yes.  50,000.  Does he have to -- is that --

8  does he have to create 50,000 a month of sales on his

9  own to get the bonus or could that be from sales that

10  someone else generates?

11    A    Oh.  It was sales of the company.  The

12  company need to create 50,000 sales for him to get the

13  bonus.

14    Q    Okay.  So it doesn't have to be him

15  personally creating that; is that correct?

16    A    He's the CEO of the company.  He's not the

17  sales person of the company.  In general he --

18    Q    Okay.

19    A    -- get the commission on the company behalf.

20    Q    Okay.

21         MS. FUCHS:  Raynette, do you have any other

22    questions here?

23         BY MS. NICOLEAU:

24    Q    How was it negotiated that he would get three

25  -- that Shimon would get 3.5 percent?

```
 1        A    Well, that is what common in the industry of

 2   sales that I know in my experience.  This how much I

 3   looking for.  If anybody want me to sell for him

 4   anything, I looking for that 3 to 6 percent from the

 5   general sales that I do and that's why I give it to

 6   him.  He didn't ask for it.  I think that's the common

 7   on our industry of sales.

 8        Q    Okay.

 9             MS. NICOLEAU:  That's all, Trish.

10             MS. FUCHS:  Okay.

11        A    And by the way, Shimon didn't get paid what

12   he should get paid because he build a beautiful

13   company, so he compensate later on for that.

14                       (SEC Exhibit No. 24 was marked

15                        for identification.)

16             BY MS. FUCHS:

17        Q    Okay.  If you could see, I've just -- I'm

18   sharing a document that's been marked as Exhibit No. 24

19   and this document is actually the Exhibit 10.3 to the

20   PSIQ filing.  It's the consulting agreement with

21   Mr. Tucker.  It's effective as of January 1st, 2019.

22   It says that it supersedes and replaces the Elite

23   products consulting agreement dated November 1st, 2017.

24        A    Yes.

25        Q    Okay.  Do you recognize this document?
```

139

```
 1        A    I recognize the document.  We made the

 2   document at that time, but we never -- we never -- we

 3   put it on.  I don't think he gets paid anything from

 4   Elite.  In my recall, he never get paid from Elite

 5   anything.

 6        Q    Well, did he -- did he provide any services

 7   to Elite?

 8        A    He suppose, yes.  He suppose.  He bring me a

 9   Chichi Chong products to the company and he supposed to

10   get, but I never -- we never fulfill that agreement.

11        Q    Did he engage in any efforts to help grow

12   Elite?

13        A    He did help me.  He did make phone call.  He

14   did call his colleagues from other industry that they

15   dealing CBD at this time and he try to get me involve

16   with a few companies that he's -- create a deal for

17   Elite.  We think how to give him some more benefits if

18   the deal would happen.  None of the deal came up

19   besides Chichi Chong.  And we didn't give -- I don't

20   think we paid him anything from Elite.  I don't recall.

21   'Cause we paid him from PSIQ.  I don't see that Elite.

22   He never get paid from Elite.

23        Q    If you look at paragraph 2, description of

24   services, where it talks about retaining him as a

25   consultant, do you know what types of duties that he
```

140

```
 1   did pursuant to this No. 2, the description of

 2   services?

 3       A    Like I say, he was involved between a few

 4   companies to introduce to us on behalf of Elite.  He

 5   was involve in the whole structure to close the deal.

 6   It was Chichi Chong and another company, Stem Holding,

 7   that we did the deal together in Africa and we think

 8   how to give him more -- if the deal will go through how

 9   to give him more pay.  That's what it was.  That's what

10   I recall.

11       Q    Okay.  And paragraph 4A talks about

12   consideration and I know that -- it says here that

13   he'll be compensated 12,150 per month.  You didn't

14   discuss this --

15       A    Yes.

16       Q    I'm sorry.  Continue, please.

17       A    I send these documents to be inspected by my

18   lawyers and at that time they tell me that's okay, to

19   write it down and to give it to him.  I didn't know if

20   I be able to pay him any commission and anything on

21   those things.  They approve that I can give him

22   commission if I do.  If he do anything, that's right,

23   so accurate and then we agree on things, but never --

24   he never get paid for them.  It never happen.  Never

25   get $1 from Elite.  In my memory he didn't get paid for
```

1    nothing.

2         Q    Okay.  So to your knowledge, he never got

3    this monthly payment from Elite?

4         A    And his knowledge -- in my knowledge he

5    didn't get paid.  In his knowledge I owe him the money,

6    so he try to go after me for the pay to pay this, but

7    we settle it out of the problem.  And he think I owe

8    him the money.

9              BY MR. SALLAH:

10        Q    After the fact?

11        A    Yeah.  After the fact he want the money from

12   me to pay him for this contract, but I didn't pay him

13   and I just took a lawyer, and then we settle our thing

14   and I didn't pay him anything, so he hire a lawyer to

15   sue me.

16             BY MS. FUCHS:

17        Q    How was this figure arrived at, the 12,150?

18        A    The true, I don't remember.  I don't want to

19   tell you something that I don't -- I don't remember.  I

20   know that we did an agreement, we calculate how much

21   profits we will make I think it was at that time and he

22   need to get paid for it because he construct the

23   introduction between me and the other companies, and I

24   was sure it's fair, but it never happen.  I know he

25   never get $1 from them.

142

```
 1        Q    And then, you know, a little bit farther

 2   down, section 4 paragraph D where it talks about in the

 3   event the consultant generates business for the company

 4   and any sales resulting he will be entitled to a

 5   commission 20 percent of the net proceeds.  Again, I

 6   know you said he got no money, but to your knowledge,

 7   did he ever get any kind of this commission of -- equal

 8   to 20 percent or any other commission?

 9        A    In my opinion, he didn't get one dime from

10   Elite company, but maybe I mistaken.  This is

11   accounting questions.  I can find out with accounting

12   and give you the answer.  I don't think -- in my

13   opinion, in my memory as much as I remember, I don't

14   think he get paid anything from Elite.

15        Q    Do you know why he would have this in his

16   agreement to get 20 percent, but Shimon did not?

17        A    Yes, I know.

18        Q    Why is that?

19        A    'Cause he push me for 20 percent and at that

20   time it was sound good because I have a plan to make

21   with this company a lot of millions of dollars and 20

22   percent was for me reasonable to give him.  It was one

23   of the best introduction that I never had in kind of

24   this business.  It was actually the best one, but it

25   all blow because of this situation we have.
```

143

1      Q    Okay.  Did anyone else have this kind of

2  arrangement, the 20 percent?

3      A    I don't think so.  He was -- nobody else

4  bring me Chichi Chong to the company, so I don't think

5  nobody else get this.

6      Q    Okay.

7           MS. FUCHS:  Raynette, do you have any

8      questions about this document.

9           MS. NICOLEAU:  No.

10           BY MS. FUCHS:

11      Q    Were there any other directors of PSIQ?

12      A    It was two more directors.  One of them is a

13  lawyer by the name Eddie Nurieli showing on the S-1.

14      Q    Okay.

15      A    Another director I cannot recall his name

16  right now.  He's a financial guy that is with us, but

17  in this time Eddie Nurieli no longer.  After this

18  investigation, he pull his name from company because he

19  didn't want to have any issue, so he pull his name out

20  and we left only me and another director.

21      Q    Oh.  So he resigned?  Did he resign then?

22      A    He resigned from the company because of the

23  situation with SEC.

24           (Court reporter clarification.)

25           MR. SALLAH:  Just for reference, he's looking

1       at if S-1 or the S -- yeah, the S-1.  Trish, we're

2       trying to find it.

3       A    It's O-D-I, last name is N-U-R-I-E-L-I.

4  Spelling it on -- it's different.  I spelling on my

5  phone different.  E-D-D-I-E, last name is

6  N-U-R-I-E-L-I.

7       Q    Thank you.

8            MS. FUCHS:  Raynette, do you have any other

9       questions in this area.

10           MS. NICOLEAU:  Well, we were waiting for the

11      name of the other director.

12           MS. FUCHS:  Right.

13           MR. SALLAH:  Yes.  That's -- he's here.

14      A    No.  This is the first one.

15           BY MR. SALLAH:

16      Q    Oh.  That's the first director?

17      A    The other director, one second.  I don't

18  recall.  One second.  I need to -- I need few minutes.

19  It's going to come to me.  I'm sorry.  I apologize.

20           BY MS. FUCHS:

21      Q    No.  Don't worry about it.

22      A    I going to come back to this.  Give me few

23  minutes, it will come to me.

24      Q    Yeah.  That's fine.  That's fine.

25           BY MS. NICOLEAU:

1       Q    Mr. Oran, do you recall the time period for

2    this other director?

3       A    I cannot tell you times, no.  Definitely I

4    cannot tell you times, but he still on the board with

5    me.  He's the only board member with me.

6       Q    And you said he was a financial guy?

7       A    The financial guy that my lawyer Eddie

8    introduce to me and I find him a very nice guy, and

9    very smart, and I want him to be on the board to help

10   me out.

11      Q    Okay.  Was he on the board more than a year?

12      A    Yeah.  It's more than a year, yes.

13      Q    Okay.  More than two years?

14      A    I cannot not tell you that.  I don't know.  I

15   can give you the times and dates when I have it in

16   front of me.

17      Q    Okay.  Thank you.

18           BY MS. FUCHS:

19      Q    Okay.

20           MS. NICOLEAU:  Trish, I have one more

21      question.

22           BY MS. NICOLEAU:

23      Q    Do you know why that director was not listed

24   on the S-1 -- the amended S-1?

25      A    I think he came after the S-1, so that's why,

1   if I'm not mistaken.

2        Q    So this S-1 was filed on March 5th, 2019, but

3   you testified that he was on the board for more than a

4   year and he resigned shortly after.

5             MR. SALLAH:  Raynette, what's the question?

6        Let's not get crazy.  What was the question?

7             MS. NICOLEAU:  So my question is, first ask

8        why was the director not listed on the amended S-1

9        and based on the time frame that was given, that

10       this person was on the board for more than a year,

11       I'm just wondering like -- I'm trying to nail down

12       the time frame.

13            MR. SALLAH:  I got it.  So if he resigned

14       over a year, he should be at least on one S-1 is

15       what you're saying?

16            MS. NICOLEAU:  Yes.

17       A    I don't remember.  I don't want -- I don't

18   remember.

19            BY MR. SALLAH:

20       Q    No.  Just say it.

21       A    I need to look at the fact to tell you.

22       Q    No.  But there was no reason -- there was no

23   specific reason?

24       A    I don't know.  Maybe he came right after we

25   put the S-1.  I don't remember if it's 6 month or 5

147

1    month, or three years.  If it's not on the S-1, it mean

2    he was not in the company at that time or the lawyer

3    forget to put him.  I don't know.

4              BY MS. NICOLEAU:

5        Q    So you will let us know when you recall his

6    name?  All right.  Thank you.

7              MR. SALLAH:  Yeah.  We'll find out.

8        A    Few minutes I will let you know.  I just need

9    to -- before we finish I would answer.

10                         (SEC Exhibit No. 27 was marked

11                          for identification.)

12             BY MS. NICOLEAU:

13       Q    Okay.  Thank you.

14             MS. NICOLEAU:  All right, Trish.

15             MS. FUCHS:  Raynette, I was going to go next

16        to our Exhibit 27, until you have anything else

17        you wanted before.  I was just going to skip ahead

18        to that unless you wanted to go a different one.

19             MS. NICOLEAU:  No.  Go ahead.

20             MS. FUCHS:  Okay.

21             BY MS. FUCHS:

22       Q    Okay.  I'm showing you what we have marked as

23    Exhibit No. 27, which is actually Exhibit 10.11 to the

24    PSIQ S-1A.  It's a subscription agreement entered into

25    between Stempro International Inc.  And it says, "The

148

1    undersigned subscriber in the company as of January

2    14th, 2019."

3            MR. SALLAH:  We're there.  We got it, Trish.

4            MS. FUCHS:  Okay.

5            BY MS. FUCHS:

6        Q    Can you tell us about this document?  Do you

7    recognize it?

8        A    Yes.

9        Q    Okay.  Can you tell us what it is?

10       A    Of course.  That's a document made between

11   PSIQ, Profile Solution Inc., and Stem Holding regarding

12   the deal that we supposed to do in Eswatini in Africa.

13   We supposed to give them 49 percent, keep 51 percent.

14   We create a new company, a new LLC, Stem Holding, and

15   they supposed to finance the whole structure in Africa.

16   Until December 31st of 2020 I was assuming I going to

17   be able to do the deal because of the lack of time and

18   the matter, I send to the government in Eswatini a

19   letter that I backing off the deal and I not interested

20   to do the deal anymore with them, and I move -- we

21   received the license in Israel instead and I have

22   another company with license in Israel that I retrieve.

23   Three weeks ago we receive it.

24       Q    Okay.  So let me just start out here with

25   this agreement, Exhibit No. 27.  Can you tell us how

149

```
 1     this came about?

 2          A     I received a phone call from one of my

 3     friends in Israel that the country of Eswatini, we will

 4     regulate a new license for cannabis for companies from

 5     all over the world.  I start to contact the

 6     government -- actually, the princess of Eswatini and we

 7     start to accomplish a solution to operate a company in

 8     Eswatini.

 9              I bring the whole crew, the prince and --

10     to the United States to work with me in company.

11     They growing cannabis.  They came over.  They been

12     with us few weeks.  When they go back, they send me

13     information that we will get a license for growing

14     cannabis in Eswatini.  I go there with my teams from

15     Israel and from the United States.  I structure what

16     I want to be and how I want to grow the cannabis

17     there.  We prefer land on the free zone of the

18     country.

19              We start the process.  We open a company.

20     We open a bank account and we start the process, the

21     license.  It was a pending license that they promise

22     to give us if we go to the structure of the

23     government.  I try to get the license for the last

24     two years.  I spend a lot of money and effort and in

25     November -- in December 31st I realize that it's too
```

1    many issues in the country, too much problem, too

2    much fighting between the king and the princess, and

3    the government.  I decide to leave that deal alone.

4    For meantime in those times, I open a company in

5    Israel to get the license from Israel and I got the

6    license a few weeks ago.

7         Q    Okay.  So we'll go and unpack that.  But

8    first of all -- so for Exhibit 27, the subscription

9    agreement, why was this done as a subscription

10   agreement as opposed to a different device such as a

11   partnership agreement?

12        A    Because at that time we didn't even have

13   nothing.  We just -- I need to have commitment for

14   somebody so I can get the money to build the facility

15   in Africa.  I didn't want to go to Africa without to

16   know that I can raise the money.  That's what I did

17   with them.  They provide with me information that they

18   raise the money for us so we can do the transaction.

