1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                      FORT LAUDERDALE DIVISION

3

4    SECURITIES AND EXCHANGE        )
     COMMISSION,                    )
5                                   )
             Plaintiff,             )
6                                   )
     vs.                            ) CASE NO.:
7                                   ) 22-61699-CIV-MARTINEZ-BECERRA
     PROFILE SOLUTIONS, INC.        )
8    DAN ORAN, AND                  )
     LEONARD M. TUCKER,             )
9                                   )
             Defendants.            )
10   _____)

11

12

13

14     VIDEO RECORDED DEPOSITION OF LEONARD M. TUCKER

15   taken before Ashley Munoz, Florida Professional

16   Reporter, Notary Public in and for the State

17   of Florida at Large, pursuant to Notice of

18   Taking Deposition filed in the above case, on

19   June 6, 2023, commencing at 11:22 a.m. and

20   ending at 2:11 p.m.

21

22

23

24

25   JOB No. 230606JRE

                                                         1

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFF:

 3      SECURITIES AND EXCHANGE COMMISSION
        801 Brickell Avenue, Suite 1950
 4      Miami, Florida 33131
        BY:  Amie R. Berlin, Esquire
 5

 6   ON BEHALF OF THE DEFENDANT LEONARD TUCKER:

 7      LAW OFFICES OF MARK C. PERRY, P.A.
        6245 North Federal Highway, Suite 321
 8      Fort Lauderdale, Florida 33308
        BY:  Mark C. Perry, Esquire
 9

10    ALSO PRESENT:

11      DICKINSON WRIGHT
        424 Church Street, Suite 800
12      Nashville, Tennessee 37219
        BY:  Frank Borger Gilligan, Esquire
13

14      David Zeeber, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

2

```
 1                    I N D E X
 2   WITNESS:           EXAMINATION              PAGE
 3   LEONARD M. TUCKER
 4                    By Ms. Berlin            5
 5                    By Mr. Perry           184
 6
 7
 8                     EXHIBITS
 9
10   EXHIBIT NO.       DESCRIPTION              PAGE
11   Exhibit 2  Form S-1; 59 pages             35
12   Exhibit 3  Order of Suspension of Trading; 78
                2 pages
13
     Exhibit 4  InvestorsHub; 2 pages          86
14
     Exhibit 5  Answer to affirmative          111
15              Defenses; 53 pages
16   Exhibit 6  Tweet; 1 page                  145
17   Exhibit 7  Press release Israel; 4 pages  65
18   Exhibit 8  Tweet; 1 page                  154
19   Exhibit 9  Tweet; 1 page                  125
20
21
22
23
24
25
                                                    3
```

1          Miami, Florida, Tuesday, June 6, 2023

2                11:22 a.m. - 2:11 p.m.

3

4          THE VIDEOGRAPHER:  This is the

5      videotaped deposition of Leonard M. Tucker,

6      taken in the matter of Securities and

7      Exchange Commission vs. Profile Solutions

8      Inc., et al.  This deposition is being

9      held at 801 Brickell Avenue, Suite 1950

10     Miami, Florida.

11         Today's date is June 6, 2023.  The

12     time is 11:22 a.m.

13         Would counsel now please introduce

14     themselves.

15         MS. BERLIN:  Amie Riggle Berlin,

16     senior trial counsel, on behalf of the U.S.

17     Securities and Exchange Commission.

18         MR. PERRY:  Mark Perry on behalf of

19     Leonard M. Tucker.

20         MR. GILLIGAN:  Frank Borger Gilligan

21     from Dickinson Wright, and I'm dialing in.

22 Thereupon,

23              LEONARD TUCKER,

24 was called as a witness and, having been first duly

25 sworn, was examined and testified as follows:

4

```
 1                    DIRECT EXAMINATION
 2   BY MS. BERLIN:
 3        Q.   Okay.  Mr. Tucker, my name is Amie
 4   Berlin.  If you need to take a break at any time,
 5   just let me know, and we'll do that.
 6        A.   Okay.
 7        Q.   And similarly, if any question I ask
 8   you is unclear, just let me know, and I'll do my
 9   best to reword it for you.
10        A.   Okay.
11        Q.   Okay.  And where are you currently
12   working?
13        A.   Boca Raton.
14        Q.   Okay.  And that's a city?
15        A.   Yes, in Florida.
16        Q.   Okay.  And so for what entities are
17   you currently working?
18        A.   Leonard Tucker, LLC.
19        Q.   And what is that?
20        A.   It's a business advisory service.
21        Q.   To provides consulting services?
22        A.   Yes.
23        Q.   Okay.  To whom?
24        A.   To various corporations.
25        Q.   Please name them.
```

5

1          A.   At this time, Quickstream Corporation;

2   Winners, Inc.; Clean Vision Corporation; Radar,

3   Inc.; Emergent Health Corporation; Maison LUX.  And

4   I believe that's it.

5          Q.   Have there been any other entities for

6   which you've provided services during the year

7   2023?

8          A.   I don't believe so.

9          Q.   Is Leonard Tucker, LLC, your source --

10  sole source of income?

11         A.   Yes.

12         Q.   Are any of the entities that you just

13  identified for which you provide services in the

14  business of doing any sort of securities or

15  promissory note offering?

16         A.   Could you repeat the question.

17         Q.   So the entities you identified,

18  Consulting Services, Inc.; Clickstream Corp.;

19  Winners, Inc.; Clean Vision Corp.; Radar, Inc.;

20  Emergent Health Corp.; and Maison LUX, I will like

21  -- I will refer to those as your clients.

22              Do you understand?

23         A.   Yes, I do.

24         Q.   Do any of your clients have securities

25  offerings at this time?

6

```
 1            A.    Yes.

 2            Q.    Which ones?

 3            A.    Emergent Health does -- Emergent

 4    Health Corporation; Winners, Inc.; Quickstream

 5    Corporation.

 6            Q.    Uh-huh.

 7            A.    Maison LUX.  I believe that's -- I'm

 8    really not sure.  I believe that's all.

 9            Q.    Are any of your clients publicly

10    traded?

11            A.    Yes, they are.

12            Q.    Which ones?

13            A.    All of them.

14            Q.    Okay.  What kind of services are you

15    providing?

16            A.    Business advisory services.

17            Q.    What do you mean by that?

18            A.    I help with the public company

19    functions, I work as the liaison between the

20    issuers and their various attorneys, accountants,

21    auditors, OTC markets, escrow agents, shareholders.

22            Q.    So you're the liaison between --

23            A.    Trans- -- transfer agents also, I'm

24    sorry.

25            Q.    I'm sorry.  Didn't mean to interrupt
```

7

1   you.  Anything else?

2        A.   In addition to those functions,

3   overall business advisory.

4        Q.   What do you mean by that?

5        A.   I review business plans that they may

6   have.  I review pro formas they may have or

7   projections they may have to give my opinion.

8        Q.   Do you review marketing materials?

9        A.   I would say that I -- I don't believe

10  I review them, no.

11       Q.   Do you draft press releases?

12       A.   No.

13       Q.   Do you review any of their SEC

14  filings?

15       A.   Yes.

16       Q.   Why?

17       A.   To get a better understanding of what

18  the company does and part of my -- my role with the

19  companies.

20       Q.   Do you give feedback on the filings?

21       A.   Yes.

22       Q.   Do you draft them?

23       A.   No.

24       Q.   Are you identified as a consultant to

25  investors in any of your clients' companies?

8

```
 1          A.   Yes.  My role is disclosed in all of
 2   the various companies.
 3          Q.   Do you own a percentage of shares in
 4   any of your clients' entities?
 5          A.   Yes, I do.
 6          Q.   What percentage of shares do you have
 7   for consulting services?
 8               MR. PERRY:  Objection, vague.
 9               THE WITNESS:  I -- I don't know off
10          the top of my head, though, all of them.  I
11          -- I don't know.
12   BY MS. BERLIN:
13          Q.   You don't know?
14          A.   I don't know the exact percentage.
15          Q.   For any of them?  For any of your
16   clients?
17          A.   I -- there with Radar, I own
18   4.99 percent.
19          Q.   Any others?
20          A.   Clean Vision, 20 percent.  Actually
21   less than 20 percent.  I'm sorry.  I think it comes
22   out to like 13 1/3rd percent.  .1333, I believe is
23   what I own at Clean Vision.  Quickstream, I'm not
24   sure.  I -- I know its under 10 percent, I believe.
25   Winners, Inc., I believe, is under 10 percent.
```

9

1      Q.   And why do you have a -- a percentage

2   of -- of shares?  Did you purchase the shares in

3   each of your clients' entities?

4      A.   I received the shares and the various

5   entities pursuant to my advisory agreements, the

6   services provided or to be provided.

7      Q.   So in exchange for the services you

8   provide, you receive shares in each of the client,

9   entities; is that correct?

10      A.   Shares and cash.

11      Q.   Do you interact with the investors in

12   any of your clients' entities?

13      A.   Yes, I do.  Not all of them, but yes,

14   I do at times.

15      Q.   Okay.  For what purpose?

16      A.   Mostly in an administrative capacity

17   to help with the paperwork.

18      Q.   What paperwork?

19      A.   Subscription agreements, legal

20   opinions that would come from counsel to issue

21   shares.  Transfer agent to have shares issued.

22   Escrow agent if there were escrow agents involved.

23      Q.   I'm going to stop you.

24      A.   I'm sorry.

25      Q.   My question was whether you interacted

10

1  with the clients' investors.  Did you understand

2  the question correctly?  You're telling me that you

3  speak with escrow agents, but I'm -- I'm asking

4  about your communications with the clients'

5  investors.

6          Do you understand?

7      A.  Yes.  I'm sorry.  I thought you asked

8  what I did for them or -- or my communication, I'm

9  sorry.

10      Q.  Tell me about your communications with

11  your clients' investors.  What do you communicate

12  with them about?

13      A.  I was the liaison with the paperwork.

14      Q.  And by "paperwork," you mean the

15  subscription agreements and other offering

16  agreements?

17      A.  Yes.

18      Q.  Do any of your clients have promissory

19  note offerings?

20      A.  I don't believe so at this time.  I

21  don't believe so.

22      Q.  Do they have PPMs, meaning private

23  placement memoranda?

24      A.  Regulation A offerings under the

25  Securities Act of 33.  Reg A offerings.

11

1          Q.   Again, do they have private -- do any

2     of them distribute or circulate private placement

3     memoranda to potential investors?

4          A.   I don't know.

5          Q.   In connection with the subscription

6     agreement communications with your clients and

7     investors, tell me about the nature of those

8     discussions.

9          A.   My role was to send them out to -- you

10    know, send out to the clients, to the

11    shareholders -- potential shareholders to review.

12    If the shareholders want to go through it and the

13    issuer wanted to go through it with them, I would

14    send everything out through DocuSign for their

15    respective parties to execute.

16         Q.   And who tells you at -- at your -- for

17    each of your clients who tells you the names and

18    contact information for the potential shareholders

19    you should send the offering documents to?

20              MR. PERRY:  Form.

21              THE WITNESS:  The --

22    BY MS. BERLIN:

23         Q.   Do you understand the question?

24         A.   Yes, I do.  I was thinking.  Either

25    the -- either the CEO or the respective investor.

                                                        12

```
 1              Q.   You mean a respective investor would
 2    contact you directly?
 3              A.   Yes.
 4              Q.   How would they get your contact
 5    information?
 6              A.   Most of the investors I know for
 7    years.  I know them.  I know them.
 8              Q.   For all off your clients?
 9              A.   Pretty much.  Pretty much, yes.
10              Q.   But these are public trade -- publicly
11    traded entities?
12              A.   Yes, they are.
13              Q.   But you know most or all of the
14    investors personally?
15              A.   Pretty much, yes.  When -- when you
16    say "personal," what does that mean "personally"?
17              Q.   I thought you just testified that you
18    know most of the investors and have for years.
19                   Did I understand you correctly?
20              A.   I -- I have business relationships,
21    but I'm not -- that's why I was asking what you
22    meant by "personally."  They're not personal
23    friends, but I have business relationships with
24    them --
25              Q.   So you know them in a personal or a
```

13

1    capacity, correct?

2            A.    A business capacity.

3                  MR. PERRY:  Objection.  Form.

4    BY MS. PERRY:

5            Q.    I'm sorry?

6            A.    In a business capacity, yes.

7            Q.    So how did these investors learn about

8    the offerings or the investments about which they

9    contact you?

10           A.    When a company files a Reg A offering,

11   it becomes public information, and the investors

12   that I know are all hedge funds.  And when an

13   offering is qualified, you know, by the commission,

14   they call the issuer, and the issuer has them

15   contact me.  The issuer refers them to me as part

16   of my role with these issuers, various issuers.

17           Q.    And so you're -- is it your testimony

18   that these clients learn about it, that's because

19   of the -- the filing with the SEC.  And they just

20   sort of randomly see it, and then somehow it's

21   always your investment?

22           A.    They don't randomly see it.  That's

23   their business.  That's what they I do.  It's not a

24   ran- -- it's -- it's definitely not a random act,

25   it's what they do.  They're -- there are -- they

14

1  know these offerings when they're coming out right

2  away.  They know.

3          Q.   They don't hear it from you?

4          A.   No.  No.

5          Q.   So if I call the -- all of the

6  investors in your clients' companies, not a single

7  one is going to tell me they heard about the

8  investment through you?

9          MR. PERRY:  Objection.  Form.

10  BY MS. BERLIN:

11          Q.   Am I understanding you correctly?

12          A.   You're saying everyone.  That's

13  typically the way it goes.  They see -- they see

14  that the company has filed a Reg A offer --

15          Q.   That's not my question.  I'm going to

16  stop you.

17          A.   I'm sorry.

18          Q.   If I contact every one of the

19  investors at your client companies, am I correct in

20  understanding that not a single one is going to

21  tell me they heard about the investment through

22  you?

23          MR. PERRY:  Objection.  Form.

24          THE WITNESS:  I don't know.  I don't

25          know.  I don't know if that's a true -- I

15

```
1              don't know if that's a true statement.
2    BY MS. BERLIN:
3         Q.   Well, have you ever told any of the
4    investors in your clients' entities -- have you
5    ever told anyone about the investment
6    opportunities?
7              MR. PERRY:  Objection.  Form.
8              THE WITNESS:  I don't sell any of
9         these investment opportunities, no.
10   BY MS. BERLIN:
11        Q.   That's not my question.
12        A.   Okay.  Sorry.
13        Q.   Please answer the question.  My
14   question was, have you ever told any potential
15   investor about the investment opportunity in one of
16   your clients' entities?
17        A.   Yes.
18        Q.   And is that part of the consulting
19   services that you provide?
20        A.   Yes.
21        Q.   And how do you go about telling
22   people?  Is it by phone or in personal meetings or
23   otherwise?
24        A.   By phone.
25        Q.   And how do you decide who to call
```

16

1   about a particular investment offering?

2        A.   I -- I don't call.  They -- they find

3   out about it, and they call me.  I only have a

4   handful of investors that I with, and they call me.

5        Q.   Where do you work on a day-to-day

6   basis, meaning physically?

7        A.   At this time, from my house.

8        Q.   At any time in 2023, have you worked

9   any -- out of any physical location other than your

10  home?

11       A.   No.

12       Q.   What about in 2022?

13       A.   I don't believe so.

14       Q.   In connection with Profile Solutions,

15  where did you conduct your work physically?

16            MR. PERRY:  Objection to form.

17  BY MS. BERLIN:

18       Q.   Do you understand the question?

19       A.   Yes, I do.  Either out of -- out of my

20  home or out of Profile's offices.

21       Q.   And where were those located?

22       A.   In Sunrise.

23       Q.   And you testified during the SEC's

24  investigation of this case, and when I say "this

25  case," I mean the SEC civil case against you that's

                                                    17

1  pending in district court.

2          Do you understand what I mean by "this

3  case"?

4      A.   Yes.

5      Q.   Okay.  The SEC took your investigative

6  testimony during the investigation in this case,

7  correct?

8      A.   Yes.

9      Q.   And you recall that occurring?

10     A.   Yes.

11     Q.   And you were represented be counsel at

12  that time?

13     A.   Yes.

14     Q.   And they attended with you?

15     A.   Yes.

16     Q.   And did you testify truthfully under

17  oath that day?

18     A.   Yes, I did.

19     Q.   And that remains your testimony today?

20          MR. PERRY:  Objection to form.

21          THE WITNESS:  I believe so.

22  BY MS. BERLIN:

23     Q.   Tell me when you commenced work for

24  Profile Solutions.

25     A.   I -- I honestly don't remember the

18

1    date that I started working there.

2            Q.    Year?

3            A.    In 2017.  I'm not sure if that's

4    correct.

5            Q.    How did you come about working there?

6            A.    I was introduced to Dan Oran by

7    Elizabeth Kowalski.

8            Q.    What was Profile Solutions in the

9    business of doing?

10            A.    Well, initially when I went to work

11   for Dan Oran, there was no Profile Solutions.  I

12   went to work for Elite Products International.

13            Q.    I understand.  Elite Products

14   International is a subsid- -- was a subsidiary of

15   Profile Solutions; is that correct?

16            A.    It was, but not initially.  I went to

17   work for Elite, and Dan wants it to go public.  So

18   Dan was looking for a public company to reverse and

19   merge into, so we found Profile Solutions, Inc.,

20   which was an existing business.

21                 I don't remember their exact business,

22   but the public company was for sale.  And Dan

23   purchased Profile Solutions and merged Elite into

24   Profile.

25            Q.    When you refer to "Dan," is that

19

1  Dan Oran?

2         A.   Yes.

3         Q.   And any time you refer to Dan today,

4  I'm going to understand you mean Dan Oran, unless

5  you specify otherwise.

6              Do you understand?

7         A.   Yes, I do.

8         Q.   Thank you.  Was Profile Solutions

9  directly or through its subsidiary, Elite, was it

10 in the -- in business relating to the cannabis

11 industry?

12        A.   Yes, it was.  I believe it still is.

13        Q.   Who worked there during the time that

14 you worked -- that you conducted work for Profile

15 Solutions?

16        A.    Dan, Robbie Hicks; Rebecca Mocca, I

17 believe her last name is; Galid Sahiv; if I'm

18 pronouncing it correctly.  Vladimir Tikiakov.

19 Dan's wife.  I believe Vladimir's wife worked there

20 also.  I can't think of her name.  Shamone Fema.

21 They had like six or seven other employees.  I

22 don't know all of their names.

23        Q.   Going back briefly to your -- the list

24 of clients that you provided me at the beginning,

25 which I -- I identified and defined.  It was

                                                    20

1  Consulting Services, Inc.; Quickstream Corp.;

2  Winners, Inc.; Clean Vision Corporate, Inc.;

3  Emergent Health Corp.; and Maison LUX.

4              Those are your clients, correct?

5       A.    Correct.

6       Q.    Are all of those penny stocks?

7       A.    Yes, they are.

8       Q.    Anyone else work at Profile Solutions?

9       A.    At this time or then?

10       Q.    During the time you were conducting

11  work for Profile Solutions, did anyone else work

12  there that you haven't identified already?

13       A.    Yes.  Yes.  You know, also the

14  attorney, Eddie Murieli.

15       Q.    Spell his last name if you can.

16       A.    M-U-R-I-E-L-I.  I don't know if all of

17  these people were employees or independent

18  contractors, but these are people that, to the best

19  of any knowledge, worked --

20       Q.    Anyone else?

21       A.    -- in some capacity in the company.

22  Dan had a couple of IT guys, one who passed away.

23  I can't think of his name.  I -- I'm not sure the

24  IT guys' names.  He had two different IT

25  technicians who worked at the company also.  There

```
 1  were like five or six people.  I don't know their
 2  names.  They were packing and shipping cannabis
 3  products from the office.  I don't know their
 4  names.  He had a salesperson.  I wasn't really
 5  involved with that part of it.
 6          Q.  And when you say "salesperson," you
 7  mean on the retail side of selling the drug
 8  products?
 9              MR. PERRY:  Objection to form.
10              THE WITNESS:  Selling the -- the
11              cannabis, you know, products to, you know,
12              retail stores.  They would go to trade
13              shows or with people to trade shows.  I
14              don't know the -- all of those people's
15              names.  They worked in the office, and I
16              don't really know their names.
17  BY MS. BERLIN:
18          Q.  Okay.  And -- and the people whose
19  names you don't know, they -- again, they were on
20  the retail side, meaning they were selling the
21  cannabis marijuana products to entities, rather
22  than being involved in the investment side.
23              Am I understanding correctly?
24          A.  The accountant was Anna Berman.  They
25  had an auditor, Daszcal Bolton (ph).
```

22

```
1              Q.    Say the name.

2              A.    Which one?  The Anna Berman or the

3    Bolton or Daszcal Bolton?

4              Q.    The -- the auditor, can you spell it?

5              A.    Yes.  D-A-S-Z-C-A-L, Daszcal.  Bolton,

6    B-O-L-T-O-N.

7              Q.    Okay.  And did he -- or she -- is that

8    a male or a female?

9              A.    That's the name of the company.

10             Q.    Okay.  So I'm -- I'm sorry.  I was

11   asking who worked for the business.  You're saying

12   this is the auditor company that they hired?

13             A.    Right.  Right.  And they had a -- an

14   audit manager, and I can't think of his name.

15             Q.    Okay.  So let's go back.  I'm asking

16   about who -- who worked there on a day-to-day

17   basis, not the external people they may have hired

18   for legal and consulting purposes, so if you -- at

19   Profile Solutions were either agent or employees or

20   consultants of the firm.

21             Do you understand?

22             A.    Yes.

23             Q.    Okay.  So we have Robbie Hicks,

24   Rebecca Mocca, Dalik Sahiv, Vladimir Ku- -- Yakov.

25             A.    Yakov.  Yakov.
```

23

1      Q.   Dan Oran and his wife.

2      A.   Yes.

3      Q.   Anna Berman, she worked on site or no?

4      A.   No.  She's outsource CFO.

5      Q.   I'm sorry?

6      A.   Outsourced CFO.

7      Q.   Outsourced --

8      A.   Right.

9      Q.   -- CFO?

10      A.   She was not, you know, on premises.

11      Q.   And Eddie Murieli, the attorney?

12      A.   Right.  He was on the board of

13  directors.