19        Q    And -- sorry.  I'm having an issue pulling

20   the documents.

21             How much money did you want to get?

22        A    I have a commitment for them to get

23   $5 million for that investment.  I have a commitment.

24   This is a writing commitment for them to invest the

25   money in Africa.

1       Q    Okay.  And how -- and this was -- who was

2   getting the money for you?  Which entity?

3       A    Stem Holding.  It's on the paper.  They sign

4   for this.  Stem Venture, Inc.

5       Q    Okay.  Now, where was Stem Ventures going to

6   raise the money?  How?

7       A    I don't know.  It's a public -- another

8   public trading company in the field.  They have their

9   own investors and they like the deal, and they commit

10  for their money, and they raise the money.  They have

11  the money in the bank for more than a year.

12      Q    Okay.  So do you know if they, in fact,

13  raised it from investors, the 5 million different

14  investors?

15      A    I'm assuming they have their own way to raise

16  money from their investors.  They're public trading

17  company and that's what they did.  They raise the

18  money.  I don't know exactly how, but I know they got

19  the money in the bank and they got the commitment fee

20  from their side.

21      Q    Okay.  And that is status of the relationship

22  with them now?

23      A    I send them -- on December 31st, 2020 I send

24  letter to everybody that I withdraw the deal from South

25  Africa; we not going to be involved and anybody is free

1    to do anything they want, including Stem.  They not

2    longer liable for that deal for me and we are not

3    liable for them.  We separate way.

4        Q    And how does this subscription agreement, how

5    does this relate to South African Ventures?

6        A    I cannot understand the question, please.

7             MR. SALLAH:  Say that again.

8             BY MS. FUCHS:

9        Q    Is there any relationship to South African

10   Ventures?

11            MR. SALLAH:  South Everest -- South Everest

12       African?

13       A    No.  South African Ventures.

14            BY MS. FUCHS:

15       Q    South African --

16       A    -- Eswatini.

17       Q    South African --

18       A    South African Ventures in Eswatini.  The

19   country was Swaziland, that's the South African

20   Venture.

21            BY MR. SALLAH:

22       Q    That's the joint venture?

23       A    The joint venture.

24            MR. SALLAH:  That's the name of the joint

25       venture, Trish, the one he was talking about in

```
 1          Swaziland.

 2              BY MS. FUCHS:

 3          Q    That's the joint venture you were mentioning?

 4          A    The write down South Africa Ventures, they

 5     mean South Africa, Eswatini.  They write Eswatini in

 6     the beginning, but they didn't the description.  They

 7     mean South Africa because it's happening in South

 8     Africa.

 9              MR. SALLAH:  Okay.  They wrote Santini, but

10          whatever they wrote, they meant South Africa is

11          what he's saying.

12              MS. FUCHS:  Okay.  Raynette, do you have any

13          other questions regarding Exhibit 27?

14              MS. NICOLEAU:  No.

15              MS. FUCHS:  Okay.

16              MR. SALLAH:  He like to add, that Lenny

17          introduce him to Stem.  Why don't you tell them.

18          A    Sorry.  I need to add another paragraph

19     there, that part Lenny introduced me to Stem.  So he

20     was -- introduce me to Stem when I tried to raise the

21     money.

22              BY MS. FUCHS:

23          Q    How did he know -- how did he know of Stem?

24          A    That's not a question for me.  That is a

25     question for Lenny.
```

154

```
1

2              BY MR. SALLAH:

3       Q    Did you know --

4       A    I don't know.  He introduce me.  I don't know

5   how he know and what he --

6       Q    So I know you kind of gave us a lot of

7   information, we just want to kind of get questions and

8   ask some more.

9            So going back to Exhibit 21, which is the

10  PSIQ amended S-1A, we want to find out more

11  information.  If you go to page 20 it talks about --

12  the beginning it says, "We plan to establish operations

13  in the Kingdom of Eswatini in southern Africa."

14           MR. SALLAH:  Hold on one second, Trish.

15       We're talking about exhibit -- the form S-1,

16       correct, the amended?

17       Q    The amended one, exactly.  Which is Exhibit

18  21?

19           MR. SALLAH:  Yes.

20           MS. FUCHS:  Okay.

21           MR. SALLAH:  Okay.

22           MS. FUCHS:  So if you go to page 20 of 64 --

23           MR. SALLAH:  Yes.  We're there, Trish.

24           BY MS. FUCHS:

25       Q    Okay.  Can we backup?  Because I know when we
```

155

```
 1    were talking about the subscription agreement, you told

 2    us a lot of information about Eswatini, so we need to

 3    break that down.  Can we just start -- you know, let's

 4    just start from the beginning following the S-1A where

 5    it says, "We received preliminary approval from the

 6    Eswatini Ministry of Economic Planning and Development

 7    to establish an exclusive growing farm and processing

 8    plant for medical cannabis and hemp in the Kingdom of

 9    Eswatini formally known as Swaziland."

10             So let's just break that up little by little.

11    Can you tell us about that?

12         A    I was -- at that time couple weeks before we

13    write this on Eswatini, I was with all the government,

14    with the prime minister, minister of health, minister

15    of agriculture.  I sit with them in the government

16    offices and they promise to give us a license to work

17    cannabis in the country.  At the bottom of that, they

18    need to go over the regulation of the government to be

19    able the give us the license.  I ask him very, very

20    clear, how long it's going to take.  They say it's

21    going to take like three, four months and we have this

22    license.  And when I get back, I have promissory from

23    them, from the prince, from the whole government that

24    we going to have the license.  I ask my lawyer if I

25    need to notify everybody about it and they suggest me
```

1    to do that because that's the right thing to do.  So we

2    write exactly what should be, what's going to happen

3    and that's what we put in the S-1.

4        Q    Okay.  So before you mentioned -- like just

5    going back to how you heard of Eswatini, I think you

6    mentioned that you got a call from a friend in Israel,

7    who was that?

8        A    His name is Dan -- hold on one second.  His

9    name is Daniel Rozner.  D-N -- D-A-N-I-E-L, last name

10   is R-O-Z-N-E-R.

11       Q    Okay.  So when did Mr. Rozner first get in

12   touch with you?

13       A    Few months before we go to -- I cannot give

14   you dates exactly.  I can give you period of time.  If

15   you want to get dates, I need to go back to the record

16   and start to look for dates.  He call me, when he call

17   me I get in with him and another partner that I have in

18   South Africa.  We contact the prince of Eswatini.  I

19   invite them to come to the US.  After they came to the

20   US, I go to visit them with my whole team to make sure

21   that it's correct and what they offer me is a

22   reasonable offer, and then I came back and I write down

23   what exactly happened.

24       Q    So let me go back.  So Mr. Rozner, what does

25   he tell you about Eswatini?

157

```
 1        A    He tell me that the government Eswatini

 2   looking for a grower for cannabis to come to the

 3   country and do the growing of cannabis on behalf of

 4   Eswatini for export all over the world.

 5        Q    And how did he know about this?

 6        A    I didn't ask him.  He have connections.  I

 7   don't know.  He work in that South Africa area and he

 8   have some connections.  How he know, I don't know.

 9        Q    Okay.  Then -- so after he calls you, then I

10   think you said you, Mr. Rozner -- tell me if I'm right.

11   You, Mr. Rozner and someone else contacted the prince

12   of Eswatini?

13        A    I have another person that's from South

14   Africa who used to work for the Israeli military that I

15   trust that I connect with him.  He was part of my team

16   to get the license for the Eswatini.  So he was part of

17   my partner to try to make the deal happen.  We contact

18   him.  His name is Rafi -- hold on one second.  His name

19   is R-A-F-I, last name is K-I-N-S-T-L-E-R.  He's a

20   resident -- a citizen of South Africa.  And I call him

21   to get together to -- actually, Daniel Rozner put it

22   together and we get together, and we meet, and we

23   decide we going to go see if -- no.  We decide that

24   first, they need to come to see how operation like this

25   create in the US before we go there.
```

158

```
 1              And I invite them and they came.  I invite

 2    the prince -- the two prince to the US and they came

 3    over here and I took them all around to Colorado, to

 4    all the facilities growing cannabis, and to Oregon,

 5    and then we came back to Florida to show them our

 6    operation.  And then they decided they like me to

 7    come to their country to represent me to the whole

 8    government.  And we plan to go there.  And I took

 9    with me a few people, Rafi, Daniel and the

10    ex-military of -- the ex-military -- police military

11    in Israel.  The captain of the police military in

12    Israel, we get him with us to look for the place in

13    Eswatini and to make sure that I -- if I do

14    something there, that I can protect it and make sure

15    it's going to be something that make sense for PSIQ

16    to get involved with.

17         Q    Okay.  And who is that ex-military police you

18    just mentioned?

19         A    His name is Golan Maimon.  If you go to

20    Canaberry Tech website you going to see him.  He's the

21    CEO of Canaberry Tech in Israel.

22         Q    Okay.  So when you first --

23         A    Golan Maimon.

24         Q    -- contact --

25         A    G-O-L-A-N.
```

1      Q    When you first contacted -- oh.  Thank you.

2           MR. SALLAH:  He's just giving you the

3      spelling.

4           MS. FUCHS:  Oh.  Appreciate it.  Appreciate

5      it.

6      A    G-L-O-I-N [sic].  Hold on one second.

7  M-I-M-O-N [sic].  Yes.

8           BY MS. FUCHS:

9      Q    Okay.  So how did you -- how were you able to

10  get in contact with princes in Eswatini?

11     A    Are you serious?

12          MR. SALLAH:  Tell them.

13     A    I have relationship all over the world and

14  somebody introduce me no this guy and we become

15  friends.  Right now he's the head of military of the --

16  he's the head of military of Eswatini.  He's a big guy.

17          BY MS. FUCHS:

18     Q    Okay.  And did they have authority to

19  negotiate with PSIQ?

20     A    The government have the authority to

21  negotiate, not the prince.  The prince only introduct

22  me to the government and I been with the prime

23  minister, with the minister of health, minister of

24  defense, minister of police.  I've been with all of

25  them in one room to discuss how we can create that in

160

1    Eswatini.  I have pictures, if you want I send you all

2    the pictures so you see.  It's really interested.

3        Q    Okay.  So first you were -- you had phone

4    calls with the princes in Eswatini.  Do you remember

5    when that was?

6        A    I don't remember dates and time.  If you want

7    dates and time, we can go to my schedule of flying all

8    over there and before there, and flying to meet the

9    people.  I can get you everything.  It's schedule.  All

10   been made with the tickets, airlines and all this

11   stuff.  I don't remember dates.

12       Q    Okay.

13            MS. FUCHS:  Raynette, do you have any

14       questions before I get to when the individuals

15       came to the United States?

16            MS. NICOLEAU:  No.

17            MS. FUCHS:  Okay.

18            BY MS. FUCHS:

19       Q    So then you mentioned some people from

20   Eswatini came to the United States, again -- I just

21   have to ask the question -- do you recall when that

22   was?

23       A    I don't, but it was sometime and then right

24   before we -- a few months before I go the Eswatini.  I

25   don't recall date.  I'm sorry.  Apologize.

161

1      Q    Okay.  Who came to the United States?

2      A    I have two princes from the Kingdom of

3  Eswatini came.  One of them is the brother of he king

4  and the second prince is the son of the king.

5      Q    And why were these the two individual who

6  came?

7      A    Because before they want to contact anybody

8  to do that operation in Eswatini, they want to know the

9  person and his ability to provide the business in

10  Eswatini.

11      Q    And so there were two individuals who came?

12      A    Two individuals came, yes.

13      Q    And how long were they in the US?

14      A    If I'm not mistaken, around a week or week

15  and a half they been present in the US.  They travel

16  with me to Oregon, Chicago, and Florida.

17      Q    And why Oregon?

18      A    Because Stem Holding have their facility in

19  Oregon, so we go to visit them, then I go to visit

20  another company in Colorado and then we come to see our

21  facility here in South Florida.

22      Q    Okay.  So what kind of facility, first of all

23  was in organ?

24      A    It's a cannabis growth places that belong to

25  Stem Holding.

162

1      Q    Okay.  And what about in Colorado?

2      A    Also cannabis.  We interested only in

3  cannabis, so we go to see different facilities in

4  cannabis, different provider of cannabis product,

5  different stores that sell cannabis.  We want to copy,

6  paste whatever happen in Colorado and in Oregon to

7  the -- to Eswatini.

8      Q    Okay.  And did you accompany them to all the

9  different cities?

10      A    I accompany them from the day, including pick

11  up their luggage to the day they leave.  I deal with

12  them 24 hours a day.

13      Q    Did anyone come with you?

14      A    Lenny Tucker, Golan Maimon, the CEO from

15  Israel, and Adam Berk, and we have another fellow from

16  Stem Holding with us.

17      Q    And what did Mr. Tucker do?

18      A    Mr. Tucker was my advisor.  He was with me

19  all around.  I told you and I keep on repeat it, repeat

20  it.  Mr. Tucker was with me.  I review his comments and

21  anytime I did anything, I bring him to make sure that I

22  don't do mistake.  That nothing that I do wrong to the

23  public trading company to make sure that everything I

24  do is been understand and I try to create something.

25      Q    Who paid for that trip that the princes took

163

```
 1    to come to the US?

 2         A    We paid for them.  We paid for the tickets

 3    for them.  We comp them a hundred percent.

 4         Q    So when you say "we", are you talking about

 5    PSIQ?

 6         A    I mean the company.  PSIQ, yes.

 7         Q    Okay.  So PSIQ paid for their airfare?

 8         A    And for the hotel, and for the food, and for

 9    the water.

10         Q    I'm sorry.  And for the what?  I couldn't

11    hear you.

12         A    For anything we did there I paid for it.

13         Q    Okay.  So they were comped a hundred percent;

14    is that correct?

15         A    Hundred percent comped.

16         Q    Did they ask for that, the princes?

17         A    I don't think they ask for that.  I don't

18    think they ask for that, but in my opinion as a good

19    faith for them to come here to see what we doing, it

20    was in my intentions to spend the money on them.  They

21    don't need my money.  They have more than what we have.

22    They are princes.

23         Q    Okay.

24              MS. FUCHS:  Raynette, do you have any other

25         questions about the trip that the princes had
```

```
 1        here?

 2              MS. NICOLEAU:  No.  No.  Go ahead.

 3              BY MS. FUCHS:

 4        Q     Okay.  So after the trip, tell me what

 5   happens next.

 6        A     After the trip I arrange to go there with my

 7   team.  So I took one of the lawyer from Stem Holding; I

 8   took Golan Maimon and I took Lenny Tucker, and I took

 9   Rafi from South Africa, and I think I took Daniel from

10   South Africa and we all go to Eswatini to meet with the

11   government.

12        Q     Okay.  And again, any recollection of when

13   that was?  How soon after -- how soon after they

14   came -- the princes came to the US did you go to

15   Eswatini?

16        A     I don't know.  It's all dating and dates.  I

17   don't remember dates and not -- months, but it was a

18   few maybe months, maybe few weeks, maybe two months.  I

19   don't remember.

20        Q     Okay.  How did it come that you went there?

21   Did you ask to go there?  Were you invited?

22        A     I didn't want to invest any money before I

23   hire a lawyer -- a local lawyer, open a local company,

24   open a bank account to make sure I be able to operate,

25   enter money to the country, to get out money to the
```

1    country.  I didn't want to do anything without to be

2    present and to understand their system.  I go talk with

3    a security exchange of them.  I go talk with the banks.