14      Q.   Understood.  And also not on site?

15      A.   On -- correct.

16      Q.   What did Robbie Hicks do at the

17  company?

18      A.   She was Dan's administrative

19  assistant.  To the best of my knowledge, she would

20  pay the bills that Danny would instruct to be paid.

21  She would organize Danny's e-mails.  She would

22  organize Danny's agreements.  She would make

23  Danny's travel arrangements.

24      Q.   Did she also work with you?

25      A.   Not really.  No, I had -- I had no

24

1  authority over her.  There's nothing that I would

2  ask her to do for me.  She didn't work for me.

3       Q.   So the answer is no?

4       A.   No.  I'm just thinking out loud, so I

5  apologize.

6       Q.   Okay.  And then Vladimir was in charge

7  of the website, correct?

8       A.   No.  Vladimir was involved -- Vladimir

9  boarded many of the shareholders.  Vladimir is from

10  Russia.  Vladimir boarded the investors for

11  profile, Dan and Vladimir.  I had nothing to do

12  with any of the investors of Profile.

13       Q.   And so why -- what was -- what is your

14  knowledge based on that Vladimir was the person who

15  was bringing in the investors?

16       A.   They in- -- they introduced them to

17  me.

18       Q.   Who's "they"?

19       A.   Dan and Vladimir.

20       Q.   They would introduce leads to you?

21       A.   No.  They would -- they would make

22  arrangements with investors, and they would have me

23  send the subscription agreements to the investors

24  and all the different documents that were required.

25  I had no negotiation or discussion --

25

1          Q.    Okay.

2          A.    -- with those investors.

3          Q.    Okay.  So they would bring potential

4    investors to you because you just testified you

5    would send them the subscription agreement.  You

6    understand that someone's not an investor until

7    they've actually invested --

8               MR. PERRY:  Objection to form.

9    BY MS. BERLIN:

10         Q.    -- correct?

11         A.    I -- I had different roles with

12   Profile than I did at the companies you asked me

13   about earlier.  At Profile, I had no -- no -- no

14   agreement -- no -- no -- no -- sorry, no

15   involvement with any of the investors.  Dan and/or

16   Vladimir, who were the investors, they would tell

17   me that so-and-so is putting $50,000 or whatever,

18   you know, into Profile, to write it up.  I would

19   write it up.  I would send out the subscription

20   agreement.

21              At that time, we didn't have DocuSign,

22   so I would send everything out by e-mail.  The

23   investors would sign, wire their money into

24   Profile's account.  I wasn't involved in any of the

25   negotiations or discussions with any of those

26

1   investors.

2          Q.   Okay.  And Profile's a penny -- was a

3   penny stock, correct?

4          A.   Yes.

5          Q.   Okay.  So when you say that Vladimir

6   would bring in the investors, do you mean these

7   people who were investing in the penny stock,

8   meaning the -- the outside public --

9          A.   Vladimir --

10          Q.   -- or are you talking about investors

11   who were -- who were investing through something

12   other than the penny stock offering?

13          MR. PERRY:  Objection to form.

14   BY MS. BERLIN:

15          Q.   Do you understand the question?

16          A.   When I -- when I'm referring to an

17   investor, I'm referring to a subscriber, just to

18   qualify it.  So the subscribers for the -- you

19   know, any of the investments, you know, came -- you

20   know, Vladimir introduced them from people that he

21   personally knew, or Dan introduced people that he

22   personally knew.

23          And typically, when they would come to

24   the office to discus it with Dan, they was really

25   speaking Hebrew, and I did not understand it.  It

27

1   wasn't my place to understand it or not understand

2   it.  And when Vladimir brought people and they

3   would speak Russian, which is not my place to

4   understand it or not understand it.  I was just the

5   scrivener of the documents after I was told that

6   they were invest- --

7        Q.   I'm going to stop you.  If you could

8   just answer my question --

9        A.   Okay.

10       Q.   -- okay?

11            MS. BERLIN:  So can we read him back

12       the question.

13            (Requested portion read.)

14            THE WITNESS:  Investors for the penny

15       stock offering.

16   BY MR. BERLIN:

17       Q.   Okay.  And other than Vladimir

18   introducing potential investors to the company for

19   the penny stock investment, were there other --

20   there were other methods of getting the word out

21   about the investment in Profile Solutions, correct?

22            MR. PERRY:  Objection to form.

23            THE WITNESS:  There is nothing that

24       was done to market the offering.  The

25       offering never became effective, so it was

                                                        28

```
 1            never marketed.
 2    BY MS. BERLIN:
 3            Q.    Did Prof- -- Profile Solutions
 4    advertise through Twitter, correct?
 5            A.    It had a Twitter account, yes.
 6            Q.    There were also people who posted on
 7    Reddit and other online forums, correct?
 8                  MR. PERRY:  Objection to form.
 9                  THE WITNESS:  That I don't know.  The
10            only one I was aware of is Twitter.
11    BY MS. BERLIN:
12            Q.    There were press releases, correct?
13            A.    Yes.
14            Q.    And so is it your testimony today that
15    every investor in -- in Profile Solutions came
16    through either Vladimir or Dan Oran?
17            A.    No, that's not what I was saying.
18            Q.    Your -- am I understanding then that
19    Vladimir and Mr. Oran would introduce investors to
20    the firm?
21                  MR. PERRY:  Objection.
22                  THE WITNESS:  May I explain?
23    BY MS. BERLIN:
24            Q.    Can -- can you just answer the
25    question I've asked.  If the answer is a no, I'll
```

29

1    ask for clarification if I need it.

2         A.    It -- its not a simple -- I can't -- I

3    can't tell -- I apologize.  I can't answer --

4         Q.    You can't answer the question --

5         A.    No.  No, because --

6         Q.    -- whether they introduce people to

7    the firm?  Okay.

8         A.    There's -- there's two different types

9    of people, so I'm trying to explain.

10        Q.    What are the two types of people?

11        A.    Okay.  There's investors who invest in

12   the company, and there's people who buy and sell

13   stock through stockbrokers.  I would have no idea,

14   you know, who bought and sold stock through

15   stockbrokers.

16        Q.    Okay.  And -- and that -- that's my

17   question.

18        A.    Okay.

19        Q.    So you're not claiming that every

20   investor came through these two people, you're

21   simply testifying that they introduced the

22   potential investors to the firm?

23        A.    To invest in the company.  To put

24   money into the company, not necessarily put money

25   into -- through Merrill Lynch who are, you know,

                                                    30

1   whatever their stockbroker may be.  I --

2          Q.   Okay.

3          A.   -- have -- have no idea of those

4   people.

5          Q.   Okay.  And if they -- if Dan and

6   Vladimir found someone who was interested in

7   investing or brought them into the office and told

8   them about the company and the potential investor

9   wanted to learn more, they would put that person in

10  contact with you for the offering documents,

11  correct?

12         A.   My role is the offering documents, not

13  more information on the company.  That was their

14  part of it.

15         Q.   So -- correct, that you would then

16  send out the offering materials --

17         A.   Yes.

18         Q.   -- to the investor, yes?

19         A.   Yes.

20         Q.   Would you provide the potential

21  investors with the registration -- the copy of the

22  registration statements?

23         A.   To the best of my memory, all of the

24  investors were prior to the offering.  Nobody

25  purchased shares that -- that I'm aware of through

                                                    31

1   Dan and/or Vladimir from the S-1 registration.  It

2   was all prior to.

3            To the best of my knowledge, they

4   purchased it through stock purchase agreements, not

5   even subscription agreements, stock purchase

6   agreements from Dan.

7            Q.   Do you have an account on Reddit, or

8   have you ever?

9            A.   I may have an account, but I -- I've

10  never posted on Re- -- I don't even know if I have

11  an account on Reddit.  I may have opened one, but

12  I've never done anything on Reddit.

13           Q.   What's your user name for Reddit?

14           A.   I have no idea.  I have -- if you show

15  it to me, I'll tell you if it's mine.  I don't

16  know.

17           Q.   You don't know?

18           A.   No.

19           Q.   And you don't recall ever posting on

20  Reddit?

21           A.   No.

22           Q.   Directing anyone to post on Reddit?

23           A.   No.  I didn't do anything on Reddit.

24           Q.   Okay.  And -- well, what sites did you

25  post on, InvestorsHub?

1            MR. PERRY:  Objection to form.

2            THE WITNESS:  No.  Never posted on

3        InvestorsHub.

4   BY MS. BERLIN:

5        Q.   Do you have an account there?

6        A.   I might have an account to observe,

7   but I never -- I never posted on InvestorsHub or

8   Reddit.

9        Q.   What's your user name on InvestorsHub?

10       A.   I don't know.  I haven't done anything

11  -- I don't -- I don't know.  I don't know.

12       Q.   Would you have signed up through your

13  personal e-mail address?

14       A.   If I did sign up, yes, I would have,

15  yes.

16       Q.   And what is that?

17       A.   Leonard -- at this time, I believe it

18  was leonardmtucker@hotmail.com.

19       Q.   Did you participate in any online

20  forums?

21       A.   No.

22       Q.   Not even Twitter?

23            MR. PERRY:  Objection to form.

24            THE WITNESS:  What do -- what do you

25       mean by "forum"?

                                                    33

```
 1   BY MS. BERLIN:

 2          Q.   Any social media outlet.  Lets start

 3   there, if you don't understand what a forum is.  Do

 4   you have a Twitter account?

 5          A.   No.  No.  I had -- no, I -- I managed

 6   certain Twitter accounts.  I don't -- I don't know

 7   what you mean by had -- it's not -- it's not like

 8   my personal Twitter account.

 9          Q.   What Twitter -- did you manage any

10   Twitter accounts for Profile Solutions?

11          A.   Myself and Adam Baker.

12          Q.   So is that a yes?

13          A.   Yes, I'm sorry.

14          Q.   And the Twitter account for Profile

15   Solutions is under your contact information,

16   correct?

17              MR. PERRY:  Objection to form.

18              THE WITNESS:  Either myself and/or

19         Adam Baker, I don't remember.

20   BY MS. BERLIN:

21          Q.   Okay.  Any other social media or any

22   online accounts or forums that you managed or

23   participated in for Profile Solutions?

24          A.   No.  Not that I can recall.

25          Q.   Only the Twitter account?
```

34

```
 1            A.    Yes.

 2                  (Thereupon, Plaintiff's Exhibit 2

 3            was marked for identification.)

 4   BY MS. BERLIN:

 5            Q.    I'm going to hand you what we've

 6   pre-marked as Exhibit 2.  I'm handing it to your

 7   counsel as well.  This is for our court reporter.

 8                  This is a -- one -- the registration

 9   statement for Profile Solutions, correct?

10            A.    Yes.

11            Q.    And did you participate in drafting

12   this?

13            A.    No.

14            Q.    Did you review it?

15            A.    Yes.

16            Q.    Did you review it before it was filed

17   with the SEC?

18            A.    Yes.

19            Q.    And it's your testimony that you did

20   not participate at all in drafting it.  And by

21   "drafting," I mean including editing, making

22   changes in any way.

23            A.    I did.  I -- I -- I didn't draft it.

24   I provided information.

25            Q.    What information did you provide in
```

35

1    connection with Exhibit 2?

2           A.   I -- I don't know what Exhibit 2 is.

3    Where -- 59 --

4           Q.   The whole thing is Exhibit 2.

5                MR. PERRY:  Oh, this whole thing is

6           Exhibit 2, I'm sorry.  The whole thing is

7           59 pages.

8    BY MS. BERLIN:

9           Q.   Exhibit 2 is the Form S-1 for Profile

10   Solutions.

11          A.   I worked -- I worked with

12   Jackson Morris who would ask me for copies of

13   agreements that he needed.  He -- he had asked me

14   for certain materials, and I -- I gave him whatever

15   he asked me for.

16          Q.   And you said Jackson Morris was the

17   person who would ask you for information?

18          A.   Yeah, he -- yes.  He was the attorney.

19   He had the S-1 registrations statement.

20          Q.   Okay.  And did you provide the -- any

21   information in connection with the risks identified

22   in the registration statement?

23          A.   I don't -- I don't believe so.

24          Q.   Did you review the risk section?

25                MR. PERRY:  Why don't you go to that

                                                          36

1          page.  Can we do that?

2     BY MS. BERLIN:

3          Q.    Then turn to Page 6.  In the bottom,

4     it'll actually say 7 out of 59.  It's titled "Risk

5     Factors."  And it goes on -- a little more -- it

6     goes on to the next several pages.

7          A.    Okay.  Let me take a look.

8          Q.    I'm not asking you to sit and read it.

9          A.    I'm sorry.

10         Q.    I'm asking if you want to look at it

11    to refresh your recollection.  And the question is

12    simply, did you provide any input on the risk

13    factors for the registration statement?

14         A.    No, I did not.

15         Q.    Turn to Page 8 of 59, please.

16         A.    Okay.

17         Q.    Do you see that the first risk factor

18    that's listed is that there could be changes in the

19    laws that would impact whether or not the products,

20    the CBD products of -- of Profile Solutions were

21    legal.

22              Do you see that as a risk factor?

23         A.    Yes.

24         Q.    Okay.  And is that -- is that an

25    accurate -- is -- is that actually a risk factor or

                                                              37

1   was it at Profile Solutions, that CBD extracts or

2   cannabis may not be legal, would that impact

3   Profile Solutions's profitability.

4          Mr. Tucker?

5          A.   Okay.  I'm reading what it says.

6          Q.   Okay.  You can close the exhibit.

7          A.   Okay.

8          Q.   And listen to the question.

9          A.   Okay.

10         Q.   My question was, is it a risk fact- --

11  was it a risk factor of Profile Solutions when they

12  were in business that cannabis or CBD products may

13  not be legal?

14         A.   Yes, that's a risk factor.

15         Q.   Why?

16         A.   Because Jackson Morris put that it's a

17  risk factor.

18         Q.   That's not my question.  You just

19  testified yourself that it -- it is a risk factor.

20  So let me ask it another way:  Part -- Profile

21  Solutions was in the business of cannabis and CBD

22  products.

23         Do you agree?

24         A.   Yes, it was.

25         Q.   So is -- did the profitability of

38

1   Profile Solutions, was that impacted almost

2   exclusively by the ability to distribute and sell

3   CBD and cannabis products?

4           MR. PERRY:  Objection to form.

5   BY MS. BERLIN:

6           Q.   That's -- that's what they were in the

7   business of doing, correct?

8           A.   Yes.

9           Q.   And so if CBD and cannabis are not

10  legal, then Profile Solutions could not sell them,

11  correct?

12          A.   Correct.

13          Q.   And so if they can't sell them and

14  they can't generate business or profits for the

15  company, is that a risk factor for investors to

16  know about?

17          A.   I would assume that's why Jackson put

18  it in here.

19          Q.   That's not my question.  Do you know?

20  I'm not asking --

21          A.   I don't know.  I don't know.

22          Q.   I'm not asking you -- please let me

23  finish the question.

24          A.   Okay.

25          Q.   I'm not asking you about what a person

39

1    name Jackson may have thought or assumed.  That's

2    not the question.  The question is, you were a

3    consultant, you worked at this company almost every

4    day, correct?

5         A.   Pretty much.  I'm -- not -- not on

6    this particular firm.  I had various different

7    accounts there.

8         Q.   For years at Profile Solutions,

9    correct?

10        A.   Right.

11        Q.   Okay.  And so were you familiar with

12   the business?

13        A.   Somewhat.  Not the laws of cannabis.

14        Q.   I'm not asking you about the laws of

15   cannabis, Mr. Tucker.

16        A.   Yes.

17        Q.   I'm asking you, as someone who worked

18   with this entity, that was involved in a public

19   offering of securities -- do you understand the

20   question so far?

21        A.   Yes.

22        Q.   Did you understand the risk factors

23   associated with the business?

24        A.   Yes, I did.

25             MR. PERRY:  Objection to form.

40

```
 1   BY MS. BERLIN:
 2           Q.   Did you take time to educate yourself
 3   about the risk factors of the business?
 4           A.   No.
 5           Q.   You did not?
 6           A.   No.
 7           Q.   Did you take time to educate yourself
 8   about what the business of Profile Solutions was?
 9           A.   Yes.
10           Q.   Did you -- but you didn't take any
11   time to look into what might impact, what risk
12   factors might exist that could impact the
13   profitability or the investment quality of the
14   business.
15           A.   Yes, I --
16           Q.   Am I understanding you correctly?
17           A.   Yes.  I -- I did take steps.
18           Q.   What did you do?
19           A.   We got a legal opinion.
20           Q.   Other -- you.  Who did you retain?
21           A.   With the company.  The company got a
22   legal opinion.
23           Q.   From?
24           A.   And I spoke with the attorney, and he
25   gave a whole written legal opinion.  I can provide
```

                                                            41

```
1    it to you.
2         Q.   Okay.
3         A.   -- that said all this is legal, all
4    the stuff they were doing.
5         Q.   That's -- that's not my question.
6         A.   That's what I relied on.
7         Q.   Okay.  So is that exclusively what you
8    relied on --
9         A.   Yes.
10        Q.   -- was this legal opinion?
11        A.   Yes.
12        Q.   And that's the opinion you relied on.
13   You relied on a legal opinion to tell you about the
14   risk factors and profitability of the Profile
15   Solutions business.
16             Am I understanding you correctly?
17        A.   No.  It wasn't my job.
18             MR. PERRY:  Objection to form.  Let me
19        -- let me get my objection --
20             THE REPORTER:  One second.
21   BY MR. BERLIN:
22        Q.   What do you mean it wasn't your job?
23             MR. PERRY:  -- before you talk over
24        each other.
25             Objection, again, as to form.
```

42

```
 1                    MS. BERLIN:  To which question?

 2                    MR. PERRY:  I don't know what question

 3          you're asking, quite frankly.  You're --

 4          you're -- all you're doing is a whole

 5          narrative.  Every time you want to rephrase

 6          the question, you don't rephrase the

 7          question.

 8                    MS. BERLIN:  I'm -- I'm not responding

 9          to narrative objections if that's what that

10          was.

11                    (Simultaneous conversation.)

12                    MR. PERRY:  Okay.  And I'm -- my

13          intention is not to make a narrative

14          objection.

15                    MS. BERLIN:  And the record will

16          reflect...

17     BY MS. BERLIN:

18          Q.   Mr. Tucker, if you don't understand a

19     question at any time, tell me, and I'll rephrase

20     it.  Do you understand that was my first

21     instruction to you?  Do understand it?

22          A.   Yes, I do.

23          Q.   Do you still understand it?

24          A.   Yes, I do.

25          Q.   Okay.  So you've te- -- I've asked you
```

43

1    about the risk factors and profitability of the

2    business.

3              Do you understand that?

4         A.   Yes.

5         Q.   Okay.  And your testimony was that you

6    relied on an attorney and his legal opinion for

7    those things; is that correct?

8         A.   Yes.

9         Q.   Anything else that you relied on?

10        A.   And Dan Oran.

11        Q.   Okay.  So a few minutes ago, you

12   testified you exclusively relied on a lawyer.  Now

13   you also relied on Dan Oran.

14        A.   I just worked there.  I -- I don't --

15   I don't know.  I don't know.

16        Q.   Can you answer the question?

17        A.   I don't know the answer.

18        Q.   You don't know the answer?

19        A.   I don't know the answer.

20        Q.   Okay.

21        A.   I worked there.  You know, I do work.

22   I -- I -- I did what I was asked to do.  I don't --

23   I don't know.

24        Q.   Okay.

25        A.   I don't know cannabis.  I'm not an

44

1  expert.  I don't know the rules and the regulations

2  or --

3           MR. PERRY:  Wait until there's a

4      question.

5           THE WITNESS:  I don't know.

6  BY MS. BERLIN:

7      Q.   Did you ever take any time to educate

8  yourself about the rules and regulations of the

9  cannabis industry when you were working for them?

10     A.   No.

11     Q.   Okay.  And but did you understand --

12 let me ask you fundamental questions of business.

13     A.   Okay.

14     Q.   Because you've been in -- a consultant

15 for how many years now?

16     A.   Many.

17     Q.   How many?  Decades, correct?

18     A.   Many.

19     Q.   A consultant for what, hundreds of

20 companies, I'm going to guess?

21     A.   No, but a lot.  Many.

22     Q.   Dozens?

23     A.   Dozens.

24     Q.   Okay.  So do you -- do you agree with

25 me that the profitability of a company is dependent

45

1 on its ability to do business?

2          A.   Yes, I do.

3          Q.   Okay.  And so if -- if a company is

4 restricted or prohibited from doing business, then

5 they're not going to be able to generate profits.

6 Agree with me on that fundamental --

7              (Simultaneous conversation.)

8          A.   You're asking if -- that wasn't my

9 role with the company.  That wasn't my role.

10 BY MS. BERLIN:

11          Q.   I'm not asking --

12          A.   I -- I didn't -- that wasn't my role.

13 Wasn't my role.  I don't know.

14          Q.   Sir, I'm asking about your role of the

15 company.  I'm asking you, as Leonard Tucker sitting

16 here today, do you agree with me that there's a

17 fundamental principal, that if a business -- any

18 business is restricted from operating, selling,

19 engaging in business, that they cannot then gen- --

20 then they cannot generate profits.

21              Do you agree?

22          A.   Yes, I agree.  I agree.

23          Q.   Okay.  Were going to take a quick

24 break.  Its 12 o'clock.

25              MS. BERLIN:  Lets go off the record.

                                                        46

```
1                    THE VIDEOGRAPHER:  We're off the

2           record.  The time the 12:02 p.m.

3                    (A brief recess was taken from

4           12:11 p.m.)

5                    THE VIDEOGRAPHER:  We're on the

6           record.  The time is 12:15 p.m.

7   BY MS. BERLIN:

8           Q.   Thanks.  Was Profile Solutions'

9   business profitability dependent on its ability to

10  distribute or cultivate or sell marijuana or

11  cannabis?

12          A.   No.

13          Q.   Okay.  What was it dependent on?  What

14  was the profitability dependent on?

15          A.   The sales and profitability of Profile

16  or with their subsidiary Elite, which was CBD

17  products.

18          Q.   I'm sorry.  Is there a difference

19  between CBD products and marijuana or cannabis?

20          A.   To the best of my knowledge, CBD is --

21  has medical benefits to it.  It doesn't get you

22  high.  Marijuana gets you high, from my

23  understanding.

24          Q.   Okay.  Is CBD a derivative of

25  marijuana or cannabis?
```

47

1           A.   Yes.  CBD's a derivative of cannabis.

2           Q.   Okay.  So CBD comes from cannabis?

3           A.   Yes.

4           Q.   Okay.  So can you explain to me then,

5    a -- like is there a connection, let's say -- let

6    me ask it a different way:  Was the profitability

7    of Profile Solutions dependent on the ability to

8    like distribute or cultivate cannabis products,

9    whether those be CBD or some other like form of

10   cannabis?