4    I talk with anybody on ground that I can get knowledge

5    before I do any business in the country.

6         Q    Okay.  So just to get some more specifics.

7    Who -- you go, you travel to Eswatini, tell me -- like

8    just make a list of who you met with and what division

9    or agency they work for?

10        A    I landed in South Africa in one of the city

11   that close to the border in South Africa.  I have

12   people waiting for me on the ground with a car.  We

13   drove four hours.  We get to Eswatini.  We took hotel.

14   We go to sleep.  I wake up in the morning.  I make a

15   meeting with a local lawyer to represent me there.

16        Q    Okay.

17        A    I finish with the local lawyers; I make my

18   phone call; I called to the prince and I went, and I

19   ask him to meet.  I meet with the prince and we did a

20   schedule for the next three days to meet with all the

21   government officials.  I meet the head of security

22   exchange; I meet the prime minister; I meet the

23   minister of health; I meet the minister of police; I

24   meet all the officials in the country to make sure that

25   if I do anything in that country, it will be legal a

1    hundred percent and I going to be safe, and nobody

2    going to kill me and none of my work there.  I bring

3    the head of security -- the head of police army from

4    Israel, that he working for one of my company to verify

5    that everything I do on ground is hundred percent safe.

6    I meet everybody for few days and I go back to the

7    United States.

8         Q    Okay.  So first -- so you meet with -- let me

9    go back.  So you meet with the minister of health; is

10   that correct?

11        A    That minister is a woman.  I don't remember

12   names, but she's a woman.  Minister of health, yes,

13   used to be.  They change the government in a couple --

14   last year.

15        Q    Okay.  What did you discuss with the minister

16   of health?

17        A    I discussed with her the options for them to

18   grow cannabis in the country and to keep it legal.  And

19   I offer them that if I going to do the business in

20   Eswatini, I will give Eswatini people options to get

21   the product at a decent price because they local and

22   they don't have money, and they have overflows with the

23   sickness.  I forgot.  They have the biggest percentage

24   of HIV people in the world and I offer to open centers

25   and to help the government to take care of those people

1   with cannabis.

2        Q     Okay.  And what did the health minister

3   say -- tell you?

4        A     She just love me.  She used my product.  She

5   love me.  She say they going to help me to get the

6   license.  That's what they need in the country.  She

7   was hundred percent positive.

8              BY MR. SALLAH:

9        Q     Did you bring products over there?

10       A     I bring products, yes.

11       Q     They try it?

12       A     Yes.  They love it.  We did like this and

13  they all use the product.  It's legal.  I don't do

14  anything illegal.  It's legal.

15       Q     Is cannabis legal there in Eswatini?

16       A     No.  We bring CBD.  CBD is legal most of the

17  world.  I didn't bring cannabis.  I bring CBD with me.

18       Q     At the time do you know if cannabis was legal

19  in Eswatini?

20       A     A hundred percent legal.  Everybody use it,

21  but it's not in the law.  I change the law.  Now the

22  law has been changed.  I work two years to change the

23  law, but I will not do the business there.  But I did

24  change the law.  They write the new law in my books and

25  what I provide them.

168

```
1          Q     What's the new law?

2          A     To be legal like in Colorado, like in Oregon.

3    We give them the books of Colorado.  I sit with them --

4    my guys on ground sit with them to write the laws and

5    it's like in the US.

6          Q     Okay.  Is 0?

7          A     We give them all the information and they

8    write the law and the Colorado and the Oregon law.

9          Q     When was the law passed?

10         A     Excuse me.  I don't --

11               BY MR. SALLAH:

12         Q     When was the law passed?

13         A     Couple weeks.  I think it's a couple months

14   ago or few weeks ago, or six months ago.  I don't know.

15   I'm not involved.  I didn't get my license, so I -- in

16   December I stopped.  So until December I didn't get my

17   license.  But I know the government sit on it and they

18   working on the law to change.

19               MR. SALLAH:  Trish, this is not the only one

20          we went over.  We can provide substantiation about

21          the flights and, you know, obviously, you can ask

22          other witnesses.

23         A     Pictures.

24               MR. SALLAH:  We got photographs we're going

25          to provide you guys.  I don't want you to think --
```

169

```
1        you know, this is not a made up story and he

2        wasn't going over there to try the street food.

3        You know, it wasn't a pleasure trip.

4        A    She call go to the prince, he's going to

5    answer.  I can do it now; put him on the line.  What's

6    the problem?  It's no problem.

7            BY MS. FUCHS:

8        Q    Did -- the health minister, did she tell you

9    what types of steps that you would have to take in

10   order to establish a business and get approval and

11   licenses?

12       A    They offer me a license -- temporary license

13   now.  Take the temporary license, invest your money and

14   do it -- try to do it now.  I say, no.  I'm not going

15   invest $5 million with temporary license.  I want

16   license to show that I authorize to import and export

17   anything regarding cannabis to the country.  And they

18   need to go through the whole process of the government.

19   So I say I wait few months.  I don't care to wait.  I

20   wait two years.  After two years, I cannot wait no

21   more, you know.  I declare the deal.  They can send you

22   the letters.  I have the letters provide to the

23   government on December 31st, 2020 that we not going

24   longer be involved.  I did the whole procedure with the

25   government from A to Z, from applying for -- help them
```

1    to change the laws; from helping them to put the

2    structures; from helping them to write the new law.  I

3    did everything with them from A to Z.  And now it's a

4    lot of people because it's two years already.  A lot of

5    people want that country.  I am tired and I spend a lot

6    of money and a lot of time, so I say, I got the license

7    in different country in Israel, I don't need them to be

8    there.  I going to do it in Israel.

9         Q    Did you meet with any other ministers besides

10   the minister of health.

11        A    I already tell you, I meet with all the

12   minister, including the prime minister.  I meet with

13   all of them on one table.  They all sit with me on one

14   table.  Commerce of chambers, minister of health,

15   minister of agriculture, the prime minister.  I've been

16   with everybody.  If you want, I send you pictures with

17   everybody and the government building.

18        Q    So when it says in the -- so what did they

19   tell you to do when you're talking with them?  They

20   heard what you had to say, what are they telling you

21   was the next step?

22        A    They give me preliminary license to do the

23   business there.  I didn't took it because I didn't want

24   preliminarily license at that time after they promise

25   to give me the original license.  They say that cannot

171

1    issue the license right now.  They need to go to the

2    government and to the whole -- to whole change the law.

3    I accept it.  I wait very -- for many months and, you

4    know, and I help them.  Whatever they ask for us, we

5    provide them.  We provide them the law in the United

6    States.  The law of Oregon; the law of Colorado.  How

7    to write the law.  They write the law.  Everybody -- my

8    lawyer was with them to structure everything and --

9            BY MR. SALLAH:

10   Q    Who was that?  Who was the lawyer?

11   A    I don't remember.  The only --

12   Q    Can we --

13   A    Yeah. yeah.

14   Q    Can we provide the SEC what we provided to

15   the east --

16   A    Of course I can provide it.  I get everything

17   in e-mails.  I can provide everything.  Of course.

18   They can call my lawyers.  They can see the letter from

19   me to the government now in December.  They can see

20   everything.  They can actually listen to all my call

21   with the prince.  It's on the phone.

22   Q    I don't want you to get --

23   A    I don't care.

24          MR. SALLAH:  Trish, we'll provide you guys

25       with any written correspondence between -- in

172

1          connection with cannabis.

2          A     I think we already provide it in the package.

3    I'm almost positive.  Everything in Eswatini they have.

4    We provided everything.  The only thing I didn't

5    provide is pictures.

6          Q     Okay.

7                BY MS. FUCHS:

8          Q     So at that first meeting when you went to

9    Eswatini they say they would give you a preliminary

10   license?

11         A     They give me a license to start to build my

12   project there and I didn't want that to be not official

13   like this for -- because the minister of health say

14   it's very good for her to do that, but I didn't feel

15   safe to do that in that condition because they can kick

16   me out anything because I don't have anything solid.

17   This is something they cancel after -- whatever they

18   want.  I didn't want to accept it to invest $5 million

19   to take a big risk.  My partners invested money.  You

20   know, it's a -- my other company friends they want to

21   invest and bring people from all over the world to do

22   that in Eswatini and then I'm not safe, so I didn't

23   took it.  I just patiently wait until today, then I

24   don't got the license.

25         Q     Did they tell you at that meeting that you

173

```
 1    went to in Eswatini that they were going to have to

 2    change the laws?

 3         A    Not at that meeting.  They tell me that after

 4    they already print the license that I didn't want to

 5    take.  I didn't took it and then they tell me they

 6    cannot do it without they change the whole law in

 7    Eswatini.

 8         Q    Change the law legalizing cannabis?

 9         A    Legalizing cannabis and hemp in Eswatini that

10    you can grow there in the street.  They growing in the

11    street they don't need license.  If you Eswatini

12    person, you don't need no license.  You just grow it in

13    the back of your house.  Everybody doing it, include

14    the king, the prince and all the crew.  They have it in

15    the back of their house.

16         Q    But is that legal?  Was that legal?

17         A    Nobody been arrested for that.  And I don't

18    know.  By the law it's not legal, no.  But by the

19    country it's legal.

20         Q    You mean it's unenforced?  Is that what you

21    mean?

22         A    No.  Never.  I never going to do anything if

23    I don't have a hundred percent license.  They can do

24    whatever they want to me.  No.  No way.

25         Q    Did you go back to Eswatini more than --
```

174

1      A     Yes.

2      Q     Did you go more than once?

3      A     Yes, I go.  The second time I go after a year

4   when they promise that the license ready and I come to

5   cut -- I come to cut the string, I guess, there and all

6   bullshit.  They just want me to start to put money in

7   their ground, you know.  I say no way.  I'm not putting

8   one dime here until I got official license.  I try to

9   get in with the United States embassy with the

10  embassador there, but he didn't have time to meet me

11  and, you know, I was there a few days and I came back.

12     Q     Did you go by yourself?

13     A     No.  I go with Rafi.  With who I go?  Rafi.

14  I think I go only with Rafi this time.  My partner from

15  South Africa.

16     Q     And that was you said about a year later?

17     A     I believe it was a year later.  I'm not -- if

18  I'm not -- I cannot recall if it's six months later, a

19  year later, but later.  I need to check exactly.

20     Q     Who did you meet with when you went back?

21     A     Huh?

22     Q     Who did you meet with when you went back?

23     A     I meet with the prince; I meet with head of

24  the house; I meet with my lawyer; of course my

25  secretary on ground; I meet with the second prince, the

1   son of the king and I meet with head of police; I meet

2   with the commerce of chamber.  All the commerce of

3   chamber of Eswatini.

4        Q    And what did you discuss with them?

5        A    Discuss with them the cannabis opportunity

6   that we have and we working with, and they promise it's

7   going to be ready and then right away; right away.

8   Because I didn't want to take this license that they

9   offer me, so they say it's going to take few more

10  months.  Then they offer me to invest in different

11  structure: agriculture, electricity, gold, all kind of

12  different structure that they have in the country that

13  they want investor.  I tell them I don't do any

14  investment until I finish the first one.  I finish the

15  first one, then we talk about another investment.  I

16  don't do another investment before I finish this one.

17       Q    Okay.  So let me ask you, going back to, you

18  know, where it's talking in the -- on page 20 of 64 of

19  Exhibit 21, the amended S-1 for PSIQ.  Where it talks

20  about receiving preliminary approval, it said the

21  proposed agreement grants us the exclusive license and

22  permits for 10 years to operate an advance hemp and

23  medical cannabis growing, and manufacturing facility to

24  export hemp and medical cannabis worldwide, to operate

25  a cannabis research and development laboratory, and

176

1     create training facility to create jobs for Eswatini

2     citizens.

3            When did you get -- when did PSIQ get the

4     preliminary approval from the Ministry of Economic,

5     Planning and Development?

6        A    They have the approval right after I was

7     there the first time they have it and they want to give

8     it to me.  When I go there I got to get there, when I

9     realize it's not what I want, I didn't take it.  But

10    for meantime, we already advertise that in our -- that

11    we got it.  But they have it, but I didn't got it.

12    Physically I didn't want to take it because that's what

13    I filled.  I filled for a license.  Complete different

14    license was what they give me.  And, you know, when I

15    get there and see it's not what I want, I left it there

16    and I didn't took it.

17           I can send to you guys the application of

18    Eswatini cannabis license hat we request with the

19    terms and conditions that they approve it verbally

20    before I get there and when I get there it was

21    changed.  So I have nothing to do.  I cannot make

22    them do what -- you know, they change on the ground,

23    but they promise me something else.

24       Q    But the preliminary approval that says from

25    the Eswatini Ministry of Economic Planning and

177

```
 1   Development, was that in a letter?

 2       A    It was a form of a letter.  I didn't got it.

 3   I didn't want it.  I didn't got it.  I didn't want it

 4   because that's not what I filled out for.  I fill out

 5   for a license.  They promise me a license.  They

 6   promise to go all this and spend all this money, and

 7   licenses, and open bank accounts and everything, and I

 8   get 10 years exclusivity rights for the country, and

 9   they change it when I get to ground and I didn't want

10   to take it.

11       Q    I'm not sure what you mean by they changed

12   it.  What does that mean?

13       A    It mean when I fill out my application, it

14   was the terms and conditions what I want.  When they

15   tell me we got it and we got the preliminary license, I

16   got back to Eswatini when they approved the license and

17   it was different license.  It's not what I request, so

18   I didn't take it.

19       Q    So does the preliminary approval that's

20   referenced here, does that refer to the -- a license

21   you're talking about, the preliminary license?

22       A    It's a preliminary license.  It's a temporary

23   license to work in the country.  It was not what I ask.

24       Q    And you have that preliminary license?

25       A    I'm repeating again; I didn't took it because
```

178

1    that's not what I applied for.  I applied for cannabis

2    license and I didn't took this preliminary license.