11          MR. PERRY:  Objection to form.

12   BY MS. BERLIN:

13          Q.   Do you understand the question?

14          A.   They didn't cultivate any products.

15   They distributed gummies with CBD in it.

16          Q.   Okay.

17          A.   And lollipops and certain products

18   like that to --

19          (Simultaneous conversation.)

20   BY MS. BERLIN:

21          Q.   So they distributed CBD products?

22          A.   CBD products, correct.

23          Q.   Okay.  But if you can't cultivate, if

24   -- if people can't cultivate cannabis, how were

25   those gummy products made?

48

```
 1            A.    From my understand, CBD was legal.

 2    Marijuana was not always legal.  There's different

 3    --

 4            Q.    Okay.

 5            A.    -- strains of the THC.

 6            Q.    That's not my question.

 7            A.    Okay.

 8            Q.    So let me see if I can analogize it

 9    for you.  Let's say that you work at a pizza place,

10    you have a pizza restaurant, okay, and you sell

11    pizza.

12            A.    Right.

13            Q.    Are you with me so far?  And one of

14    the critical elements of a pizza would be the wheat

15    that makes the breast crust.

16                  Do you understand so far?

17            A.    Yes.

18            Q.    Okay.  If you cannot cultivate wheat,

19    you cannot make pizza.

20                  Do you understand?

21            A.    Yes.

22            Q.    Okay.  So would you agree we that

23    pizza restaurant is not going to be profitable if

24    -- if the -- if the production of wheat cannot be

25    done?
```

49

```
 1          A.   Correct.

 2          Q.   Do you agree?

 3          A.   Yes.

 4          Q.   So let's then take that to this

 5   cannabis world that you were in.  Am I correct in

 6   understanding Profile Solutions distributes, not

 7   pizzas, but CBD?

 8          A.   I disagree with what -- your

 9   statement.

10          Q.   Oh.

11          A.   I was not in any world.

12          Q.   Okay.  So let me ask it a different

13   way.  If -- you under- -- if Profile Solutions was

14   in the business of distributing CBD, do you agree,

15   yes or no?

16          A.   That Profile was in the business of

17   distributing CBD?  Yes, they were.

18          Q.   You've testified that was their sole

19   profitability?

20          A.   Yes.  Yes.

21          Q.   Okay.  And cannabis is an essential

22   element for making CBD?

23          A.   I think it's a the other way around.

24   I'm not sure.  I'm not sure how that works.

25          Q.   Okay.
```

50

1          A.   I know CBD -- CBD is part of the

2     plant.  I don't know which part.  I don't know -- I

3     don't know.

4          Q.   Okay.  So can the CBD that's

5     distributed by Profile Solutions, can it exist

6     without the existence of cannabis?

7          A.   I don't -- I don't -- I don't know the

8     definition of CBD compared to cannabis.  I -- my

9     understanding is cannabis is the THC that gets you

10    high.

11         Q.   Okay.

12         A.   And they weren't doing that.

13         Q.   But CBD is some form or strain of

14    marijuana or cannabis.  Can we agree on that?

15         A.   It's a strain of the plant.

16         Q.   Okay.  Of marijuana or cannabis?

17         A.   I -- I'm not sure.  I don't know how

18    that works.

19         Q.   You don't know?

20         A.   I -- I don't know.  I don't know.

21         Q.   Okay.  So you don't know what the

22    ingredients of CBD -- you don't know if CBD is

23    derived from marijuana or cannabis?

24         A.   No.

25         Q.   Okay.  It could be derived from chalk.

51

```
 1   You have no clue --
 2          A.   I don't know.
 3          Q.   -- is that correct?
 4          A.   I don't -- I don't smoke.  I don't --
 5   you know, I don't take the products.
 6               (Simultaneous conversation.)
 7   BY MS. BERLIN:
 8          Q.   Okay.  But you worked -- you worked
 9   and you owned, what, 14 percent of the shares of a
10   company that was in the --
11          A.   I had no -- I had --
12          Q.   I'm finish -- I'm -- I'm talking.
13          A.   Okay.
14          Q.   -- that was in the business of
15   distributing CBD.
16               Do you agree with me?
17          A.   That was their business.
18          Q.   And you're testifying today that you
19   don't know what CBD is made of?
20          A.   No.
21          Q.   It could be made of chalk for all of
22   you know?
23          A.   I don't know.  I don't know.
24          Q.   It could be made from broccoli?
25          A.   I don't know.
```

                                                        52

```
 1          Q.   You don't know?  Okay.  Okay.  All
 2  right.  But you did draft registration agreements
 3  and press releases for Profile Solutions, correct?
 4               MR. PERRY:  Objection to form.
 5               THE WITNESS:  No, I did -- no, I did
 6       not.
 7  BY MS. BERLIN:
 8          Q.   You didn't?
 9          A.   No.  No.
10          Q.   Oh.  Okay.  And you remember
11  testifying in this case under oath during the
12  investigation, correct?
13          A.   I was involved with a preparation of
14  press ^ check.  I didn't draft it.  It was not my
15  information.
16          Q.   Okay.  So when you say you were
17  involved -- and -- and I think you're mincing
18  words, so lets be clear.
19          A.   Okay.  Okay.
20          Q.   I'm not asking who provided you the
21  information, and I'm not -- I'm not asking about
22  the things that you just said.  I'm asking about
23  drafting.  So when a press release or the
24  registration statements were created, you
25  participated in the drafting of them --
```

53

1          MR. PERRY:  Objection to form.

2  BY MS. BERLIN:

3          Q.   -- whether someone else gave you the

4  information or you came up with it yourself, that's

5  not the question.  You participated in drafting

6  them, agreed?

7          MR. PERRY:  Objection.  Form.

8          THE WITNESS:  Yes, I did.

9  BY MS. BERLIN:

10          Q.   Okay.  Thank you.

11          A.   Okay.

12          Q.   And the ticker symbol was -- for

13  Profile Solutions, was P- -- PSIQ?

14          A.   Yes.

15          Q.   So did you ever review; for example, I

16  have Exhibit 2 in front of you, and I just showed

17  you on Page 7 how there's a risk factor section.

18          Do you recall that?

19          A.   Yes.

20          Q.   Did you ever educate yourself or

21  become aware of any of the risk factors associated

22  with Profile Solutions' business?

23          A.   No.

24          Q.   You never did?

25          A.   No.

54

1          Q.   Okay.  Why not?  Why didn't you take

2     the time to --

3          A.   Not --

4          Q.   -- learn about the business?

5          A.   It wasn't my job.  It wasn't my job.

6          Q.   Okay.  Okay.  But you did participate

7     in drafting the registration statements and press

8     releases, correct?

9               MR. PERRY:  Objection to form.

10    BY MS. BERLIN:

11         Q.   You testified to that already?

12              MR. PERRY:  Objection.  Form.

13              THE WITNESS:  I did not -- I never

14          said I participated in the drafting of the

15          registration statement.  I did not

16          participate in the drafting.  I've provided

17          information to the attorney,

18          Jackson Morris.  I never drafted anything.

19    BY MS. BERLIN:

20         Q.   So now your -- your testimony is that

21    you didn't draft?

22         A.   I didn't draft anything in the

23    registration statement, no.

24         Q.   Okay.  You didn't participate in the

25    preparation or drafting of the regis- -- of any

                                                        55

1   registration statement of Profile Solutions?

2           Is that your sworn testimony today?

3           MR. PERRY:  Objection as to form.

4           THE WITNESS:  My sworn state- -- I

5       participated in the process.  I did not

6       draft it.  The attorney drafted it.  I

7       didn't draft anything.

8   BY MS. BERLIN:

9       Q.   So again, we just went through this.

10      A.   Uh-huh.

11      Q.   And I expressed that I thought you

12  were mincing words, and I explained to you what I

13  mean by "drafting."  And you agreed with me, and

14  you testified that you did...

15      A.   Please explain "drafting."

16      Q.   Okay.  We just went through that a few

17  minutes ago.  The record will reflect --

18      A.   Okay.  Well, I'm not understanding --

19           (Simultaneous conversation.)

20  BY MS. BERLIN:

21      Q.   -- our discussion of that, and you

22  don't remember it.

23      A.   I'm not understanding what you mean by

24  "drafting."  I know what I mean by drafting, but I

25  think it's different what you mean by "drafting."

                                                    56

1    So I'm asking you which is the right --

2             (Simultaneous conversation.)

3    BY MS. BERLIN:

4        Q.   What do you mean by "drafting,"

5    Mr. Tucker?

6        A.   I didn't draft anything.  "Drafting"

7    is -- is writing.  I didn't write anything in that

8    registration statement.  I reviewed the

9    registration statement to a certain extent.  I

10   provided information that was asked of me of

11   Jackson Morris.  I've provided copies of employment

12   agreements, consulting agreements, lease

13   agreements, financial statements.  You know, that's

14   how I participate in the process.  I didn't draft

15   -- I didn't write anything in the registration

16   statements.  It's not my writing.

17       Q.   You edited it, correct, the

18   registration statements?

19       A.   I gave -- I provided comments where I

20   felt the comments were necessary or applicable.

21       Q.   And you recall you testified about

22   this during the investigation and --

23       A.   Yes.  Absolutely.  Absolutely.

24       Q.   Okay.  So anything -- has -- has

25   anything changed since February 3rd, 2021, and

                                                    57

```
 1   today?
 2               MR. PERRY:  Objection to form.
 3               THE WITNESS:  I -- I don't know what
 4          you mean "has anything changed."
 5   BY MS. BERLIN:
 6          Q.   Has anything changed in your life?
 7          A.   I'm trying to clarify my role.
 8          Q.   Have you suffered any sort of -- okay.
 9   I'm asking --
10          A.   Okay.
11          Q.   -- has anything happened since
12   February 3rd, 2021, when you testified, meaning has
13   anything impacted your memory?
14          A.   Not that I'm aware of.
15          Q.   Are you on any medication today?
16          A.   A lot, yes for the --
17               (Simultaneous conversation.)
18   BY MS. BERLIN:
19          Q.   Anything that would impact your
20   memory?
21          A.   I don't believe so.
22               MS. BERLIN:  We're going off the
23          record for a quick break.
24               THE VIDEOGRAPHER:  We're going off the
25          record.  The time is 12:24 p.m.
```

58

1          (Thereupon, a short recess was taken.)

2          THE VIDEOGRAPHER:  We're on the

3     record.  The time is 12:32 p.m.

4          MS. BERLIN:  Thank you.

5     BY MS. BERLIN:

6          Q.   Just to make sure that you understand

7     what I'm asking you, when I ask if you participated

8     in drafting the registration statement, you

9     provided comments and edits to the registration

10    statement, correct?

11         A.   Yes, I did.

12         Q.   Okay.  And you would sent texts,

13    comments, edits, and suggestions to the attorney

14    who actually was preparing the document?

15         A.   Yes, I did.

16         Q.   And the attorney doesn't work, like

17    he's the attorney for Profile Solutions, but he's

18    relying on Profile Solutions to provide any

19    information about the company, correct?

20         A.   So am I.

21         Q.   Okay.  That's not my question.

22         A.   Okay.

23         Q.   Listen to the question.  The attorney

24    isn't internal at Profile Solutions, he's an

25    attorney who's hired, an external attorney hired by

59

```
 1   Profile Solutions.

 2              Agreed?

 3        A.   Yes.

 4        Q.   Accordingly, the attorney is relying

 5   on Profile Solutions to give it the information

 6   about the business, agreed?

 7        A.   Agreed.

 8        Q.   You testified that you relied on the

 9   attorney for information about the business and the

10   risk factors.  Which attorney, specifically?

11              MR. PERRY:  Objection to form.

12              THE WITNESS:  The risk factors of the

13         S-1 that was repaired by Jackson Morris.

14   BY MS. BERLIN:

15        Q.   Okay.  But you said you didn't read

16   those.

17        A.   I didn't say I didn't read the risk

18   factors.  I never read them?

19        Q.   I'm asking your testimony earlier

20   today.

21        A.   I said I didn't prepare the -- I said

22   I didn't prepare the risk factors.  I didn't say I

23   didn't read them.

24        Q.   Okay.  So let me just ask you again

25   directly, did you read the risk factors in this S-1
```

1  Exhibit 2 that I showed you earlier?

2      A.   To the best of my memory, yes.  To the

3  best of my memory, yes.

4      Q.   Oh, so you did?

5      A.   I never said I didn't.

6      Q.   Okay.  And did you review them during

7  the -- like when the subscription agreement

8  Exhibit 2 was prepared back in 2019?

9      A.   I -- I -- the su- -- I don't -- I

10  don't recall the time of the subscription agreement

11  versus the S-1 registration.

12      Q.   I'm sorry.  For the S-1.  Thank you.

13  For the S-1 registration --

14      A.   Correct.

15      Q.   -- statements, and there were

16  multiple.  There were at least two, correct?

17      A.   There was one filed with a commission,

18  and then an amendment, so -- okay.

19      Q.   Okay.  And you reviewed each of those

20  as they were be- -- at the time they were being

21  prepared, yes?

22      A.   Yes.

23      Q.   So you were aware of the risk factors

24  that are stated in the Profile Solutions'

25  registration statements as of at least the time

61

1    that those registration statements are being

2    prepared and generated?

3            A.   Yes.

4            Q.   And that date could be determined by

5    just looking at the last page of the registration

6    statement, agreed?

7            A.   Yes.

8            Q.   Okay.  Now, do you remember in your

9    first testimony before the SEC, you were asked

10   about the press releases that you drafted in

11   connection with other countries such as Israel and

12   Mexico where Profile Solutions was doing business?

13               MR. PERRY:  Objection to form.

14               THE WITNESS:  I remember there were

15          press releases.  I don't know what you

16          meant doing business in Israel and whatever

17          you just said.

18   BY MS. BERLIN:

19          Q.   Okay.  You addressed press releases

20   relating to Profile Solutions' business activities

21   in other countries like Israel, specifically.

22          A.   I was provided information, and I put

23   in -- from Danny, and I put it into a press release

24   form.

25          Q.   Okay.  So the answer is yes?

                                                    62

1          A.   Yes.

2          Q.   And in those press releases, they

3    would include concerning Israel a section about

4    that would have sort of like the legality of the

5    product in Israel.

6               Do you recall that?

7          A.   No.

8          Q.   You're --

9          A.   Not denying it.  I -- I would have to

10   see the press release.  I don't remember the press

11   -- if there was a press release.

12         Q.   Do you remember any of your press

13   releases that you drafted for Profile Solutions or

14   participated in drafting, any of them having a

15   section about the legality of cannabis or CBD or --

16   or marijuana in that particular country, including

17   Israel?

18              MR. PERRY:  Objection as to form.

19              THE WITNESS:  I'd like to see the

20         press release.  I don't recall.

21   BY MS. BERLIN:

22         Q.   You don't remember?

23         A.   I don't recall.  I don't recall the

24   wording of the press release.  I'm not denying it.

25   I'd like to see it.

                                                    63

1          Q.   I'm not asking about the specific

2    wording, I'm asking if you recall generally that

3    these press releases you would draft for other

4    countries would include a section about the

5    legality of the marijuana, CBD, cannabis in that

6    country?

7          A.   I don't remember.

8               MR. PERRY:   Objection to form.

9    BY MS. BERLIN:

10         Q.   You don't remember?

11         A.   No.  No.

12         Q.   Okay.  If the press release has

13   included a section about the legality of the

14   cannabis, CBD, or marijuana, is there any other

15   word that I should be aware of that was utilized

16   other than those three things?

17         A.   No.  When -- when we would have an

18   about section, and we have about that country,

19   whatever I could find on the internet, and I would

20   create an about section.

21         Q.   So you would find the information on

22   the internet?

23         A.   Yes.

24         Q.   Where would you go on the internet to

25   look it up?

                                                    64

1          A.   Google.  Google search.

2          Q.   So you'd just do a Google search about

3    Israel, for example, and then find out about the

4    legality of the product in Israel; is that correct?

5          A.   I would do a Google search and put in

6    the keywords.  I don't remember the exact keywords

7    I put it in for this press release.  But that's

8    what I would do, a Google search.

9               (Thereupon, Plaintiff's Exhibit 7

10              was marked for identification.)

11   BY MS. BERLIN:

12         Q.   Okay.  I'm going to show you just

13   Exhibit 7, which I've premarked.

14         A.   Okay.

15         Q.   Would you pass this to the court

16   reporter, please.  Thank you.  I just want to show

17   you -- this is just an -- an example of one of the

18   Profile Solutions' press releases about Israel.

19   You testified a moment ago you don't remember the

20   specific wording of them, and so I'm showing you

21   one.

22              Do you see that Exhibit 7 has a

23   heading, "PSIQ Closes Deal to Acquire License to

24   Prepare Land to Grow, Cultivate, Distribute, and

25   Export Israel Medical Cannabis."

                                                    65

1           Do you see that?

2      A.   Yes, I do.

3      Q.   Okay.  And so -- and PSIQ is Profile

4  Solutions, correct?

5      A.   Correct.

6      Q.   And I'm just confused.  You were

7  testifying earlier that Profile Solutions, if I

8  understood correctly, didn't do things with

9  cannabis.  It was a CBD company, and that's

10  different from cannabis.

11           Did I understand you correctly?

12      A.   Correct.  PSIQ is operations Elite --

13  CBD, correct.  Yes.

14      Q.   Okay.  But this -- this had more --

15  and you agree with me it says what it says, it's

16  about cannabis, right?

17      A.   Yes.  Yes.

18      Q.   So there was some business that

19  Profile Solutions did with cannabis.  Am I

20  understanding correctly?

21      A.   I think this was afterwards.  I think

22  at that time, they -- this is the -- a subsequent

23  type of thing.  I don't think they had it back when

24  you asked me the question.  Originally this was not

25  their bus- -- their core business.  It was just CBD

                                                    66

1  products.  Eventually they got into these things

2  with licenses.

3          Q.   Okay.  I'm going to ask my initial

4  question --

5          A.   Okay.

6          Q.   -- from an hour ago again --

7          A.   Okay.

8          Q.   -- because I didn't put a time period

9  on it.

10         A.   Okay.

11         Q.   Profile Solutions, I'm just trying to

12  find out, what were they in the business of doing.

13         A.   Okay.  Okay.

14         Q.   I'll say yes or no.

15         A.   Okay.

16         Q.   Were they in the business of dealing

17  with cannabis, yes or no?

18         A.   Yes.

19         Q.   CBD?

20         A.   Yes.

21         Q.   Marijuana?  I don't know if that's

22  different or not.

23         A.   Yes.  I think that one is cannabis.

24         Q.   Okay.  So marijuana and cannabis --

25         A.   I think.

67

1          Q.   -- is a synonym?

2          A.   I think.  I believe so, yes.

3          Q.   Okay.  I have no idea --

4               (Simultaneous conversation.)

5          A.   I don't know.  That's why -- that's

6   why my answer --

7               (Simultaneous conversation.)

8   BY MS. BERLIN:

9          Q.   Okay.  Anything else other than

10  cannabis/marijuana and CBD?

11         A.   No.  No.

12         Q.   It was just those things?

13         A.   Yes.

14         Q.   Okay.  So, again, you agree with me

15  that whether or not cannabis/marijuana or CBD can

16  be grown, cultivated, distributed.  Whether or not

17  those things are legal is relevant and import into

18  Profile Solutions' business?

19         A.   Yes.  Yes.

20         Q.   Okay.  So let's look --

21         A.   Okay.

22         Q.   -- on Page 2 of Exhibit 7.  And again,

23  this is a press release that you participated in

24  drafting, correct?

25         A.   Yes.

                                                    68

1          Q.   And do you see that on Page 2, there's

2     a heading, and it is "Israel's Position on Medical

3     Cannabis."

4               Do you see that?

5          A.   Yes.

6          Q.   And there's a discussion here.  Would

7     you read it aloud, please.

8          A.   "The Israeli cabinet approved the 16th

9     Amendment of the Dangerous Drugs Ordinance on

10    January 27th, 2019, that concerns the governance

11    and regulatory aspects of exporting medical

12    cannabis from Israel.  Its final approval enables

13    farmers to export medical cannabis, a move expected

14    to generate significant revenue for the state, the

15    law conditions, growing cannabis on a" healthy --

16    on a "health ministry license with police providing

17    approval and monitoring growers and investors."

18         Q.   Okay.  And so am I understand from

19    your prior testimony -- am I understanding

20    correctly that this paragraph that you just read is

21    something that you would have pulled off of Google?

22         A.   Yes.

23         Q.   Okay.  And in addition to the press

24    releases about Israel, where you provide the legal

25    position in Israel of the cannabis, the same is

                                                          69

1 true for other countries like Mexico press

2 releases, correct?

3             MR. PERRY:  Objection to form.

4             MS. BERLIN:  Thank you.

5             THE WITNESS:  I don't recall.  I'd

6        like to see that press release.

7 BY MS. BERLIN:

8        Q.  Okay.  So you don't remember without

9 seeing it?

10       A.  Yes.

11       Q.  Okay.  But you agree with me the press

12 releases are what they are?

13       A.  Correct.

14       Q.  Okay.

15       A.  Correct.

16       Q.  So why did you include that section in

17 the press release that you just read?

18       A.  No reason, other than I felt it was

19 relevant.

20       Q.  Okay.  And is it relevant because the

21 legality of the product in Israel would impact the

22 profitability of Profile Solutions if its -- the

23 press release is about Profile Solutions' business

24 in Israel with respect to cannabis?