3    When I get there to take it, I understand they issue me

4    the license for 10 years.  When I see the preliminary

5    license I understand what they want.  They want me to

6    put the money there, then I tie and I cannot do

7    anything.  I didn't want to do it.

8         Q    So is there -- you don't have the license,

9    you didn't take it, is there any documents that

10   reference this statement here about the preliminary

11   approval?

12        A    I can get you my -- probably text messages

13   with the prince and with my lawyers, and I can ask them

14   if they can pull it out from their records.  I don't

15   know.  I cannot tell you something.  I can get you all

16   our conversations and I can get you -- I can ask my

17   lawyer on ground to get me that license, if there's a

18   way to retrieve it because the new government now.  So

19   I don't know if I can retrieve it.

20        MS. FUCHS:  Raynette, before I pull Exhibit

21   41, do you have any questions?

22        MS. NICOLEAU:  Yes.

23        BY MS. NICOLEAU:

24        Q    Mr. Oran, so the statement that Trisha just

25   spoke about on page 20 that says, the proposed

179

```
1   agreement grants us the exclusive license and permits

2   for 10 years, so what was that statement in the S-1

3   based on?  Was it based on oral discussions?  Verbal

4   discussions?

5        A    Those based on -- I did that statement right

6   before I go to pick up my license.  They tell me it's

7   ready and I ask them that I can announce it, they say

8   yes.  When I get there, the license that I request is a

9   different complete license, but I already get there.  I

10  get there and they want to give me that license that I

11  didn't request, so I didn't do -- I didn't took it.

12  They promise to fix it in the next few months and

13  that's why.

14       Q    No.  I understand that, sir, that when you

15  got there you didn't take it.  I'm asking you about the

16  statement that was made in the S-1.  Was -- you hadn't

17  gotten to Eswatini at that point I think you're saying,

18  correct?

19       A    I base my statements on their verbally talk

20  with my partner on the ground, with my lawyer and with

21  the prince, yes.

22       Q    Okay.  You had mentioned two princes, so

23  which prince was that?

24       A    I cannot pronounce his name right now.  I can

25  send it to you, but it's the minister of defense right
```

1    now of the country.

2         Q    Okay.  And what was his position at the time?

3         A    At that time he was offer me to come to the

4    country and to invest money in the country for the

5    cannabis field.

6         Q    Okay.  But did he --

7         A    He didn't have position at that time.

8         Q    Okay.  Was that --

9         A    At that time he was the prince.  He didn't

10   have a position at that time.

11        Q    Okay.  So you had mentioned the brother of

12   the king and the son of the king, which one is it?

13        A    The brother of the king.  The son of the king

14   is responsible for the free zone of the country.

15        Q    For the free zone you said?

16        A    Free zone.  Free zone.  Supposed to place the

17   cannabis field there to be not controlled by the

18   country and controlled by the freedom.

19        Q    Okay.  So you had -- the verbal communication

20   you had with respect to the proposed agreement grants

21   for the exclusive license was with the brother, right,

22   the brother of the king?

23        A    With the brother of the prince.

24        Q    Yes.

25        A    It was with the prince, it was with the prime

181

```
 1    minister, it was all the people on ground when I went

 2    the first time.

 3         Q    Okay.  And you said and also your lawyer?

 4         A    And also my lawyer from Eswatini was in all

 5    the meetings, yes.

 6         Q    You said lawyer from Eswatini?

 7         A    Yeah.  He's an Eswatini lawyer that I hire.

 8    Right when I start to do the operation in Eswatini, I

 9    hire a local lawyer.  They know the laws in the

10    country.

11         Q    Do you recall his name?

12         A    Hold on.  Oh.  I send it you.  What is his

13    name on the documents?  His first name is Khumalo,

14    K-H-U-M-L -- U-M-A-L-O.  His last name is

15    A-T-T-O-R-N-E-Y-S.

16         Q    Khumalo Attorneys, is that the name of his

17    firm?

18         A    Yes.

19         Q    Okay.

20         A    His first name is Khumalo, his last name is

21    very com- -- it's very long and I don't have it.  I

22    cannot pronounce his -- you know, this is his firm.

23         Q    That's fine.  So his first name is Khumalo,

24    but he has a firm called Khumalo Attorneys?

25         A    Yes.  He's from Eswatini and he's working for
```

182

1    me on the ground there.

2        Q    Okay.  All right.  Thank you.

3             MS. NICOLEAU:  All right, Trish.

4             MS. FUCHS:  Okay.  Ready for the next exhibit

5        then, Raynette?

6             MS. NICOLEAU:  Yes.  Go ahead.

7             MS. FUCHS:  Okay.

8                    (SEC Exhibit No. 41 was marked

9                     for identification.)

10            BY MS. FUCHS:

11       Q    I brought up to the screen what we have

12   marked as Exhibit No. 41.  It's a multipage document.

13   The first page you'll see is an e-mail string from

14   October 10th, 2018 from Tomer Hefetz to Leonard Tucker.

15   There are several people who were copied, including

16   DanOran@Aol.com.  It says asking about to send sales

17   agreements with companies in Germany and USA referred,

18   and proposal letter of March 2018.  And then you'll see

19   further down when Mr. Tucker is saying to, "Per our

20   conversation, please find attached PSIQ proposal to the

21   Kingdom of Eswatini dated March 28th, 2018, an

22   establishment of growing farm and processing plant for

23   medical cannabis and hemp products in Eswatini.

24   Kingdom of Eswatini preliminary approval letter dated

25   September 3rd, 2018 and draft press release for

183

1    October 10th, 2018."  And then you'll see the

2    attachments.

3            Can you go through this document and tell me

4    if you recognize it and then I can scroll down as

5    you're reading it.  Just let me know when you want me

6    to scroll down further.

7        A    Tomer is the guy from Israel that want to

8    connect us with a few companies on Germany.  That they

9    allowed to import the cannabis to Germany from outside

10   the country and we try to connect with him, and try to

11   presell the product that we going to raise in Eswatini.

12   That's what I remember in that conversation and that

13   e-mail.  I been talk to Tomer a few times when I was in

14   Israel and that's all about.  Nothing happened because

15   we didn't grow anything in Eswatini.

16       Q    Okay.  And do you recall these e-mails?

17       A    I have.  I have.  I didn't write any e-mail.

18   So I have thousands of e-mails in my e-mail box.  I

19   probably go over the e-mail, yes.  If you have any

20   other question, I can answer it.

21       Q    Okay.  So I'm looking at the attachments that

22   it said from Lenny and the first one if you look, I've

23   scroll down to March 28, 2018 proposal for established

24   plant of growing farm and processing plant for medical

25   cannabis and hemp products in -- it says Swaziland and

1    it's directed to the minister of commerce, industry and

2    trade.

3           Do you recognize this attachment, this

4    proposal?

5       A    I'm assuming, yes.  If it -- I probably read

6    it, you know.  What is the question?

7       Q    Okay.  Well, first, do you recognize this?

8       A    Yes.  I recognize, yes.  Yes.

9       Q    Okay.  Who prepared this document, this

10   proposal?

11      A    Probably it's prepared by Lenny Tucker and --

12   I don't know.  It's coming from us to -- going back.  I

13   don't know who write it down.  I don't know who prepare

14   it.  On behalf of Profile Solutions and PSIQ.  Probably

15   lawyer or Lenny with the lawyer, or somebody prepare

16   the document.

17      Q    Okay.  Why was this document prepared?

18      A    You ask me two years later.  I don't

19   remember.  A year later, two years later, I don't

20   remember why.  I have no clue.  I don't have memory why

21   we prepare it.

22      Q    Do you know -- like, for example, do you know

23   if it was required?

24      A    It was what?  Excuse me?

25           BY MR. SALLAH:

185

1       Q    Was it required?

2            BY MS. FUCHS:

3       Q    Do you know if this was a requirement?

4       A    If you can go -- you can scroll down more --

5   a little bit more?

6       Q    Oh.  Sure.  Absolutely.  I'll keep going.

7   Tell me if I'm too fast or too slow.

8       A    Stop.  You can scroll more a little bit.

9   This has been -- I'm not sure a hundred percent, but I

10  think it was requested by the government of Eswatini to

11  put a table, work how we should work on the Eswatini.

12  They didn't know how to do it, they ask us to do it if

13  I'm not mistaken.

14      Q    Okay.  I'm going to keep going down.  As

15  you're going through this document as we're scrolling

16  down, does it look familiar?

17      A    It looks familiar, but I -- you know, it's

18  too long I don't recall exactly, but I think part of

19  the process of to get the license after I refused the

20  temporary one.  I don't know if it was this one that we

21  try to build with them a way to get what company need

22  to do to get a license and we go through all the

23  structure how to build a cannabis company in Eswatini.

24  What is the requirement.  What is -- what they going to

25  ask from the company.  We build with them the structure

186

1    of cannabis in the country and that's what I remember.

2    Exactly on the minute right now, I need to sit and read

3    the whole structures to go details through this

4    documents, but I'm assuming that was the purpose of

5    that document.

6         Q    Do you recall whether or not you reviewed

7    this document before it was submitted?

8         A    I recall I viewed the document possible and

9    the lawyer review the documents it's for sure, so I did

10   read the documents, but I cannot right now go back to

11   the documents.  It's too long.  I cannot go details on

12   the documents.

13        Q    If you look at the page I'm on now where it

14   says 5.10, it says that we have sales agreements for

15   all products with companies in Germany and USA.

16        A    USA is optional.  We have -- at that time I

17   have few relationship in Germany that want to buy the

18   whole product.  I didn't do the agreement because we

19   didn't start to grow, but, yes, it was offered.  All

20   the product was supposed to be sold before we even grow

21   them up.

22        Q    And what about Germany?

23        A    Germany in that time was the only country you

24   can import cannabis from overseas.  And I have the

25   connections in Germany to be able to close a few deals

1    before we -- when we just start to grow.  I can close

2    the whole product sold to Germany before, but it never

3    happen.

4         Q    So at that point did PSIQ have sales

5    agreements?

6         A    I don't understand the question.

7              MR. SALLAH:  Can you ask it one more time?

8              BY MS. FUCHS:

9         Q    So is that correct that at that time PSIQ had

10   sales agreements for all products with companies in

11   Germany and USA.

12        A    I have verbally sales agreement.  I didn't

13   write the agreement because I didn't raise the goods

14   yet.  But I very verbally sales agreement with people

15   that related to me all over those countries, including

16   US, but US you cannot import anything at that time,

17   until now you cannot import.  But Germany, definitely

18   we can import and Canada.  And it was part of the plan

19   to -- when we get the license to sign the contracts.

20        Q    And with the stage development No. 6, the

21   different phases, was this a requirement that there'd

22   be different phases?  Was this an Eswatini requirement,

23   for example?

24        A    I don't know.  I cannot tell you right now.

25   I don't know.  I need to ask the lawyer what does it

188

1     mean.

2         Q    Okay.  For No. 7 when it says licenses and it

3     said, Newco will apply to the Swaziland authorities for

4     all needed licenses and permits was that Newco you're

5     referring to, is that the new -- I guess a new company

6     that was supposed to be formed?

7         A    Exactly.  The new corporation Stem.

8         Q    At that point -- what was that status at that

9     point in forming a corporation?

10        A    I don't recall the dates.  I don't know the

11    dates and I cannot recall to put together the timeline

12    and stuff.  If you want me to go that deep, I need to

13    know the dates, timeline, when, how.  I cannot answer a

14    question like this.  I don't know.

15        Q    Okay.  Then when you see where I'm at now,

16    Roman numeral IV, project timeline, which is on page 10

17    of 18 of this exhibit.  These time frames, what's the

18    basis of them?

19        A    That's what I got from my people on the

20    ground when I go with them how long it's going to take

21    us to build the project and how long it's going to take

22    us to be start to manufacturing cannabis on ground.

23    This has been made for -- I think the whole document is

24    made for the Eswatini if I'm not mistaken to give them

25    the details.  We prepare it with our partner, together

189

```
 1    with Stem Holding if I'm not mistaken.  We go on all

 2    those details together to make sure that we not going

 3    to do default from the date of approval.

 4         Q    So you think this was from Stem Holdings?

 5         A    No.  It was build together with us and Stem

 6    to give to Eswatini.  They was my partners and we go on

 7    those details together.  I'm almost a hundred percent

 8    positive that they will -- they been involved in all

 9    the structure from A to Z.  How to build the farm;

10    where to; when we build; how much; what we going to

11    spend; how long.  All the details involved with them

12    together to be successful.

13            MS. FUCHS:  Raynette, I'm looking for the

14         document, do you have any questions before I

15         continue moving?

16            MS. NICOLEAU:  No.  Go ahead.

17            MS. FUCHS:  Okay.

18            BY MS. FUCHS:

19         Q    Where it says "background on Profile

20    Solutions", we're now on page 12 of 18 in Exhibit 41.

21    Where it talks about Profile Solutions through Elite

22    products is a leading distributor and manufacture in

23    the cannabinoid industry.  Who wrote this section about

24    the background on Profile Solutions?

25         A    I think it's the lawyer.
```

190

```
1        Q    Okay.  And then where it says the benefits of

2    working with PSIQ group, it talks about -- the second

3    bullet.  Our professional consultants and project

4    managers will manage the entire process from inception

5    to completion.  Who were the consultants and project

6    managers you're referring to?

7        A    I have consulting on ground in Israel.  They

8    work with me.  They build the farm in Israel.  They

9    supposed to build the farm in Eswatini, that never

10   happen.  They didn't go to Eswatini, but we build the

11   farm of Israel.

12       Q    And what was that farm in Israel you're just

13   referring to now?

14       A    When we start the project in Eswatini, I

15   hired -- I don't hired.  I had a consultant from

16   Israel; they work with me to build the farm in

17   Eswatini.  Because of the terms of the time that

18   happen, it never happen in Eswatini.  I got the license

19   and I build a farm in Israel, so those consultant

20   working with me in Israel.  So they supposed to be in

21   Eswatini to build the Eswatini farm, but it never

22   happened.

23       Q    And then the page I'm on now, which is page

24   14 of 18 of Exhibit 41 where it talks about business

25   summary and income, and revenue.  PSI revenue
```

1    estimations for the first five years first for medical

2    cannabis and then CBD extract.  How were these figures

3    -- who provided these figures?