25       A.  I don't think the press release had

                                                      70

1  anything to do with profitability.  They got a

2  licence.  That was it.  And I don't know anything

3  about the profit.  I don't know if they have

4  projections.  I wasn't involved with that part of

5  it.

6           Q.   Let me ask a --  a different way.  The

7  press releases --

8           A.   Yes.

9           Q.   -- are done in part because they get

10  distributed and circulated to people who might be

11  interested in investing in the shares of Profile

12  Solutions or investing in Profile Solutions

13  directly, correct?

14              MR. PERRY:  Objection to form.

15              THE WITNESS:  Not necessarily.

16  BY MS. BERLIN:

17           Q.   That's one of the -- the bases --

18           A.   Yes.

19           Q.   -- is that these press releases are

20  utilized because then potential investors can read

21  it and learn about PSIQ?

22           A.   Correct.  That's correct, yes.

23           Q.   And in fact, these press releases are

24  published on Yahoo Finance, and on different like

25  finance social media platforms?

1        A.    Correct.

2        Q.    Okay.  And as well as distributed

3   through social media like Twitter, correct?

4        A.    Correct.

5        Q.    Okay.  And so in fact, if you look at

6   this on Page 3, there's even a safe harbor

7   statement that you provide in your press release

8   that provides information about PSIQ.

9              Do you see that heading?

10       A.    Yes, I do.

11       Q.    Okay.  So why did you think the

12  information that you just read about Israel's

13  position on medical cannabis and the legality of

14  it, why -- why was that important to include in

15  this press release that we see in Exhibit 7?

16       A.    It was information that we found on

17  the internet, so I included it in the press

18  release.  No other reason.

19       Q.    Give me a break.  There's other

20  information you would have found on the internet

21  about Israel.  You -- this press release is brief.

22  You didn't include every single fact you learned

23  about Israel in this press release.  This press

24  release is specific, and it has headings.

25             Do you agree with me?

1          MR. PERRY:  Objection to form.

2          THE WITNESS:  I agree with you.

3   BY MS. BERLIN:

4          Q.   Okay.  So let me put it back in front

5   of you.  Let's look at this together, Mr. Tucker.

6   This press release, Turn to Page 2.  We have one

7   heading about Gidon Blum.

8          Do you see that?

9          A.   Yes, I do.

10          Q.   You have one heading, "About

11   Gidon Blum."

12          Do you see that?

13          A.   Yes, I do.

14          Q.   You have a heading, "Israel's Position

15   on Medical Cannabis."

16          Do you see that?

17          A.   Yes, I do.

18          Q.   A third heading, "About Profile

19   Solutions. "

20          See it?

21          A.   Yes.

22          Q.   And a fourth, "A Safe Harbor

23   Statement."  Do you see that?  It's on the next

24   page.

25          A.   Yes, I do.

                                                      73

1          Q.   Okay.  So this is not an encyclopedia

2    about cannabis in Israel.  This is a short press

3    release with the headings that I just identified,

4    correct?

5          A.   Yes.  Yes, you did.

6          Q.   And one of these three headings is

7    about Israel's position on medical cannabis,

8    correct?

9          A.   Yes.

10         Q.   You learned about things on the

11   internet about Israel and cannabis, other than just

12   their position, didn't you?

13         A.   Not really.  This is -- this is what I

14   found on the internet.  That's what I thought was

15   relevant, so that's what I included in the press

16   release.

17         Q.   Okay.  And you gave it its own

18   heading?

19         A.   Okay.

20         Q.   Yes?  No?

21         A.   Yes.  Yeah, abs- -- yes.  Okay.

22         Q.   And so, again, why is this relevant?

23   Why is it important to include in a press release

24   information about the legality of cannabis in

25   Israel?  Why is that relevant?

                                                    74

1          A.    I -- I thought it was relevant at the

2     time.  I don't know what my reason was.  I thought

3     it was relevant, so I included it in the press

4     release.  I thought it was relevant.

5          Q.    This -- this is a rel- -- this press

6     release is about Profile Solutions closing a deal

7     to acquire a license for distributing cannabis in

8     Israel, correct?

9          A.    Correct.

10          Q.    And so would you agree with me that

11     the legality of cannabis in Israel is relevant to

12     Profile Solutions' business?

13          A.    Yes, I do.

14          Q.    So unless Profile Solutions is going

15     to go into Israel and break the law, it has to be

16     legal for them to go into Israel and distribute

17     cannabis.

18               Agreed?

19          A.    Agreed.

20          Q.    And so if it's not legal, then Profile

21     Solutions would not be distributing cannabis in

22     Israel.

23               Fair to say?

24          A.    Fair to say.

25          Q.    And if they are not distributing

                                                      75

1   cannabis in Israel, then this deal in your

2   Exhibit 7 press release, this deal would not be

3   profitable for Profile Solutions.

4           Agreed?

5           MR. PERRY:  Objection to form.

6           THE WITNESS:  Agreed.

7   BY MS. BERLIN:

8       Q.   And their -- that is information an

9   investor would want to know, correct?

10      A.   Correct.

11      Q.   Okay.  So is that part of why this is

12  included in the press release?

13      A.   I -- I -- I feel -- felt it was

14  important.  I felt it was relevant, and I included

15  it.

16      Q.   Okay.  In fact, the risk factors that

17  are identified in the registration include that the

18  legality or illegality of cannabis or CBD or -- or

19  marijuana could cause an investor to lose their

20  entire investment, correct?

21      A.   I would assume more.

22      Q.   Because that just makes sense.

23      A.   Right.

24      Q.   That's the business, right?

25      A.   Right.  Right.

76

```
 1            Q.   So if suddenly the business becomes
 2    illegal, then the company's not going to be
 3    profitable unless the company goes the criminal
 4    route?
 5            Agreed?
 6            A.   Well, I would assume they wouldn't go
 7    the criminal route, but I -- I agree with the --
 8    your logic -- with your logic.
 9            Q.   Okay.  And so that's information that
10    a potential investor or investor who's holding the
11    share would want to know?
12            A.   Absolutely.  And we disclosed that.
13            Q.   Okay.  I'm not asking about
14    disclosures.  And we're not going to get into that.
15    Do you -- answer the --
16            A.   Yes.
17            Q.   -- question I ask, please.
18            A.   Yes.
19            Q.   Do you agree with me?
20            A.   Yes.
21            Q.   Thank you.  Ultimately the SEC
22    suspended the trading of Profile Solutions' stock.
23            Do you agree?
24            A.   Yes.
25            Q.   And why did that happen?  Do you
```

77

1  recall?

2       A.   For some -- I don't know the exact

3  reason.  I think they said there were

4  inaccuracies --

5            (Thereupon, Plaintiff's Exhibit 3

6       was marked for identification.)

7  BY MS. BERLIN:

8       Q.   I'm going to share with you what I've

9  premarked as Exhibit 3.  Would you pass this to the

10 court reporter, please.  Thank you so much.

11           Here you are, Mr. Perry.

12           Do you see this is entitled -- Exhibit

13 3 is entitled, "Order of Suspension Of Trading."

14           Do you see that?

15      A.   Yes, I do.

16      Q.   Okay.  Do you want to take a second to

17 read it to refresh your recollection?

18      A.   Okay.

19      Q.   Does this refresh your memory about

20 why the trading was suspended in Profile Solutions?

21      A.   Yes, I do.

22      Q.   Okay.  And do you own like more than

23 -- like 14.6 roughly percent of the shares at

24 Profile Solutions, correct?

25      A.   Yes, I did.  And I still do.

                                                    78

1          Q.    And you still do 'til this day?

2          A.    Yes.

3          Q.    You haven't sold any?

4          A.    No.

5          Q.    And so does reviewing Exhibit 3

6    refresh your recollection about why the SEC

7    suspended trading at Profile Solutions?

8          A.    Yes, I do.

9          Q.    Okay.  And do you see in Exhibit 3

10   this is the SEC's order of suspension of trading

11   that the SEC is stating that if you look in the

12   very first paragraph, that there are questions that

13   have arisen the accuracy of assertions by Profile

14   Solutions regarding -- and I'm paraphrasing here,

15   there -- it says regarding, among other things, the

16   possible role of undisclosed control persons in the

17   company.

18          Do you see that?

19         A.    Yes, I do.

20         Q.    And that's referring to you?

21         A.    I would assume so.

22         Q.    Okay.  And also there's a reference to

23   agreements and distribution contracts and

24   misrepresentations concerning that.

25          Do you see that?

79

```
 1          A.   I -- are you asking me to read this or
 2   do I agree with this?  I don't understand.  I'm --
 3   I'm sorry.  I don't understand your question.
 4          Q.   My question is look at the page,
 5   Paragraph 1.
 6          A.   Right.
 7          Q.   The current question that was pending
 8   is, do you see where this order of suspension of
 9   trading is stating that trading is suspended in
10   part because if -- inadequacy of representations
11   and assertions regarding agreements and
12   distribution contracts?
13          A.   It's saying questions that have
14   arisen, it doesn't saying that these things were
15   done wrong.  It says questions have arisen.  I'm
16   reading --
17          Q.   Why don't you read the first paragraph
18   into the record.
19          A.   I am.  I'm reading it.
20          Q.   Maybe that will help.
21          A.   Okay.  It -- "It appears to the
22   Securities and Exchange Commission that there is a
23   lack of current and accurate information concerning
24   the securities of Profile Solutions because of
25   questions that have arisen regarding the adequacy
```

80

1  and accuracy of the assertions by Profile

2  Solutions, a Delaware corporation with its

3  principal place of business in Sunrise, Florida, in

4  its registration statement as amended filed on Form

5  S-1, dated March 5th, 2019."

6          Excuse me.

7          "And in multiple press releases

8  concerning, among other things, its revenues and

9  agreements and distribution contracts and the

10  possible role of undisclosed control persons in the

11  company.  Profile Solutions, Inc., common stock is

12  quoted on OTC Link previously (Pink Sheets)

13  operated by OTC Markets Group under the ticker

14  symbol PSIQ."

15      Q.   Thank you.  Now, in what you just

16  read --

17      A.   Yes.

18      Q.   -- do you -- and you can look at the

19  page, do you see the reference to the agreements

20  and distribution contracts?

21      A.   Yes, I do.

22      Q.   Okay.  And is -- do you -- was it your

23  understanding that that included the press releases

24  and statements about agreements and distribution

25  contracts with the country of Eswatini?

                                                      81

```
 1          A.   It doesn't specify which ones.   It
 2   just says agreements and distribution contracts.
 3          Q.   Okay.  But I'm going to take this away
 4   an turn it over because I'm asking for you, your
 5   understanding, Mr. Tucker.
 6          A.   Right.
 7          Q.   Your understanding when this trading
 8   suspension happened.  Did you understand that that
 9   reference could be to the -- with the
10   representation about contracts or doing business or
11   licenses in Eswatini?
12          A.   Yes.
13          Q.   Okay.  And why did you have that
14   understanding?
15          A.   Because it's not specific.  I assumed
16   it's any -- it could be any or -- anything that
17   PSIQ was doing.  I didn't know that it was
18   specific.  I don't know that it was specific to
19   Eswatini.
20          Q.   Oh, okay.  So now you don't know that
21   it was in Eswatini?
22          A.   No, I'm not saying --
23               MR. PERRY:  Objection to form.
24               THE WITNESS:  That's not what I said.
25          I didn't say specific to Eswatini.
```

82

```
 1   BY MS. BERLIN:

 2          Q.   Okay.

 3          A.   I don't know if it's Eswatini or any

 4   of the other -- it said contracts, the financials.

 5   I don't know if they had problem with the financial

 6   statements, any of the other contracts, any of the

 7   other agreements.  I don't know which specific ones

 8   it was.

 9   BY MS. BERLIN:

10          Q.   Okay.  So at the time of the trading

11   suspension --

12          A.   Right.

13          Q.   -- you did not know that it was ref-

14   -- the -- you did not know whether or not

15   Exhibit 3, the order of trading suspension, could

16   have anything to do with these Eswatini

17   representations by Profile Solutions; is that

18   correct?

19          A.   That's not what I said.

20          Q.   I -- I said, "Is that correct?"  So

21   the answer is no?

22          A.   Please ask the question again.  I'm

23   not understanding what you're saying.

24          Q.   All --

25          A.   I believe it included not -- I believe
```

                                                                83

1    it included Eswatini if that's what you're asking

2    me.

3             Q.    Okay.

4             A.    I believe it included.

5             Q.    Okay.  And so at a certain point in

6    time, did you ever communicate with any investor of

7    Profile Solutions about the trading suspension?

8             A.    I -- I don't recall, but probably.

9    Probably.

10            Q.    Okay.  And what would --

11            A.    We got -- we -- we had phone calls.

12            Q.    But you don't recall any of those

13   conversations, specifically; is that correct?

14            A.    No.

15            Q.    Okay.  What do you recall about

16   what -- what did you tell -- let me ask another

17   way:  What did you tell investors, whether it was

18   by phone or e-mail or any other means of

19   communication, what did you tell -- so that could

20   be in person as well.  What did you tell investors

21   about the trading suspension, if anything?

22                 MR. PERRY:  Objection to form.

23   BY MS. BERLIN:

24            Q.    Do you understand the question?

25            A.    I'm trying to recall -- I'm trying to

                                                          84

1    recall what happened at that time.  I remember

2    Profile came out with a press release, its own

3    press release.  And I don't know if I spoke to any

4    investors directly.  I would assume I did.  I don't

5    recall if I spoke to any investors directly.

6         Q.   Okay.  And what about did you ever

7    communicate to any investors of Profile Solutions

8    that the trading suspension was ending or had

9    ended?

10        A.   No.  No.  I would never say it ended.

11        Q.   Did the trading suspension come to a

12   halt?

13        A.   No, it didn't.

14        Q.   So it remains in effect?

15        A.   Yes.

16        Q.   And in any of your communications with

17   investors -- with -- you already answered with

18   investors, but what about potential investors who

19   might be interested in investing in Profile

20   Solutions?  Did you ever tell any person who -- any

21   potential investor that the trading suspension had

22   ended?

23        A.   No.

24        Q.   Okay.  What about anyone else, like

25   whether they're an investor or otherwise, did you

                                                    85

1    ever tell anyone --

2         A.   No.

3         Q.   -- that the trading suspension had

4    ended?

5              MR. PERRY:  Objection to form.

6              THE WITNESS:  No.

7    BY MS. BERLIN:

8         Q.   Because if you did, that would have

9    been a lie, correct?

10        A.   Correct.  Correct.

11        Q.   And -- and it would have been an

12   important lie?

13        A.   Yes, it would.

14             (Thereupon, Plaintiff's Exhibit 4

15        was marked for identification.)

16   BY MS. BERLIN:

17        Q.   Okay.  I'm going to show you what I

18   have marked as Exhibit 4.  Just a moment, please.

19   Was there any investigation or action taken by

20   FINRA in regard to Profile Solutions?

21        A.   Not that I'm aware of.  I -- I recall

22   there was an inquiry, but I don't believe there was

23   ever FINRA action.

24        Q.   In this case, did you produce all of

25   your e-mails concerning Profile Solutions?

86

```
 1              A.   Yes, I did.  Yes, I did.

 2              Q.   All of them?

 3              A.   To the best of my knowledge, I believe

 4     I did.

 5              Q.   And you only used your Hotmail account

 6     for e-mails?

 7              A.   It was either Hotmail or maybe Gmail,

 8     but I think just Hotmail.  I think

 9     leonardmtucker@hotmail was the e-mail I used.  I

10     don't think there's any other one I used.

11              Q.   Okay.  I'm going to show you what I've

12     premarked as Exhibit 4.  Okay.  I'm showing you --

13     this is generated from InvestorsHub.

14              Are you familiar with InvestorsHub?

15              A.   Yes.

16              Q.   You've been on there before, right?

17              A.   Yeah.

18              Q.   Okay.  And but you -- I think you

19     testified earlier you don't remember what your

20     handle is on InvestorsHub, correct?

21              A.   Correct.

22              Q.   Okay.  But it would be under your

23     Hotmail account; so for example, InvestorsHub can

24     provide that information --

25              A.   Absolutely.
```

87

 1          Q.   -- since you don't remember?

 2          A.   Yes.

 3          Q.   Okay.  Is that information that --

 4   because you agree with me if you just logged into

 5   InvestorsHub, you would be able to see your handle,

 6   right?  Mr. Tucker, can you please not take the

 7   exhibit and turn it over.  We haven't gotten to it

 8   yet.  Can you answer the question.

 9             You agree with me that if you logged

10   into InvestorsHub right now, you would be able to

11   see your handle, yes or no?

12          A.   I don't know my user ID and passcode,

13   but I would assume if I do lost passcode or your

14   lost user ID.  I -- I don't know what it is,

15   though.

16          Q.   Okay.  Is that information that you

17   can provide after today's deposition without us

18   having to call you back?

19          A.   I would assume so.  I guess I can find

20   it right now, lost password --

21             (Simultaneous conversation.)

22             MR. PERRY:  We're not going to do it

23        right now.

24             MS. BERLIN:  No?  Okay.  We can do it

25        on a break.

                                                          88

1    BY MS. BERLIN:

2         Q.   So you can go ahead and turn over

3    Exhibit 4.  So and do you see that Exhibit 4 is a

4    post from -- this investor's handle is "Turkey

5    Red."

6              Do you see that?

7         A.   Yes.

8         Q.   Okay.  And it's from July 5th, 2019.

9              Do you see that?

10        A.   Yes.

11        Q.   And it says, "Dear, Bob."

12             Well, can you read it?  "Dear Bob."

13   Starting with "Dear Bob."

14        A.   "The temporary trading suspension is

15   over.  See such-and-such.  In order for trading to

16   resume, a broker has to file a 15-c2-11 to make a

17   market in PSIQ securities.  Hopefully this won't be

18   so difficult as PSIQ is current in its OTC markets

19   reporting, and it continues to pursue clearing the

20   S-1 registration to become a reporting company.

21   PSIQ is doing everything it can to move forward and

22   be as transparent as can be."

23        Q.   And it's signed --

24        A.   Me.

25        Q.   -- "Respectfully Lenny, Leonard

                                                      89

1   Tucker," correct?

2           A.   Yes.  That's me, yes.

3           Q.   Okay.  And so is this a message that

4   you communicated on July 5th, 2019?

5           A.   Yes, I did.

6           Q.   Okay.  Let's go ahead and set

7   Exhibit 4 aside, please.  Did you ever tell any

8   investors or potential investors of Profile

9   Solutions, or -- and when I say Profile Solutions

10  today, I hope you understand, I mean also including

11  Elite, which was its subsidiary.

12               Do you understand?

13          A.   Yes, I do.

14          Q.   Okay.  Did you ever tell any investors

15  or potential investors or any -- the investing

16  public that -- that cannabis or/marijuana or CBD

17  was not legal in Eswatini?

18          A.   Did I ever tell an invest- -- can you

19  repeat the question.

20          Q.   Did you ever tell an investor or

21  potential investor that cannabis -- and I'm going

22  to say cannabis/marijuana, 'cause you said it could

23  be either/or.

24          A.   I got it.

25          Q.   Okay.  So I'll start again.  Did you

90

1  ever tell any investor or potential investor or the

2  investing public that cannabis/marijuana or CBD was

3  not legal in Eswatini?

4          A.   I don't specifically recall, but I

5  assume so.

6          Q.   Okay.  And why would you assume so?

7          A.   Because I know we had to get the

8  license to do this.

9          Q.   Meaning you knew it wasn't yet legal

10 in Eswatini?

11         A.   Correct.

12         Q.   Okay.

13         A.   Correct.

14         Q.   So during your time at Profile

15 Solutions -- should I say cannabis, CDB, or

16 marijuana?  Like what is easiest so we're on the

17 same page?

18         A.   I got it.  The same thing.  Okay.  I

19 got it.

20         Q.   Okay.  So I'm just going to say

21 cannabis to make it simple.

22         A.   Okay.

23         Q.   But you understand that that can

24 encompass the whole world of cannabis, marijuana,

25 or CBD?

91

```
 1              A.   Yes.

 2              Q.   Okay.

 3                   MR. PERRY:  I said objection as to

 4         form, so...

 5                   MS. BERLIN:  Okay.  I think your

 6         lawyer wants me to say all three, so I

 7         will, so...

 8                   MR. PERRY:  Well, they're different.

 9         So you do whatever you want.  It's your

10         deposition.

11                   But I'm -- object to the form.

12    BY MS. BERLIN:

13              Q.   All right.  I'll ask you on each one,

14    all right?  So -- well, let me ask this one:  What

15    was the license that was the advertising that was

16    done with respect to Eswatini at Profile Solutions.

17    I'm not asking about the license, but what was

18    advertised?  Was it cannabis?  It was cannabis,

19    correct?

20              A.   Correct.

21              Q.   Okay.  So I'm going to ask you about

22    the cannabis.

23              A.   It was cannabis and also hemp.

24              Q.   Hemp.  Okay.  All right.  So did you

25    communicate -- and -- and so just as a -- to get a
```

                                                        92

1  basic understanding, during the entire time that

2  you were with or doing any work in connection with

3  Profile Solutions, you understood that cannabis was

4  not yet -- was not legal in Eswatini, correct?

5          A.   Yes.  Yes.

6          Q.   And you understood during your entire

7  time of working in connection with Profile

8  Solutions, that hemp was not legal in Eswatini,

9  correct?

10         A.   Yes.

11         Q.   You understood during your entire time

12  at Profile Solutions that marijuana was not legal

13  in Eswatini, correct?

14         A.   Correct.

15         Q.   And you understood at all times that

16  you worked in connection with Profile Solutions,

17  that CBD was not legal in con- -- in Eswatini,

18  correct?

19         A.   Correct.

20         Q.   Am I missing any terms of that covered

21  hemp, cannabis, marijuana, and CBD?

22         A.   I don't think so.

23         Q.   Okay.  And you believe that you would

24  have disclosed the information that it wasn't --

25  that those items, those four items were not legal

93

1   in Eswatini to the investing public or potential

2   investors or investors?

3          A.   Initially, I didn't know.  I did- -- I

4   didn't -- I wasn't involved with it in the

5   beginning.  Initially, I didn't know.