4        A    That figures you can provide by yourself if

5    you go to the Internet and see what's the cost of CBD,

6    what's the cost of cannabis and how much you grow per

7    acre, you can do the calculation yourself.  We have

8    people, they calculate how much money per acre and how

9    much you retrieve from oil, and how much money you

10   retrieve from flowers.  It's well-known prices.  At

11   that time it was that prices.  To date more low.  The

12   prices are low from that time because cannabis changed

13   and a lot of countries now growing them up, so that

14   projection was for that years.  It was good.

15       Q    So the basis of these projections was from

16   the Internet; is that what you're saying?

17       A    No.  The basis of the projections of the

18   price on the market that time.  We calculate the price

19   of kilogram on the market at that time and we calculate

20   how much we going to growing per acre and what we going

21   to have the results.  So it's well-known.  Any

22   accounting, any firm, anybody that doing cannabis now

23   can do the calculation.  That's the real calculation.

24       Q    Okay.  And who provided that calculation?

25       A    I cannot tell you right no.  I don't remember

192

```
 1   who provide it, but I think it's been provided by Stem

 2   because they already growing and they have result and

 3   grow for a few years already.

 4        Q    Okay.

 5             MS. FUCHS:  Raynette, do you have any

 6        questions before I get to the next attachment?

 7             MS. NICOLEAU:  No.

 8             MS. FUCHS:  Okay.

 9             BY MS. FUCHS:

10        Q    The next attachment appears to be a PSIQ

11   press release dated October 10th, 2018.  The title says

12   "PSIQ Receives Preliminary Approval from the Kingdom of

13   Eswatini Ministry of Economic Planning and Development

14   to Receive License as an Exclusive Growing Farm and

15   Processing Farm for Medical Cannabis and Hemp."

16             Do you recognize this document?

17        A    Yes.

18        Q    Okay.  And who wrote this document?

19        A    If I'm not mistake, we wrote the document.

20   Me and Lenny together.  We send it to the lawyers to

21   get it approved after he require go over the documents

22   and everything seems like good, he approve me to

23   release -- to press release it.

24        Q    And who is the lawyer you said?

25        A    Jackson Morris.
```

1    Q    Okay.  And the preliminary approval that's

2    referred to here, is the basis of that what we talked

3    about before, the verbal approval?

4    A    It was not.  It was not.  It was verbal to

5    me.  It was right on ground being made.  It's not

6    verbal, but I didn't pick it up.  So, yes, that's the

7    preliminary agreement.  Yes.

8    Q    Okay.  The preliminary approval?

9    A    Yes.

10   Q    And with your quote, again, the projections

11   of the 20 to 30 million in annual revenues after

12   facilities establish, what is the basis of that?

13   A    Basis of the land that we require from the

14   government in Eswatini and how much we going to grow,

15   and what's the result after we sell the products.

16   Q    And the -- where it says about establishing a

17   facility, which is expected to take approximately 6

18   months plus another 3.5 months for initial grow.  What

19   is that based on, the six months plus the 3.5 months

20   for initial grow?

21   A    To prepare the land to grow cannabis you need

22   6 months to prepare the land to work on the land.  And

23   the minute you put the seeds in, you need three and a

24   half months until you going to have flowers, and from

25   the time you have flowers, you can sell it as the

194

```
1    flower or you sell it in oil.  It depends what shape

2    you want.  Our first impression was to sell flowers and

3    after the second round, to sell flowers and to do oil.

4    It's a process.  You cannot just come and put things

5    onto the ground and you going to start to grow.  It

6    doesn't work this way.

7         MS. FUCHS:  Raynette, do you have any

8         questions before I move onto the next document in

9         Exhibit 41?

10        MS. NICOLEAU:  Yeah.  If you can stop and

11        just back up a little bit on that press at the

12        top.  Okay.  Right there.

13        BY MS. NICOLEAU:

14   Q    Mr. Oran, you see the statement under about

15   Profile Solutions direct subsidiary Elite products

16   International a leading distributor and manufacturer in

17   the cannabinoid industry?

18   A    Yes.

19   Q    What is that statement based on?

20   A    Based on our company growth; based on share

21   market in the United States; based on future sales that

22   we propose to make; based on distributor that we sign

23   up; based on our belief that the company will be

24   successful and we work many hours to make it happen.

25   Q    Okay.  But this statement says that Profile
```

```
 1    Solutions is a leading distributor and manufacturer in

 2    cannabinoid.  It's present tense as opposed to the

 3    future.  I'm sorry.  Go ahead.

 4         A    If you check share market of Profile

 5    Solution/Elite, you see how much we on the market.  We

 6    almost all over the country, including South America,

 7    including Brazil, including Mexico.  You can check if

 8    you really want to check about the company.  That's

 9    what mean leading.  We are leading.  We are going to

10    all the show, selling to all the customers.  We are

11    almost present in any state that's legal.  We there.

12    That's not leading?  What is that?

13              MR. SALLAH:  No.  No.  Just answer the

14         question.

15              BY MS. FUCHS:

16         Q    And so you said that you were basing in part

17    on future sales or future business.

18         A    Present and future business.

19         Q    Is that correct?

20         A    Yes.

21         Q    Okay.  So at the time that this statement was

22    made in 2018, was Profile Solutions a leading

23    distributor and manufacturer in the cannabinoid

24    industry?

25         A    Yeah.  In the state of -- in the United
```

196

```
1    States of America, yes.  In my opinion, yes.

2         Q    Okay.  And so -- and your opinion is based on

3    what?

4         A    Based off our sales.  Based off our presence.

5    Based off our customer refer back to the company.

6    Based on the structure of the company we build.

7         Q    Okay.  And so this is based on sales of Elite

8    products in 2018?

9         A    That's correct.

10        Q    Okay.

11             MS. NICOLEAU:  Trish, thank you.

12             MS. FUCHS:  Okay.

13             BY MS. FUCHS:

14        Q    And then if you -- we're going down to the

15   last page of Exhibit 41, which appears to be a letter

16   dated September 3rd, 2018 from the Ministry of

17   Economic, Planning and Development to Mr. Dan Oran

18   chairman of Profile Solutions.  It talks about an

19   establishment of growing farm and processing plant for

20   medical cannabis and hemp products, and it references

21   -- it says, referencing your letter dated March 28,

22   2018.  You can take a moment.  And I'll scroll down as

23   you tell me to if you could tell me if you recognize

24   this document.

25        A    Yes.
```

197

```
 1        Q    Do you recognize this document?

 2        A    Yeah.  I do.

 3        Q    Okay.  And tell us what it is.

 4             BY MR. SALLAH:

 5        Q    What is the document?

 6        A    What is the document?  I don't understand.

 7   She doesn't know what --

 8        Q    No.  No.  What's the purpose of the document?

 9   Why was it sent to you?  What did you take it to mean

10   when you got it?  What's your interpretation of the

11   document?

12        A    This is answer for our proposal.

13             BY MS. FUCHS:

14        Q    Okay.  So this is in response to your

15   proposal.  Let me ask you a question.  It says --

16   before it says yours faithfully it says, "This letter

17   represents only an initial indication of our interest

18   to engage with PSIQ with respect to the new proposed

19   operation."  It doesn't say anything about preliminary

20   license.

21        A    Guys, I'm not the Eswatini government.  I'm

22   not the Eswatini commerce of affair.  That's what they

23   send and that's the way they send it.  I don't know

24   this question.  You need to ask them.  I can show you

25   what we reply.  I can send you what we ask and I can
```

198

```
 1    send you what the agreement was with them.  After that
 2    this is what they send, whatever.  I don't do anything
 3    until I get what I want anyway.  I ask for a 10 year
 4    license exclusivity in the country.  I didn't got it.
 5    I didn't do any other efforts besides to spend $100,000
 6    between my efforts between back and forth, stay in
 7    hotel, spend my time, spend my effort.  That's what I
 8    did.  I didn't do anything else.  What they write, what
 9    they going to write in the future and what they going
10    to say in the future, I don't know.  I tell you what I
11    did.  I send them documents, request for X of license;
12    didn't retrieve what I want, I didn't do anything yet.
13    That's what I can say.  I cannot say what they write
14    and why they write, and who wake up in the morning with
15    different mood.  That's not what I want.
16         Q    Were you concerned when you saw this letter
17    that says it represents only an initial indication of
18    our interest to engage with PSIQ?
19         A    I very concerned after I receive that letter,
20    that's why I didn't do business until today.  I think
21    they mislead me.  And I offer one of the time to sue
22    them even in the United States for misleading me, but,
23    you know, I'm not going to sue the government of
24    Eswatini, including his king because nothing going to
25    come out of it anyway, so I leave it like this.  You
```

199

1    know, I just get out of the deal, keep my life, take my

2    losses and keep going.  You know, that's what I can do.

3    I didn't do anything to mislead anybody.  I didn't do

4    anything to mislead my pocket, my money.  I didn't do

5    anything to mislead my investors.  I did it in honest

6    way that I was sure I will get what I request from

7    Eswatini government.

8        Q    When you saw this letter that said it

9    represents only an initial indication of our interest

10   to engage with PSIQ rather than saying anything about a

11   license, did you do anything?  Did you follow-up with

12   anyone?

13       A    I follow-up with my lawyer.  I follow-up with

14   my partners.  I follow up with my prince.  I yelled in

15   the phone.  I send them bad messages, but it didn't

16   help.  That's their structure and it's Africa.  I need

17   to understand from the beginning that I deal with

18   Africa, that's it.

19       Q    What does that mean, you need to understand

20   you're dealing with Africa?

21       A    Because in Africa anybody tell you something,

22   they mean something else.  They don't mean to do

23   anything.  They just mislead you.

24            MR. SALLAH:  Can you guys scroll down just a

25       little bit.  Down the other -- I'm sorry.  The

200

```
 1        other way.  Now the other way.  Other way.

 2             MS. FUCHS:  Here?

 3             MR. SALLAH:  Just the top.  Okay.  Perfect.

 4        Thank you.

 5             MS. FUCHS:  Okay.

 6             BY MS. FUCHS:

 7        Q    So you spoke with some people about this

 8        letter; is that correct?

 9        A    That's correct.

10        Q    Okay.  Which -- who was the attorney that you

11        smoke with?

12        A    The same attorney that I give you his name in

13        the beginning, Khumalo.  He's on the ground in Eswatini

14        and he's going back and forth between the government,

15        to me and to the structure of the deal at that time.

16        Q    Okay.  Did you send any e-mails to anyone or

17        any letters to anyone basically saying what's going on.

18        Why are you sending a letter that says it represents

19        only an initial indication of our interest?

20        A    I'm assuming we didn't send a letter.  We

21        send my partner on the ground to meet the prince and we

22        meet the prime minister; we meet the minister of

23        health.  My people on ground did it.  What happened

24        from it?  Promises and promises.  That's nothing.  We

25        changing the government.  It's a new government.  You
```

201

1   know, all kind of story until December 31st, 2020 I got

2   all the stories in the world, that's why I decided I'm

3   not spending no more effort and money, and things with

4   them.  And I keep going.  I just cut my loses.

5        Q    When you got this letter, were you concerned

6   that the government was backing out and they weren't

7   going to offer you a license?

8             MR. SALLAH:  Whoa.  Whoa.  Whoa.  You can

9        answer that, but I'm not sure if that's what the

10       letter suggest that they're backing out.  It says

11       our intention is to engage PSIQ and approve their

12       licenses.  I wouldn't characterize it as backing

13       out, but you can answer the question.

14       A    In my opinion, somebody pay them money to get

15   the license.  That's my opinion, but I don't have proof

16   for it.

17            BY MS. FUCHS:

18       Q    I'm sorry.  Someone paid who money?

19       A    In my opinion --

20       Q    Yes.

21       A    -- somebody paid the government money from

22   this side to get license and not me, and they push me

23   around until I get tired from them, you know.  That's

24   my opinion, but I don't have proof for it.

25       Q    Oh.  So when you're --

1        A    We will see and hen we'll see who got the

2   license.

3        Q    Okay.  So you're saying in your opinion

4   someone is going or will be getting a license because

5   they paid money; is that what you're saying?

6        A    They bribe everybody in town probably and

7   they got the license.  I don't know if they got

8   anybody, but I'm assuming that's what's going to happen

9   because it cannot be.  I spend -- I build them.  I

10  build the cannabis industry in that country to be

11  legal.  I write the law with them to make sure they

12  have the right laws.  I did everything to make sure

13  they going to be accurate like in the United States and

14  they stop me.  In my way I been stopped, you know, but

15  I have nothing to do.

16       Q    Did anyone approach you to ask you to give

17  them money to get your license?

18       A    Nobody ask me to give them money.  I have

19  people approach me from Eswatini to part with me to get

20  the license.  I didn't agree to do any business with

21  anybody on the ground.  I didn't want to do any

22  business with anybody on ground where I do have control

23  on the business, so I just step out.  Any calls I got

24  from them, I just leave it to see what's going to

25  happen with the license.

1          Q     But did someone ever approach you, whether

2     directly from the government or through a third party,

3     or to -- did anyone ever approach you or one of your

4     representatives or partners and suggest that you would

5     get your license let's say quicker or it would come

6     through if you paid money, or gave something of value?

7          A     I not do business like this any part of world

8     I do business.   I do hundred percent caution business.

9     If somebody ask me something like that, I stop the

10    business with them, long time ago.   I'm not the guy.   I

11    don't give bribe to nobody.

12               BY MR. SALLAH:

13         Q     I got it, but that's not what she asked you.

14    She's not saying if you did it.   She's asking if anyone

15    ever --

16         A     Nobody.   Nobody.   Nobody.   Nobody ask me

17    because they know that I am not going to do it.

18               BY MS. FUCHS:

19         Q     Okay.   So nobody ever suggested to you that

20    things could get hurried up if you paid any money or

21    gave someone in the government something of value?