6          Q.   When did you find out that these --

7   that these items, that cannabis was not legal in

8   Eswatini?

9          A.   I found out after -- after we got the

10  initial letter, okay, and we had the initial press

11  release, it was sometime after that.  When I -- my

12  -- from my role found out that it was illegal.  I

13  had no idea it was legal, not legal.  I -- I didn't

14  know.

15         Q.   So again, when?

16         A.   Sometime after the initial press

17  release, which I think was sometime after March,

18  2018, I believe was the initial press release?

19         Q.   So it was after March 2018?

20         A.   Correct.

21         Q.   How did you find out?

22         A.   Through Danny.

23         Q.   When you say Danny, Oran?

24         A.   Dan -- Dan Oran.

25         Q.   Oran, sorry.

94

1          A.    Yes.

2          Q.    And how did he tell you?

3          A.    Because for -- for weeks -- weeks or

4    maybe even months prior to getting that March 2018

5    letter, Danny had a -- an offer.  I don't know if

6    that's the right word to put to, you know, a -- a

7    commitment.  And he presented a proposal that he

8    presented to Eswatini through a gentleman,

9    Daniel Wasner.

10              And Danny was saying that "We're

11   getting this license, we're getting this license,

12   we're getting this license," and nothing happened.

13   And he kept saying -- he was on the phone, "We're

14   getting a license."

15              And then he got this letter in that he

16   showed me that was date -- we got it in October or

17   something like that, but it was -- it was dated

18   September, if I remember correctly, something like

19   that, and -- and I read it.  And it did not say

20   that we had the approval.

21              And I said, "We don't have the

22   approval."  And what he said to me is that, "This

23   is the way it works in Eswatini.  This is the

24   preliminary approval, and that's the way it works.

25   Eswatini does not operate like the United States.

95

1    That's the approval.  That's the preliminary

2    approval."

3           Q.   Who said that to you?

4           A.   Dan Oran.

5           Q.   Okay.  As far as the -- we were

6    talking about cannabis being legal verses illegal

7    in Eswatini.  When did you learn that cannabis was

8    not legal in Eswatini?

9           A.   Probably -- probably sometime around

10   when I physically went to -- to Eswatini to meet

11   with the different government officials about it.

12   I didn't know there was a whole process that we had

13   to go through.  I just thought the king -- it was

14   told to us by Danny.  What Danny told me is that

15   the king has to sign off on it.  And the prince who

16   we met told us that what has to happen is the king

17   has to sign off on it, and we have the license.

18   It's the king to sign off on it.

19          Q.   Okay.  That's not my question.

20          A.   What's your question?

21          Q.   The question was when did you learn

22   that cannabis was not legal in Eswatini, like

23   month, year?

24          A.   Some -- I don't know.  Some -- it was

25   sometime after we received the initial letter from

96

1   the prince.

2          Q.   So sometime after September or

3   October 2017?

4          A.   Sometime after -- that was to the date

5   of that letter.  The letter that we got from

6   Eswatini, it was sometime after that.

7          Q.   How long after that?

8          A.   I don't honestly know.

9          Q.   Well, let's put it this way.  We just

10  looked at a press release, right?

11         A.   Yes.

12         Q.   Was it Exhibit 7, I think?  Your press

13  release that you drafted about -- or no.  Your

14  press release that you drafted, yeah, Exhibit 7.

15  Your press release that you drafted about Israel

16  where you have one of three headings is just the --

17  a paragraph about the -- the legal status of

18  cannabis in Israel.

19              You recall that?

20         A.   Yes.

21         Q.   Okay.  And you said you found that

22  because you were doing Google searches about Israel

23  and cannabis?

24         A.   Right.

25         Q.   Okay.  So did you do a Google search

97

1   about Eswatini and cannabis before you drafted any

2   of the releases or information about the deal in

3   Eswatini and Profile Solutions?

4        A.   Yes, I did the Google search for the

5   About Eswatini section.

6        Q.   Okay.  But you didn't include, unlike

7   Israel, where you included a section saying it is

8   legal, you didn't include any section in your

9   releases about Profile and --

10       A.   I --

11       Q.   -- Eswatini where you said it is not

12  legal, correct?

13       A.   I did not see anything.  I did not

14  look for anything.

15       Q.   You didn't look?

16       A.   No.

17       Q.   You didn't even look?

18       A.   No.

19       Q.   Okay.

20       A.   There's a reason, if you want to know

21  the reason.

22       Q.   Why?  Tell me why you didn't even look

23  to see if it was legal or illegal, especially since

24  that was a part of the press releases you typically

25  drafted.  Tell me why didn't you look when it came

1   to Eswatini, Mr. Tucker?

2          A.   Good question.

3               MR. PERRY:  Objection to form.

4               THE WITNESS:  The initial release

5          having to do with anything with the

6          cannabis distribution in any of these

7          countries, the first one was with Eswatini.

8          And the reason I ever thought was it legal

9          or illegal is because we got a letter.  Dan

10         presented a letter to me from the

11         government of Eswatini talking about the

12         process to get this license.

13              So I guess I assumed if the government

14         is giving us a letter as to the process to

15         get a license, the -- within that letter,

16         it said nothing that it was illegal.

17              So I did not think was it legal or was

18         it illegal because they didn't say in their

19         letter that it was illegal.  I did not even

20         think about it.

21   BY MS. BERLIN:

22         Q.   Right.  But, again, we went back to

23   the other, like, Israel.  It just -- this is just

24   one example, because you also drafted releases

25   about Mexico and other countries in Profile

                                                    99

```
 1  Solutions, correct?
 2           MR. PERRY:  Objection as to form.
 3           THE WITNESS:  After the Eswatini
 4      release, correct.
 5  BY MS. BERLIN:
 6      Q.   Correct.  Okay.
 7      A.   Yes.
 8      Q.   So in those other -- you Googled the
 9  information yourself, and that's how you came up
10  with the -- you've already testified to that?
11      A.   Yes, yes.  I'm not disagreeing.
12           MR. PERRY:  Objection to form.
13  BY MS. BERLIN:
14      Q.   But you didn't do the same sort of
15  search for Eswatini within Google search for
16  Eswatini.  That's the question.
17           Agreed?
18      A.   I did a -- a -- I did a search for
19  Eswatini by Google.  That -- and what I found,
20  that's what I put.  I did not look is it legal or
21  illegal.  I didn't even -- I didn't even consider
22  that as an option.
23      Q.   Okay.
24      A.   I didn't consider that as part of my
25  responsibility.
```

100

```
 1          Q.   So for the Israel on -- I'm just going
 2   to put it back in front of you again.
 3          A.   Okay.
 4          Q.   It's not a general statement.  Like
 5   you actually have like a citation to the -- you
 6   reference the name of the ordinance in Israel.  You
 7   leave a little paragraph about the legal status of
 8   cannabis in Israel.
 9               You see that?
10          A.   Yes, I do.
11          Q.   Okay.  And then you agree that it
12   doesn't like automatically pop up.  If I type in
13   Israel into Google, I'm not going to find a whole
14   article about this Drug Act in 2019.  That's
15   something that you searched for in --
16               (Simultaneous conversation.)
17          A.   No, I did not.  No, I did not.
18   BY MS. BERLIN:
19          Q.   You did not?
20          A.   No, no.  I put up Israel and cannabis,
21   and that's what came up.
22          Q.   Okay.  And so is it your testimony you
23   didn't -- but you also testified you didn't do a
24   search on Eswatini.  Did you do a Google search on
25   Eswatini and cannabis?
```

                                                         101

```
1              A.    Yeah, I did.

2              Q.    You did?

3              A.    I did.  On Eswatini.

4              Q.    But not with cannabis?

5              A.    I'm -- I'm sure I did.  I'm sure I

6    did.

7              Q.    You did.  And so it your te- -- and on

8    Google?

9              A.    On Google, probably, yeah.  On Google.

10             Q.    Or yahoo?

11             A.    No.  It's Google.  I never use Yahoo.

12             Q.    Okay.  And under your Google profile

13   name for Leonard Tucker?  Is that it?

14             A.    Yeah.

15             Q.    But what's your Google profile,

16   because I know you have a Hotmail account.

17             A.    Leonard.

18             Q.    So when you log in to Google, did you

19   research?  If I want to see your research history

20   and I went into Google, which I -- we can do to

21   find out your history --

22             A.    Good idea.

23             Q.    -- and what you looked at, what is the

24   profile and what do you log in as when you go to

25   Google?
```

102

1          A.   I don't think anything.  When you do a

2     Google search, you just go on Google, and you --

3     you type in what you're searching.  I don't think

4     that goes to --

5               (Simultaneous conversation.)

6     BY MS. BERLIN:

7          Q.   So you're not logged in?

8          A.   I don't think so.

9          Q.   Okay.

10         A.   If I am, I don't know that I am or I'm

11    not -- I don't -- I don't know.

12         Q.   Okay.  So did you search for Eswatini

13    and marijuana or not?  Did you do any research

14    about Eswatini and cannabis?

15         A.   I probably -- I probably did.  It was

16    the first press release we did on that subject.  I

17    probably did not.

18         Q.   Okay.

19         A.   I had -- I had the letter.  You know,

20    I reviewed the letter that Dan presented to me.

21         Q.   Which is just about --

22         A.   I --

23         Q.   Let me stop you.  You say the letter.

24    You're referencing a letter that simply concerns a

25    potential licensing deal in Eswatini; is that

                                                    103

```
 1  correct?

 2          A.   Which Dan represented, and everybody

 3  --

 4          Q.   Just answer the question.

 5          A.   Yes.

 6               (Simultaneous conversation.)

 7               MR. PERRY:  Objection to form.

 8               THE WITNESS:  Whatever that date was,

 9      Oct- -- September 18th letter or October

10      18th letter, yes.

11  BY MS. BERLIN:

12          Q.   The letter references a licensing --

13          A.   Yes.

14          Q.   -- a potential licensing, though,

15  correct?

16          A.   Yes.

17          Q.   The letter does not discuss in any way

18  whether it's legal or illegal, correct?

19          A.   Correct.  Correct.

20          Q.   Okay.  And there -- and you've

21  testified already today that you relied on lawyers

22  for Profile Solutions, correct, yes or no?

23          A.   Yeah.  To a certain extent, yes.

24          Q.   Did you ask any of Profile Solutions'

25  lawyers whether or not it was illegal or legal and
```

104

```
 1    --

 2          A.    No.

 3          Q.    No?

 4          A.    No.

 5          Q.    Okay.  So what research, if any, did

 6    you do to ascertain the legality of cannabis,

 7    marijuana, CBD, hemp, in Eswatini prior to drafting

 8    press releases about Profile Solutions' potential

 9    licensing activity or other business --

10          A.    I didn't deem that --

11          Q.    -- entities in Eswatini?

12          A.    I just did outside consulting.  I

13    didn't deem that to be my role to do due diligence,

14    in which I'm not an attorney to do legal opinions.

15    It was presented to everybody.  Dan presented to

16    his attorneys.  Dan approved the press release.

17          Q.    My question is what -- I asked what

18    research you did.  So is the answer none?  Is that

19    where this is going?

20          A.    None.  I didn't -- other than I've

21    read the letter that Dan presented.  That was my

22    research.

23          Q.    So you did not --

24          A.    No.  No.

25          Q.    -- do any Google research for that?
```

1          A.   No.

2          Q.   Okay.  And now when you started to

3  testify a second ago about Dan talking to lawyers,

4  were you present for those conversations that you

5  started to testify about?  Which -- were you there?

6  Did you personally witness Dan meeting with his

7  lawyers?

8          A.   No.  I was there when Dan would be on

9  the phone with them in the office when he would

10  call them.  And he said the attorney didn't have

11  any problem with the press release.  There was no

12  changes, or if there was changes, it wasn't proved.

13          Q.   I'm sorry.  Let's back up.

14          A.   Okay.

15          Q.   Dan Oran, is it your testimony that

16  Dan Oran would take the press releases you drafted

17  and send them to a lawyer?

18          A.   Absolutely.  Absolutely.

19          Q.   Which lawyer?

20          A.   Whatever lawyers we had at the time.

21  We had -- we had -- originally we had the attorney

22  who was the president of a Pot Network.

23          Q.   What -- I need names, please.  If you

24  can recall.  If you can't, just say you can't

25  recall.  But if you can recall the name, that would

106

```
 1   be helpful.
 2        A.   I don't recall his name.  I just know
 3   he was the president of the Pot Network.  It's a
 4   public company.
 5        Q.   Did you say "the Pot Network"?
 6        A.   That was the name of the public
 7   company, Pot Network.  POTN, that was the symbol.
 8   They're based in -- also in Sunrise.  He's the
 9   president of the company.  Also a shareholder, you
10   know, of Profile Solutions.
11        Q.   He's a lawyer?
12        A.   Yeah.  Yes.
13        Q.   And you don't remember his name?
14        A.   No.  But I -- if I can look it up in
15   another second, I'll tell you if that's his name.
16        Q.   And so did the lawyer advise that
17   cannabis wasn't legal in Eswatini?
18             MR. PERRY:  Objection to form.
19             THE WITNESS:  What Dan told me is that
20             the attorney approved the press release,
21             and the press release was the press
22             release.  There was no mention of you need
23             to avoid disclosure or you need to say that
24             it's illegal in the country --
25             (Simultaneous conversation.)
```

107

 1   BY MS. BERLIN:

 2          Q.   Which press releases?

 3          A.   The initial press release on Eswatini.

 4          Q.   When was that?

 5          A.   I -- I don't -- I don't remember the

 6   date.  The initial press release that we had in

 7   Eswatini, that we had the preliminary approval

 8   subject to government approval.

 9          Q.   Any -- did they -- did Dan Oran tell

10   you that a lawyer reviewed any other press release?

11          A.   And Eddie Murieli.  You know, when we

12   did the S-1, I believe he signed off on the S-1.

13   Eddie Murieli --

14               (Simultaneous conversation.)

15   BY MS. BERLIN:

16          Q.   I'm talking about press releases.  Now

17   you're talking about -- just listen to the

18   question, please.  My question is, because you're

19   now testifying today that Dan Oran told you that a

20   lawyer reviewed and approved the press releases you

21   drafted.

22               Am I understanding correctly?

23          A.   Yes.

24          Q.   And you testified that that occurred

25   with the initial press release on Eswatini, the

                                                       108

1  date of which you do not know, correct?  My

2  question -- is that a yes or no?

3          A.   Yes.

4          Q.   My question is, did Mr. Oran tell you

5  that an attorney had reviewed any of your other

6  press releases about Profile Solutions in Eswatini?

7          A.   Yes.  Eddie Murieli.

8          Q.   Eddie Mur- -- Murieli was not a lawyer

9  for Profile Solutions.

10          A.   He was on the board of directors.

11          Q.   He's, again, not a lawyer for Profile

12  Solutions, correct?

13              MR. PERRY:  Objection to form.

14  BY MS. BERLIN:

15          Q.   You understand the difference.  I am a

16  lawyer.  Do you understand I'm a lawyer?  Do you

17  understand that --

18          A.   I don't -- I don't know if he reviewed

19  in his capacity as a lawyer or board member.

20          Q.   Stop.  Can you answer the question?

21  Dan Oran you understand that I am a lawyer?

22          A.   Yes.

23          Q.   But I am not your lawyer?

24          A.   Correct.

25          Q.   Okay.  So Mr. Murieli is a lawyer.

109

1              Agreed?

2        A.   Yes.

3        Q.   Okay.  But he, you would agree with

4   me, is in not the lawyer for Profile Solutions.

5              Do you agree with me or not?

6        A.   I don't know.

7        Q.   You don't know?

8        A.   I honestly don't know.  I don't know

9   -- I don't know --

10        Q.   You don't know?

11        A.   I don't know if he reviewed it in his

12   capacity as a lawyer or as a board member because I

13   think he was getting paid by Profile, so I don't

14   know the answer.

15        Q.   So no one told you if that was -- he

16   was representing it as a lawyer or board member,

17   correct?

18        A.   No.  Correct.  Correct.

19        Q.   Now, you didn't assert a reliance on

20   advice of counsel affirmative defense in this case.

21              Do you understand that?

22              MR. PERRY:  Objection to form.

23              THE WITNESS:  I don't understand what

24        you're saying.

25   BY MS. BERLIN:

                                                    110

1          Q.   All right.  Let me show you your

2     answer.

3               MR. PERRY:  Objection to form.

4               (Thereupon, Plaintiff's Exhibit 5

5          was marked for identification.)

6     BY MS. BERLIN:

7          Q.   I'm showing you what I've premarked as

8     Exhibit 5.  Could you pass one of those to the

9     court reporter, please.

10         A.   Oh, I'm sorry.  Sorry.

11         Q.   Do you see that Exhibit 5 is your

12    answer in this case?

13         A.   Yes.

14         Q.   Okay.  You reviewed it before it was

15    filed?

16         A.   Yes.

17         Q.   It's all true, according to you?

18         A.   Yes.

19         Q.   So why don't you please turn to

20    page 51.  Do you see "Affirmative Defense" as -- as

21    the heading?

22         A.   Yes.

23         Q.   Do you see that?  Okay.  Flip to page

24    -- you can see first through fifth, and then turn

25    the page all the way to eight on Page 52.  These

111

1    are what I mean when I say affirmative defenses.

2                Do you now understand what that word

3    means --

4          A.   Yes.

5          Q.   -- or phrase?

6          A.   Yes.

7          Q.   I will proffer to you that none of

8    your affirmative defenses are reliant on advice of

9    counsel defense.  You can set it aside.  I was just

10   showing you what an affirmative defense was.

11               Are you now claiming today that you

12   relied on a lawyer for the representations made in

13   the press releases?

14         A.   Well, no, I -- I don't think that's

15   what I said, no.  I relied on Dan who represented

16   to me that he was relying on the press releases

17   being approved by the various attorneys.

18         Q.   Did Dan Oran ever tell you this in

19   writing?

20         A.   Possibly in our -- in our e-mails,

21   possibly.

22         Q.   Okay.

23         A.   Because I -- everything, you know, I

24   -- I would show it to him, we would discuss it, he

25   would give his input, and he would give his

112

1  changes.  And then I would e-mail, and I would -- I

2  would always e-mail to -- you know, that Dan

3  suggested changes, comments, approval.  I'm sure

4  it's all over my e-mails.  I don't know exactly

5  who's on all the different e-mails.  We'd have --

6  we have to look at them, but I always sent it out,

7  but he --

8             (Simultaneous conversation.)

9  BY MS. BERLIN:

10        Q.   You agree with me if you didn't

11  produce it, it doesn't exist?

12            MR. PERRY:  Objection.  Form.

13  BY MS. BERLIN:

14        Q.   You testified earlier you -- you

15  produced all of your documents, correct?

16        A.   Correct.

17        Q.   So if you didn't produce it to us, if

18  doesn't ex- -- if it's not in your production,

19  agree that it doesn't exist?

20        A.   No, I don't agree with that, and I'll

21  tell you why.

22        Q.   Tell me.

23        A.   We had hard copies.  Dan fired me.

24  When Dan fired me, I didn't get access to any of

25  the records in the office.  I don't know what

113

 1   happened to them.  I know what I had on my e-mails.

 2   I presented to you guys everything that I had on my

 3   e-mails.

 4          Q.   Right.

 5          A.   But I don't know what Dan physically

 6   had in the office.

 7          Q.   But you just testified that he

 8   e-mailed you.  Do you understand?  Do you -- do you

 9   remember testifying five minutes ago that Mr. Oran

10   e- -- might have e-mailed you?

11          A.   He may -- he may have e-mailed -- he

12   may e-mailed me.  I know I e-mailed that to

13   everybody.

14          Q.   Okay.  And your -- your testimony

15   today was that you have produced all of your

16   e-mails.

17          A.   Correct, I have produced all of my

18   e-mails.

19          Q.   So do you agree with me that if your

20   e-mail production to us does not show Dan Oran

21   telling you about some lawyer supposedly reviewing

22   your press releases and approving them, that it

23   doesn't exist?

24          A.   No, I don't -- he would have told me

25   verbally in the office.

                                                    114

1          Q.   Stop.  A moment ago -- we'll get to

2     verbal in a second -- you testified --

3          A.   Right.

4          Q.   Okay.  Just listen to the question.

5     You testified about e-mails.

6          A.   Correct.

7          Q.   Okay.  You've produced everything to

8     us, all of your e-mails.

9          A.   Right.

10         Q.   So to the extent there is any e-mail

11    message from Dan Oran to you telling you that a

12    lawyer approved your press releases, that e-mail,

13    if it exists, it's going to be in your production

14    to the SEC.

15              Agreed or not?

16         A.   Agreed.

17         Q.   Thank you.  So if it's not in your

18    production, it doesn't exist.

19              Agreed?

20         A.   No.  I'm not saying that at all.

21    That's not what I said.  That's not what I'm

22    saying.

23         Q.   Did you lose your e-mails?  Were they

24    destroyed?

25         A.   No, because if he would have verbally

                                                      115

1  told me in the office and signed it, it would be on

2  a hard copy in the files.

3          Q.   Mr. Tucker, stop.

4          A.   I wouldn't have it on the e-mail.

5          Q.   Do you understand the difference

6  between an e-mail and a verbal conversation?

7          A.   Yes, I do.

8          Q.   Okay.  We're talking about e-mails.

9  Do you understand that?

10         A.   Yes.

11         Q.   So again, if the production you made

12 to the SEC of your e-mails does not include an

13 e-mail between you and Dan Oran about a lawyer

14 approving your press releases, do you agree that an

15 e- -- that e-mail where Dan Oran supposedly

16 communicated to you, it doesn't exist?

17         A.   Correct.  In an e-mail, correct.

18         Q.   Thank you.  Who would have witnessed

19 any such conversations between you and Duran -- Dan

20 -- Dan Oran, that you're testifying happened where

21 he told you the lawyer approved your press

22 releases?

23         A.    I -- I don't know.  I would just be,

24 you know, guessing.  Who -- who was in the office,

25 I don't know.

                                                    116

1          Q.   When did the conversations occur?

2          A.   Prior to every press release.

3          Q.   Before everyone --

4          A.   Every press release was discussed.

5     Every -- every press released was discussed.  Dan

6     would provide the topic.  I provided the first

7     draft.  He would provide comments.