22               BY MR. SALLAH:

23         Q     Yes or no.

24         A     No.

25               BY MS. FUCHS:

204

```
 1          Q     Okay.  I'm just going to the top for a
 2     second.
 3                And do you know -- I'm just going back to the
 4     top, the first page.  Do you know why Lenny sent these
 5     documents to Tomer?
 6          A     Because I ask him to send the documents to
 7     Tomer to show them that we in the process to get the
 8     license and we can commit for the deal.  In a minute we
 9     have the license, we commit the deal in Germany and we
10     can do the deal from Eswatini.
11          Q     What was Tomer supposed to do with these
12     documents?
13          A     Tomer have connections with the German
14     company.  He's open and do some business with them.
15     It's not easy to get to the industry in cannabis in
16     Germany.  You need to be very well connected.  Tomer
17     have the connections and I trust his judgment to make
18     sure that if we want to be read to sign contract with
19     the Germany company, I need Tomer to be involved and to
20     do the sales for me.
21          Q     And this says it was a draft press release,
22     do you know if this press release went out, like if it
23     was edited before it went out or if it went out as is?
24          A     I have no clue this is get out from Lenny
25     Tucker e-mail so I don't send -- I don't send e-mails
```

205

```
 1   to anybody.  You can see only two e-mails in my whole

 2   life I send.  I don't send e-mails.  I ask my staff to

 3   seasoned e-mail and I don't send anything, so I don't

 4   know what's there.

 5        Q    Okay.

 6             MS. FUCHS:  Raynette, do you have any other

 7        questions on in document?

 8             MS. NICOLEAU:  Yes.  Could you scroll to the

 9        very last page, please.

10             BY MS. NICOLEAU:

11        Q    Mr. Oran, do you recognize that name, his

12   royal highness prince and I can can't pronounce the

13   name?

14        A    Yeah.  Yeah.  Yeah.  This is one of the

15   princes.

16        Q    Okay.  Is it one that you've spoken to?

17        A    So that's one of the princes.  I bring him.

18        Q    Okay.  That's one of the princes that you

19   brought to the US?

20        A    Yeah.  This one is -- I think he's the king's

21   son.

22        Q    Okay.  The son.

23        A    He's the one that have the economic zone, you

24   know.  He control all the part of the country, the free

25   zone.
```

206

1      Q     Okay.  Thank you, Trish.

2            MS. FUCHS:  Okay.

3            MR. SALLAH:  Trish, before you ask any

4      questions, stay on the record; I'm just grabbing a

5      diet coke right there.

6            MS. FUCHS:  What's that?

7            MR. SALLAH:  I'm grabbing a diet coke.  We

8      don't have to go off the record, it's right there.

9            MS. FUCHS:  Okay.  I'm trying to share a

10     document, I'm just having an issue.

11           MS. NICOLEAU:  Which one?

12           MS. FUCHS:  29.

13           MS. NICOLEAU:  Okay.  Let me see.

14                      (SEC Exhibit No. 29 was marked

15                      for identification.)

16           BY MS. FUCHS:

17     Q     Can you -- can you see it?

18     A     Yes.

19     Q     You can see Exhibit 29?

20     A     Yes.

21     Q     Perfect.  Okay.  All right.  So I'm showing

22     you what's been marked as Exhibit 29, a PSIQ press

23     release dated October 10th, 2018 stating, PSIQ receives

24     preliminary approval from the Kingdom of Eswatini

25     Ministry of Economic, Planning and Development to

1    receive license as exclusive growing farm and

2    processing plant for medical cannabis and hemp in

3    Eswatini.  So if you can take a moment, I'll scroll

4    down as you read.  Just let me know when you want me to

5    scroll down or up and let me know when you had an

6    opportunity to read it.

7        A    I want to understand what is it exactly.

8    It's the same thing about Eswatini.

9        Q    Right.  You did -- before it said draft press

10   release, so you didn't know if it was actually the

11   final.  So now we're showing Exhibit 29, which is a

12   press release dated October 10th, 2018 and this is on

13   OTC Markets.

14       A    This is a 2020.

15            MR. SALLAH:  No.  2018.  Press release --

16            (simultaneous cross-talk.)

17            MR. SALLAH:  Is there a question or you just

18       want him to review it first?

19            BY MS. FUCHS:

20       Q    Just -- once you've reviewed it let us know.

21            MR. SALLAH:  Once you've reviewed it let them

22       know.

23       A    This is exactly what we say in the other

24   press release.  I don't understand.  It's the same

25   thing.

208

1              BY MS. FUCHS:

2       Q    Okay.  So you've had an opportunity to review

3    it?

4       A    I read it.  It is exactly what --

5       Q    Okay.  So who -- again, 'cause this is the

6    final one as the draft.

7            So who prepared this document, this press

8    release?

9       A    I don't know.  I think we hire a company to

10   prepare the press release.  I really cannot recall who

11   prepared that particular one.

12      Q    And who approved this press release?

13      A    I read it, the lawyer read it and we approve

14   it together.

15      Q    And the lawyer, was that Jackson Morris?

16      A    It can be Jackson Morris or Eddie Nurieli.  I

17   don't know at this present time who.  Some -- one of

18   the lawyer approved it.

19      Q    Okay.  In light of that September 3rd, 2018

20   letter which we saw a short while ago with Exhibit 41,

21   was there a concern in saying that there was a

22   preliminary approval from Eswatini?

23      A    I was not concerned until December 31st, 2020

24   that I would not have this license.  I will -- I been

25   not concerned with anything.  I believe them that they

209

1    do the license, that they going to give us the license

2    until December 31st, 2020.

3        Q    Because the other letter that we just looked

4    at from Swaziland government, it said that there was

5    only an indication of interest to engage.  So based on

6    that statement, why did PSIQ issue this press release?

7        A    Because --

8             MR. SALLAH:  I'm going to object to the form.

9        It was a very long press release.  It didn't say

10       that at the end.  It also said that our intention

11       is to engage PSIQ and approve -- to approve the

12       sale of blah, blah, blah, blah.  So this was a

13       little -- but I understand.  You can go ahead and

14       answer.

15       A    After that letter I call to the prince and he

16   tell me don't worry about.  This inside something for

17   them.  You know, them to go to the right way to approve

18   the license.  I didn't worry about them not to issue

19   the license because I believe them and I trust them.

20   That guy, they come to my house and eat with my family.

21   They promise that hundred percent a way to get the

22   license; we doing the right thing.  I trust him.  Until

23   December 31 I was believing them that I going to get

24   the license.  If you call the prince now he will tell

25   you that I going to get the license, but I don't want

1   it no more.

2        Q    But I guess why -- why did PSIQ issue this

3   press release when in September?  The letter from the

4   Minister of Economic, Planning Development had said it

5   was an intention to engage and represents only an

6   initial indication of our interest to engage, so why

7   was this still sent out like this?  Why didn't it

8   say -- why didn't this press release state that there

9   was indication of interest?

10       A    I cannot tell you why we did it.  I read it

11  before I announced it and I didn't have any intention

12  to mislead anybody because they tell me that I'm

13  getting the license.  And when I call after this

14  letter, they tell me it's inside letter from the

15  Eswatini inside government letter, I need to get it.  I

16  get it.  I didn't do it.  I don't know why.  I cannot

17  answer why.  I didn't do it.

18       Q    Was there any discussion that people reading

19  this press release would have an understanding that

20  there was preliminary approval?

21       A    I don't have any discussion with anybody

22  about anything about the company.  I work only for the

23  good of the company.  I didn't mean to mislead anybody.

24  I didn't put it and advertise it to mislead anybody.  I

25  did it because I think that's the right way to not to

211

```
 1   lie to anybody because that's the truth that I going to
 2   get the license.  And by this letter it doesn't look --
 3   for you maybe it doesn't look good.  For me after I
 4   talk to the prince, I trust his word and I believe him
 5   until 31st of December.  I did believe him.  That's
 6   what I can say.  Why?  How?  It happen.  That's what
 7   you got.
 8        Q    But before this press release was issued, was
 9   there any discussion amongst -- within PSIQ, was there
10   any discussion of whether or not this press release
11   should be issued in light of that September 2018
12   letter?
13        A    I talk to any press release, I talk to the
14   lawyer and the lawyer have all the documents up front
15   and they -- if I -- if this press release come up to
16   her it's two reasons; because the lawyer approve it and
17   because it's the truth.  It's no other reason why we
18   put the press release out.  So if by any chance we
19   mislead this letter and the lawyer didn't get it before
20   or this press release was already on the system and we
21   didn't pay attention, I don't know.  I cannot tell you.
22   It's two years ago.  It's nothing on purpose.
23        Q    Did -- the lawyer who reviewed it, did they
24   send something in writing approving this press release
25   in light of the September 3rd, 2018 letter from the
```

212

1    Ministry of Economic Planning?

2         A    I don't recall, but we can find out from the

3    e-mails.  I don't recall.  I'm sorry.  I cannot go back

4    to that terms, but if I go dig in the files and find

5    the e-mails and look for them, I probably going to find

6    the lawyer approve it.

7         MS. FUCHS:  Raynette, do you have any

8         questions about this exhibit?

9         MS. NICOLEAU:  No.

10         MR. SALLAH:  He needs to go to the restroom.

11         Can we take a quick break, Trish?

12         MS. FUCHS:  Yeah.  Absolutely.  Absolutely.

13         We take a break.

14         (Whereupon, a brief recess was taken, after

15         which, the following was had.)

16         MS. FUCHS:  We're back on the record after a

17         short break. during that time we had no

18         substantive conversations; is that correct?

19    A    That's correct.

20         BY MS. FUCHS:

21    Q    Okay.  Mr. Oran, you had mentioned when we

22    were talking about how recently you just decided not to

23    pursue a license anymore in Eswatini and I know you had

24    mentioned that there was another company where you got

25    licenses about three weeks ago I think you said.  You

213

1   received it in Israel; is that correct?

2        A    Yeah.  Canaberry Tech.  It's one of our

3   affiliate of PSIQ.  We applied for a license two years

4   ago and we process the farm.  For the last two years we

5   build the farm and we just got the license to start to

6   operate.  So in the beginning of February we going to

7   start to operate the farm in Israel.

8        Q    Okay.  And that's -- so Canaberry Tech has

9   a -- has an agreement with the farm; is that correct?

10       A    No.  The farm belong to Canaberry Tech.  We

11  build it.  We have agreement with the farmer to grow

12  for us and to be in this process, and we build the

13  facility in Israel.

14       Q    And what does it --

15            BY MR. SALLAH:

16       Q    A farm in Israel and they're going to convert

17  it to grow?

18       A    It already been converted.  It's ready grow.

19       Q    So you bring in the farmer and so as of

20  February you guys are going to start growing?

21       A    All my team start to grow there, yeah.

22  Research and development.  The plan that I have to do

23  in Eswatini I convert it to Israel.  Now we doing it in

24  Israel instead because I got the license already.

25       Q    So you have a license.  And what does the

214

```
 1   license provide?

 2        A    To do research and development in the country

 3   of Israel for cannabis.

 4             MR. SALLAH:  We can provide you with that.

 5        Canaberry Tech, the subsidiary.

 6             MS. FUCHS:  Okay.

 7        A    I got in English and in Hebrew.  I translate

 8   it to English, so we have it as well.

 9                       (SEC Exhibit No. 32 was marked

10                        for identification.)

11             BY MS. FUCHS:

12        Q    Perfect.  Okay.  I'm sharing a document that

13   was marked as Exhibit No. 32.  Are you able to see it?

14        A    Yes.

15        Q    Okay.  And for the record, this is a

16   document.  It's a letter dated February 15th, 2019.

17   The Kingdom of Eswatini Ministry of Health.  It is to

18   Stempro Eswatini Limited.  It talks about the

19   application for cannabis license.  It says the Ministry

20   of Health would like to acknowledge receipt of your

21   application to operate in the business of cannabis

22   cultivation for medical use and research.  It says, on

23   behalf of the minister of health who is mandated by law

24   to authorize the issuance of such a license, they

25   express their gratitude for interest and they said they
```

1    will revert to you once they have finalized their

2    internal process.

3              Do you recognize this document?

4         A    Yes.

5         Q    And did you receive it on or about the date

6    of the letter?

7         A    I cannot recall the date, but I received that

8    letter.

9         Q    Okay.  So can you explain to us the

10   connection in Eswatini between the minister of health

11   and then the other letter that came from the Ministry

12   of Economic, Planning and Development how they work

13   together?

14        A    To understand what's going on in Africa, you

15   need to be in Africa.

16        Q    Okay.

17        A    There's nothing that I know that I need to go

18   through in the beginning.  This is develop around the

19   time that they promise to issue a license.  So each

20   time they push to somebody else responsibility, give me

21   a few months, after a few months they move it to

22   another to give me few months.  They drag me like this

23   for two years.  They promise to issue the license in

24   three months.  So I spend the time, the effort, my

25   money to get the license.  Apparently I understand that

216

1    it not going to happen at the end of the year of 2020.

2    So again I'm telling you, I'm tired to listen to

3    nonsense and promises that I don't know if they going

4    to complete them.  I move on from that Eswatini because

5    of that.

6         Q    Were you surprised to get this letter from

7    the Ministry of Health?

8         A    I don't surprise to get anything from them

9    because they every day doing something to keep me on

10   the deal.  They try to keep me on the deal with phone

11   calls, with text messages, with -- we already there.

12   We already come after the deal, but, You know, I cannot

13   keep it like this.

14        Q    So do you know how it works?  Does it have to

15   be both the Ministry of Finance and Economic, planning

16   and Development?  Do they both have to approve an

17   application in order for a company to get a license?

18        A    In that minute after we create the new law

19   with Eswatini, it need to be approved by the prime

20   minister, by the minister of defense, by the minister

21   of police, by the agriculture minister, by the health

22   minister, by everybody that they need to get approved.

23        Q    But at this time in February of '19 --

24        A    That's a new thing for me.  We didn't know

25   that we going to go through the Department of Health.

1   They said there procedure have nothing to do with us.

2   They come up with all these things along the way

3   because they didn't understand how to issue a license

4   and they didn't want to fall between people that say

5   they issue the license because of personal

6   relationship, so they dragging it and dragging it and

7   dragging it to be on the safe side, but for meantime,

8   we lost the opportunity.

9        Q    And the letter is addressed to Stempro

10  Eswatini Limited, is that the entity that was in

11  Eswatini that was -- the new company that had been

12  developed?

13       A    Yeah.  It's the new company that I opened in

14  Eswatini, yes.

15       Q    Were you surprised when you got this letter

16  from the Ministry of Health?

17       A    I surprise every day.  Every minute of my

18  life I got new surprise.

19       Q    But at the time you got the letter, were you

20  surprised that they also had to approved your

21  application?

22       A    That's not part of our agreement with the

23  government of Eswatini.  That's their part inside.

24  It's nothing to do with Stempro.  It's their inside

25  creating a new laws to be able to give cannabis

218

1    license.  Apparently somebody wake up in the new

2    government and they see they going to miss the

3    opportunity, so they send a letter.  Because I always

4    complain to the prince that I'm backing up, so they

5    create something to keep us more time to see what they

6    want to do.