8          Q.   But that's not my question.

9          A.   I don't know what your question is.

10         Q.   We were talking about lawyers

11    reviewing and supposedly blessing your press

12    releases.  When did that happen?  Before every

13    press release --

14         A.   Before every press release.

15         Q.   -- a lawyer would be hired to --

16         A.   Yes.

17         Q.   -- retain -- to review and determine

18    if they were correct?

19         A.   Dan would communicate with the

20    attorneys.  I didn't communicate -- that was Dan.

21    Dan would communicate with the attorneys, so I --

22    BY MS. BERLIN:

23         Q.   But you weren't present, so you don't

24    know, correct?

25         A.   No, I was most times, but he -- he was

                                                    117

1   on the phone with them.  He would call them on the

2   phone, and he would go over the press release with

3   them.

4         Q.   And did Mr. Oran tell the lawyers --

5   since you were claiming you heard the

6   conversations, did you hear Mr. Oran tell the

7   lawyers that marijuana/cannabis or TC- -- CBD or

8   hemp was not legal in Eswatini?

9         A.   No.

10        Q.   You never heard him say that?

11        A.   No.  No.  No.

12        Q.   Okay.

13        A.   No.

14        Q.   So you don't know if the lawyers gave

15   any advice about whether your press releases or

16   Tweets were okay because you don't even know if the

17   lawyers had been told by Mr. Oran about the legal

18   status of marijuana in Eswatini.

19         Is that fair?

20        A.   He told me that he sent them the

21   agreement that we had with -- with the Eswatini.

22        Q.   Just listen to the question.  I'm not

23   asking about what documents he sent.  I am asking

24   you --

25         MS. BERLIN:  Just can you repeat back

                                    118

1          the question.

2    BY MS. BERLIN:

3          Q.   Just answer the question asked.

4               (Requested portion read.)

5               THE WITNESS:  Yes.

6    BY MS. BERLIN:

7          Q.   Did you personally ever speak with any

8    lawyer during the time of -- of Profile Solutions

9    that you were working there, working in connection

10   with it, did you ever personally -- did you seek

11   any legal advice from any lawyer about your press

12   releases or anything else connected to Profile

13   Solutions?

14         A.   No.  No.

15         Q.   Okay.  Now, you testified a bit ago

16   that you probably told potential investors or

17   investors or the investing public that cannabis is

18   not legal in Eswatini.

19              Do you recall that?

20         A.   I don't know if anyone ever

21   specifically asked me is it legal or not.  I --

22         Q.   That's not my question.  I'm not

23   asking if anyone asked you.

24         A.   Right.

25         Q.   I'll ask you again.  Did you tell

                                                    119

 1  anyone whether a potential investor, an investor or

 2  the investing public that cannabis was not legal in

 3  Eswatini?

 4            MR. PERRY:  Objection to form.

 5            THE WITNESS:  I don't remember.

 6  BY MS. BERLIN:

 7       Q.   Okay.  So you can't point to a person

 8  or a -- any communication where you did disclose

 9  that, correct?

10       A.   Correct.

11       Q.   And the same questions, but with

12  respect to marijuana?

13       A.   Correct.

14       Q.   And the same question, but with

15  respect to CBD?

16       A.   Correct.

17       Q.   And the same questions but with

18  respect to hemp?

19       A.   Correct.

20       Q.   Did Tom Arnold have any connection to

21  Profile Solutions, the actor or comedian,

22  Tom Arnold?

23       A.   Not that I'm aware of.  Never heard of

24  him.  I mean, I've heard of the actor, but I'm not

25  aware of any involvement he had.

                                                    120

1         Q.   Who -- Adam Baker was a -- an

2   individual who did work in connection with PR or

3   social media posting for Profile Solutions.

4              Yes?

5         A.   Correct.  Correct.  He -- he handled

6   investor relations and social media for Profile.

7         Q.   Did Mr. Baker also post on forums

8   other than Twitter concerning Profile Solutions?

9         A.   I don't know.  I assume so.  I know he

10  did social media.  I don't know exactly what he

11  posted.

12        Q.   Okay.  And he -- you would provide

13  that information to him?  You would e-mail it to

14  him, correct?

15        A.   I would e-mail him public information.

16  If the company came out with a press release, I

17  would send it to Adam.

18        Q.   Okay.  So if you drafted a press

19  release, you would send it to Adam Baker, correct?

20        A.   Correct.

21        Q.   And the purpose of that is for

22  Mr. Baker to then distribute it through social

23  media and elsewhere, yes?

24        A.   Correct.

25        Q.   And Mr. Baker, did he -- did he have

                                                    121

1    access to the Twitter account directly?

2          A.    Yes.

3          Q.    Okay.  Because the Twitter account is

4    maintained using your phone number.  Do you -- are

5    you aware of that?  Do you know that?

6          A.    I -- I don't doubt that.

7          Q.    Okay.

8          A.    I -- I know I started it.

9          Q.    Okay.  So both -- and you would post

10   on the Twitter account as well?

11         A.    Correct.

12         Q.    Other than you and Mr. Baker, did

13   anyone else have access to a lot of information?

14         A.    I don't think so.  I don't think so.

15         Q.    So it would either be you posting or

16   Mr. Baker posting what you sent him to post,

17   correct?

18         A.    I would provide the public information

19   to Mr. Baker, and Mr. Baker would come up with the

20   post.  So either he posted it directly or he

21   drafted it and then I posted it.

22         Q.    Okay.  And when you say "the public

23   information," you're talking about the press

24   releases, and the information -- the press releases

25   basically, correct?

                                                    122

1          A.   Right.  The press release, or he would

2    take excerpts with -- because there's a quote by

3    Dan Oran.  Maybe he would take the quote from

4    Dan Oran and post that.

5          Q.   Okay.

6          A.   You know, he did separate things.  He

7    did the press release, he would do excerpts from

8    the press release, yes.

9          Q.   Okay.  But it all kind of flows back,

10   these press releases that he drafted, yes?

11         A.   Correct.

12         Q.   And I think we established before, and

13   you persisted with me that sometimes you would

14   draft -- when you drafted the press releases, you

15   would draft the language of a quote and attribute

16   it to Mr. Oran, correct?

17              MR. PERRY:  Objection to form.

18              THE WITNESS:  No.  I -- what Dan would

19              do is Dan would communicate to me what he

20              -- you know, what the agreement was or what

21              he wanted to say in the press release, and

22              he'd want me to help him draft it and put

23              it together in words for him to review.

24              That -- that was our process.  That was the

25              procedure.

                                                      123

1    BY MS. BERLIN:

2         Q.   Understood.  But some of the press

3    releases include quotes that are attributed to

4    Mr. Oran, so we have quotations marks, a quote, and

5    then it would attribute that quote to Mr. Oran.

6              Do you remember that?

7         A.   Yes.  I agree with you, yes.

8         Q.   Okay.  And you would drafts those

9    questions and attribute them to Mr. Oran.

10             Agreed?

11        A.   I was part of the process of creating

12   the quotes, yes.

13        Q.   Yes.

14        A.   I didn't just come up with the quotes.

15        Q.   Well, Mr. Oran didn't provide the

16   quotes to you for every press release?

17        A.   He would tell me what he wanted me to

18   say.

19        Q.   He would give you the general overview

20   of what he wanted the press release to say, and you

21   would come up with the quotes, correct?

22        A.   And -- and what he wanted to say in a

23   quote.  He would give me the general ideas of what

24   he wanted to say, and then I would put it, you

25   know, in good English and stuff like that and

                                                       124

1    present it back to him, "Is this what you want to

2    say, Danny, is this not what you want to say?"

3                Yes.

4        Q.   As a quote?

5        A.   As a quote or as a press release, as a

6    topic in a press release.

7        Q.   Let me ask you another way:  When

8    there's a quote in a press release --

9        A.   Yes.

10       Q.   -- that's not necessarily something

11   Mr. Oran like said or wrote down for you, he would

12   convey the general idea, you would draft the press

13   release, you would come up, you would craft a

14   quote, you would put it in there, and then you

15   would -- that would be the -- that's how it would

16   happen, correct?

17       A.   Yes.  Yes.

18                (Thereupon, Plaintiff's Exhibit 9

19           was marked for identification.)

20   BY MS. BERLIN:

21       Q.   Okay.  Thank you.  I'm going to hand

22   you what I've premarked as Exhibit 9.  And this is

23   one of the Tweets for Profile Solutions, correct?

24       A.   Yes.

25       Q.   Okay.  And these all still remain up

                                                      125

1   on your Twitter account, yes?  Mr. Tucker --

2          A.   Are you asking -- are you asking if

3   it's still up on the Twitter account?  I have -- I

4   have no idea.  I --

5               (Simultaneous conversation.)

6   BY MS. BERLIN:

7          Q.   The Profile Solutions account is in --

8   is -- you're the one who created it --

9          A.   Right.

10         Q.   It's all under your contact

11  information, correct?

12         A.   Yes.

13         Q.   And is it your testimony that you

14  don't know if that account is still active?

15         A.   I don't know.

16         Q.   Okay.  So Exhibit 9 is one of these

17  Twitter posts for Profile Solutions.

18              Agreed?

19         A.   Agreed.

20         Q.   Okay.  And rather, I did not print out

21  the Twitter -- your entire Twitter account for

22  Profile Solutions, so you would agree with me that

23  your Twitter account is whatever it is online, like

24  if I go to Twitter, I type in Profile Solutions,

25  I'm going to see its Twitter account with its

                                                    126

1   various Tweet posts?

2         A.   Yes.

3         Q.   Have you deleted any posts?

4         A.   No.

5         Q.   And so the posts that we see there

6   that are attributed to, say, this one, Exhibit 9 is

7   from October 26, 2018.

8              Do you see that in the top right

9   corner?

10        A.   Yes.

11        Q.   So the date that's on a Tweet, that

12  would be the date that it's posted?

13        A.   Say that again.  That -- that's not

14  March, it says October.  Is that what you said?

15        Q.   Do you see on Exhibit 9, it says

16  October 26, 2018?

17        A.   Yes.

18        Q.   Is that the date that this was

19  posted --

20        A.   I assume so.

21        Q.   -- Exhibit 9?

22        A.   I assume so.  And I assume -- I assume

23  that's the date.

24        Q.   Okay.  So you use Twitter, correct?

25  You created this bank -- this account for Profile

                                                  127

1  Solutions, yes?

2          A.   Yes.

3          Q.   Okay.  So you've used Twitter.  You

4  have admitted to posting --

5          A.   Actually, hon- -- honestly, I don't

6  even know if I created it.  Adam might have created

7  it using my e-mail, but I -- I don't even think

8  that I created it.  I don't -- at that time, I

9  don't even know how to -- I didn't know how to open

10  up a Twitter account.  I think Adam is probably the

11  one who created it with my stuff.

12         Q.   How many various Twitter accounts have

13  been created to date using your -- your

14  information?

15             MR. PERRY:  Objection to form.

16             THE WITNESS:  I mean, I've used

17         Twitter since then.  This is the first time

18         I was involved in Twitter.

19  BY MS. BERLIN:

20         Q.   How many accounts?  Answer the

21  question.

22         A.   I don't know.  I have a couple

23  definitely.

24         Q.   Okay.  And what about maintaining

25  Twitter accounts for your various clients that we

                                                    128

1   identified at the beginning of your testimony that

2   were publicly traded entities.  Do you maintain

3   their Twitter -- or their Twitter accounts --

4                (Simultaneous conversation.)

5                THE WITNESS:  Yes, some of them I do,

6         some of them I don't.  Some of them I do,

7         some of them I don't, yes.

8   BY MS. BERLIN:

9         Q.   Yeah.  So you're familiar with

10   Twitter, yes?

11        A.   Yes.  Yes.

12        Q.   And you understood -- do you agree

13   with me that when you see -- I'm look- -- we're

14   looking at Exhibit 9 together.  Fair to call this a

15   Tweet?

16        A.   Yes.

17        Q.   Okay.  And the date that is on the

18   first line of the Tweet, is that -- generally

19   that's the date that the Tweet is posted.

20                Do you agree with me?

21        A.   Yes.  Yes.

22        Q.   Okay.  So we're looking at Exhibit 9.

23   Would you agree this is posted October 26, 2018?

24        A.   I assume so.  That's what it looks

25   like, yes.

129

1          Q.    Okay.  You have no reason to doubt

2    that?

3          A.    I have no reason to doubt that,

4    correct.  Correct.

5          Q.    Okay.  So and do you see this Tweet,

6    Exhibit 9, it says, "Update on our cannabis growing

7    deal"?

8          A.    Yes.

9          Q.    PSIQ is to form a subsidiary in

10   Eswatini to operate the cannabis operations?

11         A.    Yes.

12         Q.    Eswatini is set to grant PSIQ the

13   required licenses and permits to research, grow,

14   distribute worldwide.

15               Do you see that?

16         A.    Yes.

17         Q.    And there's a note in here about

18   providing 1,000 hectares of secured land for

19   growth?

20         A.    Yes.

21         Q.    Okay.  And below that, we see this is

22   at a trade conference in, I think it was in Nevada;

23   is that right, the picture?

24         A.    I -- I don't remember.

25         Q.    You don't remember where this was?

                                                  130

```
 1              A.   No, no.  I know they went to trade
 2   shows.  I don't know where this particular one was.
 3              Q.   Okay.  And you would -- it was ad- --
 4   Profile Solutions is advertised at these trade
 5   shows as a publicly trade company --
 6              A.   Yes.
 7              Q.   -- providing its ticker symbol?
 8              A.   Yes.
 9              Q.   So when people go to these trade
10   shows, they can also -- this is also a way to
11   market the investment in Profile Solutions.
12              Agreed?
13              A.   It was to create awareness for the
14   company, yes.
15              Q.   And to provide information for
16   potential investors, this is the ticker symbol, and
17   we're publicly traded.
18              A.   Okay.
19              Q.   That's not just there as an FYI, it's
20   there to let people know if they want to invest,
21   here's what are our ticker symbol is.
22              Agreed or not?
23              A.   Okay.  Agreed.
24              Q.   Did you ever attend any of these trade
25   shows?
```

131

1          A.   No.

2          Q.   You can put Exhibit 9 aside.

3          A.   I didn't -- this is not -- I didn't do

4    this, just so you know.  I didn't do this.  This is

5    not my -- my Tweet.

6          Q.   Meaning you're not the one who entered

7    Exhibit 9 into Twitter?

8          A.   It's my account.  I'm not debating

9    that it's not my account.  Yes, I -- it's my

10   account, but myself and Adam both did Tweets.

11   That's not a Tweet that I ever did.

12         Q.   So are you saying this is the

13   Adam Baker?

14         A.   Yes.

15         Q.   So but Mr. Baker would get the

16   information for the Tweets from you, correct?

17         A.   No.  He would get the press releases

18   from me, and he would draft whatever he drafted.  I

19   didn't give him the wording on that.

20         Q.   Understood.

21         A.   Okay.

22         Q.   So you would give him -- for

23   Exhibit 9, for example --

24         A.   Right.

25         Q.   -- you would give him the information,

132

1   whether it's a -- a press release that you drafted,

2   and then he would take from that press release and

3   post a few lines on Twitter; is that correct?

4           A.   Correct.

5           Q.   And you would agree the press releases

6   are longer than a Tweet has a limit, correct?

7           A.   Correct.

8           Q.   And so he would take what you put in

9   your press release and it would take a few lines of

10  it and put it into a Tweet.

11          Agreed?

12          A.   Correct.  Correct, yes.

13          Q.   And sometimes you would do it?

14          A.   I'm sorry?

15          Q.   Sometimes it would be you.

16          A.   Correct.

17          Q.   Sometimes it would be Adam?

18          A.   Correct.

19          Q.   But whenever it was Adam, he got the

20  information from you?

21          A.   Right.  And I got the information from

22  Dan.

23          Q.   Every time you got the information

24  from Dan?

25          A.   Absolutely.

                                                   133

1          Q.   Okay.

2          A.   I just work there.

3          Q.   That's not true, is it?

4          A.   Oh, it was very true.  It's very true.

5               MR. PERRY:  Objection as to form.

6     BY MS. BERLIN:

7          Q.   Mr. Tucker, you worked in the offices

8     every day.  There were employees who were there as

9     well, correct?

10         A.   Pretty much.

11              (Simultaneous conversation.)

12    BY MS. BERLIN:

13         Q.   Any reason why those employees would

14    lie under oath?

15         A.   No.  I --

16              MR. PERRY:  Objection as to form.

17         A.   No.  I'm not -- I'm not saying I

18    didn't work very hard.

19    BY MS. BERLIN:

20         Q.   Well, I mean, my question is --

21         A.   Right.

22         Q.   -- is there a reason why we would

23    question the credibility of the individuals who

24    worked at Profile Solutions during the time you

25    did?

                                                   134

```
 1              A.   No.
 2              Q.   What about Mr. Oran?  Is there a
 3   reason that we should question his sworn testimony
 4   or his credibility?  Does he have a reason to lie?
 5              MR. PERRY:  Objection to form.
 6              THE WITNESS:  I read Mr. Oran's
 7         testimony.
 8   BY MS. BERLIN:
 9              Q.   My question is, does Mr. Oran have a
10   reason to lie about your involvement in Profile
11   Solutions?
12              MR. PERRY:  Again, objection to form.
13              THE WITNESS:  I -- I believe, yes.
14   BY MS. BERLIN:
15              Q.   What is that?
16              A.   To protect himself.
17              Q.   From what?
18              A.   To protect himself.  To keep blaming
19   me, because before that, he blamed me, blamed me,
20   blamed me.  I -- I've made no decisions.
21              Q.   You understand --
22              A.   I just worked there.  I wasn't a
23   control person.  I had no say.  I had no authority.
24              Q.   You understand that Mr. Oran is also a
25   defendant in this case, correct?
```

135

```
 1              A.   Yes, I do.  Yes, I do.

 2              Q.   And he has actually taken

 3    accountability for the charges against him.

 4                   Do you understand that?

 5                   MR. PERRY:  Objection as to form.

 6    BY MS. BERLIN:

 7              Q.   Yes or no?

 8              A.   I understand that he made the

 9    agreement, yes, I do.

10              Q.   Well, it's not an agreement.  He

11    consented to the Judge would -- to the judgment

12    into all charges against him, being --

13              A.   No.

14              Q.   -- entered --

15                   (Simultaneous conversation.)

16                   THE WITNESS:  No.  That's not what --

17              that's not what I understood.  What I

18              understood is that he consented without

19              admitting or denying.  That's what I

20              understood.

21    BY MS. BERLIN:

22              Q.   And you understand that you could do

23    the same exact thing today if you wanted to, but

24    you haven't, correct?

25                   MR. PERRY:  Objection to form.
```

136

```
 1              THE WITNESS:  Do I agree that -- I
 2         mean, I -- I assume I -- I don't know.  I
 3         mean, I -- I -- I assume that was offered
 4         to me at one time, I don't know if I still
 5         can.  I don't know -- I don't know -- I
 6         don't understand what you're asking me.
 7   BY MS. BERLIN:
 8         Q.   So what is Mr. Oran -- your -- your --
 9   is -- is it your testimony, because you said you
10   read -- you've read Mr. Oran's testimony,
11   correct --
12         A.   Right.
13         Q.   -- in this case?
14         A.   Right.
15         Q.   And is it your testimony that Mr. --
16   was Mr. Oran's testimony about your involvement at
17   Profile Solutions true?
18         A.   To a certain extent.
19         Q.   Okay.  Well, what parts of it were
20   false?
21         A.   What he relied on me and depended on
22   me and trusted me and counted on me, I don't
23   believe that to be true at all.
24         Q.   Okay.  So it was the things that
25   you're -- that you believe or that you're
```

                                                    137

```
 1  questioning are the things that where he testified

 2  about his -- what trust he put in you and to what

 3  was going on in his own head?

 4          A.   Right.

 5          Q.   Okay.

 6          A.   Right.

 7          Q.   All right.  Let's move on.  So who's

 8  Laurie Sherman?

 9          A.   Laurie Sherman is my fiance.  Her name

10  is Laurie Tepper.

11          Q.   She invested in Profile, correct?

12          A.   No.

13          Q.   Laurie Sherman doesn't have any --

14          A.   No.

15          Q.   -- shares in Profile Solutions?

16          A.   None.

17          Q.   And never has?

18          A.   Zero.  Never has.

19          Q.   What about any other company she's

20  been involved with as a consultant or officer?

21          A.   Does she have shares in any other

22  company?

23          Q.   Correct.

24          A.   Yes.

25               MR. PERRY:  Objection as to form.
```

138

1    BY MS. BERLIN:

2         Q.   Which one?

3         A.   Beta Music Group.

4         Q.   Any others?

5         A.   I know Beta Music Group.  I don't

6    think there are any other ones.  She might have had

7    restricted shares in Profile.  I don't think she

8    ever had any free trading shares in Profile.

9         Q.   I didn't ask free trading versus --

10        A.   No.  I'm trying to remember.  I'm

11   trying to remember because I don't know if she had

12   any shares in Profile.

13        Q.   So are you changing your answer from

14   no, she didn't to you don't know.

15        A.   I don't think so.  That's my answer.

16   I don't think she had any shares in Profile.

17        Q.   Okay.  And she has shares in Beta

18   Music Group?

19        A.   Yes.

20        Q.   How?  Why?  Did she buy them?

21        A.   He purchased them, yes.

22        Q.   How did she learn about it?

23        A.   From me.

24        Q.   And has -- has she made any profit

25   from the Beta Music Group shares?