7        Q    When you had met the first time with the

8    prince, do you know if there were any other companies

9    in Eswatini that had applied for licenses to

10   manufacture or grow cannabis and hemp?

11       A    Apparently I received few e-mails and

12   documents from other companies that they want to get

13   involved with me on the Eswatini deal.  They all

14   Eswatini local farmer, but I didn't answer them because

15   I didn't -- they didn't issue me the license.  My plan

16   in the future was to involve anybody who wanted to grow

17   the cannabis and send to us as the master distributors

18   and we export it.  That's what the plan, but the plan

19   is not effective no more.

20       Q    When you spoken with all these different

21   government officials in Eswatini, had they told you

22   that other entities were interested in obtaining

23   licenses?

24       A    They didn't tell me.  My lawyer tell me there

25   is other people that try to get license in Eswatini,

219

1    not them.

2        Q    Do you know of any instances when people or

3    companies were turned down in Eswatini for their

4    request for licenses prior to you?

5        A    Prior to me it was not law in Eswatini to get

6    any license.  I create the law in Eswatini.  Because of

7    me they have a law now in Eswatini.  That's why they

8    have the law because I provide them with all the

9    procedure how to create a law.

10       Q    But do you know about the time that you were

11   having discussions with different government officials

12   in Eswatini, did anyone ever tell you that other

13   companies had tried to operate there in or obtained

14   licenses, but had been denied?

15       A    No.  I don't know.

16       Q    Okay.

17           MS. FUCHS:  Raynette, do you have any other

18       questions regarding this document?

19           MS. NICOLEAU:  No.

20           MS. FUCHS:  Jim, can you go back to Exhibit

21       21, which was the amended PSIQ S-1.

22           MR. SALLAH:  Yes.  We're there.

23           MS. FUCHS:  Okay.

24           BY MS. FUCHS:

25       Q    Going to page 23 of 64.  You know we wanted

220

```
 1    to follow-up -- we talk briefly before about Eddie

 2    Nurieli and another director that you had mentioned.

 3    First of all, what did Mr. Nurieli do for PSIQ?

 4         A    He was the board member of the company and he

 5    was represent me and when I have law questions, I ask

 6    him most of the time because he was very close to me.

 7    So most of the e-mails that I need answers fast before

 8    to wait for other lawyers, he would answer.  He's a

 9    lawyer.

10         Q    Okay.  So he answered questions as a lawyer,

11    was there anything else he did for PSIQ?

12         A    Board member.  He was part of the board

13    member when we had board member meeting and try to work

14    together to find out new deals, and to decide if we

15    making that deal or that deal.  He was part of the

16    board.

17         Q    And then the other director that you

18    mentioned you couldn't recall his name, is it your

19    understanding or do you think that the other director

20    was there at the same time as Mr. Nurieli?

21         A    Mr. Nurieli got -- resigned few months or

22    couple months, or six months after that subpoena

23    arrived.  The other board member was already and part

24    of the time with him on the board.  I can make a call

25    if you want the name, I can get the name, but I
```

221

1    don't -- I just don't recall in this minute.

2        Q    The other director is he still with PSIQ?

3        A    He's still a director with PSIQ.  We didn't

4    have any director -- anything to do until before the

5    Corona and until now because of the Corona, but we talk

6    on the phone and I brief him about what's going on with

7    the company each time we talking on the phone.

8        Q    Okay.

9            MS. FUCHS:  Raynette, do you have any

10           questions before I move on?

11           BY MS. NICOLEAU:

12       Q    How much is the other director paid?

13       A    I think they pay with shares.  If I'm not

14   mistaken, we have an agreement to pay with them shares.

15   I don't recall.  They didn't get -- only Eddie gets

16   paid I think $500 a week or month, or $1,200 a month

17   after that because he did a lot of work with me, but

18   other director didn't get paid.  We promise to pay him

19   with shares.  So he didn't get paid money.

20       Q    Okay.

21           MS. NICOLEAU:  Trisha, if you can scroll down

22           on that page that you're on or up.  The other way.

23       A    Yes.

24           MS. NICOLEAU:  Keep going a little bit.  Hold

25           on a second.  Right here.

222

```
 1              BY MS. NICOLEAU:

 2       Q    Do you see where it says we have a two-year

 3   director's agreement with Mr. Nurieli who serve as the

 4   director and provide consulting services through

 5   November 30th, 2020?

 6       A    Yes.

 7       Q    An annual salary of 52,000?

 8       A    Yes.

 9       Q    Was he not paid 52,000?

10       A    He didn't get paid 52,000.  I don't think

11   he -- if I recall, he get paid $2,000.  1,000 a month,

12   or 2,000, or 1,500.  I don't know.  The book and

13   records show.  I don't know.  It's not something that I

14   remember, but he didn't get paid 52,000 a year.  How

15   much is the --

16              MR. SALLAH:  He got four grand a month I

17         think.

18       A    He gets paid -- if you ask me, he gets paid

19   2,000.  I don't know.  I don't know.  I don't want to

20   tell you numbers that I don't remember.

21              BY MS. NICOLEAU:

22       Q    Okay.  So you had an agreement to pay him,

23   but you didn't actually pay him the 52,000 annually?

24       A    I didn't pay him because he work with me for

25   a few months and then that thing happened, and I stop
```

223

1    to pay him because I tell him I cannot pay anybody.  I

2    need to keep the company alive.  I pump in more money

3    from my own pocket and I cannot pay him, so I stop to

4    pay him.

5        Q    Does Nurieli also review press releases for

6    PSIQ?

7        A    I'm positive that he review any press release

8    when he was with me.

9        Q    You're positive that he did review?

10       A    Yes.  Positive.  Positive.

11       Q    Okay.  And what about the other director?

12       A    I didn't I think -- I think he read them, but

13   I didn't ask his opinion on them because Nurieli is a

14   lawyer and I trust his judgment.  He probably read them

15   before I release them, but I didn't ask his opinion to

16   press release and all.

17            MS. NICOLEAU:  All right.  Thank you, Trish.

18            MS. FUCHS:  Okay.  Jim and Mr. Oran, if you

19       can go down to stay on the same exhibit, Exhibit

20       21, but go down to page 26 of 64 where it says

21       "selling stockholders".

22            MR. SALLAH:  Yeah.  We're there.

23            MS. FUCHS:  Okay.

24            BY MS. FUCHS:

25       Q    So I want to confirm.  So these are all the

224

```
 1    individuals and entities that were selling pursuant to

 2    this S-1 A; is that correct?

 3         A    That's correct.  It's all my friend and my

 4    family.

 5         Q    Okay.  And there were no officers or

 6    directors selling; is that correct?

 7         A    I don't understand that question.

 8              BY MR. SALLAH:

 9         Q    Were there any officers or directors selling?

10         A    No.  They didn't sell.  They didn't sell any

11    shares.

12              BY MS. FUCHS:

13         Q    Did any of these --

14              MR. SALLAH:  Whoa.  Whoa.  Whoa.  Wait a

15         minute.  Wait a minute.  Whoa.  Whoa.  Whoa.  Time

16         out.  There is some confusion.  Just --

17         A    There was no selling.  Nobody sell anything.

18              BY MR. SALLAH:

19         Q    Selling stockholders for the purpose of the

20    registration, the S-1?

21         A    They are both stockholders from the company.

22    They don't sell any stockholder.  They shareholder of

23    the company.  The company sold them stock.  They don't

24    sell one share, none of them.  I don't think so.

25         Q    So you're not aware that any of those
```

225

1     individuals sold shares?

2         A     They cannot sell the shares.  Until we have

3     S-1 registration, they cannot sell.  They cannot sell

4     any shares.  They never sold any shares.

5         Q     You don't think any of these people ever sell

6     any shares?

7         A     Hundred percent no.  They --  hundred

8     percent.

9             MR. SALLAH:  Sorry, guys.  I digressed.

10            BY MS. FUCHS:

11        Q     Okay.  Did any of these individuals or

12    entities help pay the cost of preparing and filing this

13    registration statement?

14        A     No.  The company paid the registration

15    filing.

16        Q     Okay.  The first entity Capri International

17    Ventures, LLC, who are they?

18        A     It's one of my friends that owned a company

19    that is in the cosmetic company.  He own a cosmetic

20    company.

21        Q     Okay.  And what's his name?

22        A     His name is, I think, David.  I don't know

23    his last name.  First name is David.

24        Q     Okay.  So he's a friend of yours; is that

25    correct?

```
 1        A    It's a friend of mine of 30 years; he trust

 2   my judgment.  I ask him to invest with me and he did.

 3        Q    Okay.  Do you have any business relationship

 4   with Capri or David?

 5        A    I have no business relationship with Capri.

 6        Q    Okay.

 7        A    Never had.

 8        Q    Okay.  So no beneficial ownership interest in

 9   Capri; is that right?

10        A    Never had any business, any relationship

11   beside friendship.

12        Q    Okay.  No loans or agreements, correct?

13        A    No business, no loans, no agreement, no --

14   only friendship and the shares.

15        Q    Okay.  And then do you see the entity called

16   LAEL investments?

17        A    It's another friend of mine.  His name is

18   Ofer.

19        Q    Do you know his last name?

20        A    Ofer Sadik.  Sadik.

21        Q    Okay.

22        A    I think Sadik is his name.

23        Q    Do you have the --

24        A    S-A-D-I-K.

25        Q    Oh.  Thank you.  Do you have any -- I know
```

227

```
 1   you're friends, but do you have any business
 2   relationship with Ofer or LAEL Investments?
 3        A    I don't have any business with Ofer.  We good
 4   friend of 30 years.  I did business with him in the
 5   past many years ago, but in this moment we don't have
 6   any business relationship.
 7        Q    When is the last time you did business with
 8   him in the past?
 9        A    If I'm not mistaken, it was around six,
10   seven; something like that.
11             BY MR. SALLAH:
12        Q    Did you owe him any money?  Did he owe you
13   any money?
14        A    He doesn't owe me any money; I don't owe him
15   any money.  I don't have anything with him.
16             BY MS. FUCHS:
17        Q    Okay.  S&H Land Development, who were they?
18        A    It's the same guy, Ofer.
19        Q    Oh.  It's Ofer?
20        A    Yeah.
21        Q    Okay.  Same question.  Any business
22   relationship with S&H Land Development?
23        A    No.  I don't have any business with Ofer, no.
24        Q    Okay.  No loans or anything like that?
25        A    No loan terms, no.  No nothing.  No nothing.
```

228

```
 1          Q     Okay.  And then Shayna Tucker, is she related

 2    to Lenny Tucker?

 3          A     Shayna Tucker is the daughter of Lenny

 4    Tucker, yes.

 5                BY MR. SALLAH:

 6          Q     Montana or Shayna?

 7          A     Shayna also.  He have two.

 8          Q     Montana is the famous one?

 9          A     Yeah.

10                BY MS. FUCHS:

11          Q     Did Shayna ever provide any services to PSIQ?

12          A     I don't think Shayna shares are from the

13    current shareholder.  She was in the company before I

14    came.

15          Q     Okay.  Do you know what she did?

16          A     I have no clue.

17          Q     Why do you think she was with company before

18    you came?

19          A     Apparently that company used to belong to --

20    to be -- Mr. Tucker was involved in the company before

21    I purchased it in 2000 something.

22          Q     Was it operating under a different name then?

23          A     I assuming, yes, before I got it.

24          Q     And do you know how Shayna obtained her

25    shares of PSIQ?
```

1        A    I have no clue.  Maybe -- I don't want to

2    confuse here because I don't remember exactly, but it's

3    two options.  Or she was from the first investment she

4    put some money and she got shares or she come up with

5    the company when we got the company.  I don't remember.

6        Q    Okay.

7             MS. FUCHS:  Raynette, do you have any

8        questions?

9             MS. NICOLEAU:  Yes.

10            BY MS. NICOLEAU:

11       Q    Mr. Oran, the second person on the list is

12   Alon Elezra?

13       A    Yes.

14       Q    Do you see that?  Is that the same person

15   that you said was a large customer for Elite products?

16       A    That's correct.  That guy used to be one of

17   largest customers of the company in 2016, '17, I think

18   '18 and I offer him to buy some shares because of his

19   involvement.  It was small amount of money I think.

20   5,000-dollar if I not mistake.

21       Q    Okay.

22            BY MR. SALLAH:

23       Q    Which person?

24       A    Alon Elezra.  This one.  This is the guy who

25   used to sell for us on eBay, Amazon.

230

1    Q    Oh.  That was the one of the two people.

2         BY MS. NICOLEAU:

3    Q    And you think he purchase $5,000 worth of

4  shares?

5    A    I'm almost positive it was $5,000 worth of

6  shares, maybe less than that.  I don't remember

7  exactly.

8    Q    Okay.  And the for first person -- first

9  customer, Capri International Ventures, you said there

10  was a person named David who owns it?

11   A    I'm almost positive.  I'm not sure.  I -- in

12  my memory, but maybe I mix the names.  I don't know.  I

13  need to stand next to the computer to tell you.  But

14  it's somebody that I bring to the company.  I just

15  don't remember because I don't have the first name.

16   Q    Okay.  And so did -- how did Capri

17  International Ventures obtain shares?

18   A    They just bought some shares.

19   Q    Okay.  And do you know for about how much?

20   A    I'm assuming couple thousands of dollars.

21   Q    Okay.  Do you know Rafael Salvia?

22   A    Who?

23   Q    Rafael Salvia.

24   A    Oh.  Rafael Salvia, yes.  Yes.  Is one of our

25  customer from Argentina.  RCS International.