139

```
 1            A.    Yes, she did.

 2            Q.    Tell me about that.

 3            A.    She sold some of her shares, and she

 4   made a profit.

 5            Q.    Did you tell her to sell?

 6            A.    No.

 7            Q.    Do you live together?

 8            A.    Yes.

 9            Q.    You didn't tell her there was a good

10   time to sell?

11            A.    I didn't know if we lived together at

12   that time.

13            Q.    So she just randomly happened to sell

14   for a profit?

15            A.    Yeah.  She had a bigger profit.  And

16   she had a profit and a stock, and she wanted to

17   sell her stock.

18            Q.    Is -- she's not -- is she -- she's

19   noted a sophisticated investor, would you agree?

20            A.    Agreed.

21            Q.    And how much money did she make from

22   the Beta Music Group shares that she sold, if you

23   remember?

24            A.    I don't recall.

25            Q.    She made a significant profit.
```

                                                    140

```
 1              Agreed?

 2         A.   I don't think so.  I don't know what

 3    you consider "significant profit."

 4         Q.   How about we just say she made a

 5    profit.  How's that?

 6         A.   She made a profit.

 7         Q.   Yeah.

 8         A.   Yes.

 9         Q.   And is it your testimony today that

10    you didn't provide her with any information that

11    caused her -- or let's just say any information

12    whatsoever prior to her about Beta Music Group or

13    its activities prior to her selling her shares for

14    a profit?

15              MR. PERRY:  Objection to form.

16              THE WITNESS:  Nothing -- nothing more

17         than was public information.

18    BY MS. BERLIN:

19         Q.   Okay.  So what did you tell her?

20         A.   I don't remember what I told her.  I

21    would have told her whatever is public.  I don't

22    know.

23         Q.   So it's a coincidence that she is --

24         A.   It's not a coincidence.

25         Q.   I'm sorry.  I'm asking a question.
```

                                                      141

```
 1              A.    Okay.

 2              Q.    Is it your testimony it's a

 3    coincidence that she's your fiance -- and what is

 4    your role at Beta Music again?

 5              A.    I was a consultant and a shareholder.

 6              Q.    Right.  So you're a consultant and

 7    shareholder, very involved in Beta Music at the

 8    time, correct?

 9              A.    Correct.

10              Q.    Yes?

11              A.    Yeah, I'm an -- I was a consultant,

12    yes.

13              Q.    You knew all the -- you knew all the

14    ins an outs of Beta Music Group, yes?

15              A.    Right.

16              Q.    And so is it your testimony that it is

17    a coincidence the timing of her sale of the shares

18    that she made a profit --

19              A.    I don't think she --

20                    (Simultaneous conversation.)

21                    MR. PERRY:  Objection as to form.

22    BY MS. BERLIN:

23              Q.    -- and while she was engaged to you,

24    and you knew everything going on in the business on

25    a day-to-bay business, yes or no?
```

142

```
 1          A.   No, I don't think it's -- I don't
 2   think it's a coincidence.
 3          Q.   It's not a coincidence?
 4          A.   No, I don't think it's a coincidence
 5   at all.
 6          Q.   Okay.  So then tell -- explain why.
 7          A.   She sold -- she sold some of her
 8   shares.  I -- I don't see -- I don't see what the
 9   relevance is.
10          Q.   The question is -- you know what?  So
11   meaning it's a coincidence that she has access to
12   you, and you have -- you agree with me you have
13   access to inside information about Beta Music
14   Group?
15          A.   I sold --
16               MR. PERRY:  Objection as to form.
17               THE WITNESS:  If I remember correctly,
18          I sold some of my shares also.
19   BY MS. BERLIN:
20          Q.   My question is --
21          A.   All right.
22          Q.   -- do you agree with me, yes or no,
23   that you have inside information about Beta Music
24   Group at the time --
25          A.   No.  No, I don't.
```

143

```
 1              Q.   -- that she --

 2              A.   No.

 3              Q.   You didn't have any inside --

 4              A.   No.

 5              Q.   -- information about --

 6              A.   No.

 7              Q.   -- Beta Music Group?

 8              A.   No.  No, I didn't.

 9              Q.   So at the time that she sold her

10    shares, your testimony is you had no inside

11    information about Beta Music Group?

12              A.   Correct.

13              MR. PERRY:  Objection to form.

14              THE WITNESS:  Correct.

15              MS. BERLIN:  I'm getting close to the

16         end, which is good news.

17              THE WITNESS:  Yes, it is.

18              MS. BERLIN:  We'll be finished

19         shortly.

20              THE WITNESS:  I don't know what that

21         means when a lawyer says that.

22              MS. BERLIN:  Right.  I know.  That's

23         always a dangerous --

24              THE WITNESS:  One more question.

25              MS. BERLIN:  Yeah.
```

```
1                THE WITNESS:  Yeah.

2                MS. BERLIN:  I'm going to try to

3          really get it to the end.

4                (Thereupon, Plaintiff's Exhibit 6

5          was marked for identification.)

6    BY MS. BERLIN:

7          Q.   So let's see here.  I'm going to show

8    you what I've marked as Exhibit 6.  And again, I

9    didn't print out the entire Profile Solutions

10   Twitter account with all of your various Tweets,

11   but I'm showing you Exhibit 6, okay?  And -- and

12   this is a Tweet from Profile Solutions.

13               Do you see that?

14         A.   Yes.

15         Q.   Okay.  And this is from -- do you see

16   the date of February 12, 2019?  Look at the bottom

17   under the picture.

18         A.   I see it.

19         Q.   Okay.  And do you see the reference

20   says, "Eswatini increases cannabis development.

21   King Mswati calls on Trump to help Africa play

22   bigger role at the UN."

23               Do you see that?

24         A.   Yes.

25         Q.   Okay.  So you would agree with me,
```

145

 1   though, that Eswatini, cannabis is always -- has --

 2   was at the time of this release and still is not

 3   legal in Eswatini, yes or no?

 4         A.   I don't know if -- I don't know the --

 5   the current status, but it wasn't legal at that

 6   time.

 7         Q.   Okay.  There was no cannabis

 8   development in Eswatini in 2019, correct?

 9         A.   I -- I have no idea.  I didn't -- I

10   mean, I didn't do this Tweet.

11         Q.   Okay.

12         A.   This is definitely not me.

13         Q.   So this would have been Mr. Baker?

14         A.   Definitely.

15         Q.   And you would have gotten -- and you

16   said -- testified before he was getting things from

17   your press releases?

18         A.   No.  It Wall street Bulletin.  I have

19   no idea who Wall Street Bulletin is.  That's --

20   that looks like the originator of that information.

21         Q.   Okay.

22         A.   I don't know.

23         Q.   I --

24         A.   I don't know.  I -- he didn't get that

25   from me, definitely didn't get that from me.

                                                    146

1          Q.   He didn't get this from you?

2          A.   No.  No.  No.

3          Q.   Okay.  And I -- I will proffer to you

4     that the link for the Wall Street Bulletin is not

5     like a third party making this representation about

6     Eswatini increasing cannabis development.

7               So where did -- if you're claiming it

8     was Mr. Baker, you're claiming Mr. Baker, who's a

9     third party --

10         A.   Yeah.

11         Q.   -- that he just came up with this, and

12    he invested it on his own?

13         A.   What do you mean "invented"?  I -- I

14    never -- I never provided that information to him.

15         Q.   So he decided to --

16              (Simultaneous conversation.)

17    BY MS. BERLIN:

18         Q.   Okay.  So where would Mr. Ba- --

19    Mr. Baker on his own decided to just draft a Tweet

20    about Profile Solutions.

21              Is that the testimony?

22         A.   Yeah.  Yes.

23         Q.   Yeah.  And when you saw it on -- did

24    he -- did she show the -- did he show the Tweets to

25    you?  He e-mailed them to you.

                                                        147

1          A.   Probably.  Probably.  Probably.

2          Q.   Yes.  And so if you didn't draft this

3   --

4          A.   Right.

5          Q.   -- and you don't know where it came

6   from, why didn't you -- did you ask Mr. Baker, like

7   hey, why did you unilaterally draft this?

8          A.   He probably -- he probably sent it to

9   me.

10         Q.   Okay.

11         A.   Okay.

12         Q.   And then you posted on Twitter?

13         A.   He posted on Twitter.

14         Q.   Okay.  He posted on your account on

15  Twitter?

16         A.   Yeah.  He did it all the time.

17         Q.   Okay.  And after he sent it to you,

18  and when he sent it to you, did you tell him not to

19  post it?

20         A.   I didn't tell him anything.

21         Q.   Did you question where he got the

22  information?

23         A.   I think he gave the source there, Wall

24  Street Bulletin.

25         Q.   Okay.

                                                    148

1          A.   I -- I think he gave -- I think he

2    gave -- if I remember correctly, I think he gave it

3    to -- I think he sent it to me, the article.

4          Q.   I'm, again, proffering to you.  I'm

5    trying to help --

6          A.   Okay.

7          Q.   I'm proffering to you that that --

8    this Wall Street Bulletin is not something that

9    said Eswatini increases cannabis development, okay?

10   Let's assume -- so I -- don't take my word for it,

11   but assuming that that's the case --

12         A.   Right.

13         Q.   -- okay, you didn't ask when you got

14   this from Mr. Baker where he got this information,

15   you just allowed him to post it on your Twitter

16   account?

17         A.   I didn't allow him or not allow him.

18   He posted it on my Twitter account.

19         Q.   You gave him your log-in information.

20         A.   Right.

21         Q.   It's your Twitter account.

22         A.   Right.  Right.

23         Q.   Right?

24         A.   Right.

25         Q.   And it's your account.  You can delete

149

1  things, correct?

2         A.   I guess.  I guess.  You're right.  No,

3  I'm not -- I'm not --

4         Q.   It's your Twitter account.  You agree

5  with me, yes?

6         A.   I'm not disagreeing with you.

7              Right.

8         Q.   So my question is, did you ask -- did

9  you tell Mr. Baker he could not post this?

10        A.   I didn't tell him anything.

11        Q.   You didn't tell him anything?  Okay.

12             And Mr. Baker has no position at

13 Profile Solutions, correct?

14        A.   I don't know that it's my personal

15 Twitter account either.  I think it's the company's

16 Twitter account.  I think that's his account.  It

17 might have my e-mail and phone number.

18        Q.   Yeah.  You --

19        A.   But it's the -- it's the -- it's the

20 company's Twitter account.  That's the only thing,

21 I was on that Twitter account.  The stuff on

22 Profile is the company's Twitter account.

23        Q.   Mr. Tucker --

24        A.   Yes.

25        Q.   -- you created the Pro- -- the Twitter

                                                    150

```
 1   account.
 2           A.   On behalf of Profile.
 3           Q.   Just listen to me and answer yes or
 4   no.  You created the Twitter account, yes or no?
 5               MR. PERRY:  Form.
 6   BY MS. BERLIN:
 7           Q.   You created the Twitter account,
 8   correct?
 9           A.   Yes.  Yes.
10           Q.   You created this Twitter account using
11   your personal phone number, correct?
12           A.   Yes.
13           Q.   You created the Twitter account using
14   your personal e-mail account, correct?
15           A.   It's the only e-mail I had.
16           Q.   Is that a yes?
17           A.   Yes.  Yes.
18           Q.   And you named your Twitter -- the
19   account that you created --
20           A.   Right.
21           Q.   -- and you maintained, you named it
22   the Profile Solutions, Inc., correct?
23           A.   Right, because it was Profile's.
24           Q.   You cre- --
25           A.   I'm not understanding what your
```

151

1    question is.

2            Q.   Mr. Tucker, answer the question.

3            A.   Okay.

4            Q.   You created the password for the

5    Twitter account, yes?

6            A.   Yes.

7            Q.   Now, Mr. Tucker, the -- and at all

8    times, you had the ability to delete and control

9    this Twitter account?

10           A.   Yes.

11           Q.   And you still do, yes?

12           A.   I never even thought about it, but

13   yes.  I didn't think about this a whole lot.

14           Q.   And that -- again, I'm not showing you

15   every single Tweet because your Twitter account

16   speaks for itself.  It is still active.  You have

17   not deleted it, correct?

18           A.   I didn't know that.

19               MR. PERRY:  Objection to the form.

20               THE WITNESS:  No, no.  I -- he -- I --

21           he -- I'm not -- I'm not debating with you.

22           I'm just saying I didn't know that it was

23           up or not up.  I never thought about it.

24   BY MS. BERLIN:

25           Q.   Have you ever deleted it?

                                                    152

```
 1              A.   No.  I didn't personally delete it,
 2     no.
 3              Q.   Okay.  And Mr. Baker was not a
 4     shareholder of -- of Profile Solutions?
 5              A.   Yes.  He has shares.
 6              Q.   How many shares did he have?
 7              A.   I have no idea.  But he had shares.  I
 8     remember him getting shares.
 9              Q.   Who gave him shares?
10              A.   The company.  His work.  Part of his
11     agreement.
12              Q.   At what time?
13              A.   During this time, he had shares.  He
14     had shares in his agreement.  I don't remember
15     exactly how many shares or what date he had his
16     shares, but he had shares in his agreement.
17              Q.   Okay.  And so it's your testimony
18     sitting here, and -- you're pos- -- you're positive
19     that Mr. Baker had shares in -- let's go back to
20     this Exhibit 6 -- February 12, 2019 that Mr. Baker
21     held shares in Profile Solutions?
22              A.   I'm not saying I'm positive, but I
23     believe he had shares.  I'm not -- I'm not
24     positive.
25              Q.   Okay.
```

153

```
 1              A.   I would look at the shareholders, but
 2  I believe he had shares.  I -- I can't swear to it,
 3  but I believe he had shares.
 4              Q.   Okay.  But you don't know?
 5              A.   I believe he had shares.
 6              Q.   So you understand you're here
 7  testifying under oath.  If --
 8              A.   Yeah.  Yeah.
 9              Q.   -- I ask you a question and you say
10  yes, I understand that you mean yes.  If you don't
11  recall or you don't know, one of the first
12  instructions is just say I don't know.
13              Do you understand?
14              A.   Okay.  Okay.
15              Q.   Do you understand, yes or no?
16              A.   Yes.  Yes, I do.
17              (Thereupon, Plaintiff's Exhibit 8
18              was marked for identification.)
19  BY MS. BERLIN:
20              Q.   So Profile Solutions -- this is
21  Exhibit 8.  It's another of the Tweets on your
22  Profile Solutions account.
23              Will you give one to the court
24  reporter, please?
25              A.   Sure.
```

154

1          Q.   Thank you.

2               THE REPORTER:  Thank you.

3    BY MS. BERLIN:

4          Q.   Exhibit 8, do you see this is posted

5    June 11, 2019?

6               Do you see that?

7          A.   Yes.

8          Q.   And we see that it states, "PSIQ

9    closes a deal to acquire license to prepare land to

10   grow, cultivate, distribute an export Israel

11   medical cannabis."

12              Do you see that?

13         A.   Yes.

14         Q.   And so -- and it -- it's actually

15   attaching to a press release.

16              Do you see that?

17         A.   Yes.

18         Q.   And I will proffer to you that it is

19   the press release I showed you earlier that is

20   Exhibit 7.

21              Do you recall seeing that?

22         A.   Yes.

23         Q.   So and in that press release, you

24   recall we looked at it together?

25         A.   Yes.

                                                    155

```
 1          Q.   So Exhibit 8 links to -- this Tweet
 2  links to the press release where you -- that you
 3  drafted that discloses the legal status of cannabis
 4  in Israel; correct?
 5          A.   Yes.
 6          Q.   Okay.  And you did not do the same
 7  thing with respect to your post about Profile
 8  Solutions in Eswatini, correct?
 9               MR. PERRY:  Objection to the form.
10               THE WITNESS:  Yes.
11  BY MS. BERLIN:
12          Q.   I'm sorry.  The answer -- you talked
13  over each other at the same time.  You said "yes"?
14          A.   Yes.
15          Q.   You can set that aside.  And you
16  understand that your Twitter account is evidence,
17  correct?
18               MR. PERRY:  Objection to form.
19  BY MS. BERLIN:
20          Q.   Do you understand that, yes or no?
21          A.   Yes.
22          Q.   And you have been seeing that -- the
23  Tweets and posts today, correct?
24          A.   Yes.
25          Q.   Okay.  And do you have any intent at
```

156

1  this time to delete that Profile Solutions Twitter

2  account or take it down?

3       A.   I'd like to now -- I didn't even know

4  it was up.  I'd like to take it down, unless I'm

5  not allowed to take it down.  If I'm allowed to

6  take it down.  If I'm allowed to take it down, I

7  will take it down.  I didn't know it was up.

8       Q.   So again, do you plan to take it down

9  as a le- -- that Profile Solutions Twitter account?

10       A.   If my counsel says I can legally take

11  it down, I am taking it down.

12       Q.   Don't tell me about any of your

13  conversations with your counsel.

14       A.   I don't know if I'm allowed to.  I --

15  I haven't -- I don't know how to answer your

16  question.

17       Q.   Okay.

18       A.   I would like to take it down, yes.

19       Q.   Okay.  But you don't know if you will,

20  you're going to speak to your counsel; is that

21  correct?

22       A.   If I am allowed to, I will.

23       Q.   Okay.  And why is that?

24       A.   Because I don't want these things up

25  anymore.  I don't --

                                                    157

1        Q.   Why?

2        A.   Because -- because there's things that

3   were posted, you know, on my Twitter that I didn't

4   do, and now I'm being asked about it.  I didn't

5   post these things.  These are not my postings.

6        Q.   Okay.  They are -- you've testified

7   already that you -- either you posted them or

8   Mr. Baker posted them --

9        A.   The ones you showed me --

10       Q.   -- based on your press releases,

11  correct?

12       A.   Right.  The ones you showed me are not

13  ones that I posted.

14       Q.   Okay.  They're on your account.

15       A.   I got it.  I understand.

16       Q.   So and -- and you have known that --

17  you have known about your own Twitter account in

18  the name of Profile Solutions since the day you

19  created it.

20            Agreed?

21       A.   Correct.  Yes.

22       Q.   And you know what's on the Twitter

23  account, yes?

24       A.   I -- I should have taken it down.  I

25  didn't think about it.

                                                    158

1          Q.   My question is, you --

2          A.   Yes.  Yes.

3          Q.   -- have known what's on there.  Every

4   time something's posted, you know?

5          A.   Yes.  Yes.

6          Q.   All right.  Who's Larry Orlaf (ph)?

7          A.   I have no idea.

8          Q.   You don't know?

9          A.   No.

10          Q.   Do you have a YouTube account?

11               MR. PERRY:  I'm sorry.  I didn't hear

12          what you said.

13   BY MS. BERLIN:

14          Q.   Do you have a YouTube account?

15          A.   I don't think so.

16          Q.   And when I say "you," I'm not being

17   cute like you tried to with the Twitter where you

18   were like oh, I created the account, but it doesn't

19   belong to me, it belongs to Profile Solutions, so

20   let me be clear.

21               MR. PERRY:  Objection -- objection to

22          form.

23   BY MS. BERLIN:

24          Q.   When I say do you have a YouTube

25   account or do you have a Reddit account or do you

                                                    159

1  have and I fill in the blank social media account,

2  that could mean it's an account you created in the

3  name of one of -- of a different entity.

4          Do you understand?

5      A.   Yes.

6      Q.   Okay.  So have you ever created or

7  maintained any YouTube account?

8      A.   I don't think so.

9      Q.   Okay.  You agree with me that

10 generally when people put out statements and

11 representation about a company, it impacts the

12 stock price?

13          MR. PERRY:  Objection to form.

14 BY MS. BERLIN:

15     Q.   Agreed or not?

16     A.   Agreed.  In they are.

17     Q.   But not just in theory?

18     A.   Sometimes it doesn't.  Sometimes

19 there's absolutely nothing.

20     Q.   But the purpose of when a company puts

21 out statements so when you put out statements about

22 Profile Solutions, you understand that the

23 statement that you're putting out in a press

24 release or in a Tweet can impact the stock price of

25 the Profile Solutions shares, correct?

                                              160

```
 1              MR. PERRY:  Objection to form.
 2   BY MS. BERLIN:
 3         Q.   Do you understand that, yes or no?
 4         A.   Yes.  Yes.
 5         Q.   And you understand it at the time that
 6   these representations are being made?
 7         A.   Yes.
 8         Q.   Let's go back to your answer.  Do you
 9   still have it in front of you?  It was Exhibit 5.
10   I can give you another copy.  I might have taken
11   yours.
12         A.   We have it.
13         Q.   Let's look at your affirmative
14   defenses.  Can you turn to that page I told you
15   about before near the end?
16         A.   I think -- I think you were saying
17   Page 52?  Is that what you're talking about, 51?
18   52?
19         Q.   Do you see the heading that says
20   "Affirmative Defenses"?
21         A.   Okay.  51.
22         Q.   Yeah?  Page 51.  Okay.  So let's look
23   at the second affirmative defense, all right?
24              Do you see it?
25         A.   Yes.
```

161

1          Q.   Read it aloud, please.

2          A.   "The commissions claims are barred in

3    whole or in part because Mr. Tucker acted in good

4    faith at all material times and in conformity with

5    all applicable federal" -- federal "statute,

6    including the Securities and Exchange Act and all

7    the federal rules and regulations" prolong- --

8    "promulgated thereunder."

9          Q.   Okay.  So tell me how did you act in

10   good faith with respect to the allegations of the

11   complaint against you?

12              MR. PERRY:  Object to the extent it

13          calls for a legal conclusion.

14              MS. BERLIN:  I'm not asking for a

15          legal conclusion.

16              THE WITNESS:  All right.

17   BY MS. BERLIN:

18          Q.   You understand what the words "good

19   faith" mean?  Mr. Tucker --

20          A.   Yeah, I mean, I'm -- I'm trying to

21   under- -- no.  I -- I --

22          Q.   You don't understand what the words

23   "good faith" mean?

24          A.   I -- I think -- I think everything I

25   did was in good faith.  I don't think I did

                                                    162

1   anything in bad.

2        Q.   Why -- tell me what evidence -- what

3   steps did you take, okay, to -- to engage -- you've

4   read the complaint against you, correct?

5        A.   Yeah.  Yes.

6        Q.   So tell me what good faith efforts did

7   you make to in- -- in connection with the

8   allegations, the misconduct alleged against you?

9        A.   Okay.  Initially I had no knowledge

10  about Eswatini, or initially I had no knowledge

11  about cannabis and anything in Eswatini until this

12  whole thing happened.  But after we got the initial

13  letter, you know, then I was involved.  You know,

14  Danny introduced me to the parties.  I spoke

15  directly -- I met the two princes.  I spoke to them

16  directly.

17        Both of them told me you're definitely

18  getting the license, that this is the process, one

19  being the king's brother, one being the king's son.

20  Met with them in Florida.  Met with them in Oregon

21  to show them operations where they reaffirmed that

22  we were getting these licenses.