231

```
1        Q    RCS International?

2        A    Yes.  His company name and he's a -- the name

3   Rafael Salvia.

4        Q    Okay.  And he's a customer of any products?

5        A    He's a distributor overseas in Argentina and

6   Mexico.

7        Q    So he's --

8        A    My wife on the line.  One second, please

9   because she not stopping and she think something happen

10  to me.

11       Q    Okay.

12       A    Sorry.

13       Q    No problem.  Okay.  So RCS International is a

14  distributor for CBD products?

15       A    He's a distributor.  He buy products in local

16  and he distribute it overseas, yes.

17       Q    Okay.  I'm sorry.  I just sort of didn't

18  understand everything you said.  So distributor of what

19  company?

20       A    He's distributor -- he have exclusivity

21  distribution for South America and the country of

22  Argentina, and the country of Mexico.

23       Q    Okay.  For Elite products?

24       A    For Elite hemp products, yes.

25       Q    Okay.  And does Rafael Salvia have any
```

232

```
 1    relationship with Capri International Ventures?

 2         A    Actually, you know what?  I think Capri is

 3    Rafael.  It's not David.  I'm sorry.  I apologize.

 4         Q    Okay.

 5         A    I know him.  I know his company by the name

 6    of -- Capri is one of Rafael company.  I apologize.

 7    I'm taking back David.  Is Capri belong to Rafael.

 8         Q    Rafael is the -- is an LLP, do you know if

 9    Rafael is the owner of the company?

10         A    I am assuming -- I'm almost positive is

11    Rafael or his wife the owner, but they are to Capri.

12    It's not David.  I'm sorry.

13         Q    Okay.  The Adrianas Batoba (Ph), who is that?

14         A    His ex-wife.

15         Q    His ex-wife, okay.

16         A    Sorry.  Too many names, too many things on

17    mind, so is not clear.

18         Q    Okay.  So while we on that topic.

19              MS. NICOLEAU:  Trish, can you go back to page

20         19 of 64.  Okay.  Stop right there.

21              BY MS. NICOLEAU:

22         Q    Okay.  You see where it says, we recently

23    establish international distributors in Israel, Mexico

24    and Argentina, RCS International?

25         A    That is correct.
```

233

1      Q     So this is the company you're talking about,

2   RCS International Investments Corp.?

3      A     RCS International was and is still the

4   distributor of Mexico and Argentina.

5      Q     And has RCS distributed any products for

6   Elite?

7      A     He buy products from Elite in the United

8   States and doing his business outside the United

9   States.

10     Q     Okay.  How much product does he buy from

11  Elite?

12     A     I don't -- I cannot tell you numbers.  I

13  don't go follow the numbers, but he was -- he supposed

14  to do a big amount of product, but the license that he

15  supposed to get in Mexico delayed.  I know that last

16  month he just retrieved the license.  It taking time.

17  And he probably he bought few -- maybe 60, 80, 100,000

18  in the time and he's -- we expecting for him to do big

19  business in Mexico because he just got the license out

20  there.

21     Q     When did he get the license in Mexico?

22     A     I think in 2020.  He take time from the date

23  we did the signature with him to import the product

24  until he get the official license.  It taking time like

25  in any country, but he called me a few weeks ago to

234

1    make sure that he still on the distribution of Mexico,

2    that he's going to do big business and I hope he's

3    going succeed.  He going to be -- it take time to get

4    those licenses, but we have the agreement place with

5    him already I think two years ago if I'm not mistaken.

6         Q    Okay.  So does RCS International Investments

7    have licenses in Israel and in Argentina?

8         A    No.  No.  No.  I say Mexico --

9         Q    Yes.

10        A    -- Argentina.  What he have, I don't know.  I

11   only sell him the products in the US.  So he's

12   responsible for his license and for his import and for

13   his releases in those country.  We not his partner.  We

14   not doing any business out of the US with him.

15        Q    Okay.  So -- but my question is, do you know

16   if RCS International has a license to distribute in

17   Israel and in Argentina?

18        A    I repeat it again.  He just got the license

19   in Mexico.

20        Q    Yes.

21        A    In Argentina I don't know if he got the

22   license and I don't have any clue what he does.  He

23   just buy for us for locally for export.  We sell him

24   hemp here in south Florida to him.

25        Q    Well, did you inquire from -- I guess, it

235

```
 1   would be Rafael, right?  Rafael?  Did you inquire as to

 2   whether his company would be able to sell your product

 3   in Israel, Mexico and Argentina?

 4        A    In Israel?  He's not the one in Israel.

 5             MR. SALLAH:  Wait.  Wait.  Wait.

 6             BY MS. NICOLEAU:

 7        Q    I'm reading the S-1.

 8        A    But Israel it's my company.  Is not his.

 9   He's in Mexico and in Argentina.  He have nothing to do

10   with Israel.

11        Q    Okay.  Sorry about that.  I see it.  The

12   second sentence, RCS is the distributor for Mexico and

13   Argentina.  Okay.

14             MR. SALLAH:  You got it now?

15             MS. NICOLEAU:  Yes.

16             BY MS. NICOLEAU:

17        Q    So did RCS -- did you inquire as to whether

18   RCS had a license to distribute the product in

19   Argentina?

20        A    RCS is a Florida corporation.  We selling to

21   RCS Florida corporation.  We don't -- and we don't need

22   to see if he have license in Mexico or in Argentina.

23   He tell us that he sell in those countries.  I don't --

24   I selling to all Florida corporation.

25        Q    Okay.  The next sentence says, our agreement
```

1  with RCS requires first year minimum guarantee of

2  5,000 -- the 500,000 and 20 percent growth per year

3  thereafter.

4       A    The first year that's what the agreement with

5  him, but because of his structure with Mexico until he

6  got his license he taking long-terms.  I don't think he

7  spend that much of money.  I think he spend around

8  100,000 maybe less.  This was the requirement and the

9  exclusivity for him through Stem, but I don't think --

10      Q    Okay.  Go back to the page for the selling

11  share ownership.  It's 26 or 64.

12           MS. FUCHS:  Yeah.  Almost there.  I'm here

13      now.

14           MR. SALLAH:  Which one?  26?

15           MS. NICOLEAU:  Yeah.

16           MS. FUCHS:  Yes.

17           BY MS. NICOLEAU:

18      Q    Okay.  So besides the first two, Capri

19  International and Alon Elezera, is there anyone else on

20  this selling shareholder list that has any other

21  relationship with Elite products or Profile Solutions?

22      A    Robbie Hicks, Galit Sagiv, Henry Rengifo,

23  Tomas.  That's it.

24      Q    So Robbie Hicks is your assistance, right, or

25  used to be?

237

```
 1        A    He was my personal assistance, yes.

 2        Q    Okay.  And what about Henry Rengifo?

 3        A    He was my IT guy.

 4        Q    Okay.  And then Tomas?

 5        A    Was a salesperson in Elite.

 6        Q    Did I say Galit?  Galit Sagiv.

 7        A    Galit was my accounting at that time.  She is

 8   no longer working for me.

 9        Q    Okay.  Does Ofer Sadik have any other

10   companies that he own or is associated with?

11             MR. SALLAH:  We can't hear you, Raynette.

12             MS. NICOLEAU:  Okay.  Can you hear me now?

13             MR. SALLAH:  Now we can.

14             BY MS. NICOLEAU:

15        Q    Okay.  Does Ofer Sadik who is the owner of

16   LAEL Investments and S&H Land Development, doe he have

17   any other companies that he is either owner or an

18   officer that has a relationship with PSIQ or Elite

19   products?

20        A    I don't understand.

21             BY MR. SALLAH:

22        Q    She wants to the owner if the owner of LAEL

23   and S&H has any other companies that have a

24   relationship with PSIQ or Elite or anything like that?

25        A    The only relationship, we bought from him
```

238

1   picture frame for our offices.  You know, that's the

2   only relationship.  One time buy from him pictures for

3   our offices.

4        Q    He sells picture frame?

5        A    Yeah.  Art Connections is another company of

6   him.

7        Q    So he has a company called Art Connections,

8   correct?

9        A    Yes.

10       Q    And they bought some pictures for the office,

11  some art and picture frames and stuff from Art

12  Connection.  Was it substantial?  How much money?  Are

13  we talk about fine art?  Tens of thousands of dollars?

14       A    No.  No.  Maybe a few thousand dollars worth

15  of picture for the offices.

16            BY MS. NICOLEAU:

17       Q    Okay.  And you said this list comprise of

18  friends and family, who on the list is your family?

19       A    Not in this company.  This company is my

20  friend.  Everybody here is my friend.  Not in this one.

21            MR. SALLAH:  So this was all friends.  This

22       was not family.  This was just friends.

23            BY MS. NICOLEAU:

24       Q    Okay.  So you had mentioned David, is his

25  last name Harari?

239

 1        A    David Harari is the partner of Ofer Sadik.

 2   They are partners.  It's two guys.  David Harari and

 3   Ofer Sadik.

 4        Q    Okay.  So David -- all right.  So he's -- do

 5   you know if he's a partner in LAEL Investments and S&H

 6   Land Development?

 7        A    I don't know if they're partnerships.  If you

 8   look at the records you can find out.  I don't know

 9   how -- where they partner and where not.  They are both

10   my friends.  They are no longer partner in this time

11   today.

12        Q    Okay.  So I'll ask the same question about

13   David Harari with respect to -- do you know whether he

14   had -- does he have any companies that -- where he's an

15   officer or an owner where there's a relationship with

16   Profile Solutions or Elite products?

17        A    No.

18        Q    Okay.

19             MS. NICOLEAU:  Trish, that's all I have.

20             MS. FUCHS:  Okay.  Raynette, should we go off

21        for a quick break or --

22             MS. NICOLEAU:  Sure.  Let's take a break for

23        about five minutes.

24             MR. SALLAH:  Okay.

25             MS. NICOLEAU:  And finish up.

1          MR. SALLAH:  Let me just ask real quick.

2     What are you guys expecting?  I'm only asking that

3     because I know we haven't even cover Blackpoll.

4          MS. FUCHS:  Yeah.  That's what -- I think --

5          MR. SALLAH:  I don't think we're going to go

6     9:00 tonight.  I mean --

7          MS. FUCHS:  Yeah.  Yeah.  Exactly.  We -- I

8     think the purpose -- okay.  So we're off the

9     record.

10         (Whereupon, a brief discussion was had off

11    the record, after which, the following was had.)

12         MS. FUCHS:  We are back on the record after a

13    short break and during that time we had no

14    substantive conversation; is that correct?

15         MR. SALLAH:  That's correct.

16         BY MS. FUCHS:

17    Q    Okay.  We're just going to down a very few

18    clean up questions.  I have Exhibit 29, which is the --

19    we've already talked about it before, the October 10th,

20    2018 Profile Solutions press release and we wanted to

21    know, Mr. Oran, why did PSIQ issue a press release if

22    the company knew that it was illegal -- cannabis was

23    illegal in Eswatini?

24    A    I cannot answer that.  Ask -- you need to ask

25    the lawyer why he advise me to do that.

241

1          BY MR. SALLAH:

2     Q     Which lawyer?

3     A     Eddie.  I don't know which one.  We need to

4   find out which one I ask to do the press release.  One

5   of our lawyers.  I need to -- I got to tell her the

6   name.  I got to verify who got that and why they tell

7   me to do that. I don't have any --

8     Q     Well, if did you think it made sense that --

9   were there discussions about growing cannabis --

10  medical cannabis -- let's -- medical cannabis if

11  cannabis is illegal in Swaziland -- Eswatini?

12    A     We are in the middle of the process of the

13  license and -- I don't know.  I cannot recall.  I don't

14  want to tell you some -- just know that I don't

15  remember.  I don't remember.  I need to go through the

16  details and I going to get exactly what they want.  I

17  don't know.  I don't want to tell -- answer because I

18  don't know.  It's already the same thing back and

19  forth, back and forth.  I don't know.  I answer that

20  already.

21    Q     Mr. Oran, did you talk to Mr. Nurieli about

22  that, about whether --

23    A     I talk to -- before I did any press release,

24  I talk to my lawyers.  So I would need to go back to

25  the time of the press release ask which lawyer that I

242

1    talk to him about and why they all tell me to put it

2    on.  I don't want to answer something that I don't

3    remember.  I don't remember.

4        Q    Do you remember if you had any concerns about

5    PSIQ issuing this press release when knowing that

6    cannabis was illegal in Eswatini?

7        A    No.  No.  No.  I have the authorization from

8    the prince for that press release.  The prince himself

9    read it, he say it's okay with them for me to do that.

10   I did anything in my ability to make sure that was

11   correct.  I didn't try to mislead anybody.  You coming

12   back to that, well I telling you again, I did it; I ask

13   permission; I send it to Eswatini; I send it to my

14   lawyer; everybody tell me that we can press lease it.

15   I did it.

16            MS. FUCHS:  Raynette, do you have anything?

17            MS. NICOLEAU:  No, I don't.  Thank you.

18            MS. FUCHS:  Okay.  Jim, what we spoke about

19   is, continuing Mr. Oran's testimony and we can --

20   you and Raynette and I, we can figure out a date.

21   Hopefully it won't be too long, but we do need to

22   go over the documents that were produced.  Some

23   were produced last week and as you know, the very

24   tail end of December.

25            Is there anything else Mr. Oran or Jim that

243

1    you want to add before we go off the record?

2         A    Yes, please.

3              BY MR. SALLAH:

4         Q    What do you want to add?

5         A    I don't want to add anything.

6              MR. SALLAH:  No.  No.  He doesn't want to add

7    anything now.

8              MS. FUCHS:  Okay.  So we're ready go off the

9    record today?

10             MR. SALLAH:  Yes, Trish.  Yes.

11             MS. FUCHS:  Okay.  So we are going to go off

12   the record at 5:28 on January 21st with the

13   understanding that we're not adjourning, but we

14   are going to be continuing Mr. Oran's testimony.

15   Thank you so much everyone.

16             (Whereupon, at 5:28 p.m., the examination

17   was concluded.)

18                   *  *  *  *  *

19

20

21

22

23

24

25

244

1                    PROOFREADER'S CERTIFICATE

2

3    In the Matter of: CERTAIN POSSIBLE ISSUERS OF FRAUDULENT

4    SECURITIES

5    Witness:       Dan Oran

6    File Number:        FL-04204-A

7    Date:               Thursday, January 21, 2021

8    Location:      Miami, Florida

9

10        This is to certify that I, Christine Boyce,

11   (the undersigned), do hereby certify that the foregoing

12   transcript is a  complete, true and accurate transcription

13   of all matters contained on the recorded proceedings of the

14   investigative testimony.

15

16   _____         2-3-2021

17   (Proofreader's Name)

18

19

20

21

22

23

24

25

245

1                              STATE OF FLORIDA

2     COUNTY OF PALM BEACH

3

4          I, Caretha Wisdom, Professional Court Reporter

5     and Notary Public in and for the State of Florida at

6     Large, do hereby certify that I was authorized to and

7     did report said hearing in stenotype; and that the

8     foregoing pages are a true and correct transcription to

9     the best of my ability of my shorthand notes of said

10    hearing.

11         I further certify that said Hearing was taken

12    at the time and place hereinabove set forth and that the

13    taking of said hearing was commenced and completed as

14    hereinabove set out.

15

16         I further certify that I am not an attorney

17    or counsel of any of the parties, nor am I a relative

18    or employee of any attorney or counsel of any party

19    connected with the action, nor am I financially

20    interested in the action.

21         Dated this 3rd day of February, 2021.

22    _____

23         Caretha Wisdom,

24         Professional Court Reporter

25