23        Danny invited me to go to Eswatini,

24  and I went with Dan to Eswatini with people from

25  another public company, Stem Holdings, okay, who

                                                    163

1  also believed we had the preliminary approval who

2  put up $2 and a half million in escrow towards this

3  license.

4            We met with the attorney general, you

5  know, in there in Eswatini.  We met with the prime

6  minister.  We met with the minister of health, all

7  of them assuring us we're getting a license.  They

8  took us to the property that we were going to be

9  able to grow.  They took us to the building that we

10 were going to be able to have our offices.

11           The director of operation, I believe

12 it was, for Stem Holdings went there also.  They

13 asked us to prepare the actual licenses because

14 they did not have licenses, and the representative

15 from the Stem Holdings prepared the licenses.

16           I saw the licenses, I met with the

17 people.  I -- I don't know what else I -- I -- I

18 could have done to assure that I was acting

19 properly in my role.

20      Q.   So you attended lots of meetings,

21 right?

22      A.   The -- a -- this was the ones I met,

23 yes.  Yeah.

24      Q.   So many opportunities to ask

25 questions, correct?

                                                     164

```
 1              A.   Oh, yeah, absolutely.
 2              Q.   So many conver- -- at least some of,
 3    what, 100, maybe 100 hours of conversations between
 4    everything you've just described?
 5                   MR. PERRY:  Objection to form.
 6                   (Simultaneous conversation.)
 7                   THE WITNESS:  I don't know.  Not even
 8              -- I don't know how many hours.
 9    BY MS. BERLIN:
10              Q.   50?  30?
11              A.   Okay.  I don't know --
12              Q.   Okay.
13              A.   -- probably.
14              Q.   Yeah?  And it never came up that
15    cannabis in this entire operation was not legal in
16    Eswatini?
17              A.   No.  I found out that it was illegal,
18    and that -- and that's what they were doing.  They
19    were making it legal, you know, with our licensing,
20    and that's why the king had to sign off on it,
21    which we were told the king is going to approve
22    this.  That's what -- that's what we were led to
23    believe.  That's what we were told.
24              Q.   That's what -- did the king -- so wait
25    a second.  So if the king -- when the king of
```

1    Swatin- -- of Eswatini, when he testifies in your

2    trial, he's going to say that he told you that

3    he --

4                (Simultaneous conversation.)

5    BY MS. BERLIN:

6          Q.   -- the law?

7          A.   I never met the king.  I've met the --

8    I never met the king.  I never said I met the king.

9    I met the two princes.  That's who I met, the two

10   princes.

11         Q.   What are their -- which princes?  Tell

12   me their names.  Which princes told you that the

13   king -- and they told you, if I understand

14   correctly, that the king --

15         A.   And I have it in my text, which --

16   which you have also.

17         Q.   Just listen to me, please.

18         A.   Yeah.

19         Q.   Let me ask a question.

20         A.   Okay.

21         Q.   The pri- -- is it -- am I

22   understanding you correctly, that the two princes

23   of Eswatini told you that the king could create

24   laws in Eswatini that was making cannabis legal,

25   and that he was creating that law?

                                                    166

```
 1          A.   That parliament would create law, and

 2    the king would approve it.

 3          Q.   Right.  So it's par- -- I just want to

 4    make sure you understood.

 5          A.   Right.

 6          Q.   It's parliament.  It's not the king

 7    that creates the law.  You understood that.

 8          A.   Right.

 9          Q.   And you understood that then?

10          A.   Right.

11          Q.   Yes?

12          A.   Right.

13          Q.   Okay.  So but it didn't happen.  So

14    let's just get to -- you agree with me it never

15    happened, there's never been a law that -- that

16    cannabis is legal?

17          A.   I -- I haven't -- I haven't followed

18    it recently, but, you know, when I was involved, it

19    was never approved.

20          Q.   It was never a law.

21          A.   Right.  Right.  Right.

22          Q.   Okay.  So and you knew that.  During

23    all these meetings, you knew it's still not legal

24    in Eswatini?

25          A.   Right.  We knew the government had to
```

167

1    approve it.

2          Q.   Right.  And you knew that parliament

3    had to do it, yes?

4          A.   Yes.  Absolutely.

5          Q.   Okay.  So and you knew that that had

6    not occurred?

7          A.   Right.

8          Q.   You knew all of that, yes?

9          A.   Right.  Right.  Not initially, but I

10   came to learn that, yes.

11         Q.   Yeah.  And there were a lot of

12   conversations about it, yes, internally?

13         A.   All -- all the same.

14         Q.   But there were -- just answer the

15   question.  Were there a lot of --

16         A.   Yes.

17         Q.   -- conversations about --

18         A.   Yes.  Yes.  Many, many conversations.

19         Q.   -- it that you had?

20         A.   Yes.

21         Q.   Because it was very important,

22   correct?

23         A.   Yes.

24         Q.   Critical?

25         A.   Yes.

                                              168

1        Q.  Because there's no profits to come

2  from Eswatini with -- with Profile Solutions if

3  cannabis remains illegal, yes?

4        A.  Correct.  Absolutely.

5        Q.  So all these conversations are

6  happening so important, but you never once included

7  that single line in any of the press releases you

8  drafted about Profile Solutions in Eswatini, agreed

9  or no?

10       A.  Nobody told me to do that.

11       Q.  Just --

12       A.  No -- no one did it.  No one -- no one

13  did it.

14       Q.  Mr. Tucker --

15       A.  I was not the decisionmaker.

16       Q.  -- I am not asking that.  You're --

17  you're pivoting an answer, something I'm not

18  answering.  Answer the question.

19         My question is, this was so important,

20  you had all of these conversations internally.  You

21  knew it, right?

22       A.  Right.

23       Q.  You knew it wasn't legal in Eswatini.

24         Agreed?

25       A.  Right.

169

1          Q.   And you agree with me that that was a

2     critical fact that would affect profitability of

3     Profile Solutions, yes or no?

4          A.   Yes.

5          Q.   It would affect the stock price of

6     Profile Solutions, yes or no?

7          A.   Possibly.  Possibly.

8          Q.   Really?

9          A.   Yeah.  Yes.  Yes.

10         Q.   Yes, it would?

11         A.   Yes.  Not -- not necessarily.

12         Q.   And it would affect the profitability

13    of the overall business, yes or no?

14         A.   Not necessarily.

15         Q.   It wouldn't?  So --

16         A.   No.  It might not be profitable.

17         Q.   Mr. Tucker, you drafted press releases

18    about Profile Solutions possibly doing business in

19    Eswatini.

20         A.   Correct.

21         Q.   And you posted those or you -- you

22    gave them to Mr. Baker to do Tweets about or to

23    distribute because it was important information

24    about Profile Solutions?

25         A.   Correct.

                                              170

1          Q.    Okay.

2          A.    Right.

3          Q.    And in none of those press releases --

4    and I'm not asking you whose decision it was.  In

5    not a single press release you ever drafted did you

6    disclose the fact that it wasn't legal in Eswatini

7    to have cannabis?

8          A.    Correct.

9          Q.    But you did it for other countries

10   like Israel where it was legal, yes?

11              Yes or no?

12              MR. PERRY:  Objection to form.

13              THE WITNESS:  I guess so.  I guess so.

14   BY MS. BERLIN:

15         Q.    Well, you looked at it earlier.  Do

16   you remember?

17         A.    Okay.  Yeah.

18         Q.    So if it was legal and -- and

19   beneficial to Profile Solutions, then you disclosed

20   it in a press release, yes?

21              MR. PERRY:  Objection to form.

22              THE WITNESS:  No, we put it as subject

23         to government approval.  I guess those are

24         --

25              (Simultaneous conversation.)

171

```
 1   BY MS. BERLIN:

 2          Q.   Okay.  Let's stop and go back.

 3          A.   Okay.

 4          Q.   We're going to pull it up again.

 5          A.   Okay.

 6          Q.   We keep looking at it.

 7          A.   Okay.

 8          Q.   We're going to show you one more time.

 9   The press release --

10               MR. PERRY:  Objection.

11   BY MS. BERLIN:

12          Q.   -- that you drafted for Israel -- I'm

13   handing it to you again.

14          A.   Okay.

15          Q.   Exhibit 7.  Turn to Page 2.  Do you

16   see the heading, "Israel's Position on Cannabis"?

17          A.   Yes.

18          Q.   And here you disclose the fact that --

19   you cite the law "The Dangerous Drug Ordinance of

20   January 27th, 2019."

21               Do you see that?

22          A.   Yes.

23          Q.   You drafted that.  And then you say,

24   "This approval enables farmers to export medical

25   cannabis."
```

172

1              You see that?

2        A.    Yep.

3        Q.    And it says, "The law conditions

4  growing cannabis on a health ministry license."

5              You see that?

6        A.    Yes.

7        Q.    Okay.  So you provide a whole

8  paragraph here about how its legal in Israel, but

9  you need a license, correct?

10       A.    Yes.

11       Q.    You even cite the law.

12       A.    Yes.

13       Q.    Okay.  So again, Mr. Tucker, when it

14 was legal in the country that Profile Solutions was

15 doing business in, when cannabis was legal in that

16 country, you included that fact in the press

17 release.

18             Agree or not?

19       A.    I agree.

20       Q.    But when it wasn't legal in the

21 country like with Eswatini, you did not include it.

22             Agree?

23       A.    No.  No, because we put subject to

24 government approval.  That's what that -- that's

25 the wording that we put.  I don't know what to tell

                                              173

1    you.  That's what we put.

2           Q.   Mr. Tucker, the Eswatini press

3    releases, you agree with me, they speak for

4    themselves?

5           A.   Yes.

6           Q.   They are what they are, aren't they?

7           A.   Yes.  Yes.

8           Q.   And there's not a single one that is

9    going to say that it is not legal in Eswatini, that

10   cannabis is not legal in Eswatini.

11               You agree with me or not?

12          A.   Yes.  Yes.

13          Q.   You never put that in there?

14          A.   No.

15          Q.   Did you ever put in a press release

16   about the Eswatini deals or about Eswatini and

17   Profile Solutions, did you ever put in a single

18   press release or Tweet that cannabis was not legal

19   in Eswatini?

20               MR. PERRY:  Objection.  Asked and

21          answered.

22               THE WITNESS:  We put subject to

23          government approval.  What can I tell you?

24   BY MS. BERLIN:

25          Q.   Please answer the question.

                                                    174

1          A.   No.  No.  No, I did not.

2          Q.   I know you want to talk about other

3     things, but I want to leave.

4          A.   You're right.  No.  No.

5               MR. PERRY:  He just answered the

6          question.

7     BY MS. BERLIN:

8          Q.   Answer the question.  I'm going to ask

9     it again because I want a clear answer, and it's

10    not clear to me.

11              Yes or no?

12         A.   No.

13         Q.   You -- in every press release for

14    Profile Solutions where it references Eswatini, you

15    never disclosed that cannabis was not legal in

16    Eswatini; is that correct?

17         A.   Correct.

18         Q.   Now, let's continue looking at your

19    affirmative defenses.  Could you please go there.

20         A.   I don't have it in my...

21         Q.   I'm going to give it to you again.

22    51.  I think I took it from you, I'm sorry.  51.

23    Look at your third affirmative defense.  You say

24    there's no reasonable likelihood that any violation

25    will be repeated.

                                                            175

1                    Do you see that?  It's on Page 51.

2          A.    Okay.  I have Page 51.  What am I

3    looking at?

4          Q.    Do you see where your affirmative

5    defense is that there's no reasonable likelihood

6    that a violation will be repeated?

7          A.    Yes.

8          Q.    Mr. Tucker, you continue working

9    exclusively for publicly traded entities who have

10   penny stocks.

11                Agreed?

12         A.    Yes.

13         Q.    And you continue drafting press

14   releases.  You've testified you have the Twitter

15   accounts for those as well.

16                Yes or no?

17         A.    Some of them, yes.

18         Q.    Let's look at your fourth.  You claim

19   that any violation was isolated or unintentional.

20                Do you see that?

21         A.    Yes.

22         Q.    How many years did you work at Profile

23   Solutions?

24         A.    A -- a years and a half or something.

25   Two years.

                                                     176

1          Q.   Okay.  How many -- how many press

2    releases did you draft about potential -- Es- --

3    about Eswatini and Profile Solutions?

4              MR. PERRY:  Objection to form.

5    BY MS. BERLIN:

6          Q.   If you remember.

7          A.   I think there were like two or three

8    or something like that.

9          Q.   Okay.  And then also the Tweets,

10   correct?

11         A.   Correct.

12         Q.   And would you agree with me that that

13   conduct where there are Tweets or press releases

14   going out, it covers about -- it expands at least a

15   year?

16         A.   Correct.

17         Q.   Let's look at your fifth affirmative

18   defense.  Well, we -- I think we've covered that.

19   Let's look at your sixth affirmative defense.  Do

20   you see that?  And you see your seventh affirmative

21   defense, where you're claiming this is a selective

22   prosecution --

23         A.   Yes.

24         Q.   -- motivated by arbitrator unjust

25   consideration.

                                              177

```
 1                    Do you see that --
 2          A.   Yes.
 3          Q.   -- in your seventh affirmative
 4   defense?
 5          A.   Yes.
 6          Q.   Mr. Tucker, is it true you are not
 7   privy to the SEC's investigation or decisionmaking,
 8   correct?  Mr. Tucker.
 9          A.   I'm not -- I'm not privy to -- no.
10          Q.   You have no idea, and you under- -- do
11   you understand that when cases are brought by the
12   SEC and they are decided if there's a vote by the
13   five commissioners of the Securities and Exchange
14   Commission?
15                    Do you understand that?
16          A.   I -- I -- no.  I don't know the
17   procedure.
18          Q.   Okay.
19          A.   I'm not denying you.
20          Q.   Well, what evidence do you have to
21   support your allegation that the commission, the
22   Securities and Exchange Commission, a federal
23   agency, engaged in selective prosecution motivated
24   by arbitrary or unjust considerations.
25                    Why do you have -- why would you plead
```

178

1  that?

2         A.   I am absolutely under the belief that

3  what happened to me 35, 40 years ago with F.D.

4  Roberts Securities is being held against me today.

5         Q.   And so, but Mr. Tucker, my -- my

6  question isn't about your personal beliefs or your

7  personal feelings.

8         A.   You asked me why do I believe that --

9              (Simultaneous conversation.)

10  BY MS. BERLIN:

11         Q.   You put this in the legal pleading,

12  okay?  I'm asking you about evidence.  Do you have

13  any evidence that when the five commissioners voted

14  to bring a case against you, that we are now taking

15  a deposition in, that those five commissioners of

16  the Securities and Exchange Commission made a

17  decision that was arbitrary or unjust?

18         A.   I do.

19         Q.   What's the evidence?

20         A.   When -- when I the everyday, the whole

21  like first page is all about F.D. Roberts

22  Securities, so that's why I believe that had some-

23  -- something to do with their opinion of whether

24  the --

25              (Simultaneous conversation.)

179

```
 1    BY MS. BERLIN:
 2         Q.   My question is not about --
 3         A.   Well, that's my answer.
 4         Q.   Okay.  But let me explain.  My
 5    question is not about the complaint that I drafted,
 6    okay --
 7         A.   Okay.
 8         Q.   -- or the background material that's
 9    about your background, okay?  My question is about
10    when the commission -- five commissioners of the
11    SEC voted to bring this case against you, yes or
12    no, do you have any evidence of what they even
13    considered?
14         A.   That's my -- the background
15    information that I guess you provided is -- was
16    used as a basis for them to go after me, because I
17    -- all I did was work for this company.
18         Q.   Mr. -- Mr. Tucker, do you have --
19         A.   Yeah.
20         Q.   -- evidence of that or are you just
21    speculating?
22         A.   That's my belief.  That's my belief.
23         Q.   Okay.
24         A.   That's my belief.
25         Q.   I'm not asking about your belief.
```

180

1  Mr. Tucker, what I'm trying to get at --

2          A.   Yeah.

3          Q.   -- is the government meetings where

4  they decide what cases to bring and not are

5  nonpublic.

6          A.   Okay.

7          Q.   You've made allegations about how the

8  SEC made its decision.  I'm asking you, do you have

9  inside -- do you have information about what the

10  commission considered and how they reached their

11  decision, yes or no?

12         A.   No.

13         Q.   So you have nonpublic information

14  about the SEC's investigation, correct?

15         A.   Correct.

16         Q.   You have no inside nonpublic

17  information about what the five commissioners of

18  the SEC deliberated or decided on, correct; is that

19  correct, or do you?

20         A.   I still stand by this statement.

21         Q.   Mr. -- just Mr. Tucker --

22         A.   Yeah.

23         Q.   -- okay?  I'm asking you a question.

24  Answer what I'm asking, please.

25         A.   Okay.

181

```
1           Q.   Do you have evidence, yes or no?

2           A.   No.  No.

3           Q.   Okay.  You have your feeling and

4  speculation, and that's it, correct, yes or no?

5           A.   I have -- I guess I have no evidence.

6  I have my belief.

7           Q.   Okay.  We're finished.  Set that

8  aside.  And actually, let me -- let me show you my

9  copy for the eighth one.  So in your eighth copy,

10 you're -- you make a reference to exculpatory

11 evidence.  Do you see that?  Do you see the

12 reference to "exculpatory"?  I can point it out to

13 you if it's easier.

14           Do you see the word?

15           A.   Yes.

16           Q.   What are you referring to?  What

17 exculpatory evidence is there?

18           MR. PERRY:  Objection.  Calls for a

19           legal conclusion.

20 BY MS. BERLIN:

21           Q.   I'm not asking you for a legal

22 conclusion.  Do you know what that means,

23 "exculpatory evidence," meaning evidence that shows

24 you didn't engage in the conduct.  What are you

25 referencing in your eighth affirmative defense
```

182

1  fact-wise?  Which documents?  What evidence?

2  Please identify them.

3        A.   Stem Holdings, a -- a public company

4  pops up with a Profile Solutions partner of the

5  transaction, had the same press release, made the

6  same representations, you know, in public filings,

7  in press releases, an no action was taken against

8  Stem Holdings.

9        Q.   Okay.  Is that it?

10        A.   Yeah.

11        Q.   Okay.  And you don't know if

12  there's -- you're not public -- you understand the

13  SEC is a federal law enforcement agency, correct?

14             Do you?

15        A.   Yes.

16        Q.   And you understand that investigations

17  are not public, correct?

18        A.   Yes.

19        Q.   You have no idea what, if any,

20  investigations have occurred or are occurring with

21  respect to Stem Holdings or any other entity in the

22  United States.

23             Isn't that true?

24        A.   What I do know there's no charges

25  against them, yes.

183

1          Q.   Just answer the question.

2          A.   Yes.  Yes.

3          Q.   You have no idea.

4          A.   I have no idea.

5          Q.   It's again, speculation and feelings,

6    correct?

7          A.   Yes.

8          Q.   Just one moment.

9               MS. BERLIN:  I have no questions.

10          We're done.

11               MR. PERRY:  I have one question.  Just

12          want to ask for clarity.

13                    CROSS-EXAMINATION

14    BY MR. PERRY:

15          Q.   If you look at the seventh affirmative

16    defense, Mr. Tucker, it says that the commission's

17    decision --

18               MS. BERLIN:  Hold on.  Just a moment,

19          let me give it to him.  I took his copy.

20               MR. PERRY:  In Exhibit 5.

21               MS. BERLIN:  Here you go.

22               THE WITNESS:  Which one we're on?

23    BY MR. PERRY:

24          Q.   Seventh defense.  It's commission's

25    decision to file this amended complaint because

                                                        184

1   Mr. Tucker, while not bringing civil charges

2   prosecuting another similarly situated entity for

3   the same allege offenses is a selective

4   prosecution.

5           Does that relate to Stem Holdings?

6           A.   Yes, it does.

7           Q.   Okay.  So in order to clarify your

8   previous answer, the seventh affirmative defense is

9   based on the -- your understanding the commission

10  --

11              (Simultaneous conversation.)

12              MS. BERLIN:  I'm objecting that this

13          is leading.

14              MR. PERRY:  Yeah.  Yeah, like --

15              MS. BERLIN:  I get it.  You're

16          referring your seventh affirmative defense

17          to Stem Holdings?

18              THE WITNESS:  Yes.

19              MS. BERLIN:  Understood.

20              MR. PERRY:  I have no further

21          questions.

22              MS. BERLIN:  I think we're done.

23              THE VIDEOGRAPHER:  We're off the

24          record.  The time is 2:11 p.m.

25  (Thereupon, deposition was concluded at 2:11 p.m.)

                                                    185

1                    CERTIFICATE OF REPORTER

2

    STATE OF FLORIDA   )
3                      )  SS.
    COUNTY OF DADE     )

4

5

        I, Ashley Munoz, Registered Professional
6   Reporter, Florida Professional Reporter, do hereby
    certify that I was authorized to and did
7   stenographically report the deposition of Leonard
    Tucker; that a review of the transcript was not
8   requested; and that the foregoing transcript, pages
    1 through 185, is a true record of my stenographic
9   notes.

10       I FURTHER CERTIFY that I am not a relative,
    employee, or attorney, or counsel of any of the
11  parties, nor am I a relative or employee of any of
    the parties' attorney or counsel connected with the
12  action, nor am I financially interested in the
    action.

13

14

15       DATED this 14th day of June, 2023.

16

17

18            _Ashley Muñoz_____
19            Ashley Munoz, Registered Professional
              Reporter Florida Professional Reporter
20

21            ASHLEY MUNOZ
              MY COMMISSION # HH 242408
              EXPIRES: March 20, 2026
22

23

24

25
                                                  186

```
1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF DADE

5

6

7              I, the undersigned authority, certify

8    that Leonard Tucker appeared before me and was duly

9    sworn.

10             WITNESS my hand and official seal this

11   6th day of June, 2023.

12

13

14

15

16   _ Ashley Muñoz _ _ _ _ _

17   Ashley Muñoz

18   Notary Public State of Florida

19   My commission Expires: 03-20-26

20         ASHLEY MUÑOZ
           MY COMMISSION # HH 242406
21         EXPIRES: March 20, 2026

22

23

24

25                                              187
```